The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PATRICK CALLIARI, individually and as
Representative of the Former Shareholders of
GCI INVESTMENTS, INC., a Washington
corporation,

Plaintiff,

v.

SARGENTO FOODS INC.,

Defendant/
Counterclaim
Plaintiff,

v.

PATRICK C. CALLIARI, FLORA
DAMASIO, ANTOINNE IOANNIDES,
ANDREAS IOANNIDES, GAYLE K.
GOODRICH, GILLIAN OLSON,
RICHARD J. OLSON, and BETTY CROUSE,

Counterclaim
Defendants.

No. 2:08-CV-1111MJP

(Consolidated with 2:08-CV-1112MJP)

COUNTERCLAIM DEFENDANTS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT DISMISSING
COUNTERCLAIM PLAINTIFF'S
CLAIMS RELATING TO DAIRY LAWS
AND REGULATIONS

Note on Motion Calendar:
August 28, 2009

**SEALED PENDING ORDER ON
MOTION TO SEAL**

## I.   INTRODUCTION

Sargento's counterclaims in this lawsuit arise from the 2007 sale of a Bellingham,

Washington-based company known as Portionables, Inc. ("Portionables") to Sargento Foods,

Inc. ("Sargento"), a cheese producer based in Wisconsin.  Sargento's claims go far beyond the

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1   terms of the sale that are set forth in the Stock Purchase Agreement ("SPA") entered into

2   between the parties on April 30, 2007.   In the SPA, Sargento agreed to purchase all of

3   Portionables in exchange for $19 million, plus an earnout, with $3 million of the original $19

4   million held in escrow to indemnify Sargento against breaches of the specific representation and

5   warranties in the SPA.   Sargento now claims that no earnout is due (not the subject of this

6   motion) and now purports to have claims that exceed the entirety of the $3 million holdback in

7   escrow.

8        As described in Counterclaim Defendants' Motion for Partial Summary Judgment

9   Dismissing Portions of Count One and the Entirety of Counts Two and Three of Defendant's

10   Counterclaim (Dkt. No. 45) [the "Pending Summary Judgment Motion"], Sargento is making six

11   claims against the escrow.   This motion for partial summary judgment seeks dismissal of

12   Sargento's claim that prior to the closing of the sale Portionables' North Sioux City, SD facility

13   impermissibly produced products without having a dairy license, and thus violated "applicable

14   law." (Sargento Foods, Inc.'s Counterclaim ¶ 30).   Sargento asserts that Portionables' South

15   Dakota plant is now required to have a dairy license, and that Portionables should pay for an

16   expensive remodel of the North Sioux City, SD plant in order to comply with Sargento's

17   interpretation of South Dakota dairy laws.

18        Sargento's assertions are without merit.   By Sargento's own binding admissions, at the

19   time of the acquisition, which is the relevant standard for purposes of the SPA, Portionables did

20   not sell milk or milk products, and therefore, at the time of the acquisition, Portionables was not

21   required to obtain a dairy license under South Dakota law.   Even if it is *now* required to obtain a

22   license, the purported "violation of applicable law," if any, 1) did not occur until more than one

23   year after the parties executed the SPA; 2) resulted from a new definition of South Dakota dairy

24   law that was privately determined in the summer of 2008, long after the transaction closed; and

25   3) is based on a "rule" that has not gone through appropriate administrative and rule-making

26

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 2
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

1    procedures, and is thus either null and void, or, at a minimum, may not be applied retroactively.

2    Portionables did not warrant the South Dakota plant against future changes in South Dakota law

3    and, even if a dairy license is now required, that was not the case when the representations in the

4    SPA were made, or when the transaction closed.   Accordingly, this Court should summarily

5    dismiss Counts I, II, and III of Sargento's counterclaims to the extent they are based on alleged

6    violations of applicable dairy law.

7                        **II.      STATEMENT OF FACTS**

8    **A.    Background on Portionables.**

9          Counterclaim Defendants Patrick Calliari, Flora Damasio, Antoinne Ioannides, Andreas

10   Ioannides, Gayle Goodrich, Gillian Olson, Richard Olson, and Betty Crouse (hereinafter

11   collectively referred to as "former shareholders") were the shareholders of GCI Investments, Inc.

12   ("GCI").  GCI was the sole shareholder of Portionables, which is a specialty manufacturer of

13   high quality frozen sauces and other food products used in restaurants, cafeterias and home

14   cooking.  Portionables began producing its products at a facility in Bellingham, Washington in

15   1999 and in 2005, the company began operating a second plant in North Sioux City, South

16   Dakota (the "South Dakota Facility").  A number of the sauces and other food products produced

17   by Portionables contain dairy ingredients that have been previously pasteurized and packaged at

18   milk processing or dairy manufacturing facilities.  Portionables does not manufacture or sell milk

19   or milk products.

20   **B.    Stock Purchase Agreement.**

21         On April 30, 2007, the former shareholders of Portionables executed the SPA with

22   Sargento. (First Declaration of Jeffrey S. Miller in Support of Counterclaim Defendants' Motion

23   for Partial Summary Judgment Dismissing Counterclaim Plaintiff's Breach of Contract Claims

24   Relating to Dairy Law and Regulations ("Miller Decl."), ¶ 2, Exhibit A, SPA). Under the SPA,

25   Sargento agreed to pay the former shareholders a purchase price of $19 million, plus a potential

26

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 3
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1  Contingent Payment[1], in consideration for the shareholders' sale, assignment, and transfer of

2  GCI's common stock, which included Portionables. (SPA at § 1.3). The SPA is governed by

3  Washington law. (SPA at § 9.7).

4  **C.**   **Representations and Warranties Contained in the SPA.**

5  **1.**   **Compliance with Laws.**

6  In the SPA, the former shareholders represented that Portionables was not currently in

7  violation of "any statute, law, ordinance, treaty, rule, regulation or other legal requirement

8  applicable of a Governmental Authority …" (SPA at § 2.5(a)). They also represented that to

9  their "Knowledge . . . no event has occurred or circumstance exists that (with or without notice

10 or lapse of time) may constitute or result in a violation by the Company or the Sub of, or a failure

11 on the part of the Company or the Sub to comply in any material respect with, any Laws, or that

12 may give rise to any material obligation on the part of the Company or the Sub to undertake, or

13 to bear all or any portion of the cost of, any remedial action of any nature." (SPA at § 2.5(b)).

14 Finally, under § 2.5(c) the former shareholders stated that they had no notice of "any

15 actual, alleged or potential violation of, or failure to comply with, any Laws, or actual, alleged or

16 potential violation of, or failure to comply with, any Laws, or actual, alleged or potential

17 obligation on the part of the Company to undertake, or to bear all or any portion of the cost of,

18 any remedial action of any nature." (SPA at § 2.5(c)).

