

*EXHIBIT 6*

 **FOSTER PEPPER** PLLC

Direct Phone    (206) 447-6408
Direct Facsimile  (206) 749-1969
E-Mail        mllje@foster.com

May 23, 2008

<u>VIA E-MAIL</u>

Robert Henkle, Jr.
Reinhart Boerner Van Deuren S.C.
1000 North Water Street, Suite 2100
Milwaukee, Wisconsin 53202

      Re:    Sargento Foods Inc.

Exhibit 18
Witness Calliari
Date 6/30/09
Buell Realtime Reporting
(206) 287-9066

Dear Bob:

      Please accept this letter as Patrick Calliari's notice that he is invoking his right to resign under the "Termination for Good Reason" provisions of Section 7(a)(ii) of his April 30, 2007 Employment Agreement with Sargento Foods Inc. (the "Employment Agreement"). Sargento has materially breached the Employment Agreement. Mr. Calliari hereby demands that the breaches described below be cured within thirty (30) days after receipt of this detailed written notice. If all breaches are not cured within that time frame, then he (and the Shareholders) will be entitled to the maximum contractual benefits owing to them under the terms of both the Employment Agreement and the Stock Purchase Agreement.

**A.   <u>Sargento's Material Breach of Employment Agreement.</u>**

      Over the past year with increasing frequency Sargento has stymied Mr. Calliari's ability to maintain or assert operational control over Portionables. Mr. Calliari believes this interference has prevented Portionables from lowering expenses, has potentially cost Portionables significant revenue, has damaged key customer relationships and has created unnecessary strain within Portionables' management team. All of it is outside the scope of involvement and control that Sargento was allocated under both the Stock Purchase Agreement and the Employment Agreement and has been significantly impairing Mr. Calliari's ability to maximize the earn-out payment.

      Here are five examples of Sargento's impermissible actions in the past year:

      1) <u>The Unilever negotiations.</u> As Sargento well knows, Unilever and Portionables have had a healthy, ongoing, and expanding relationship spanning more than a decade. Under the

TEL: 206.447.4400 FAX: 206.447.9700 111 THIRD AVENUE, SUITE 3400 SEATTLE, WASHINGTON 98101-3299 WWW.FOSTER.COM
50916935.1      SEATTLE WASHINGTON SPOKANE WASHINGTON PORTLAND OREGON

**CONFIDENTIAL**                     **CALLIARI000377**

Mr. Robert Henkle, Jr.
May 23, 2008
Page 2

terms of a Manufacturing Agreement in place at the time Sargento bought Portionables, Unilever had contracted to pay Portionables $0.370/lb through August 2010 on any purchase amount above 20,000,000 lbs. Unilever invested about $10 million of its own equipment and intellectual property into Portionables' production facility in Bellingham for the sole purpose of making Unilever's product. Unilever is unquestionably important to Portionables' business.

Within three weeks after closing the purchase, Sargento began renegotiating the terms of the Unilever Manufacturing Agreement. Mr. Calliari did not initiate this process, nor did he think it was wise, as the focus of the discussion was to reduce the overall price per pound paid by Unilever. Ultimately, Sargento instructed and forced Mr. Calliari to send Unilever a proposal to decrease processing fees for production above 20,000,000 lbs from the existing price of $0.370/lb to $0.230/lb. The negative impact of this reduction on EBITDA will be dramatic (expected to exceed $1.3 million for this year alone) and may well further harm Portionables because we understand the contemplated revised agreement does not provide any meaningful additional long term benefit.

This is especially troubling because Sargento has impermissibly and intentionally excluded Mr. Calliari from certain discussions and communications with Unilever despite his long-term working relationship with key managers in Europe and in the United States. Furthermore, Sargento has ignored Mr. Calliari's warnings that the amendment is not necessary to maintain the Unilever business because Unilever has already invested heavily in Portionables' production facility. In fact, several weeks ago you told us that Mr. Calliari has now been cut off from the Unilever negotiations altogether.

2) Interference with Birdseye account. Portionables had long-standing discussions with a large potential frozen foods customer, Birdseye, prior to execution of the Stock Purchase Agreement, and it was well on the way to landing significant work from Birdseye without any input or involvement from Sargento. Without even telling Mr. Calliari, Sargento employee(s) have been impermissibly conducting parallel, separate and interfering discussions with Birdseye over the past few months. This has created confusion at Birdseye and is harmful to both Sargento and Portionables. Even after Mr. Calliari properly directed Sargento to cease trying to negotiate a separate deal with Birdseye, Sargento has continued to reach out to that entity without involving Mr. Calliari and to the detriment of the company.

