UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PATRICK CALLIARI,

                                        Plaintiff,

        v.

SARGENTO FOODS, INC.,

                Defendant/Counterclaim Plaintiff,

        v.

PATRICK CALLIARI, et al.,

                        Counterclaim Defendants.

Case No. C08-1111MJP
(Consolidated with C08-1112MJP)

**ORDER ON MOTIONS FOR PARTIAL
SUMMARY JUDGMENT**

        This matter comes before the Court on three separate motions for partial summary

judgment.  Defendant and Counterclaim Plaintiff Sargento has filed a motion for partial

summary judgment on the issue of a "rebuttable presumption" contained the in the parties' Stock

Purchase Agreement.  (Dkt. No. 56.)  Counterclaim Defendants have filed motions for partial

summary judgment seeking dismissal of portions of Count One and the entirety of Counts Two

and Three of Sargento's Counterclaim.[1]  (Dkt. Nos. 45, 53.)  The Court has considered the

---

[1] The Court notes that the local rules discourage multiple motions for summary judgment.  LR
7(e)(3) ("The filing of multiple dispositive motions to avoid the page limits of this rule is strongly
discouraged and successive motions may be stricken.").  The Court suggests that, in future practice,
counsel for Counterclaim Defendants seek leave before filing multiple dispositive motions.

motions, the responses (Dkt. Nos. 58, 63, 69), the replies (Dkt. Nos. 62, 67, 71), and all other pertinent documents in the record. The Court ORDERS as follows:

1. The Counterclaim Defendants' motion for summary judgment on Sargento's misrepresentation and promissory estoppel claims, as well as portions of the breach of contract claim (Dkt. No. 45) is GRANTED.

2. Sargento's motion for summary judgment on the issue of a "rebuttable presumption" (Dkt. No. 56) is DENIED.

3. The Counterclaim Defendants' motion for summary judgment on Sargento's dairy law claim (Dkt. No. 53) is GRANTED.

The Court's reasoning is set forth below.

## Background

I. Procedural History

This matter originated as two cases filed by Plaintiff Patrick Calliari, former President of Portionables, in King County Superior Court. (See Calliari v. Sargento Foods, Inc., Case No. C08-1111MJP, Notice of Removal filed Jul. 23, 2008 ("Calliari I"); Calliari, et al., v. Sargento Foods, Inc., Case No. C08-1112MJP, Notice of Removal filed Jul. 23, 2008 ("Calliari II").) Defendant Sargento removed both matters to this Court and, on October 21, 2008, the Court consolidated both actions. (Dkt. No. 18.)[2] On January 30, 2009, Sargento filed its Counterclaim. (Dkt. No. 29.)

---

[2] Unless otherwise noted, all citations to docket entries refer to Calliari I, Case No. C08-1111MJP.

ORDER-2

II.  Factual Background

Plaintiff Patrick Calliari, a Washington resident, is the founder and former President of Portionables, Inc. ("Portionables").  (Dkt. No. 1, Ex. B ("Compl.") ¶ 8.)  Portionables, a Washington corporation, is a "specialty manufacturer of high quality sauces and other value-added food products" whose stock was held entirely by GCI Investments, Inc. ("GCI").  (Id. ¶ 7.) Portionables operates plants in both Bellingham, Washington and North Sioux City, South Dakota.  In addition to Calliari, Counterclaim Defendants Flora Damasio, Antionne Ioannides, Gayle Goodrich, Gillian Olson, Richard Olson, and Betty Crouse (collectively "Counterclaim Defendants" or "Shareholders") were the sole shareholders of GCI.  (Dkt. No. 29 ("Counterclaim") ¶ 13.)  Calliari is GCI's shareholder representative.  (Id.)  Defendant Sargento Foods, Inc. ("Sargento"), a Wisconsin corporation, is a "national packager and marketer of cheese products" and other food items.  (Id. ¶ 1.)

On April 30, 2007, Sargento entered into a Stock Purchase Agreement ("SPA") with the Shareholders to purchase all shares of GCI.  (See Fisher Decl., Ex. A (hereinafter "SPA").) Sargento purchased GCI in order to expand its product line to include the "frozen sauce pellets" Portionables manufactured.  (Gordy Decl. ¶¶ 2-3.)  These sauce pellets are used by other food manufacturers in their final products.  (Id. ¶ 2 (some Bertolli brand frozen pasta products use Portionables' sauce pellets).)  This dispute focuses on the performance of the terms of the SPA as well as the terms of Calliari's Employment Agreement with Sargento.  (Linehan Decl., Ex. 2 (hereinafter "EA").)