19 **2.**   **Condition and Sufficiency of Assets.**

20 Section 2.14 of the SPA addresses the former shareholders' representations about the

21 condition and sufficiency of assets sold to Sargento, and states, in pertinent part:

22         Except as set forth on Section 2.14 of the Company Disclosure
           Schedules, the equipment, and to the Knowledge of the Disclosing
23         Parties, the buildings, plants, and structures, of the Company and
           the Sub are in all material respects structurally sound, are in good
24         operating condition and repair, and are adequate for the uses to

25 ───────────────

[1] The SPA contemplated that Portionables could archive an earn out of up to $25 million if certain financial
26 thresholds were met between April 30, 2007 and December 28, 2008. (SPA at § 1.5).

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 4
Case No. 2:08-CV-1111MJP

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51006711.4

which they are being put, … and to the Knowledge of the
Disclosing Parties, the buildings, plants and structures, and all
other tangible and intangible assets of the Company and the Sub
are reasonably sufficient for the continued conduct of the
Company's and the Sub's businesses after Closing in substantially
the same manner as conducted prior to the Closing, subject to the
expiration of any leases, licenses or statutory time periods
applicable to any such assets…

(SPA at § 2.14).

**D.      The Former Shareholders' Disclosures in the SPA.**

The former shareholders did not disclose any violation of South Dakota law, nor did they
list a dairy license from the SDDA in Schedules 2.5 or 2.14 of the SPA.  The reason for this is
simple: Portionables did not have a license from the SDDA because it was not required to have
such a license when the SPA was executed.  (Second Declaration of Jeffrey S. Miller in Support
of Counterclaim Defendants' Motion for Partial Summary Judgment Dismissing Counterclaim
Plaintiff's Breach of Contract Claims Relating to Dairy Law and Regulations ("Miller Second
Decl."), ¶ 2, Ex. 1, Deposition of Darwin Kurtenbach ("Kurtenbach Dep."), 18:4-17, July 29,
2009).  Sargento, a sophisticated cheese company with expertise in dairy products, was aware
that the South Dakota Facility did not have a "dairy license" or "dairy certification" from any
governmental entity at the time of the sale.  (Miller Second Decl., ¶ 3, Ex. 2, Deposition of
Michael A. Gordy ("Gordy Dep."), 30:19-32:17; 102:11-13; July 8, 2009; Miller Second Decl.,
¶ 4, Ex. 3, Deposition of Karl Linck ("Linck Dep."), 28:11-19; July 8, 2009).

The Bellingham, Washington facility produces or has the capability of producing
substantially all of the same products that were produced prior to the SPA being executed.  The
Bellingham, Washington facility has a Washington Food Processor license, but does not have a
Washington dairy plant license.  (SPA at Schedule 2.5).  Sargento has not alleged that the
Bellingham, Washington facility license is inadequate in any way even though that plant does
not have a "dairy license."  Portionables purchases from other entities, previously processed or
manufactured milk products or dairy products for the preparation of its sauces and other food

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 5
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

1    products. However, Sargento acknowledges that Portionables never received or purchased milk

2    or cream before the acquisition. (Miller Decl., ¶ 3, Ex. B, pp. 7-8, Sargento's Answers to Flora

3    Damasio's First Set of Interrogatories and Requests for Production of Documents dated

4    August 4, 2009).

5        When Sargento sought a license from the SDDA in 2008, it believed that the products

6    produced at the South Dakota Facility (like those produced in Bellingham) were completely safe

7    and sanitary, and, according to its own writings, if no agency decided to inspect the facility,

8    "[c]urrent practices could remain in place [and] equipment could continue to run without

9    modification" (Miller Decl., ¶ 4, Ex. C, Email dated April 17, 2008). Sargento has confirmed

10   that the sauces produced in South Dakota were "safe and fit," that no governmental agency has

11   stopped Portionables from producing any products, and that it has continued producing all of the

12   same products, except for one. (Gordy Dep., 83:8-21; 101:2-7; 102:11-23).

13       No one, other than Sargento, has asserted that Portionables was in violation of any law or

14   regulation at the time of the sale. Darwin Kurtenbach, the Program Administrator for the Dairy

15   and Plant Protection for the SDDA, testified that to this day, the SDDA has never analyzed or

16   taken a position as to whether Portionables was required to have a license issued to it by the

17   SDDA before April 30, 2007. (Kurtenbach Dep., 18:4-18:17; 123:25-124:2). Moreover, the

18   SDDA testified that it takes no position as to whether Portionables was in compliance with other

19   standards set forth by the USDA and Food and Drug Administration (such as the "General

20   Specifications for Dairy Plants Approved for USDA Inspection and Grading Service" and the

21   "Pasteurized Milk Ordinance") prior to April 30, 2007. (Kurtenbach Dep., 18:18-19:6; 19:22-

22   20:8). Indeed, it is undisputed that Portionables has never received a fine, penalty or sanction for

23   violation of any South Dakota dairy law. (Kurtenbach Dep., 76:10-13; Gordy Dep., 78:1-8;

24   Linck Dep., 31:15-21). And Portionables has never had any of its South Dakota operations shut

25   down, or had any production halted. (Kurtenbach Dep., 75:22-24; 168:18-22).

26

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 6
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

**E.     Sargento's Pursuit of an Export Certificate from the SDDA.**

In the ensuing ten months <u>after</u> the closing of the sale – just as it was before closing – no one at Sargento, Portionables, or the South Dakota government even considered that Portionables might need a dairy license.  (Kurtenbach Dep., 11:22-13:4; 31:7-21; Miller Decl., ¶ 5, Ex. D, Deposition of Patrick Calliari ("Callairi Dep."), 127:5-13, June 30, 2009; Linck Dep., 28:11-19).  Indeed, the chain of events that ultimately led the SDDA to re-analyze its own dairy license process did not even begin until February 21, 2008, when a mid-level manager at Sargento approached the SDDA about getting a new export certificate for a prospective product known as a "yogurt pellet."[2]  Sargento asked for "some guidance" on what "documents" or "issued plant number" it needed to get the export certificate.  (Miller Decl., ¶ 6, Ex. E, Kurtenbach Dep. Ex. 2).  The SDDA initially dismissed the request, because as of February 2008, the SDDA was of the view that *only products that were 100% dairy were under their jurisdiction*.[3] (Kurtenbach Dep., Ex. 2; Kurtenbach Dep., 23:15-24:6).