3) Bellingham Cold Storage Contract. After execution of the Stock Purchase Agreement, Sargento representatives negotiated directly with Bellingham Cold Storage concerning a lease dispute and reached a resolution that was contrary to the advice of Mr. Calliari and to the significant financial detriment of Portionables. Mr. Calliari was prepared to implement a "direct shipping" model that was estimated to reduce Portionables' expenses by approximately $500,000 per year. Bellingham Cold Storage objected to the change in approach because it would have lowered the storage and "in-and-out" fees that it received from Portionables. Mr. Calliari was prepared to move forward with the direct shipping plan despite the objection and the legal assessment of the lease, including that conducted by Sargento's counsel, which indicated that he was entitled to do so. Nevertheless, Sargento overruled him and the plan has been scrapped.

50916935.1

Mr. Robert Henkle, Jr.
May 23, 2008
Page 3

4) <u>SAP Implementation</u>.  Portionables has approximately 110 employees and it has effectively and efficiently operated on its current accounting and software systems for the past ten years.  Portionables has no current business need for a complex and extensive system known as SAP, Sargento has insisted that Portionables undertake an extensive, time-consuming and costly attempt to supplant Portionables' current systems with the SAP system.  The training, data entry and analysis alone in converting to SAP will be a several week process that unfairly and unnecessarily distracts Portionables staff from operations during the earn out period.  In fact, Portionables estimates that it has already spent about 200 hours evaluating SAP, and that product has not even begun implementation.

Despite protestations from Portionables, Sargento has continued to demand implementation of this system during the earn out period.  But Sargento's insistence on implementation of SAP is directly contrary to Exhibit 1.5(b)(i) of the Stock Purchase Agreement, which provides in relevant part:

(b) charges for replacement or upgrade of existing equipment or software shall be Limited to associated cost savings except to the extent the charges are required in connection <u>with specific revenues approved by the Shareholders' Representative</u>...(Emphasis added).

<u>Id.</u> at § 2(b).  Here, Mr. Calliari is clearly and repeatedly telling Sargento that he does not approve of the replacement, but Sargento has charged forward anyway.

5) <u>Unreasonable Demands on Mr. Calliari and Portionables' Senior Management</u>.  After Mr. Calliari hired counsel and his attorneys corresponded with Sargento's lawyers about the foregoing issues, Sargento turned hostile overnight and began imposing unreasonable and arbitrary conditions on Mr. Calliari and Portionables' senior management.  For example, in response to two letters from Mr. Calliari's attorneys, Sargento's counsel demanded in April, 2008 that Mr. Calliari act as follows:

a) Mr. Calliari shall take no further action with respect to the discussions concerning the Unilever amendment except after discussion and approval of such actions by Mr. Gentine [CEO of Sargento] (and such approval must be in writing);

b) Mr. Calliari shall promptly provide to Mr. Gentine a written summary of all actions he has taken with respect to the Unilever amendment from the summer of 2007 to the present and shall include with such summary copies of all related documentation, analyses, memoranda and other information in his possession, including correspondence and drafts, whether in hard copy or in e-mail form or from any other medium.

Just a few weeks ago, Mike Gordy sent a highly disruptive memorandum to Portionables Management Team in an effort to undercut Mr. Calliari's authority in front of Mr. Calliari's subordinates.  That memorandum stated, among other things, that all Portionables management must adhere to the following protocol:

50916935.1

**CONFIDENTIAL**

CALLIARI000379

Mr. Robert Henkle, Jr.
May 23, 2008
Page 4

1.    Any substantive communications between you and Mr. Calliari concerning
Portionables business, including but not limited to, correspondence, emails, memos and report,
occurring subsequent to the date of this memo or within 45 days prior to the date of this memo
should be disclosed and made available to me. Substantive oral communications should be
summarized in writing and handled in the same manner....

2.    Any substantive communications between you and any former shareholder of
[Portionables] other than Patrick Calliari ("Former Shareholders") concerning Portionables
business, including, but not limited to, correspondence, emails, memo and reports, within the last
60 days shall be disclosed and made available to me (and, on his request, Patrick) in the same
manner described above....