a.   Stock Purchase Agreement

Sargento paid the Shareholders an initial purchase price of $19 million and agreed to pay

an additional contingent payment of up to $25 million ("contingent payment" or "earn-out

payment") if Portionables met certain defined performance targets.  (SPA §§ 1.3, 1.5.)[3]  The

Court summarizes the factual allegations in the context of the relevant provisions of the SPA.

i.   Article II: Warranties

Section 2.14 provides that the equipment and plants Sargento purchased "are in all

material respects structurally sound, are in good operating condition and repair, and are adequate

for the uses to which they are being put" and are "reasonably sufficient for the continued conduct

of the Company's" operation.  (SPA § 2.14.)  Sargento alleges Calliari falsely represented the

production capacity of the South Dakota facility by claiming the plant could produce 40 million

pounds of sauce per year.  (See Dkt. No. 58 at 5, Second Linehan Decl., Ex. A at 36:1-8.)  After

the sale, Sargento concluded a more realistic figure for production capacity fell between 23 and

26 million pounds per year.  (Linehan Decl., Ex. A at 73:1-3.)  Shareholders respond by pointing

to a non-reliance provision of the contract, which provides that the purchaser "is not relying upon

any representation or warranty, express or implied . . . as to the accuracy or completeness of any

information regarding the company" except as set forth in the agreement.  (SPA § 4.9.)  The

contract also includes an integration clause which provides that the SPA "supersedes any other

agreements, whether written or oral, that may have been made or entered into by or among" the

parties.  (Id. § 9.9.)

---

[3] Portionables' performance was measured by earnings "before deduction of the expense of
interest, taxes, depreciation and amortization," or EBITDA, calculated according to generally accepted
accounting principles.  (Id. § 1.5(b).)

Section 2.12, entitled "Absence of Undisclosed Liabilities" warrants that Portionables has no "material liability or obligation" other than those articulated in certain schedules. (Id. § 2.12.) Section 2.8 provides that there are no "actions suits, proceedings, claims or investigations" instituted or pending other than those disclosed in the SPA. Sargento alleges Portionables failed to disclose the existence of potential liability resulting from a product recall involving inclusion of an egg white allergen. (Dkt. No. 58 at 7 (citing the "Chianti Cheese" litigation).) Unilever sold a product labeled "Bertolli Meatballs Pomodoro and Penne with Peppers and Onions in a Tomato Basil Sauce, Complete Skillet Meal for Two." (Fisher Decl., Ex. I.) Portionables manufactured the sauce for the product by incorporating an alleged tainted cheese supplied by Chianti Cheese, a Unilever vendor. (Id.) Though Unilever sued Chianti Cheese directly for damages associated with the recall, Chianti Cheese sought contribution from Portionables. (Fisher Decl., Ex. J.) Sargento settled the claim with Chianti Cheese for $5,000.00, but it seeks to recover $100,000.00 in litigation expenses that were not reimbursed by its insurer. (Fisher Decl., Ex. B (Gordy Dep.) at 43:7-24; Dkt. No. 58 at 17.) The Chianti Cheese suit was filed approximately one year after the SPA was executed. (Fisher Decl., Ex. I.)

In § 2.5(a), the sellers warranted that, at the time of sale, Portionables was not "currently in violation . . . of any statute, law, ordinance, treaty, rule, regulation or other legal requirement applicable of a Governmental Authority." Sargento complains that Portionables was not in compliance with South Dakota's laws and regulations governing dairy facilities. (Dkt. No. 63 at 3.) After the sale was complete, Portionables sought an export certificate for a "yogurt pellet" it hoped to distribute to Mexico, Japan, and Korea. (Miller Decl. Ex. E.) In pursuit of that certificate, it contacted representatives from the South Dakota Department of Agriculture

("SDDA"). (Id.) Though the SDDA initially responded that it only supervised plants

manufacturing products whose ingredients were "100% dairy," the organization later determined

that the Portionables facility would have to be licensed by the SDDA because it produced

products consisting of at least 50% dairy. (See Miller Decl., Exs. E-I.) The SDDA later

identified a number of shortcomings at the Portionables facility. (Linehan Decl., Ex. E.)

Sargento also complains that Portionables misrepresented the amount of leased space at

the South Dakota facility. (Second Linehan Decl., Ex. D (Linck Dep.) at 46:14-47:10.)

ii. Article I: Procedures

Section 1.5 sets out the method for calculating the contingent payment and describes how

the parties can object to Sargento's payment calculation. (SPA § 1.5.) In essence, disputes over

Sargento's calculation of the earn-out may be submitted to an Arbitrating Accountant on a

defined schedule. (Id. § 1.5(c).) The Court previously ruled that the objection procedures did

not require that this entire matter be submitted to arbitration. (Dkt. No. 20.)