---

[2]  In the realm of international food export many importing countries request export certificates as a way for a supplier to show that the food meets the requirements of the exporting and/or importing country, international standards, or other specifications agreed to by the buyer and the seller.  Linda R. Horton, *Food from Developing Countries: Steps to Improve Compliance*, 53 Food & Drug L.J. 139, 147 (1998)(discussing food export controls). According to the United States Department of Agriculture ("USDA"), "it has been difficult for agricultural exporters to locate information about export certificates" and "the lack of clarity regarding...procedures to obtain the necessary certificates from various U.S. federal and state agencies has frustrated U.S. exporters", which has been further complicated by "overlapping responsibilities between federal and state agencies and the lack of a single source for information on the requirements and procedures to identify and obtain foreign country export certificates."  Food Export Certificate Project, United States Department of Agriculture, Foreign Agricultural Service, http://www.fas.usda.gov/itp/ofsts/exportcertif/intro.asp (last visited July 27, 2009).

[3]  According to Sargento, Portionables had previously contacted the Food and Drug Administration ("FDA") to obtain an "export license", which reportedly deferred to the USDA on the issue since dairy products appeared to be involved.  (Linck Dep., 19:15-20:10).  The USDA subsequently came to inspect the Portionables facility but, according to Sargento, declined to provide an export certificate because certain "deficiencies" were found.  (Linck Dep., 19:15-20:10).  (USDA certification is entirely optional, it has the same effect as does a "Good Housekeeping Seal" and, in any event, is not at issue here).  (Kurtenbach Dep., 35:14-22). Sargento then initiated contact with the SDDA in February of 2008 to inquire about obtaining a food export certificate.  (Gordy Dep., 149:1-4; Miller Decl., ¶ 6, Ex. E, Kurtenbach Dep. Ex. 2).

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 7
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1

**F.     The SDDA's Subsequent Informal Adoption of a New Rule.**

2        Sargento's February 2008 e-mail inquiry was just the beginning of what became a four

3    month period of internal debate and rampant confusion among the SDDA and its attorneys.  In

4    February, 2008, the SDDA candidly admitted that there were several gaps in South Dakota law

5    relating to dairy, and that to that point, the SDDA had only regulated plants producing products

6    that were 100% dairy – specifically fluid milk and ice cream.  (Kurtenbach Dep., 23:15-24:6;

7    Kurtenbach Dep., Ex. 2; Miller Decl., ¶ 7, Ex. F, Gordy Dep. Ex. 36) (historical "definition of

8    dairy product associated required inspections was pretty much limited to fluid milk and ice

9    cream products," but in 2008, SD was *reviewing this and may expand the products* and plants

10   that it may require to be dairy inspected") (emphasis added).  For example, the SDDA could not

11   even answer in February 2008 whether it had jurisdiction over Portionables, much less whether

12   and how to license the company.  (Kurtenbach Dep., 18:1-3).  Nonetheless, Sargento on behalf of

13   Portionables, months after the acquisition, "requested to be licensed" and the SDDA wanted to

14   "determine how we could help this company out…" (Kurtenbach Dep., 39:20-40:12; 12:18-

15   13:4).  Mr. Kurtenbach recalled that the reason the SDDA "worked so hard with Portionables"

16   was to enable it to obtain the export certificate it sought.  (Kurtenbach Dep., 77:22-78:8).

17       Several months later, the SDDA was still trying to figure out whether or not the

18   Portionables South Dakota Facility could or should be licensed by the SDDA.  (Kurtenbach

19   Dep., 38:11-19; 53:20-54:10).  The following e-mail chains are illustrative of the confusion

20   besetting the SDDA.

21              **From:** Radloff, Cory
                **Sent:** Thursday, April 17, 2008 10:33 AM
22              **To:** Linck, Karl
                **Subject:** Swab results
23
                                    * * *
24
                Also, I spoke with Scott Schultzky [sic] with the SD dept of ag
25              dairy branch, he seemed as confused as I am about how we should
                be regulated.  He comes across as wanting to be very helpful from
26

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 8
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

a dairy perspective, but I am worried I am opening a can of worms…

Any advice?

(Miller Decl., ¶ 8, Ex. G, Kurtenbach Dep., Ex. 5).

> **From:** Shumaker, Tony
> **Sent:** Wednesday, June 11, 2008 2:38 PM
> **To:** Kurtenbach, Darwin; Schelske, Scott; Stegeman, Gene
> **Subject:** RE: Dairy products plant license
>
> Do we have an answer for everything that they want?

\* \* \*

> **From:** Kurtenbach, Darwin
> **Sent:** Friday, May 30, 2008 7:10 AM
> **To:** Williams, George; Brady, Amber; Best, Diane; Even, Bill; Fridley, Kevin
> **Cc:** Webber-Boyer, Karen; Schelske, Scott; Shumaker, Tony; Stegeman, Gene
> **Subject:** RE: Dairy products plant license
>
> I am glad everyone is muddying the water, that way when all the mud settles to the bottom we will have a clean and clear product. … They [Sargento] called me yesterday with the concern if we would be able to give them some clearer answer next time we met.  I told them [Sargento] we had our legal staff looking at it and we should have something for them in four weeks.  Thanks to everyone for helping me with this.

(Miller Decl., ¶ 9, Ex. H, Kurtenbach Dep. Ex. 8).

Sometime in June 2008, the SDDA finally "resolved" the issue.  (Kurtenbach Dep., 41:16-42:7).  Specifically, the SDDA made an informal and internal decision to create a new definition of a previously undefined term within the pertinent South Dakota statute, SDCL § 40-32-4, to expand the category of persons required to have a license thereunder:

> Q:   What did you expand?
>
> A:   We came up with a definition on what we could license as a dairy plant and that's when we came up with the determination that the plant in Sioux City could be licensed.  That would be the only case at this time in South Dakota.
>
> Q:   And that occurred in the spring of 2008, correct?

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 9
Case No. 2:08-CV-1111MJP

1          A:    Yes.

2 (Kurtenbach Dep., 25:1-7) (emphasis added).  The new definition that the SDDA "came up with"

3 would now require companies selling products made up of at least 50% dairy by reconstituted

4 weight to have a dairy license.  (Kurtenbach Dep., 41:16-42:7).  The SDDA orally

5 communicated its decision to Sargento some time in late June of 2008 during an inspection of the

6 South Dakota Facility (Kurtenbach Dep., 42:10-13), and later in writing on July 7, 2008.  (Miller

7 Decl., ¶ 10, Ex. I, Kurtenbach Dep. Ex. 12).

8      Yet, despite making up a definition out of thin air (Kurtenbach Dep., 83:4-11), the SDDA

9 never communicated this new and expansive definition of "milk products" to anyone else.

10 (Kurtenbach Dep., 42:14-22).  The SDDA has not circulated a memo advising the industry of

11 this change in position.  (Kurtenbach Dep., 42:14-43:2).  The SDDA has not drafted any rules

12 reflecting this new definition.  (Kurtenbach Dep., 42:23-43:2; 48:18-25).  The SDDA has not

13 done anything to notify anyone (except Portionables) of this new interpretation, nor has the

14 SDDA attempted to take the steps necessary to apply its new jurisdiction retroactively.

15 (Kurtenbach Dep., 42:14-43:16; 48:18-25; 85:2-86:3).  While no one would know it, it is

16 apparently the SDDA's new rule going forward that any person or company selling any product

17 that is comprised of 50% dairy products by reconstituted weight should obtain a "dairy license"

18 from the SDDA.