As if this were not bad enough, Mike Gordy subsequently demanded that Portionables
senior management meet individually with him last week to discuss Portionables business—but
insisted that Mr. Calliari could not attend those meetings. After involving several lawyers on
both sides, we ultimately were able to gain Sargento's agreement not to proceed with these
detrimental secret meetings.

We believe there are other similar instances of Sargento's impermissible interference with
Mr. Calliari's "operational control" that collectively demonstrate Sargento's efforts to
prematurely wrest control of Portionables from Mr. Calliari and do not honor the spirit or intent
of the parties' agreements such as Sargento's recent decision to relocate Portionables' computer
system and e-mail accounts to Sargento's headquarters.    Indeed, Sargento's actions are
tantamount to giving Mr. Calliari reason to resign for "Good Reason." See Stock Purchase
Agreement § 1.6(d).   If that happens, then a rebuttable presumption arises that the Shareholders
are entitled to receive the maximum earn out: Id. (If Mr. Calliari resigns for "Good Cause" or is
terminated without cause, then "a rebuttable presumption shall arise that, but for such action, the
Shareholders would have earned the maximum [earn-out].")

**B.    Demand for Cure.**

If Sargento promptly takes all the following reasonable steps to cure its material breaches
of the Employment Agreement, then Mr. Calliari will withdraw his "Termination for Good
Reason."

1.    Unilever Contract

Sargento agrees not to execute the proposed revised Unilever Manufacturing Contract
that would lower processing fees for production above 20,000,000 lbs from the existing price
of 37 cents/lb. Alternatively, if Sargento insists on consummating or has already consummated a
revised contract with Unilever, then the Shareholders should receive full credit (*i.e.*, 37 cents/lb)
to their year-end EBITDA calculation for any amount sold to Unilever in 2008 above 20,000,000
lbs.

50016035.1

**CONFIDENTIAL**                                                                **CALLIARI000380**

Mr. Robert Henkle, Jr.
May 23, 2008
Page 5

2.    Bellingham Cold Storage

Sargento will provide a $500,000 credit to the Shareholders' EBITDA stemming from Sargento's decision to forego the direct shipping plan that would have reduced Portionables expenses by a like amount.

3.    Mike Gordy's Memorandum

Sargento agrees to withdraw Mike Gordy's April 30, 2008 "Management Communication" Memorandum to "Portionables Management Team" and agrees to retract the conditions stated in that document until after the earn out period ends.

4.    Lou Gentine's Letter

Sargento agrees to withdraw Lou Gentine's April 28, 2008 "expectations" letter to Patrick Calliari and agrees to retract the conditions outlined in that document until after the earn out period ends.

5.    SAP

Sargento will refrain from any further attempts to implement, integrate, train employees, or otherwise convert the Portionables plant in Bellingham, WA to SAP until after the earn out period ends.

6.    Portionables' Executive Chef

Sargento will acknowledge to Mr. Calliari in writing that Portionables' Executive Chef, Glenda Murray, will take supervision and direction only from Mr. Calliari. This will prevent occurrences like the recent example where Mr. Calliari's decision about Ms. Murray's attendance at a national restaurant trade convention was overruled by Sargento.

7.    Interaction with Portionables Customers

Every contact with a Portionables customer by Sargento's sales or marketing staff must first have Mr. Calliari's prior approval.

If these fundamental conditions are not fully satisfied, then Mr. Calliari is entitled to any and all remedies available to him under section 7(c) of the Employment Agreement, including continuing to receive full salary and benefits through 2012. Furthermore, if Mr. Calliari resigns for "Good Reason" he and the other Shareholders are entitled to a rebuttable presumption that they are entitled to receive the maximum earn out of $25 million pursuant to section 1.6(d) of the Stock Purchase Agreement. In short, this is a more than $27 million issue for Sargento if it fails to cure.

50916935.1

**CONFIDENTIAL**                                                     **CALLIARI000381**

Mr. Robert Henkle, Jr.
May 23, 2008
Page 6

We look forward to receiving your response within the allotted thirty day window.

Sincerely,

Jeffrey S. Miller

JSM:ked
cc:    Tim J. Filer

50916935.1

**CONFIDENTIAL**                                         **CALLIARI000382**

Mr, Robert Henkle, Jr.
May 23, 2008
Page 7


bcc:    Chris Osborn
        Patrick Calliari

50916935.1

**CONFIDENTIAL**                                    **CALLIARI000383**