Section 1.6 contemplates that Portionables would "be operated in a manner consistent

with past practice and under operational control of [Calliari]." (SPA § 1.6(a).) It also provides a

detailed scheme by which either party can submit disputed issues to mediation. (Id. § 1.6(c).)

Finally, the provision identifies three hypothetical scenarios whose occurrence would trigger a

rebuttable presumption that the Shareholders are entitled to the maximum possible contingent

payment. (Id. § 1.6(d).)

b. Calliari's Employment

Pursuant to the SPA, Calliari retained operational control over Portionables during the

earn-out period. (SPA § 1.6(a).) Calliari's employment contract provided that he would remain

ORDER-6

as president of Portionables until December 31, 2012.  (See EA § 2.)   Like the SPA, the EA

indicates Calliari "shall have operational control of the Portionables' business."  (EA § 3.)

The parties describe in some detail the events that culminated in Calliari's termination,

but most of these facts are not relevant to the motions at hand.  On April 15, 2008, Calliari's

attorney sent a letter to Sargento's counsel invoking the disputed matters provision of § 1.6(c).

(Linehan Decl., Ex. 4.)  On May 23, 2008, Calliari's counsel sent a letter indicating Calliari

intended to invoke the "Termination for Good Reason" clause of the EA (§ 7(a)(ii)) unless

Sargento remedied its alleged material breaches which deprived him of operational control.

(Goldfarb Decl., Ex. 12.)  One month later, on June 23, 2008, Calliari sent a notice of

termination and indicated his intent to invoke the maximum contingent payment presumption of

the SPA.  (Linehan Decl., Ex. 5.)

c.   Causes of Action

Calliari's complaint arising out of his operational control dispute asserts claims for: (1)

breach of contract (Calliari I Compl. ¶¶ 18-22); (2) breach of the implied duty of good faith and

fair dealing (Id. ¶¶ 23-28); (3) declaratory judgment that he had "Good Reason" for terminating

his employment with Sargento (Id. ¶¶ 29-33); and (4) injunctive relief seeking to prevent

Sargento from violating RCW 49.52.050 to prevent Sargento from depriving him of his wages

(¶¶ 34-40).   Calliari's Shareholders' complaint alleges the following causes of action: (1) breach

of contract (Calliari II Compl. ¶¶ 21-26); (2) breach of the implied duty of good faith and fair

dealing (Id. ¶¶ 27-32); and (3) declaratory judgment seeking a finding that the Shareholders are

entitled the maximum Contingent Payment under the SPA (Id. ¶¶ 33-37).

ORDER-7

Sargento asserts a number of causes of action in its Counterclaim: (1) breach of the SPA contract because Portionables misrepresented (a) the legal status of the Sioux City plant, (b) the plant's production capacity, and (c) the nature of Portionables' liabilities (Counterclaim ¶¶ 30-33); (2) promissory estoppel (Id. ¶¶ 34-38); (3) misrepresentation (Id. ¶¶ 39-45); (4) declaratory judgment that Calliari did not have "Good Reason" to terminate his employment (Id. ¶¶ 46-49); (5) breach of the employment agreement claiming Calliari terminated his employment without good cause (Id. ¶¶ 50-55); and (6) conversion against Calliari for wrongfully taking company funds and property (Id. ¶¶ 56-60).

## Discussion

### I. Summary Judgment Standard

Summary judgment is not warranted if a material issue of fact exists for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996). The underlying facts are viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317,

323-24 (1986).  To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial.  Id. at 324.

II. Counterclaim Defendants' Motion on Sargento's Reliance Claims

The Counterclaim Defendants seek dismissal of Sargento's (1) misrepresentation claim, (2) promissory estoppel claim, and (3) the portions of the breach of contract claim relating to Portionables' production capacity and the Chianti Cheese litigation.  (Dkt. No. 45 at 2-3.)

a.  No Reliance Clause

The Shareholders argue Sargento's misrepresentation and promissory estoppel claims should be dismissed because of the SPA's no reliance clause.  (Dkt. No. 45 at 11.)  To prevail on either a misrepresentation or promissory estoppel claim, a claimant must demonstrate justifiable reliance on a defendant's promise or representation.  Uznay v. Bevis, 139 Wn. App. 359, 369-70 (2007) (promissory estoppel); Carlile v. Harbour Homes, Inc., 147 Wn. App. 193, 204-05 (2008) (intentional misrepresentation); Haberman v. Wash. Public Power Supply Sys., 109 Wn.2d 107, 161-62 (1987) (negligent misrepresentation).  The Shareholders reference a number of instances where courts have dismissed claims based on fraud theories where a contract provided a no reliance clause.  See Vigortone AG Products, Inc. v. PM AG Products, Inc., 316 F.3d 641, 644-45 (7th Cir. 2003) (Posner, J.); FMC Technologies, Inc. v. Edwards, No. C05-0946JCC, 2007 WL 1725098 at *4-5 (W.D. Wash. 2007) (Coughenour, J.) (no reliance clause embedded within an integration clause sufficient to preclude tort relief).