19      As demonstrated by its internal correspondence and the testimony of its Rule 30(b)(6)

20 designees, Sargento is apparently unclear about what provisions of South Dakota law

21 purportedly require licensure and why.  As discussed below, a cursory analysis of South Dakota

22 administrative law reveals that the new rule was not properly promulgated, is unenforceable, and

23 cannot be applied retroactively.  Nevertheless, Sargento did (and has done) nothing whatsoever

24 to challenge the private determination of the new rule expansively defining "milk product."

25 Based on the supposed need to modify the South Dakota plant to meet the new regulatory

26

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 10
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

1   requirements, Sargento set about spending hundreds of thousands of dollars on upgrades,

2   including custom ordering new cookers that would increase the production capacity by 37%

3   (Linck Dep., 40:14-16), and claims that the total costs will exceed $2.4 million. (Miller Decl.,

4   ¶ 11, Ex. J, Defendant/Counterclaim Plaintiff Sargento's Supplemental Initial Disclosures

5   Pursuant to Fed. R. Civ. P. 26(a)(1)). Presumably because of their desire to get a remodel of the

6   South Dakota plant paid for at the cost of the former shareholders, Sargento has acquiesced in –

7   if not encouraged – licensure.

8   **G.   Sargento's Counterclaims Relating to South Dakota Laws and Regulations.**

9          On January 30, 2009, Sargento filed a Counterclaim against the former shareholders.

10  (Defendant Sargento Foods, Inc.'s Counterclaim, Dkt. No. 29).   In the Counterclaim, Sargento

11  asserted a cause of action for breach of contract (Claim 1) in which it alleged that "[c]ontrary to the

12  representations and warranties for which the Shareholders were responsible, one of the Portionables

13  facilities ***was in violation*** of applicable law by producing products without a required license" and

14  that "[a]s a result, the plant equipment was not adequate for the uses to which it was put and

15  Sargento will be required to expend substantial time and resources to retrofit the facility and bring it

16  into compliance with applicable laws and regulations." (Counterclaim, p. 5, ¶30) (emphasis added).

17  Sargento also asserted claims for misrepresentation and promissory estoppel (Claims 2 and 3) based

18  on the same allegations relating to violations of and failure to comply with applicable law.

19  (Counterclaim, p. 6).

20         The former shareholders filed the Pending Summary Judgment Motion to dismiss

21  Sargento's misrepresentation and promissory estoppel counterclaims on July 23, 2009, and that

22  motion is noted for consideration on August 14, 2009.  The grounds for dismissal of those tort and

23  quasi-contract claims apply with equal force to the "licensure" claim.   The former shareholders

24  now move to dismiss Sargento's counterclaims under the SPA as those claims relate to dairy laws

25  and regulations.

26

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 11
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

III.   **ARGUMENT**

A.   **The Portionables South Dakota Facility Complied with Applicable Law at the Time Sargento Acquired the Company.**

Sargento alleges that the former shareholders breached the SPA because Portionables manufactured certain products without a license from the SDDA, and that its equipment did not comply with the applicable regulations for manufacturing such products. (Counterclaim, pp. 3-4). Sargento's assertions ignore the language of the SPA, misinterpret controlling statutory authority, and seek to impose rules and procedures on Portionables that, on the undisputed facts, *did not exist as of April 30, 2007 and by law cannot be applied retroactively*.

1.   **The Former Shareholders' Fulfilled Their Duties Set Forth in 2.5 and 2.14 of the SPA.**

In Section 2.5(a) of the SPA, the former shareholders properly and correctly warranted that Portionables was not "in violation (nor is it currently liable or otherwise currently responsible with respect to prior violations) of any statute, law, ordinance, treaty, rule, regulation or other legal requirement applicable of a Governmental Authority ("Laws")" and that "none of the processes followed, results obtained or services provided by" Portionables "violate any Laws applicable thereto…"  (SPA at § 2.5(a)).

In Section 2.5(b), the former shareholders dutifully warranted that "to the Knowledge of the Disclosing Parties, no event has occurred or circumstance exists that (with or without notice or lapse of time) may constitute or result in a violation by the Company or the Sub of, or a failure on the part of the Company or the Sub to comply in any material respect with, any Laws…" (SPA at § 2.5(b)).

And in Section 2.5(c), the former shareholders correctly warranted that there had been no receipt of "any written notice or other written communication" or "oral notice or other communication, from any Governmental Authority regarding any actual, alleged or potential

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 12
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

1    violation of, or failure to comply with, any Laws, or actual, alleged or potential violation of, or

2    failure to comply with, any Laws...." (SPA at § 2.5(c)).

3        The term "Knowledge" used in Section 2.5 is defined as "actual knowledge of the party

4    and knowledge that would have been obtained by inquiry of sources reasonably accessible to

5    such party") or about which they had notice. (SPA at § 8.1, definition of "Knowledge"). The

6    SPA provides that "actual knowledge of breach shall not be inferred from knowledge of

7    individual facts or circumstances underlying the breach of knowledge that could have been

8    obtained through inquiry of any other person." (SPA at § 2.33).

9        Likewise, in Section 2.14 of the SPA, the former shareholders properly warranted that the

10   equipment was "in all material respects structurally sound, are adequate for the uses to which

11   they are being put, and none such equipment is in need of maintenance or repairs except for

12   ordinary, routine maintenance and repairs that are not material in nature or cost" and that the

13   equipment is "reasonably sufficient for the continued conduct of the Company's and the Sub's

14   businesses after Closing in substantially the same manner as conducted prior to the Closing..."

15   (SPA at § 2.14).

16       Despite the Shareholders Representatives' unequivocal testimony that Portionables had

17   no knowledge whatsoever of any purported dairy license issue (Calliari Dep., 127:2-13) and

18   despite the SDDA clearly stating that it did not decide to license Portionables until 15 months

19   after the closing of the sale (Kurtenbach Dep., 41:16-42:13), Sargento still clings to the mistaken

20   notion that the former shareholders breached the warranties in the SPA, and that the former

21   shareholders should pay to substantially upgrade the South Dakota plant. Sargento's claims fail

22   on the undisputed facts and South Dakota law.

23       **2.      Portionables Was in Compliance with the Law in Effect in April 2007.**

24       Sargento alleges that the former shareholders breached the representations in Sections 2.5

25   and 2.14 of the SPA because Portionables was somehow in violation of SDCL § 40-32-4, S.D.