A court interpreting a contract according to Washington law must follow the "objective manifestation theory of contracts" under which it must "attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed

subjective intent of the parties." <u>Hearst Commc'ns, Inc. v. Seattle Times Co.</u>, 154 Wn.2d 493, 503 (2005). In its entirety, the no reliance clause reads:

> 4.9 <u>No Reliance</u>. NOTWITHSTANDING ANY ACCESS, MEETINGS, AND DISCUSSIONS OR ANY OTHER PROVISION OF THIS AGREEMENT, THE PURCHASER ACKNOWLEDGES THAT IT HAS NOT RECEIVED AND IS NOT RELYING UPON ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING THE COMPANY OR THE SUB OR THE BUSINESS FURNISHED OR MADE AVAILABLE TO THE PURCHASER OR ITS REPRESENTATIVES, EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE 2 OF THIS AGREEMENT.

(SPA § 4.9 (capitalization in original).) Sargento acknowledges that its misrepresentation claim is an alternative to its underlying contract claim and does not dispute the Shareholders' summary of the law. (Dkt. No. 58 at 9.) Instead, Sargento insists dismissal of the misrepresentation claims would be erroneous because of (1) the language of § 4.9 and (2) the common law torts clause in § 9.12.

First, Sargento argues that the "as to the accuracy or completeness of any information regarding the company" language precludes dismissal of the misrepresentation claim because representations about the factory's production capacity are not completeness or accuracy representations. (Dkt. No. 58 at 15-16.) There is an obvious tension between this argument and the statement in the preceding paragraph of Sargento's brief, which observes "Section 4.9 may well preclude Sargento from relying on new or different warranties than those in Article 2." (<u>Id.</u> at 15.) Sargento's argument is misplaced, particularly in light of its own argument that "Section 2.14 is a representation and warranty that 'speaks specifically to capacity' and it is obviously found in Article 2." (<u>Id.</u> at 15 (quoting Mot.).) If the Shareholders provided some "other kinds of warranties" about the plant's production capacity, they would necessarily implicate the

ORDER-10

accuracy and completeness of the Article 2 warranty. The plain language of the no reliance

clause precludes the misrepresentation and estoppel claims.

Second, Sargento claims § 9.12 expressly permits extra-contractual tort suits. (Dkt. No.

58 at 14.) That section provides, in pertinent part: "The parties agree that nothing in this

Agreement shall be construed to limit or negate the common law of torts or trade secrets where it

provides the Purchaser with broader protection than that provided herein." (SPA § 9.12.) For

this clause to apply, Sargento would have to identify an applicable "broader protection" viable

under tort law. However, the clause cannot be read so broadly as to permit any tort suit without

regard to Sargento's other agreements. Sargento's misrepresentation and promissory estoppel

claims are simply not viable in light of the company's express disclaimer of reliance. (SPA

§ 4.9.)[4]

In sum, Sargento has not identified any representation that is not subject to Article 2 on

which it could claim reliance. Because reliance is an element of both causes of action and

because Sargento disclaimed reliance in § 4.9, Counterclaim Plaintiff's Second and Third claims

must be dismissed.

b. Promissory Estoppel

The Shareholders also move to dismiss the promissory estoppel claim because the

doctrine has limited applicability in the presence of a viable contract. (Dkt. No. 45 at 16.)

Sargento does not respond to the argument. The Washington Supreme Court has stated that the

"purpose of promissory estoppel is to make a promise binding, under certain circumstances,

---

[4] The Court observes, however, that the Shareholders' argument based on § 9.9's integration
language is misplaced with respect to the tort claims. Integration clauses implicate the parol evidence
rule, but do not bar fraud suits based on statements not contained in the contract. See FMC Technologies,
2007 WL 1725098 at*4.

without consideration in the usual sense of something bargained for and given in exchange."