26

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 13
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1    Admin. R. 12:17:06:01, and S.D. Admin. R. 12:05:14:01 in April 2007 when Sargento acquired

2    the company.  Sargento simply cannot produce sufficient evidence to preclude the Court from

3    deciding this issue in favor of the former shareholders as a matter of law.

4              **a.    SDCL § 40-32-4**

5         At the time the SPA was executed, SDCL § 40-32-4, titled "License required for dairy

6    products plant, distributor, or person buying or selling milk products", provided that:

7              Any person engaged in the operation of a creamery, cream station,
                 receiving station, transfer station, plant fabricating single-service
8              articles or milk distributor in South Dakota, or any person buying
                 milk or cream produced in South Dakota, or any person selling
9              milk or milk products, shall, before beginning business, obtain
                 from the secretary a license for each place of business owned or
10             operated by such person in South Dakota, and for each creamery,
                 cream station, milk distributor, or milk plant buying or selling milk
11             or milk products in South Dakota.

12   SDCL § 40-32-4 (amended March 19, 2009).[4]

13        According to SDCL § 40-32-4 (amended March 19, 2009) (emphasis added), the

14   categories of persons required to obtain a license as of the date of the SPA were as follows:

15             (1) Any person engaged in the operation of a <u>creamery</u> in South Dakota.
                 (2) Any person engaged in the operation of a <u>cream station</u> in South Dakota.
16             (3) Any person engaged in the operation of a <u>receiving station</u> in South Dakota.
                 (4) Any person engaged in the operation of a <u>transfer station</u> in South Dakota.
17             (5) Any person engaged in the operation of a <u>plant fabricating single-service articles</u> in
                     South Dakota.
18             (6) Any person engaged in the operation of a <u>milk distributor</u> in South Dakota.
19             (7) Any person <u>buying milk or cream</u> produced in South Dakota.
                 (8) Any person <u>selling milk or milk products</u>.
20

21   ────────────────────────
     [4] SDCL § 40-32-4 was amended on March 19, 2009 as follows:
22
               Any person engaged in the operation of a ~~creamery, cream station,~~ receiving station, transfer
23             station, **bulk milk pick-up tanker, milk transport tank,** plant fabricating single-service articles
                 or milk distributor in South Dakota, or any person buying milk ~~or cream~~ produced in South
24             Dakota, or any person selling milk or milk products, shall, before beginning business, obtain from
                 the secretary a license for each place of business owned or operated by such person in South
25             Dakota, and for each ~~creamery, cream station,~~ milk distributor, or milk plant buying or selling
                 milk or milk products in South Dakota.  (H.B. 1071, 84th Leg., Reg. Sess. (S.D. 2009), 2009 S.D.
26             Sess. Laws 205).

     COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL             **FOSTER PEPPER PLLC**
     SUMMARY JUDGMENT REGARDING DAIRY LAWS – 14              1111 THIRD AVENUE, SUITE 3400
     Case No. 2:08-CV-1111MJP                                SEATTLE, WASHINGTON 98101-3299
                                                             PHONE (206) 447-4400  FAX (206) 447-9700
     51006711.4

1    Only if a person fell into one of these eight categories was it then required to obtain a license for

2    each (A) place of business owned or operated by such person in South Dakota and (B) each

3    creamery, cream station, milk distributor, or milk plant buying or selling milk or milk products in

4    South Dakota.

5        In this case, Portionables' pre-SPA activities clearly do not fall within the first six of the

6    eight potential categories of persons that would have been required to obtain a license:

7
8    •   Category No. 1: Any person engaged in the operation of a creamery in South Dakota.
         The definition of a creamery at the time the SPA was executed was a "place where
9        cream, delivered by two or more persons, is churned into butter for commercial
         purposes…" SDCL § 40-32-2(1) (amended March 19, 2009).[5] Sargento does not
10       appear to be claiming that Portionables was operating as a creamery. Even if it did
         make such a claim, there is no evidence that Portionables churned cream delivered by
11       two or more persons into butter. Furthermore, the SDDA's 30(b)(6) designee
         concluded that Portionables is not a creamery. (Kurtenbach Dep., 80:20-81:22).
12
13   •   Category No. 2: Any person engaged in the operation of a cream station in South
         Dakota. When the SPA was executed a cream station was defined as "any place other
14       than a creamery where deliveries of cream are made by two or more producers except
         to a duly authorized agent of a common carrier…" SDCL § 40-32-2(2) (amended
15       March 19, 2009). Sargento does not appear to be claiming that Portionables was
         operating as a cream station. In any event, there is no evidence that deliveries of
16       cream were made to Portionables' South Dakota Facility by two or more producers.
         Furthermore, Mr. Kurtenbach concluded that Portionables is not a cream station.
17       (Kurtenbach Dep., 80:20-81:20).

18
19   •   Category No. 3: Any Person engaged in the operation of a receiving station in South
         Dakota. "Receiving station" is defined as "any place, premise, or establishment
20       where raw milk is received, collected, handled, stored, or cooled and prepared for
         further transporting." SDCL § 40-32-2(14). Sargento admitted in its responses to
21       Requests for Admissions that it did not receive raw milk at any time. (Miller Decl.,
         ¶ 12, Ex. K, Plaintiff's First Requests for Admissions to Defendant and Defendant's
22       Responses Thereto, Responses to Requests for Admissions Nos. 18 and 19). As such,
         Portionables was *per se* not a receiving station. Mr. Kurtenbach agrees. (Kurtenbach
23       Dep., 80:20-25).

24   _____
25   [5] SDCL § 40-32-2 was amended on March 19, 2009 by H.B. 1071, 84th Leg., Reg. Sess. (S.D. 2009), 2009 S.D.
     Sess. Laws 205. Among other changes to the statute included in the amendments, the definitions for "creamery" and
26   "cream station" have been eliminated from SDCL § 40-32-2 altogether.

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 15
Case No. 2:08-CV-1111MJP

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51006711.4

- <u>Category No. 4</u>: Any person engaged in the operation of a transfer station in South Dakota. Sargento admitted in its responses to Requests for Admissions that it did not operate as a transfer station at any time. (Miller Decl., ¶ 12, Ex. K, Sargento's Responses to Requests for Admissions Nos. 36 and 37). Mr. Kurtenbach also concluded that Portionables is not a transfer station. (Kurtenbach Dep., 80:20-81:2).

- <u>Category No. 5</u>: Any person engaged in the operation of a plant fabricating single-service articles in South Dakota. Sargento admitted in its responses to Requests for Admissions that it did not operate as a plant fabricating single-service articles at any time. (Miller Decl., ¶ 12, Ex. K, Sargento's Responses to Requests for Admissions Nos. 34 and 35). Mr. Kurtenbach reached the same conclusion. (Kurtenbach Dep., 80:20-81:12).