Klinke v. Famous Recipe Fried Chicken, Inc., 94 Wn.2d 255, 261 n.4 (1980) (citations and internal quotation omitted).  There is no question both sides gave consideration for the SPA and agreed to its terms.  (See SPA.)  The Shareholders' argument thus provides an independently sufficient justification for dismissing the promissory estoppel claim.

c.   Misrepresentation and Economic Loss

Sargento disclaims the applicability of the economic loss rule because the SPA's common law of torts clause.  (Dkt. No. 58 at 14.)  Under Washington law, the economic loss rule exists "to hold parties to their contract remedies when a loss potentially implicates both tort and contract relief."  Alejandre v. Bull, 159 Wn.2d 674, 681 (2007) (further noting that tort law was not developed to compensate for losses arising out of breaches of an agreement).  The Court's "key inquiry" looks to the nature of the loss, differentiating economic loss from personal injury or injury to property.  Id. at 684.  As analyzed above, Sargento has not presented an injury cognizable in tort that differs from its contract-based injury.  The economic loss rule thus provides a related rationale for dismissing the misrepresentation claim.

d.   Breach of Contract and Production Facilities

The Shareholders move to dismiss a portion of Sargento's first counterclaim for breach of contract, which alleges "Portionables did not have the capacity necessary to meet projected sales to its customers."  (Counterclaim ¶ 31.)  Sargento complains the Shareholders are liable because Calliari represented that the South Dakota plant could manufacture 40 million pounds of frozen sauce per year, when it could only in fact produce 23 to 26 million pounds.  (Dkt. No. 58 at 10.)

ORDER-12

Section 2.14 of the SPA provides that the Portionables' equipment and facilities "are in good operating condition and repair, and are adequate for the uses to which they are being put." Sargento claims that § 2.14 cannot simply be interpreted to mean that the equipment was sufficient to manufacture the amount of sauce produced at the time of sale because such an interpretation would render the provision either a "tautology" or an "illusory promise." (Dkt. No. 58 at 11.) Neither argument is persuasive. The term "adequate" does not make the phrase "for the uses to which they are being put" redundant and it is therefore not a tautology. Likewise, an agreement to purchase a factory producing some quantity of frozen sauce, even if that quantity is unspecified, is by no means illusory.

Sargento further suggests that the clause must incorporate "the parties' common understanding of what the plant's actual production capacity . . . was" and it seeks to describe that common understanding by introducing extrinsic evidence. (Dkt. No. 58 at 12-13.) However, § 2.14 is not ambiguous simply because it does not specify a certain quantity of frozen sauce. It would therefore be inappropriate for the Court to incorporate such extrinsic evidence. Furthermore, Sargento's suggestion ignores the integration clause (§ 9.9), which limits the evidence available to the parties when a dispute arises over the contracts' interpretation. See FMC Technologies, 2007 WL 1725098 at *4.

The Shareholders' motion invites Sargento to provide the textual basis for its production capacity claim. (Dkt. No. 45 at 21.) Sargento has failed to articulate a rationale that can be squared with § 2.14 and other pertinent provisions of the SPA. The contract counterclaim must be dismissed with respect to the production capacity allegation.

e.   Breach of Contract and Litigation Liabilities

The Shareholders also move to dismiss the portion of the contract counterclaim relating to the Chianti Cheese litigation.  (Dkt. No. 45 at 18.)  Sargento premises this claim on §§ 2.8 and 2.12 of the SPA, but has not presented evidence that would create a triable issue of fact.  The Shareholders also move to dismiss the claim to the extent it implicates § 2.23 and Sargento appears to concede the issue by failing to respond.

Section 2.8 guarantees that there are no undisclosed "actions, suits, proceedings, claims or investigations formally instituted and pending or, to the Knowledge of the Disclosing Parties, threatened against or specifically involving or affecting the Company . . . ."  (SPA § 2.8.)  The Shareholders present a straightforward sufficiency of the evidence challenge, arguing that Sargento has not come forth with evidence that the Shareholders had any knowledge about a threatened claim.  To meet its burden under Celotex, Sargento references three items of evidence, none of which create a material issue of fact as to the Shareholders' knowledge of the possibility of liability.  First, it offers a copy of complaint filed against Chianti Cheese.  (Dkt. No. 58 at 7; Fisher Decl., Ex. I.)  The complaint was filed in January 2008, several months after the SPA had been executed, and it cannot be interpreted to provide any insight into the Shareholders' knowledge before the sale.  (Fisher Decl., Ex. I.)  Second, Sargento offers the deposition testimony of Mike Gordy, a division President at Sargento.  (Second Linehan Decl., Ex. A at 46:8-25.)  The testimony provided merely demonstrates Sargento's belief that the shareholders "should have anticipated that there would be a claim" while acknowledging that

there was no actual or threatened claim at the time of sale.  (<u>Id.</u> at 46:10-19.)[5]  Third, Sargento

offers a declaration from Gordy, who makes factual claims about notices received by the

Shareholders and investigations conducted by the Food and Drug Administration before the sale.

(Gordy Decl. ¶ 10.)  The declaration is defective because it does not establish the basis for

Gordy's knowledge and is ultimately a self-serving repetition of allegations.  <u>See</u> Fed. R. Civ. P.

56(e)(1).  Sargento simply has not met its burden to present evidence that would create a triable

issue of fact on this contract claim.  <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 324.