- <u>Category No. 6</u>: Any person engaged in the operation of a milk distributor in South Dakota. Sargento admitted in its responses to Requests for Admissions that it did not operate as a milk distributor at any time. (Miller Decl., ¶ 12, Ex. K, Sargento's Responses to Requests for Admissions Nos. 32 and 33). Mr. Kurtenbach agrees that Portionables is not a milk distributor. (Kurtenbach Dep., 80:20-81:25).

Based on the foregoing, Sargento can only be claiming that Portionables needed to obtain a license because it was a "person buying milk or cream produced in South Dakota" and/or a "person selling milk or milk products" prior to the SPA.

**(1)    Portionables is not "[a] person buying milk or cream produced in South Dakota."**

With the benefit of discovery, it is now apparent that Portionables never bought milk or cream produced in South Dakota prior to the acquisition by Sargento.

In Sargento's Amended Responses to Counterclaim Defendant Flora Damasio's Interrogatories and Request for Production of Documents, Sargento admitted as follows:

<u>Answer to Interrogatory No. 3</u>

* * *

"… Sargento has no knowledge or reason to believe that Portionables, prior to acquisition by Sargento, ever bought milk produced in South Dakota."

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 16
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Answer to Interrogatory No. 4

* * *

"… Sargento has no knowledge or reason to believe that Portionables, prior to acquisition by Sargento, ever bought cream produced in South Dakota."

(Miller Decl., ¶ 3, Ex. B, pp. 7-8).

Thus, there is no evidence that Portionables purchased milk or cream that was produced in South Dakota prior to the date of the SPA.  Without such evidence, the former shareholders cannot have violated SDCL § 40-32-4 (amended March 19, 2009) for the reason that Portionables was a "person buying milk or cream produced in South Dakota…"[6]

> **(2)    Portionables was not "[a] person selling milk or milk products," the new definition of "milk products" privately determined more than a year after the SPA was executed, and it is, in any event, the result of improper rulemaking.**

As to the final category of persons who are expected to obtain a license, the former shareholders and Sargento agree that Portionables ***was not a company that sold milk or milk products at the time of the sale***:  Sargento flatly admitted in its responses to Requests for Admissions that Portionables did not sell milk or milk products at any time.  (Miller Decl., ¶ 12, Ex. K, Sargento's Responses to Requests for Admissions Nos. 28, 29, 30, and 31).   As such, and pursuant to Fed. R. Civ. P. 36(b), the matter admitted has been conclusively established.  Sargento's admissions of these dispositive facts were not some sort of inadvertent slip.  Sargento's President of Food Ingredients recently reiterated that Portionables absolutely did not sell milk or milk products prior to the SPA.  (Gordy Dep., 92:16-18).  Because Portionables was not selling milk or milk products at the time of the sale, it was not required to obtain a license under SDCL § 40-32-4, and Sargento's claim fails as a matter of law.

---

[6] Moreover, even purchasers of cream produced in South Dakota are no longer required to obtain a dairy license under the recent amendments to the statute, and thus historical purchases of such cream would not support a claim for damages.

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DAIRY LAWS – 17 Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

1    Despite Sargento's repeated admissions to the contrary, in an effort to obtain a new

2    export certificate and secure funds to dramatically upgrade its plant at the former shareholders'

3    expense, Sargento may now attempt to argue that Portionables *was* selling "milk products" based

4    on a new definition created by the SDDA long after the SPA was executed.  But even if Sargento

5    could recant its unequivocal admissions at this late date, the SDDA's new definition does not

6    give rise to a claim because it was privately determined well after the SPA was executed, and

7    because the new definition is unenforceable under South Dakota laws.

8    The term "milk products" used in SDCL § 40-32-4 is defined neither in the statute nor the

9    corresponding administrative rules promulgated by the SDDA.  The undisputed evidence is that

10   as of February 2008, the SDDA believed its jurisdiction was limited to products that were "100%

11   dairy," and Mr. Kurtenbach testified it was not until June of 2008 (fourteen months after the SPA

12   was executed) that the SDDA first decided to define "milk products" as products containing 50

13   percent or more reconstituted dairy weight.  (Kurtenbach Dep., 41:16-42:7).  The SDDA readily

14   admits that its "50 percent dairy" definition is not reflected anywhere in the statutes or

15   regulations.  (Kurtenbach Dep., 45:14-25).  Mr. Kurtenbach testified that the SDDA's decision

16   on the definition was not based on any particular document or standard, but rather was the result

17   of brainstorming and ideas from within the SDDA and its legal department.  (Kurtenbach Dep.,

18   45:14-25; 82:9-83:18).  In fact, during the brain-storming session, the SDDA tossed around a

19   wide range of possibilities:

20           Q:      So the 50 percent reconstituted weight equals dairy concept
                 originated with you in conversations that were had in roughly
21           February to May of '08?

22           A:      Did not originate with me, I just threw that out for the
                 starting point and if they wanted to come up with 75 percent that's
23           fine.   We had to come up with a ballpark figure in order to
                 determine a dairy plant, what is it, is it 100 percent dairy, is it 50,
24           40, or 75, yes.

25

26

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

1    (Kurtenbach Dep., 83:4-11). Even after it settled on this new "ballpark figure," Mr. Kurtenbach

2    also testified that the SDDA has never communicated the "50 percent dairy" decision to the

3    industry or issued a statement in that regard because the rule has never been applied to anyone

4    but Portionables. (Kurtenbach Dep., 42:14-43:2). In any event, there is no dispute whatsoever

5    that Portionables was not in violation of this subsequently privately determined re-definition at

6    the time of the sale, and that there was no breach of a representation or warranty.

7          Aside from the fact that the new definition of "milk products" was privately determined

8    well after the sale, the SDDA's new definition of dairy does not apply to the former shareholders

9    for a second fundamental reason: the SDDA acted outside of its authority in adopting a

10   definition for "milk products" without following the administrative procedure and rules set forth

11   in SDCL § 1-26 *et seq*. SDCL § 40-32-18 provides that "[t]he secretary of agriculture may

12   promulgate rules <u>pursuant to chapter 1-26</u> as may be needed to...[d]efine individual milk

13   products and set standards for each..." SDCL § 40-32-18 (emphasis added). As a matter of law,

14   the SDDA's decision to promulgate a definition of "milk products" resulted in a new "rule"

15   under South Dakota law. SDCL 1-26-1(8) ("Rule" is defined as "each agency statement of

16   general applicability that implements, interprets, or prescribes law, policy, procedure, or practice

17   requirements of any agency"). Indeed, under the authority of SDCL § 40-32-18, the SDDA has

18   promulgated many definitions, including those for milk, cream, and butter. *See* S.D. Admin. R.

19   12:17:01:01 (amended February 2, 2009).