The Shareholders may be liable under § 2.12 if they failed to disclose "any material

liability or obligation, secured or unsecured."  (SPA § 2.12.)  Once more, Sargento offers no

specific reference to any evidence indicating that anyone knew the Chianti Cheese litigation was

a material liability at the time of closing.  (Dkt. No. 58 at 19 (focusing on post-closing costs).)

As with its § 2.8 claim, Sargento has failed to carry its burden necessary to proceed beyond

summary judgment.

The Shareholders are entitled to dismissal of those portions of the contract counterclaim

that assert liability based on the Chianti Cheese litigation.

      f.   Amount of Leased Space

Sargento argues separately that both its contract and tort claims regarding the amount of

leased space in the South Dakota facility should survive summary judgment.  (Dkt. No. 58 at 20-

22.)  The Shareholders acknowledge they have not moved for summary judgment on Sargento's

allegations relating to the amount of leased space.  (Dkt. No. 62 at 10.)  The duplicative tort

---

     [5] The Court notes that, although Sargento cites page 47 of the Gordy deposition, they have not
attached it as part of the Second Linehan Declaration.  (<u>See</u> Dkt. No. 58 at 7, 18.)  The relevant pages
were included in the Fisher Declaration.  (Fisher Decl., Ex. B)

claim is properly dismissed for the reason that the no reliance clause and economic loss rule preclude the misrepresentation claim.

The Shareholders are entitled to summary judgment on Sargento's promissory estoppel and misrepresentation claims as well as the portions of Sargento's contract claim relating to production capacity and the Chianti Cheese litigation.

III. Sargento's Motion on the "Rebuttable Presumption"

In the second motion before the Court, Sargento moves for summary judgment on the applicability of a "rebuttable presumption" that the Shareholders are entitled to a $ 25 million contingent payment. (Dkt. No. 56.) Sargento's motion does not challenge the sufficiency of the Shareholders' evidence in demonstrating Calliari terminated his employment for Good Reason. Indeed, Sargento recognizes this will be a disputed issue at trial. (Dkt. No. 71 at 6, n.3) Instead, Sargento moves for a determination that, even if the Shareholders establish Calliari's termination was for a "Good Reason," the rebuttable presumption does not apply. (Dkt. No. 56 at 11-12.) In the absence of disputed facts, a court may determine the "construction or legal effect" of a contract as a matter of law. <u>Yeats v. Estate of Yeats</u>, 90 Wn.2d 201, 204 (1978). The Court's analysis continues to be guided by the "objective manifestation" principles outlined above.

There are two provisions that are most relevant to the disposition of this motion. First, Section 1.6(c), entitled "Disputed Matters," provides a reticulated scheme the parties may pursue if "a dispute arises related to the operation of the Company." In essence, if the parties could not reach agreement within a short time frame, they could submit the matter to a mediator who would issue written recommendations. (SPA § 1.6(c).)

ORDER-16

Second, § 1.6(d) offers three scenarios that would give rise to a rebuttable presumption the Shareholders are entitled to a maximum contingent payment, though only the first two are at issue in this dispute. The presumption is triggered if either:

> "(i) the employment of the Shareholders' Representative as an executive of [Sargento] and/or President of [Portionables] is terminated, directly or indirectly, by the Purchaser without Cause or by [Calliari] for Good Reason (in each case, as defined in [Calliari's] Employment Agreement with [Sargento]);
> [or]
>  (ii) the authority or operational control of [Calliari] with respect to the operations of the business of [Portionables] is inappropriately and materially reduced and is not restored within a reasonable period of time after receiving a written recommendation to do so from the mediator under subsection [1.6(c)] …"

(SPA § 1.6(d).) The EA defines "Good Reason" as "a termination of the Executive's employment by the Executive following a material breach by the Corporation of any provisions of this Agreement, which failure continues for a period of 30 days after the Corporation's receipt of written notice from Executive specifying the details of such alleged failure." (EA § 7(a)(ii).) The EA also provides that Calliari "shall have operational control of the Portionables' business, subject to the limitations in the Purchase Agreement." (Id. § 3.) For the purposes of this motion, there is no dispute that Calliari asserted breaches of the EA and SPA based on infringement on his operational control over Portionables. (Linehan Decl., Ex. 6 (May 23, 2008 letter).)

The question before the Court is whether § 1.6(d)(ii) and § 1.6(c) preclude the applicability of the rebuttable presumption when Calliari claims to have terminated his employment for loss of operational control under § 1.6(d)(i) for breach of the material terms of the Employment Agreement.