20         Although the SDDA could have promulgated a rule defining "milk products," it did not.

21   Instead, in June 2008, the SDDA unilaterally opted to use a new definition of "milk products"

22   without following the administrative process set forth under SDCL § 1-26 *et seq*. For example,

23   the SDDA did not "publish the notice of hearing in the manner prescribed by SDCL § 1-26-4.1,"

24   nor did it "afford all interested persons reasonable opportunity to submit amendments, data,

25   opinions, or arguments at a public hearing held to adopt the rule." SDCL § 1-26-4. The SDDA

26

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 19
Case No. 2:08-CV-1111MJP

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

1   openly acknowledges that it did not promulgate a rule with the new definition for "milk

2   products." (Kurtenbach Dep., 48:18-49:11).

3        SDCL § 1-26-6.8 clearly states that "[n]o agency rule may be enforced by the courts of

4   this state until it has been adopted in conformance with the procedures set forth in this chapter."

5   SDCL § 1-26-6.8.  There is no dispute that the SDDA's new definition of "milk products" was

6   not adopted in conformance with the procedures set forth in SDCL § 1-26 *et seq.*  As such, the

7   SDDA's definition of "milk products" is unenforceable.  *See, e.g., Valley State Bank v. Farmers*

8   *State Bank of Canton*, 87 S.D. 615, 620, 213 N.W. 2d 459 (S.D. 1973) (Banking commission's

9   rules of procedure must be adopted pursuant to the South Dakota Administrative Procedures Act

10  to have force of law); *First Am. Title Co. of S.D. v. S.D. Land Title Assoc.*, 541 F. Supp. 1147,

11  1162 (D.S.D. 1982) (stating that the South Dakota Abstracter's Board of Examiners must comply

12  with the State APA when making rules and regulations).

13       Furthermore, the SDDA did not satisfy the criteria for promulgating a ***retroactive*** rule,

14  which is what would have been required to find that a license was required back in 2007.  SDCL

15  § 1-26-8.3 requires that "[i]f any rule is proposed to have retroactive effect, the burden is on the

16  agency to show that the retroactivity is authorized by law or is necessary to implement new

17  provisions of law." SDCL § 1-26-8.3.  Therefore, even if the SDDA had followed the notice and

18  hearing procedures set forth in SDCL § 1-26 *et seq.*, the new definition for "milk products" could

19  only be enforced prospectively against Portionables because the SDDA did not attempt to

20  comply with SDCL § 1-26-8.3.

21       In the SPA, the former shareholders warranted, in the present tense, that Portionables was

22  not in violation of the law as of the date of the SPA.  Nowhere in the SPA does it state that the

23  former shareholders would be liable for any <u>future</u> changes in the law or new rules actually

24  promulgated by a relevant agency.  The former shareholders could not possibly have known

25  when building the South Dakota Facility in 2005, or upon execution of the SPA in April 2007,

26

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 20
Case No. 2:08-CV-1111MJP

**FOSTER PEPPER PLLC**
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51006711.4

1   that the SDDA would later privately determine without warning an unexpressed definition of

2   "milk products." Even Sargento has conceded that there would have been no way for the former

3   shareholders to "look into the future" in that regard, and does not believe that the former

4   shareholders should be held responsible for any change in the law that occurred after Sargento

5   acquired Portionables. (Gordy Dep., 111:3-112:14). Consequently, Sargento cannot now to try

6   to hold the former shareholders responsible for "every possible law or regulation that the

7   SDDA ... might one day assert ... was violated," which appears to be exactly what Sargento

8   intends to do based on recent communications from Sargento's counsel. (Miller Decl., ¶ 13,

9   Ex. L, July 27, 2009 Linehan letter, p. 2 ¶ 3). Portionables was not in violation of the law as it

10  existed and was applied in April 2007, and Sargento's claim for a breach of the representations

11  in the SPA fails as a matter of law.

12          **b.     Portionables Did Not Violate S.D. Admin. R. 12:17:06:01: General**
                     **Specifications for Dairy Plants Approved for USDA Inspection and**
13                   **Grading Service**

14          Sargento alleges that the Portionables South Dakota Facility somehow violated S.D.

15  Admin. R. 12:17:06:01. These allegations are unfounded because like SDCL § 40-32-4, S.D.

16  Admin. R. 12:17:06:01 did not apply to Portionables prior to the sale to Sargento in April 2007.

17          S.D. Admin. R. 12:17:06:01 titled "Requirements for licensed dairy plants", provides in

18  relevant part:

19                  Licensed manufacturing grade dairy plants shall meet the
                    requirements set forth in General Specifications for Dairy Plants
20                  Approved for USDA Inspection and Grading Service effective
                    August 28, 2002, .... The department shall also use the current
21                  issue of the U.S. Department of Agriculture's DA Instruction 918-
                    PS, Instructions for Dairy Plant Surveys, and USDA guidelines for
22                  the sanitary design and fabrication of dairy processing equipment
                    when conducting plant inspections.
23
24  S.D. Admin. R. 12:17:06:01. "Manufacturing grade" as used in the above definition means "any

25  milk or milk product subject to the requirements of chapter 40-32 that is produced for processing

26

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 21
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1   and manufacturing into products for human consumption not subject to Grade A requirements

2   stated in chapter 39-6…"  SDCL § 40-32-2(6).

3         S.D. Admin. R. 12:17:06:01 mandates only that "licensed manufacturing grade dairy

4   plants" meet the requirements set forth in certain portions of the General Specifications for Dairy

5   Plants Approved for USDA Inspection and Grading Service.  If an entity is not required to have a

6   license under SDCL § 40-32-4, then it follows that the entity is not required to meet the

7   requirements set forth in certain portions of the General Specifications for Dairy Plants

8   Approved for USDA Inspection and Grading Service.  As discussed in detail above, there is no

9   evidence suggesting that Portionables was required to have a license under SDCL § 40-32-4.

10   And because Portionables was not required to have a license under SDCL § 40-32-4, it was

11   likewise not required to meet the specifications contained within the General Specifications for

12   Dairy Plants Approved for USDA Inspection and Grading Service adopted by the SDDA in S.D.

13   Admin. R. 12:17:06:01.  In fact, Mr. Kurtenbach acknowledged that even as of July 7, 2008,

14   Portionables was not in violation of the General Specifications for Dairy Plants Approved for

15   USDA Inspection and Grading Service because Portionables had not yet obtained a license.[7]

16   (Kurtenbach Dep., 78:14-20).  For these reasons, the former shareholders were not in violation of

17   S.D. Admin. R. 12:17:06:01.

18        **c.**     **S.D. Admin. R. 12:05:14:01: Grade A Pasteurized Milk Ordinance, 2005 Revision**

19         At the time the SPA was executed, S.D. Admin. R. 12:05:14:01 stated in pertinent part:

20

21        The production, transportation, processing, handling, sampling, examination, grading, labeling, and sale of all milk and milk

22        products and the inspection and suspension of permits for dairy farms, milk plants, receiving and transfer stations, milk tank truck

23        cleaning facilities, milk tank trucks, bulk milk hauler/sampler, and single-service manufacturing plants shall be regulated in

24   ───────────────

   [7] Portionables did not officially fall under the SDDA's jurisdiction until June 1, 2009 when it received a "Milk

25   Plant" license in South Dakota (Miller Decl., ¶ 14, Ex. M, Kurtenbach Dep. Ex. 23).  And even that process was rife with confusion because South Dakota does not have an application for a dairy plant license.  (Kurtenbach Dep.,

26   111:8; 112:1-25; 113:1-2).