Sargento argues that disputes over operational control may only trigger the rebuttable presumption if they arise through the mechanism described in §§ 1.6(c) and 1.6(d)(ii). In Sargento's view, if Calliari could raise the presumption by unilaterally determining the terms of the EA had been breached, the mediation provisions in §§ 1.6(c) and 1.6(d)(ii) would be superfluous. Thus, Sargento proposes § 1.6(d)(ii)'s reference to § 1.6(c)'s mediation procedures limits § 1.6(d)(i)'s "Good Reason" language to disputes other than those relating to operational control. (Dkt. No. 56 at 15-17.)

In contrast, the Shareholders observe that § 1.6(d)(i) specifically adopts the "Good Reason" definition in the EA, which provides a breach may arise under "any provision" of the Employment Agreement. It is undeniable that a number of the provisions in the EA address Calliari's operational authority. (See EA §§ A (recital), 3, 7.) A determination that disputes over operational control could only arise under 1.6(d)(ii) runs the danger of reading § 1.6(d)(i) out of the contract. The SPA subsection's use of "or" suggests that §§1.6(d)(i) and 1.6(d)(ii) are equal alternatives. Thus, the Shareholders' argue that §§ 1.6(d)(i) and 1.6(d)(ii) provide parallel paths to the rebuttable presumption. (Dkt. No. 69 at 14-15.) Further, the Shareholders observe that § 1.6(d)(ii) differs from § 1.6(d)(i) by allowing Calliari to regain operational control without taking the drastic step of resigning. (Dkt. No. 69 at 14, n. 51.)

In the Court's view, the Shareholders' interpretation is more in tune with the language of the contract. Sargento's suggestion that "loss of operational control may, in some cases, constitute a breach" of the EA without triggering the rebuttable presumption is at odds with the plain language of § 1.6(d)(i), which does not differentiate among the types of termination for "Good Reason." (Dkt. No. 71 at 5.) This interpretation does not eviscerate the contract's

ORDER-18

mediation provisions as Sargento suggests.  Indeed, if Calliari had wanted to remain at Portionables while settling the dispute over operational control, his only available avenue would be to follow the scheme outlined in § 1.6(c).

Sargento's motion on the rebuttable presumption must therefore be denied.  If Calliari terminated his employment for "Good Reason," he may well be entitled to the rebuttable presumption for the purposes of the earn-out calculation.

IV. Shareholders' Motion on Sargento's Dairy Law Claim

The final dispositive motion before the Court is the Shareholders' motion for partial summary judgment on the portion of Sargento's Counterclaim alleging breach of contract related to Portionables' compliance with South Dakota's dairy laws.  (Dkt. No. 53 at 2.)

Sargento's dairy law claim asserts the breach of three contractual provisions.  Section 2.5(a) of the SPA warrants that, at the time of sale, "neither the Company nor the Sub is currently in violation . . . of any statute, law, ordinance, treaty, rule, regulation or other legal requirement applicable of a Governmental Authority."   Section 2.5(b) provides the related warranty that, to the sellers' knowledge, "no event has occurred or circumstance exists that . . . may constitute or result in a violation by the Company . . . ."   The SPA defines "knowledge" as "actual knowledge of the party and knowledge that would have been obtained by inquiry of sources reasonably accessible to such party."  (SPA § 8.1.)  Section 2.14 warrants that Portionables' equipment is "reasonably sufficient for the continued conduct" of the company.

Under § 40-32-4 of the then-applicable South Dakota Codified Laws, "any person selling milk or milk products, shall, before beginning business, obtain from the secretary a license for each place of business."  South Dakota C.L. § 40-32-4 (2004).  Furthermore, South Dakota

Administrative Regulation 12:17:06:01 provides "[l]icensed manufacturing grade dairy plants shall meet the requirements set forth" by a USDA regulation. Neither provision defines "milk product." The Parties agree that federal ordinance offers a definition of "Grade A" milk product, but that definition does not govern Portionables' products. (Dkt. No. 63 at 7.) Indeed, the apparent absence of a relevant definition of "milk product" is at the heart of this dispute.

The Shareholders observe that the relevant authorities did not decide to include Portionables' "yogurt pellet" under the definition of "milk product" until long after the sale to Sargento was complete. Calliari testified that, Portionables had no knowledge prior to the sale that the plant in South Dakota needed a dairy license. (Miller Decl., Ex. D at 127:5-24.) There is also no dispute that the SDDA did not decide to assert jurisdiction over plants producing less than 100% dairy products until 15 months after the execution of the SPA. (Second Miller Decl., Ex. 1 (Kurtenbach Dep.) at 42:4-13.) The record demonstrates that when Darwin Kurtenbach, a Program Administrator for the SDDA, first responded to Portionables' request, he stated his belief the SDDA's only "reason to be in the plant is if the yogurt product was 100% dairy." (Miller Decl., Ex. E (February 26, 2008 email); Second Miller Decl., Ex. 1 at 13:14-25.) Similarly, Kurtenbach's July 7, 2008 letter to Sargento frames the licensure issue as an open question. (Miller Decl. Ex. I (purpose of visit to facility was "to determine if your facility would be required to be licensed . . .").)[6] Kurtenbach recognized that developing a new definition for "milk product" would be complicated and, at one point in the process, stated "I am glad everyone is muddying the water, that way when the all the mud settles to the bottom we will have a clean