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 22
Case No. 2:08-CV-1111MJP

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51006711.4

1   accordance with the provisions of the Grade A Pasteurized Milk
    Ordinance (PMO) (with the exception of sections 16 and 17) 2005
2   revision, ... .

3   S.D. Admin. R. 12:05:14:01 (amended February 2, 2009).[8]   Though the SDDA later adopted the

4   2007 PMO to supplant the 2005 PMO, Mr. Kurtenbach confirmed that it was the 2005 PMO that

5   was operative as of April 30, 2007.  (Kurtenbach Dep., 59:24-60:3).

6          No evidence supports Sargento's allegation that the Portionables South Dakota Facility

7   was in violation of S.D. Admin. R. 12:05:14:01 (amended February 2, 2009).  Sargento admitted

8   in responses to Requests for Admissions that "Portionables was not required to obtain a Grade A

9   Permit under SDCL § 39-6 *et. seq*." and that "Portionables did not label any product

10  manufactured in its South Dakota facility as 'Grade A' prior to April 30, 2007 because no such

11  label was required for Portionables' products."  (Miller Decl., ¶ 12, Ex. K, Sargento's Responses

12  to Requests for Admissions, Nos. 24 and 26).  Thus, Sargento's admissions conclusively establish

13  that the PMO does not apply because the PMO relates solely to the production of Grade A

14  products, which are not at issue here.

15         The title of the PMO itself – "Grade A Pasteurized Milk Ordinance" – indicates that it

16  only applies to Grade A products.  The standards set forth within the PMO, such as the Section 4

17  requirement that all bottles, containers of packages containing milk or milk products defined in

18  the PMO must be conspicuously marked with the words "Grade A" on the exterior surface, also

19  make clear that it only applies to Grade A products.  *See Grade "A" Pasteurized Milk*

20  *Ordinance, 2005 Revision*, U.S. Department of Health and Human Services, Public Health

21  Service,       Food       and       Drug       Administration,       http://www.idfa.org/

22  news/stories/2006/02/2005_pmo.pdf (last visited July 30, 2009).  This is also evident because the

23  SDDA promulgated S.D. Admin. R. 12:05:14:01 under SDCL § 39-6-9, which is titled "Rules

24  prescribing Grade A standards."   Mr. Kurtenbach confirmed that if Grade A products are at

25

26  _____
    [8] Effective February 2, 2009, S.D. Admin. R. 12:05:14:01 was amended to adopt the 2007 PMO.

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 23
Case No. 2:08-CV-1111MJP

51006711.4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1   issue, the PMO applies, but if dairy products requiring licensure are not Grade A, as here, then

2   the General Specifications for Dairy Plants Approved for USDA Inspection and Grading Service

3   applies.  (Kurtenbach Dep., 71:6-72:8).  And even if the 2005 PMO did apply to Portionables, no

4   state or federal agency has stated that Portionables violated the 2005 PMO prior to April 30,

5   2007.

6        Consequently, the former shareholders did not violate S.D. Admin. R. 12:05:14:01.

7                          **IV.    <u>CONCLUSION</u>**

8        Portionables was not in violation of South Dakota law when Sargento purchased the

9   company in April 2007.  There is no genuine dispute that the alleged "violation of law" is based

10  on a rule that was illegally privately determined at Sargento's prodding well after the fact.  For

11  all of the foregoing reasons, the former shareholders respectfully request that Sargento's

12  counterclaims relating to violation of dairy laws be summarily dismissed as a matter of law.

13       DATED this 6th day of August, 2009.

14  ///

15  ///

16

17  ///

18

19  ///

20

21  ///

22

23  ///

24

25  ///

26

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FOSTER PEPPER, PLLC


_____/s/ Jeffrey S. Miller_____
Christopher R. Osborn, WSBA No. 13608
Jeffrey S. Miller, WSBA No. 28077
Stacey A. Fitzpatrick, WSBA No. 33525
Foster Pepper PLLC
1111 Third Avenue, Suite 3400
Seattle, WA 98101
(206) 447-4400 Phone
(206) 447-9700 Fax
osboc@foster.com
milje@foster.com
fitzs@foster.com
Attorneys for Plaintiff/Counterclaim Defendant
Patrick Calliari

- and -

Bradley L. Fisher, WSBA No. 19895
Hozaifa Cassubhai, WSBA No. 39512
Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
(206) 622-3150 Phone
(206) 628-7699 Fax
bradfisher@dwt.com
hozaifacassubhai@dwt.com

- and -

Michael A. Goldfarb, WSBA No. 13492
Felix G. Luna, WSBA No. 27087
Anthony Todaro, WSBA No. 30391
Peterson Young Putra
2800 Century Square
1501 Fourth Avenue
Seattle, WA 98101
goldfarb@pypfirm.com
luna@pypfirm.com
torado@pypfirm.com
Attorneys for Plaintiff And Counterclaim
Defendants

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS – 25
Case No. 2:08-CV-1111MJP

51006711.4

1

### DECLARATION OF SERVICE

2      I, Elizabeth Whitney, state that I am a citizen of the United States of America and a

3  resident of the State of Washington, I am over the age of twenty one years, I am not a party to

4  this action, and I am competent to be a witness herein.  I electronically filed the aforementioned

5  with the Clerk of the Court using the CM/ECF System who will send notification of such filing

6  to the following parties who have appeared in this action as of today's date:

7      **Robert M. Sulkin**          **rsulkin@mcnaul.com**
       **Gregory J. Hollon**          **ghollon@mcnaul.com**
8      **Barbara H. Schuknecht**    **bschuknecht@mcnaul.com**
       **David A. Linehan**          **dlinehan@mcnaul.com**
9

10     There are no other parties who have appeared in this action as of today's date that need to

11 be served manually.

12     I DECLARE under penalty of perjury under the laws of the State of Washington that the

13 foregoing is true and correct.

14     DATED this 6th day of August, 2009.

15

16                                    _____

17                                    Elizabeth Whitney

18

19

20

21

22

23

24

25

26

COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING DAIRY LAWS
Case No. 2:08-CV-1111MJP

51006711.4

**FOSTER PEPPER PLLC**
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700