---

[6] Sargento has acknowledged that dairy law was underdeveloped in South Dakota. (Miller Decl., Ex. F (April 14, 2008 email).)

and clear product." (Miller Decl., Ex. H (July 11, 2008 email).) The SDDA's definition of "milk product" as encompassing items containing 50% dairy did not exist until the SDDA reached an internal legal determination sometime after February 2008. (Second Miller Decl., Ex. 1, 82:11-83:18.) These undisputed facts demonstrate that, at the time of the sale in April 2007, Portionables could not plausibly have had knowledge of the applicability of the "milk product" licensure law because the SDDA had not yet defined the term to include products containing less than 100% dairy.[7]

Sargento asserts that a material issue of fact exists because of Kurtenbach's own speculation about the existence of a violation in April 2007. They repeatedly cite one passage of Kurtenbach's deposition, where he "guesses" that the facility may have been in violation at the time of sale because Portionables had no license:

> Q: Is it the SDDA's position that the Portionables plant in North Sioux City was in violation of any South Dakota statute, regulation, or other standard before April 30, 2007?
> A: I guess I'd have to say yes because they wasn't [sic] licensed.
> Q: You are guessing, you said I have to …
> A: Well, they are not licensed so they was [sic] in violation. They was [sic] not licensed by the state of South Dakota, so they would have been in – there would have been some violations there."

(Linehan Decl., Ex. A at 20:22-21:6.) This portion of Kurtenbach's testimony simply presents a speculative legal conclusion; it does not present any statement of fact that would bear on Portionables' knowledge at the time of sale.

Sargento has not put forth any evidence that would create a material issue of fact on its claim that the Shareholders had knowledge of potential SDDA violations prior to the sale. As

---

[7] The parties also dispute the applicability of certain responses to Portionables' requests for admission. (Dkt. No. 67 at 4.) At this stage, the Court draws the inference in favor of Sargento and does not find that the Shareholders are entitled to summary judgment because of their responses to the RFAs.

such, its claim under § 2.5(a) must be dismissed.  Nor has Sargento presented any evidence of the Shareholders' knowledge of an event that "may constitute or result in a violation" in violation of § 2.6.  In light of the then-in-use definition of "milk product," Sargento cannot use the South Dakota dairy laws as a basis for a claim under § 2.14 that Portionables' equipment was not "reasonably sufficient for the continued conduct" of the company.   The Shareholders are entitled to summary judgment on this claim.

South Dakota law further limits the retroactive application of new rules.  S.D.C.L. § 1-26-8.3 ("If any rule is to have retroactive effect, the burden is on the agency to show that the retroactivity is authorized by law . . . .").   Without taking any position on whether the definition of "milk product" has been appropriately promulgated by the SDDA, there is no evidence before the Court that would justify a retroactive application of the 50% dairy definition of "milk product" to Portionables at the time of sale.  The definition's presumptive prospective application provides an additional basis to grant the Shareholders' motion.  (Dkt. No. 53 at 20.)

The Court's ruling in favor of the Shareholders on this motion also implicates one of the motions in limine that have been filed.  (Dkt. No. 73.)  In that motion, the Shareholders acknowledge that, if they prevail on their motion for summary judgment, the Court need not decide whether to exclude the testimony of Tim Tolley.  (Id. at 2.)  The Court thus finds as moot the Shareholders' motion in limine regarding the potential testimony of Tim Tolley.

### Conclusion

Sargento has failed to present evidence to survive summary judgment on a number of its claims.  Accordingly, the Shareholders' motions for partial summary judgment (Dkt. Nos. 45, 53) are GRANTED.  Sargento's misrepresentation and promissory estoppel claims are

dismissed. Sargento's contract counterclaims based on (1) Portionables' production capacity, (2) the Chianti Cheese litigation, and (3) South Dakota's dairy laws are also dismissed. The Court further DENIES Sargento's motion on the applicability of the "rebuttable presumption." (Dkt. No. 56.) Finally, the Court finds as MOOT the Shareholders' motion in limine (Dkt. No. 73) seeking the exclusion of testimony from Tim Tolley. It is SO ORDERED. The Clerk is directed to transmit a copy of this Order to all counsel of record.

DATED this 10th day of November, 2009.

Marsha J. Pechman
United States District Judge