<pre>
 1                 UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON AT SEATTLE
   _____
 3   PATRICK CALLIARI,              )
     individually and as           )
 4   Representative of the         )   Case No. C08-1111MJP
     Former Shareholders of GCI    )   (Consolidated with
 5   INVESTMENTS, INC., a          )   C08-1112MJP)
     Washington Corporation,       )
 6                                 )   SEATTLE, WASHINGTON
        Plaintiff,                 )   December 8, 2009
 7                                 )
     v.                            )
 8                                 )
     SARGENTO FOODS, Inc.,         )
 9                                 )
                                   )
10   Defendant/Counterclaim        )
     Plaintiff,                    )
11                                 )
     v.                            )
12                                 )
     PATRICK C. CALLIARI, et       )
13   al.,                          )
                                   )
14      Counterclaim Defendants.   )
   _____
15               VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE MARSHA J. PECHMAN
16              UNITED STATES DISTRICT JUDGE
   _____
17   APPEARANCES:

18    For the Plaintiff:    MR. MICHAEL GOLDFARB
                            MR. BRAD FISHER
19
      For the Defendant:    MR. ROBERT SULKIN
20                          MR. DAVID LINEHAN

21
      Reported by:          Kari McGrath, CCR, RMR, CRR
22                          Federal Court Reporter
                            206.370.8509
23                          kari_mcgrath@wawd.uscourts.gov

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by Reporter on computer.
</pre>

EXAMINATION INDEX

EXAMINATION BY                                                    PAGE
  **ANTOINE IOANNIDES**   CONTINUED DIRECT EXAMINATION        16
                          BY MR. FISHER
                          CROSS-EXAMINATION                   24
                          BY MR. SULKIN
                          REDIRECT EXAMINATION                44
                          BY MR. FISHER
  **LOUIS GENTINE**       DIRECT EXAMINATION                  46
                          BY MR. GOLDFARB
                          CROSS-EXAMINATION                  146
                          BY MR. SULKIN

EXHIBIT INDEX

EXHIBITS ADMITTED                                                PAGE
    233                                                          17
    13                                                           21
    15                                                           51
    2                                                            89
    4                                                           116
    20                                                          117
    8                                                           120
    24                                                          122
    16                                                          124
    5                                                           129
    34                                                          131
    14                                                          132
    58                                                          136
    59                                                          137
    1                                                           156
    215                                                         174

```
 1                        PROCEEDINGS
 2   ─────────────────────────────────────────────────────
 3        THE COURT:  Good morning.  Please be seated.
 4   Counsel, a couple of things on your time.  You start out with
 5   825 minutes.  The plaintiffs used 75 minutes, and so they
 6   have a balance of 750.  The defendants have a balance of 768.
 7      I have the corrected page from our jury instructions for
 8   No. 19.  What I intend to do is ask that the jurors hand in
 9   No. 19, and we will substitute with a new instruction to
10   correct the typographical error.
11        MR. LINEHAN:  Thank you, your Honor.
12        THE COURT:  Before we bring our jurors out, are there
13   any other issues we need to take care of?
14        MR. FISHER:  There are two stipulations, your Honor,
15   that we would like to put in the record before we begin
16   today.
17        THE COURT:  All right.
18        MR. FISHER:  But first I looked up this nuance
19   argument on Rule 801.  The parties have agreed that exhibits
20   that have been identified by the opposing party may be used
21   in the case.  So, in other words, the plaintiffs can use
22   anything on defendants' exhibit list, and the defendants can
23   use anything identified by the plaintiffs on their list.
24   We're stipulating to --
25        THE COURT:  What does "use" mean?  Are you talking
```

1   about admitted?  Are you talking about authentic?

2          MR. FISHER:  My understanding is that we're talking

3   about admitted.  If the opposing party elects to use an

4   exhibit that the other party has designated, then the first

5   box would be checked on those.

6          THE COURT:  So you are modifying your pretrial order?

7          MR. SULKIN:  No, your Honor.  I'm just not -- to make

8   it much more simple, I won't object when he tries to put in

9   an exhibit that's on my list already.  It will just come in,

10  so we won't bother the court with that.  This was one of the

11  horse-trading issues we talked about.

12         THE COURT:  Well, Mr. Sulkin, I'm not bothered by it.

13         MR. SULKIN:  Oh, okay.  I'm sorry.

14         THE COURT:  So essentially you are negating your

15  pretrial order, because you went through and classified

16  various documents, including the one that we were talking

17  about yesterday, 233, I believe, as authentic but

18  inadmissible.

19         MR. FISHER:  Your Honor, I think what we're doing is

20  waiving any of our objections to our own exhibits.  We

21  designated 1 through 61.  The stipulation is that we are

22  waiving any objections to the admissibility of those.  The

23  defendants are waiving any objections to the admissibility of

24  their 200 through 288, if we elect to use them.

25         THE COURT:  So let me try again, Mr. Fisher.  You are

1  negating your pretrial order with this stipulation?

2       MR. FISHER:  No, your Honor.  We understood we were

3  stipulating to our own exhibits under Local Rule 16(I) or

4  16(H).  So we understood that we were not objecting to our

5  own exhibits and that --

6       THE COURT:  Why would you object to your own

7  exhibits?

8       MR. FISHER:  I wouldn't, your Honor.  I've never

9  objected to our own exhibits.  I think the point was,

10  yesterday the dispute about 233 was, it was on their list, we

11  wanted to use it, and then they objected to it as hearsay.

12  And it's their own exhibit.

13      And the agreement that was reached to resolve these issues

14  was that we were both agreeing not to object to our own

15  exhibits.  So if there's an objection to admissibility in our

16  respective lists, those are reserved.

17      So if Mr. Sulkin has objected to something on the

18  plaintiffs' list, we would still have to lay the foundation

19  for the admissibility of that document, and vice versa.

20       THE COURT:  Mr. Fisher, I have not understood

21  anything you just told me.  Let's pull up a pretrial order

22  and start from there.  Is the pretrial order still operative?

23       MR. FISHER:  It is in our view, your Honor.

24       THE COURT:  All right.  Then let's use 233 as an

25  example.  233 was the e-mail that we were talking about with

1    the witness yesterday.

2            MR. FISHER:  Correct.

3            THE COURT:  In the pretrial order, it indicates that

4    it is authentic but it is inadmissible.  Okay.  That means to

5    me that you don't have to lay the foundation that it is in

6    fact an accurate e-mail, but you do have to show that it is

7    admissible.  And hearsay would be a valid objection to the

8    document.

9        So what is different about your agreement?

10           MR. FISHER:  The difference is, your Honor, that

11   Mr. Sulkin and Sargento have agreed that, because that is one

12   of the exhibits that they selected for trial, that they are

13   not objecting to the use of that exhibit.

14           THE COURT:  So they are now moving everything that

15   they put into the authentic but inadmissible category into

16   the agreed admissibility category?

17           MR. FISHER:  No, your Honor, because if we don't want

18   to use -- if we don't use the exhibit, but they want to use

19   the exhibit, our objections to admissibility would still be

20   in place and vice versa.

21       I think we can -- maybe, I think, for the instant purposes

22   here, the consequences of this is that there is no objection

23   to the use and admissibility of 233 for purposes of

24   completing Mr. Ioannides.

25           THE COURT:  Well, that's different than what we

1   started out with.  If you want to admit 233, Mr. Sulkin, all

2   he has to do is, you have to offer and he has to withdraw his

3   objection.

4         MR. FISHER:  Okay.  And we were trying to do that in

5   one sweep with respect to our respective exhibits.  But we

6   can do it that way, certainly.

7         THE COURT:  Okay.  Mr. Sulkin, can you try here?

8   Because I'm not understanding what your agreement is.

9         MR. SULKIN:  Okay.  Your Honor, if you look at 233,

10   this is a document that we listed that we wanted to use.

11   They objected to our use of it, okay?  There is no place on

12   this list, pretrial order, for our objecting to their using

13   it.

14         THE COURT:  I see.  All right.

15         MR. SULKIN:  I'm trying to cut to it.  So when they

16   offered it, it is hearsay.  We've agreed that if I listed

17   something on my list, they can use it, okay, and vice versa.

18   If they list something on their list, I can use it.  We're

19   not changing any of the objections the other way around.  So

20   that was sort of the horse-trading deal that we made.  I hope

21   that's clear.

22         THE COURT:  All right.  I get it.  Let's bring in our

23   jury.

24         MR. FISHER:  Your Honor, could we put one other

25   stipulation on the record before we begin?

1           THE COURT:  Okay.

2           MR. FISHER:  We've had discussions about the issue of

3    damages in the event the jury finds for the plaintiff on the

4    employment claim under the employment agreement.  And the

5    agreement of the parties is that the issue of the amount of

6    damages on the contract claim under the employment agreement

7    would be decided by the court on the following basis:  The

8    parties stipulate that if there is discounting, that it would

9    take place at 5 percent; that prejudgment interest, if any,

10   of course, is for the court; and the issue that Sargento is

11   reserving is whether, if there was a breach of that

12   agreement, the payment stream from today through 2012, they

13   are reserving the right to argue that that should not be

14   discounted to present value and paid in a lump sum now, but

15   that they should be able to resume making periodic payments

16   under that agreement if the jury finds them to be in breach.

17        So the parties are in agreement that those things would be

18   for the court at the end.  So the jury will not be asked to

19   put a number on the contract employment claim.

20           THE COURT:  Mr. Sulkin.

21           MR. SULKIN:  That's correct, your Honor.

22           THE COURT:  All right.

23           MR. LINEHAN:  Your Honor, we have one other point we

24   would like to raise before the jury comes in.

25           THE COURT:  All right.

1      MR. LINEHAN:  And it relates to the deposition

2  transcript of Karl Linck, which I understand that the

3  plaintiffs are intending to read into the record today.

4  There is actually two significant problems with that that I

5  think would be better to take care of it before the jury

6  comes in, if that's possible.

7     The first problem is that the lion's share of their

8  designations in Mr. Linck's testimony relate to questions and

9  e-mails regarding Mr. Linck's discussions with the South

10 Dakota Department of Agriculture.  And as I'm sure the court

11 remembers, you dismissed all the claims relating -- or our

12 counterclaims relating to the South Dakota regulatory issues.

13      THE COURT:  Back up and tell me who Mr. Linck is,

14 please.

15      MR. LINEHAN:  I'm sorry.  Certainly, your Honor.

16 Mr. Linck is the head of engineering at Sargento.  So he

17 deals with a lot of the regulatory and compliance issues

18 related to their plants.

19      THE COURT:  Okay.

20      MR. LINEHAN:  So they've designated some of that

21 testimony.  They would like to read it in.  We think it's

22 irrelevant in light of the court's ruling dismissing the

23 South Dakota regulatory counterclaims.

24     Our understanding is that their argument is, well, whether

25 or not Mr. Linck passed those e-mails or had those

 1    discussions regarding South Dakota regulatory issues with

 2    Mr. Calliari is a reflection of whether or not he was

 3    deprived of operational control.

 4         But as we've already seen in Mr. Calliari's notice, where

 5    he resigns for good reason and lists his good reasons,

 6    there's nothing in there -- he raises Unilever and Bellingham

 7    Cold Storage and SPA accounting issues and Birds Eye

 8    interference, but he says nothing about being excluded from

 9    South Dakota regulatory negotiations.

10         And the fact that Mr. Sulkin deposed him, Mr. Calliari, in

11    June of this year, he was asked, okay, we want to make sure

12    we understand everything you are claiming is an operational

13    control violation.  And he listed Unilever, Bellingham Cold

14    Storage, SAP, Birds Eye, and some general interference by

15    Mr. Gordy and Mr. McEvoy with relation to the Bellingham

16    plant.

17         Again, he said nothing whatsoever about South Dakota

18    regulatory issues being something that was a reflection of an

19    infringement of his operational control.  So for all those

20    reasons, we think that anything about that in his deposition

21    should be excluded.

22         I mentioned there were actually two problems.  The second

23    problem is that Mr. Linck was -- the only reason Mr. Linck

24    testified in this case is because we had those warranty

25    counterclaims.  His testimony was not relevant or offered for

1    anything else.

2        After they deposed him on his 30(b)(6) issues, which was

3    relating to South Dakota warranties and wastewater and all

4    those sort of things, they asked him some other questions

5    just generally about his substantive understanding of the

6    operational control language in the agreement.

7        And even though he testified that he hadn't read the stock

8    purchase agreement until a couple of days before the

9    deposition, and even though he had had no basis for knowing

10   anything about what the operational control language meant to

11   Mr. Calliari's employment agreement or under the SPA, they

12   got a few sound bites that they liked from Mr. Linck.

13       And our concern is that if the jury were to hear all those

14   -- it's not a lot, just a few snippets where he talks about

15   his understanding of what operational control meant, number

16   one, it's immaterial because this is a contract case, and one

17   witness' subjective understanding of what operational control

18   meant is not relevant to interpreting what operational

19   control means in the contract.

20       And second of all, there was a 30(b)(6) deposition on

21   operational control.  And Sargento identified the testimony

22   of Mr. Gordy on some operational control issues and

23   Mr. Gentine on other operational control issues.  That is the

24   testimony of Sargento on what operational control means, not

25   an engineer who has never read any of the documents.

1     That's our pitch on that point.

2          THE COURT:  So what is it that you are asking me for?

3          MR. LINEHAN:  I'm asking you to preclude the reading

4     of Mr. Linck's deposition, because other than a couple of

5     snippets about his background, they haven't identified any

6     other pieces of that deposition that they want to read that

7     relates to anything other than South Dakota regulatory or his

8     subjective understanding of operational control.

9          THE COURT:  And how can I do that without reading his

10    deposition?

11         MR. LINEHAN:  Your Honor, you probably should take a

12    look at those snippets and read through.  It's not a very

13    voluminous set of designations.

14         THE COURT:  Okay.  Because I was told that I didn't

15    have to look at any depositions that were going to be read.

16    So you are asking me to preclude testimony without me taking

17    a look at it.

18         MR. LINEHAN:  Okay.

19         THE COURT:  And how can I do that right now while

20    we've got the jury waiting?

21         MR. LINEHAN:  I completely agree, your Honor.  You

22    probably should take a look at all of those and make sure

23    that I've characterized them accurately, because the other

24    side may obviously have a dispute with whether or not I've

25    accurately summarized what they said.

```
 1              THE COURT:  Then my suggestion is that you put those
 2    before me so I have a chance to look at it.
 3              MR. LINEHAN:  Okay.  I've got the transcripts here if
 4    you would like, your Honor.
 5              THE COURT:  Okay.  Well, right now we're going to run
 6    a trial, so I don't usually listen to testimony and read well
 7    at the same time --
 8              MR. LINEHAN:  Sure.
 9              THE COURT:  -- if you want me to pay attention to one
10    versus the other.
11              MR. LINEHAN:  Sure.
12              THE COURT:  So why don't you give me the material.
13              MR. LINEHAN:  Okay.
14              THE COURT:  I'll take a look at it this evening.  And
15    we will push on from there.
16              MR. LINEHAN:  Thank you, your Honor.  May I approach?
17              THE COURT:  I'm assuming that that is what the
18    plaintiffs would like to have me do?
19              MR. LINEHAN:  You should hear from them perhaps.
20              MR. FISHER:  Your Honor, there's one problem with
21    that.  I think this is going to happen today.  I didn't know
22    there was any objection to relevance or anything else until
23    this morning, so I didn't -- but we were planning on reading
24    his testimony after Mr. Gentine testifies.
25              THE COURT:  Do you have to do that?
```

```
 1          MR. FISHER:  No.  Yeah, I think -- yeah.  Okay.
 2   We'll reorder the witnesses.
 3          THE COURT:  Because we still have another witness to
 4   finish, and you want to put on Mr. Gentine.  You've got to
 5   give me time to look at these things.
 6          MR. FISHER:  Sure, your Honor.  And, also, at an
 7   appropriate time, obviously, we do disagree.  It's an
 8   admission of a party opponent.  And we reserve our discussion
 9   on that for later.  We just didn't want you to rule before we
10   had a chance.
11          THE COURT:  All right.  Do you have the designations?
12          MR. LINEHAN:  This is the copy you e-mailed to me.
13   And I've got an extra copy for you as well.
14          MR. FISHER:  I have copies.
15          MR. LINEHAN:  May I approach, your Honor?
16          THE COURT:  Yes.
17      All right.  Now are we ready to bring the jury in?
18          MR. FISHER:  We are, your Honor.
19          THE COURT:  Okay.  Let me explain a little bit about
20   the rules here, okay?  When we keep the jury waiting, your
21   clock is ticking.  If you let me know that you need something
22   to be ruled on either before 9 o'clock or after, then it's my
23   time, okay?
24          MR. LINEHAN:  Understood, your Honor.
25          THE COURT:  Okay.  So I don't know how to fix this
```

1  particular problem if you want me to read this.  If you have

2  things that you want to get rulings on ahead of time, you've

3  got to put them in front of me.  I don't guess at it, okay?

4          MR. LINEHAN:  Understood.

5          THE COURT:  All right.  Let's bring out our jury.

6          (Jury enters courtroom.)

7          THE COURT:  Please be seated.  Good morning.  Ladies

8  and gentlemen, let me explain a little bit.  We kept you

9  waiting here a while.  And I want you to know that we didn't

10  take an extra coffee break.  We've been out here working.

11  There are things that happen in a trial.  Actually, two

12  things are going on at the same time.  There's your job and

13  there's my job.

14    My job is to decide the law.  Your job is to decide the

15  facts.  So sometimes we will wait for each other.  For

16  example, I will wait for you while you deliberate.  Sometimes

17  you will have to wait for me to do my job so that the next

18  presentation can run smoothly.  So that's why I ask for your

19  patience.

20    We've discovered that there is a typographical error in

21  one of the instructions that you were given, Instruction 19.

22  So what I would like you all to do is pull out 19 from your

23  notebooks.  Pass them down, and we'll gather those up.  And

24  put the new 19 in.  That way everybody will have a decent

25  set.

1   I believe we're going to continue with our witness this

2   morning.  Is that right, Mr. Fisher?

3                MR. FISHER:  It is, your Honor.

4                THE COURT:  All right.  Could I please have you come

5   forward, sir?  You've not been released from your oath.  You

6   may have a seat.

7                          ANTOINE IOANNIDES,

8   being previously duly sworn, the witness was recalled and

9   further testified as follows:

10                  CONTINUED DIRECT EXAMINATION

11  BY MR. FISHER:

12  Q   Good morning, Mr. Ioannides.  We're picking up your

13  testimony where we left off yesterday afternoon in this

14  matter.  When we ended the day yesterday, we were discussing

15  events that took place after the stock purchase agreement had

16  been executed by the parties.

17      And I would like to start by asking you some questions

18  about when it was that you became concerned about this issue

19  of operational control, okay?  So let's start there.  When

20  did you become concerned about the issue of operational

21  control under the stock purchase agreement?

22  A   As early as August 2007.

23  Q   In the summer of 2007?

24  A   A few months after signing the contract.

25  Q   Okay.  And what were the issues that gave you concern?

1   A   Well, it was mainly the contract of Unilever.

2   Q   And what do you recall about what was going on with

3   Unilever?

4   A   They were trying to nullify the contract prices.

5   Q   And what did you do in response to that?

6   A   I have informed verbally and written Mr. Calliari about

7   our concern and our willingness to come over, if it's

8   necessary, to discuss with all parties.

9   Q   Okay.  Can I ask you to look at Exhibit 233.

10  Mr. Ioannides, do you have Exhibit 233 in front of you?

11  A   Yes, I do.

12  Q   Do you recognize Exhibit 233?

13  A   Yes, I do.

14  Q   What is Exhibit 233?

15  A   It's an e-mail which I sent to Mr. Calliari.

16  Q   And what is the date of that e-mail?

17  A   12th of August, 2007.

18  Q   August 12, 2007?

19  A   Yes.

20          MR. FISHER:  Your Honor, plaintiffs would offer

21  Exhibit 233.

22          MR. SULKIN:  No objection, your Honor.

23          THE COURT:  233 is admitted.

24          (Exhibit(s) 233 admitted.)

25  BY MR. FISHER:

1   Q    Let's talk a little bit about -- have you had a chance to

2   review Exhibit 233?

3   A    Yes.

4   Q    Okay.  Let's talk a little bit about the issues that you

5   raised in this August 2007 letter, okay?  Can you look at

6   that and just describe generally what your main points are in

7   this e-mail?

8   A    We were specifying that Mr. Calliari is a representative

9   of the shareholders during that entire period and we were

10  very worried about the EBITDA, which is earning.  And we said

11  also explicitly, we don't see the point of reducing the price

12  for Unilever, as they were paying much lower price than the

13  other customers.  And we did not want any deviation from the

14  spirit of the contract which we have signed with Sargento,

15  and that I was willing to come, if necessary, to talk about

16  all this with all concerned parties.

17  Q    So the suggestion that you made up a concern about

18  operational control in the spring of 2008 because earnings

19  were looking bad by that point, is that a fair

20  characterization?

21  A    I did not have any figures, but I knew that they were

22  going -- early 2008 I learned that they are amending the

23  prices of the contract.  And I said also to Mr. Calliari

24  that, really, we disagree very much on this point.

25  Q    So after the summer of 2007, what's the next time that you

1  recall hearing about a proposal to amend the Unilever

2  contract?

3  A   Sometime early 2008.

4  Q   Okay.  And what did you do in response when you heard that

5  Sargento had resumed this effort?

6  A   I insisted coming to Bellingham Cold Storage to see the

7  different managers of the site.

8  Q   So you made a trip to the States for a meeting, is that

9  correct?

10  A   Yes.

11  Q   Okay.  What was the approximate date of your trip over?

12  A   It was in March 2008.

13  Q   Okay.  Who did you meet with when you came over in March

14  of 2008?

15  A   Mr. McEvoy, who was the representative of Sargento

16  Portionables, and the financial officer, as well as the plant

17  manager and the commercial vice president for marketing and

18  sales.

19  Q   Okay.  What did you discuss with Mr. McEvoy when you

20  visited the plant in March of 2008?

21  A   Well, I was telling him that Mr. Calliari has lost the

22  control.  We have no elements.  We know nothing about what's

23  happening.  One thing is sure, is that amending the contract

24  of Unilever, on this point totally we're adamant about it.

25  And we insisted heavily on our concern that, you know, it

1   should not have been done this, or allowed, and Mr. Calliari

2   was losing the control totally of the operation.

3   Q   What did Mr. McEvoy say in response when you gave these

4   concerns?

5   A   Mr. McEvoy told me that it's none of his concern -- not

6   concern.  It's not for him to give me an answer, I should

7   write a letter directly to the CEO of the company, which was

8   Mr. Gentine.

9   Q   Did he respond to any of the concerns that were discussed

10  about operational control?

11  A   No.

12  Q   After the meeting with Mr. McEvoy in Bellingham on these

13  issues, what did you do next?

14  A   Well, I came back to Seattle, and we went to see our

15  lawyer.  And we asked him to write a letter.

16  Q   Okay.  Can I ask you to look at Exhibit 13 in this case.

17  Do you have Exhibit 13 in front of you?

18  A   Yes, I do.

19  Q   Do you recognize Exhibit 13?

20  A   Yes, I do.

21  Q   And what is Exhibit 13?

22  A   It's a letter which was sent to Mr. Henkle, the lawyer of

23  Sargento.

24  Q   And is this the letter that you prepared in response to

25  your meeting with Mr. McEvoy?

1    A    Yes.

2    Q    And what was the purpose of preparing this letter?

3    A    It's to remind Sargento that Mr. Calliari is losing the

4    control, the operational control of the company, and we have

5    raised all the issues on which we disagree, meaning the

6    contract with Unilever, the SPA, all the issues on which we

7    are disputing.

8              MR. FISHER:  Your Honor, plaintiffs offer Exhibit 13.

9              MR. SULKIN:  No objection, your Honor.

10             THE COURT:  13 is admitted.

11             (Exhibit(s) 13 admitted.)

12   BY MR. FISHER:

13   Q    Mr. Ioannides, what did Sargento do in response to this

14   letter that had been requested?

15   A    To my knowledge, nothing.

16   Q    Now, there has been a suggestion that nothing happened in

17   April and May of 2008 after these disputes began surfacing.

18   Can you tell us about what did happen during that period of

19   time?

20   A    Something had happened, because I know I came all the way

21   from Paris to Chicago to discuss with the mediator.  I've

22   accepted the fact to have a mediator and to see if he can

23   find a solution.  And so I came all the way to Chicago with

24   Mr. Calliari to discuss.

25   Q    So between the time that the letter went out and May, when

1    there was a resignation letter, the parties participated in a

2    mediation, is that correct?

3    A    That is correct.

4    Q    In an effort to address the issues that had been raised by

5    you and Mr. Calliari?

6    A    Yes.

7    Q    Okay.  And we're not going to talk about what happened

8    there.  The matters were not amicably resolved, is that

9    correct?

10   A    No.

11   Q    Okay.  What ultimately happened?

12   A    Mr. Calliari has sent a letter for his resignation.

13   Q    And is that a decision you supported?

14   A    Yes, I did.

15   Q    Okay.  And why is that?

16   A    Because he lost total control, operational control of the

17   company, and he had no choice.

18   Q    Now, finally, before we wrap up, I want to spend just a

19   couple minutes talking about this decision with respect to

20   Unilever, okay?

21   A    Uh-huh.

22   Q    Let's talk briefly.  Can you describe the experience that

23   you personally have had with Unilever?

24   A    Yeah.  Okay.  I am working with Unilever.  Unilever is an

25   Anglo-Dutch conglomerate, well known in Europe.  And they

1    have too many factories.  And I've been working with them for

2    many, many, many years.  I have launched the concept of

3    Portionable in Italy.  It was a success story with them.  And

4    I'm in contact with a lot of people in the Unilever group,

5    among them an important CEO, ex-CEO, for all the frozen

6    sector in the group.

7        And the policy of Unilever was the following:  Is that

8    they were shutting many, many factories.  And they were

9    concentrating on their main branch, and they are working more

10   and more with subcontractors.  And this is -- you can have

11   access to all this information in the newspaper and magazine.

12       And so the objective at Unilever is not to manufacture for

13   themselves, because that was the policy made by the chairman

14   of the company.  And we have launched the concept with them,

15   which is working.  And then they transfer this concept to the

16   USA.  Unilever Italy transferred this concept to Unilever

17   USA.  And they were delivering to them the sauces of Italy,

18   which were extremely expensive.  This is why they wanted to

19   do it locally.

20       So Unilever is an important customer, but they have

21   interest to work with subcontractors to keep subcontractors

22   alive, because otherwise they are scared of us going direct

23   to the retail market and producing the same products, because

24   we can get 30 to 40 percent cheaper.  So the interest of

25   Unilever is to keep people like us alive.

1   Q   So when you say you can take your products direct, you can

2   sell them to Wal-Mart and their generic brand?

3   A   Yes.  Because Mr. Calliari told me that we were contacted

4   by Wal-Mart to produce certain items which they were buying

5   from Unilever under their own brand.  We can do it because

6   all the other ingredients are commodities, meaning we can buy

7   them from wherever we want.

8       But the most important issue is the sauces which

9   Portionable was producing.  So we can do the same thing as

10  Unilever at a much lower price if ever they threatened to

11  quit us.

12  Q   So in summary here, what were your views on whether the

13  Unilever contract should be amended in the spring of 2008?

14  A   We should have never done it.

15  Q   And at the end of the day, if there's a dispute over a

16  decision like that, whose decision is that?

17  A   Mr. Calliari's.

18          MR. FISHER:  Thank you.  Nothing further, your Honor.

19          THE COURT:  Any cross-examination?

20          MR. SULKIN:  Yes, your Honor.

21                         CROSS-EXAMINATION

22  BY MR. SULKIN:

23  Q   Good morning, Mr. Ioannides.  I don't think we've met

24  before.

25  A   No.  Good morning.

1   Q   My name is Bob Sulkin.  I have a few questions for you

2   this morning.  You talked about a Trial Exhibit 3.  That is a

3   stock purchase agreement.  You were not involved in this?

4   A   As I said yesterday, I was -- on the major issue, I was,

5   not directly, but indirectly, with Patrick Calliari.

6   Q   I'm sorry if my question wasn't clear enough.  You were

7   talking to Mr. Calliari, but you did not negotiate this

8   agreement with Sargento?

9   A   No.

10  Q   Okay.  You did sign the agreement?

11  A   I did.

12  Q   And so you are bound by it, fair enough?

13  A   Exactly.

14  Q   Okay.  And you were not involved in negotiating Exhibit

15  No. 2, which is the employment agreement?

16  A   No.

17  Q   And you had a good law firm representing you when you

18  signed the stock purchase agreement?

19  A   Sorry?

20  Q   You had a law firm that represented you?

21  A   Yes.

22  Q   Okay.  And you were satisfied with their work?

23  A   Yes.

24  Q   You knew Mr. Calliari had a separate employment agreement,

25  right?

1   A   I knew, yes, that he had another employment agreement,

2   yes.

3   Q   And you didn't know the details of that agreement, did

4   you?

5   A   No.

6   Q   You have not seen the details of that contract?

7   A   No, only he told me -- the only question I have asked him

8   at that time is -- his contract is his private business.  The

9   only question I have asked him is the operational control of

10  the company.  And he told me that he had it.

11  Q   And that's all you knew?

12  A   Yes.

13  Q   All right.  And so that we understand, Exhibit 2, he told

14  you, was his private concern, not your concern?

15  A   No.  I told him my concern was -- was/is the operational

16  control.  And, also, on top of it, he told me he had a

17  contract of five years with Sargento.

18  Q   But you understood that Mr. Calliari had agreed to serve

19  under the direction of Mr. Gentine?

20  A   Well, yes, but with one condition.  During the earnout

21  period, he had the operational control of Portionable.

22  Q   You understood that Mr. Calliari agreed to perform those

23  duties assigned to him by Mr. Gentine?

24  A   Assigned to him?  He has the control, operational control,

25  with some exception, which we have mentioned yesterday,

1    meaning he has to abide by certain rules regarding, as

2    mentioned yesterday, the investment and selling the shares

3    and so forth.

4    Q   My question, though, is:  You understood Mr. Calliari was

5    to serve under Mr. Gentine?

6    A   That's yes, but with having the power of the operational

7    control.

8    Q   And you understood that Mr. Calliari was to be seen as a

9    division head?

10   A   A division head, during the earnout period he is having --

11   he is the CEO of Portionable, which interests us.  And after

12   that period, he becomes a president of a division and abiding

13   by the rules of Sargento.

14   Q   In fact, you agreed to Exhibit No. 2, didn't you, sir?

15   A   No. 2?  You are talking about the contract?

16   Q   Yes, his employment contract.

17   A   As I told you, I haven't read it.  But these are the main

18   lines which Mr. Calliari gave me on the phone.  And on this

19   issue I was agreeing with him, on that, provided he doesn't

20   lose the operational control.  He signs whatever he wants.

21   Q   But you yourself signed on to Exhibit No. 2; you are

22   legally bound to Exhibit No. 2.  Did you understand that?

23   A   You are talking about his contract?

24   Q   Yes.

25   A   No, this does not mean that.  It doesn't concern me,

1   because I haven't seen it.  I was telling you how I knew

2   about this contract.  He gave me the headlines, about he's

3   going to work five years, he has the operational control of

4   the company.  And about his salary, about all the other

5   details, it's his concern.

6   Q   You know nothing of what was discussed between Mr. Gentine

7   and Mr. Calliari about the scope of his operational control

8   under Exhibit No. 2, his employment contract, do you, sir?

9   A   No.

10   Q   Let's take a look, if you would, at Exhibit No. 3.  That

11   is the stock purchase agreement.  If you would look at page

12   45 of the document, paragraph 9.9.

13   A   9.9?

14   Q   Are you there?

15   A   Yeah.

16   Q   Okay.  It reads:  This agreement, meaning the stock

17   purchase agreement, together with the additional agreements,

18   comma, the company disclosures, comma, the exhibits and other

19   writings referred to herein or delivered pursuant hereto

20   constitutes the entire agreement among the parties and

21   supersedes any other agreements.

22       Do you see that?

23   A   Okay.

24   Q   I need an answer.  Do you see that?

25   A   Yes, I can read it, yes.

```
 1   Q    Okay.  And you agreed to that?

 2   A    Yes.

 3   Q    Okay.  Now, if you would, let's take a page.  We need to

 4   figure out what additional agreements means, right?  Let's

 5   look at page 38 of the document.  Additional agreements means

 6   the escrow agreement, the Calliari employment agreement, and

 7   the management team employment agreements, and all other

 8   agreements and documents contemplated by this agreement.  Do

 9   you see that?

10   A    Yes, I see it, yes.

11   Q    So we can agree that you were bound by Mr. Calliari's

12   employment agreement?  That was part of the deal?

13   A    Yes.

14   Q    Okay.  Now let's take a look at that agreement, Exhibit

15   No. 2.  Do you have it in front of you, sir?

16   A    I have it here on the screen.

17   Q    Okay.  Fair enough.  All right.  Let's take a look, if you

18   would, at paragraph No. 3, duties.  And it says:

19   Executive -- that means Mr. Calliari -- shall serve as the

20   president, Portionables division of the corporation, and

21   will, under the direction of the corporation's president and

22   chief executive officer, use reasonable best efforts to

23   perform his duties as assigned by the president and chief

24   executive officer.

25        Do you see that?
```

1    A    Yes.

2    Q    And you understood that was the deal?

3    A    Yes.

4    Q    And if we go to the second page of the document, sir --

5    and certainly feel free to read anything.  If we go to the

6    fifth line down -- sixth line down.  Sorry.  Do you see the

7    word "throughout"?

8    A    Okay.

9    Q    It reads:  Throughout the employment period, not just the

10   earnout period, throughout the employment period the

11   executive shall have the duties, responsibilities, and

12   obligations that are not inconsistent with that of a division

13   president and/or executive officer of the corporation.

14       Do you see that?

15   A    Uh-huh.

16   Q    I need a "yes" for the court reporter.

17   A    Yes.

18   Q    Okay.  You never knew about this provision?  You never

19   read it before?

20   A    No, I have not read it.  I never read the contract.  But

21   excuse me to interrupt you.

22   Q    Well, let me just finish my question.  And you had no

23   discussions with Mr. Gentine or anyone over what the duties

24   of a division president are, did you?

25   A    No.

1    Q    And you never spoke to a division president to know what

2    they do, correct?

3    A    No.

4    Q    And you understand that Sargento is a big company that

5    Mr. Gentine runs, fair enough?

6    A    Yes.

7    Q    Okay.  Now, you did say -- if we look at paragraph number

8    -- let's go to page No. 7 if we could.

9    A    No.  Excuse me.  You told me if I want to make a comment

10   about the reading.

11   Q    Sure.

12   A    You would not let me finish.  So please allow me to do it.

13   Q    Sure.

14   A    Under the contingent payment due date, under the purchase

15   agreement, executive shall serve as president of Portionable

16   and shall have operational control of the Portionable

17   business, subject to the limitation in the purchase

18   agreement.

19   Q    Understood.  That's what it says.

20   A    But it's an important element for me.  This is the main

21   issue.

22   Q    I understand.  But you understood that he was a division

23   president?

24   A    I learn now he's a division.  I did not participate in the

25   contract, as I told before.

1   Q    Right.  And Mr. Calliari never told you in all your

2   discussions that he was being akin to a division president,

3   did he?

4   A    No.  He told --

5   Q    Thank you.  Now let's take a look at page 7, if you would.

6   And it says, termination provision.  Do you see that?

7   A    Uh-huh.

8   Q    And then if we go to the next page, there's a good reason

9   provision up at the top.  Do you see that?

10  A    Yeah.

11  Q    Now, again, you've never seen this provision before, have

12  you?

13  A    On this contract, I've never seen it.

14  Q    Okay.  So I'm not going to question you about it any

15  further than to read it and question you about it, and we'll

16  go from there.  It says:  Good reason.  Termination for good

17  reason shall mean a termination of executive's -- that means

18  Mr. Calliari's -- employment by executive, meaning

19  Mr. Calliari, following a material breach by the corporation

20  of any provisions of this agreement, which failure continues

21  for a period of 30 days after the corporation's receipt of

22  written notice from the executive, meaning Mr. Calliari,

23  specifying the details of such alleged failure.

24       Do you see that?

25  A    Yes.

1  Q    And you were unaware of Mr. Calliari ever sending notice

2  prior to the spring of 2008 under this provision?

3  A    No.

4  Q    All right.  Now, you did refer to the letter you wrote,

5  which is Trial Exhibit 13.  Let's take a look at that.

6  That's the letter dated March 28 from your lawyer,

7  Mr. Weinstein, to Mr. Hinkle.

8  A    Yeah.

9  Q    And in this letter, you can go to the second page of the

10  letter, sir.  I'm going to start toward the middle and we'll

11  work up, okay?  So let's start with that first bullet point,

12  Bellingham Cold Storage.  You write:  One area of loss of

13  operational control was, quote, the refusal of Sargento to

14  allow direct shipment of goods from the cold storage facility

15  of Bellingham Cold Storage resulting in substantial loss.  It

16  is likely now too late for this change -- for this change to

17  have a meaningful impact on the contingent payment.

18      Do you see that?

19  A    Yes.

20  Q    Now, you had no personal contact with Bellingham Cold

21  Storage?

22  A    I had it at the beginning when I built the factory, that's

23  all.

24  Q    But on this issue you had no --

25  A    No.

1  Q    Okay.  And you were not involved in resolving any

2  disagreements with Bellingham Cold Storage?

3  A    No.

4  Q    And you did not see any plan provided by Mr. Calliari for

5  direct shipping?  You never saw such a plan?

6  A    No.  He was only informing me on the phone.

7  Q    And you don't know if a plan was ever created by

8  Mr. Calliari, do you?

9  A    I did not see the way he was presenting things, so I don't

10 know.

11 Q    You would expect Mr. Calliari to present the plan if he

12 was considering to direct ship, wouldn't you, sir?

13 A    I had confidence in him.  He's the CEO, and I'm the CEO in

14 France.  So he knows what he's doing.  I'm not supposed to

15 ask him questions.

16 Q    My question's a little different.  You would have expected

17 Mr. Calliari to present a plan if he was going to direct

18 ship?

19 A    Personally, not necessarily.

20 Q    Okay.  Let's take a look, if you would, at your deposition

21 transcript.

22       MR. SULKIN:  Your Honor, may I approach with the

23 transcript?

24       THE COURT:  Ladies and gentlemen, this is the first

25 time we've used a deposition.  A deposition is a sworn

```
 1   statement by the witness given in front of the attorneys for
 2   each side.  It's then transcribed and written down by the
 3   court reporter.
 4            MR. SULKIN:  Your Honor, if I may, I would like --
 5   there's an objection interposed here.  So I would like
 6   perhaps you to read to make sure that you don't think I'm
 7   overstepping my authority.  I'm on page 59, your Honor, lines
 8   14 to 17, and page 60, lines 7 through 9.
 9            MR. FISHER:  I'm sorry.  Could you repeat that?
10            MR. SULKIN:  Sure.  59, lines 14 to 17, page 60,
11   lines 7 through 9.
12            THE COURT:  Go ahead.
13            MR. SULKIN:  Thank you, your Honor.  Would you please
14   play for me clip number AI15.
15            (Video played, not reported.)
16   BY MR. SULKIN:
17   Q   Now, you testified about Exhibit 233, sir.  I would like
18   you to take a look at it.
19   A   Which is Exhibit 233, sir?
20   Q   This is the e-mail you sent on August 12th to
21   Mr. Calliari.  You testified about that to Mr. Fisher.
22   First, you did not speak to Mr. Gentine about your concerns,
23   did you?
24   A   No.  I didn't have any contact with Mr. Gentine.  I didn't
25   even know him.
```

1  Q   I'm not blaming you.  I'm just asking.  And you did not

2  get confirmation from Mr. Calliari that he even spoke to

3  Mr. Gentine about your concerns?

4  A   I did not ask that question.  I know that Mr. Calliari has

5  spoken to Mr. Gentine about his disagreement about the

6  contract.  He told me that.

7  Q   You understood, Mr. Calliari understood what was in his

8  employment contract?

9  A   I'm referring on the stock purchase agreement.  We're

10  talking about -- you asked me if Mr. Calliari informed me

11  about his disagreement with what Mr. Gentine was asking him

12  to do.

13  Q   My question is a little different.  The employment

14  agreement was important to Mr. Calliari; you understood that?

15  A   Okay.  It's important for him, yes.

16  Q   And you have no doubt that he understood his rights under

17  that agreement, right?

18  A   Under that agreement and under the SPA.

19  Q   Okay.  And my only question to you is:  You've never seen

20  any notice that Mr. Calliari gave to Mr. Gentine about his

21  concern?

22  A   No.

23  Q   Okay.  Now, you talk about in your letter, which is

24  Exhibit No. 13, if we can go back to that, the second page,

25  sort of at the top, your first sentence says:  Sargento has

1   excluded Mr. Calliari from these discussions with Unilever,

2   although he negotiated the initial agreement with Unilever.

3        Do you see that?

4   A    Yes.

5   Q    And it was Mr. Calliari that told you that he had been

6   excluded?

7   A    Yes.

8   Q    Did Mr. Calliari tell you that he was the one that called

9   Unilever and communicated a reduction in price of the initial

10  offer from 39 cents a pound to 35 cents a pound?

11  A    The only thing I knew is that the first time he sent the

12  offer he was compelled to do it.

13  Q    My question is a little different.  Did he tell you that

14  he made the initial call to Unilever and said he would be

15  willing to reduce the price?

16  A    I do not recollect that he told me that, that he told them

17  on the phone.

18  Q    You were not aware he told them in any manner, were you,

19  sir?

20  A    Sorry?

21  Q    You weren't aware that he told Unilever in any manner,

22  whether by phone or e-mail, that he was willing to reduce the

23  price?

24  A    No.  He told me that he reduced the price, but I don't

25  know how much, when he made the first offer.  It was sent by

1  Sargento.  He had to accept the signature of that offer.

2  Q    And when you wrote Exhibit 233, which is that August 12th

3  memo, e-mail, you didn't know that Unilever had threatened to

4  self-manufacture the product if it didn't get a reduction in

5  price, did you?

6  A    No, but I did not -- it didn't come even to my mind,

7  because information I had from Europe is different from

8  yours.

9  Q    Maybe my question isn't clear.  You didn't know that

10 Unilever had threatened to self-manufacture if it did not get

11 a reduction in price?

12 A    No.

13 Q    Mr. Calliari didn't tell you that?

14 A    Not to my knowledge.

15 Q    And it's fair, sir, that you have no idea what Unilever

16 would have done in that circumstance, do you?

17 A    See, having the information from my side, I would not

18 even, I mean, thought about this, because I have different

19 information than yourself.

20 Q    You had not sold a product to Unilever since 2002, isn't

21 that right?

22 A    Yes.

23 Q    You can't recollect the last time you spoke to anyone at

24 Unilever, isn't that right?

25 A    No.  As I told you, I was in contact with somebody of

1    importance, which was an ex-CEO which resigned two years ago

2    as the chairman of Unilever France.  And also he was the

3    ex-CEO for all the frozen division of Unilever.  And we were

4    discussing about the situation.  And the newspaper also was

5    giving us the right information.  So I knew what's happening

6    in Unilever, even if I stopped working with them directly on

7    shipping products since 2002.

8    Q    Would you take a look at your deposition, sir?  You took a

9    deposition under oath, is that right?

10   A    Yes.

11   Q    And you told the truth, right?

12   A    Yes.

13   Q    Okay.  And that was back on October 25, 2009, relatively

14   recently?

15   A    Yes.

16   Q    Okay.  If you would take a look at page 72, lines 2

17   through 4, and page 72, lines 12 through 15.

18        MR. SULKIN:  Your Honor, I don't think there are any

19   objections to these, so I ask we be allowed to play that

20   clip.

21        MR. FISHER:  What are they?

22        MR. SULKIN:  Sure.  72, lines 2 through 4, and 72,

23   lines 12 through 15.

24        THE WITNESS:  Excuse me.  I have -- go ahead.

25        MR. FISHER:  Your Honor, if we're reading these in,

1    for completeness, I would ask that the following four lines

2    on page 72 be read along with the excerpt that's cited by

3    Mr. Sulkin.  On page 72, lines 2 through 4, I'm asking for

4    lines 5 through 8.

5            MR. SULKIN:  I have no objection to him reading that

6    in, your Honor, after we play the clip.

7            THE COURT:  Go ahead.

8            MR. SULKIN:  Okay.  Why don't you play the clip.

9            (Video played, not reported.)

10           MR. SULKIN:  Why don't you read, and then we'll play

11   the next clip.

12           MR. FISHER:  Do you want to give the parenthetical?

13   Was it in the last year?  It says:  No audible response.

14   Last two years?

15      You want to read your answer on line 8, page 72, line 8 of

16   your deposition?

17           THE WITNESS:  Yes.  I have regular contact with them.

18           MR. FISHER:  Thank you.

19           THE WITNESS:  Excuse me.  I was trying not to divulge

20   the names.  And after a long discussion --

21           THE COURT:  Sir.  There's no question before you

22   here.

23           THE WITNESS:  Sorry.

24           MR. SULKIN:  And then lines 9, 10, 11, read, and then

25   we'll pick up at 12:  What does that mean, regular contact?

1   When was the last time you talked to somebody there?   Answer:

2   I cannot recollect.

3        Now let's pick up, please.

4            (Video played, not reported.)

5   BY MR. SULKIN:

6   Q   Now, you weren't aware that under the new Unilever

7   contract -- let me rephrase it.   You were not aware that the

8   new Unilever contract guaranteed a minimum level of

9   production that was higher than the previous levels had been?

10   You weren't aware of that, were you, sir?

11   A   I was involved only on the price, on the price issue with

12   the contract.   And Mr. Calliari was supposed to follow that.

13   Q   I'm sorry.   I understand what you're saying, but I'd like

14   an answer to my question, with due respect.   Let me read it

15   again to you and see if I can get an answer.

16   A   Okay.

17   Q   You weren't aware that under the new proposed Unilever

18   contract you guaranteed a minimum level of production that

19   was greater than the previous level of production?   You

20   weren't aware of that, were you?

21   A   I can't recollect.

22   Q   And Mr. Calliari never told you that, did he?

23   A   He spoke with me very often, but I cannot recollect the

24   volume, the exact volume at the present moment.

25            MR. SULKIN:   Your Honor, I would like to play another

```
 1    clip of that.  It's at page 75.  There's an objection there.

 2    Lines 13 through 21.

 3            THE COURT:  Mr. Fisher.

 4            MR. FISHER:  Your Honor, I'm not clear on the purpose

 5    of having him read this.

 6            THE COURT:  It's not impeaching.

 7            MR. SULKIN:  What he answered, if I may, your Honor,

 8    was:  I don't recollect today.  Here, he doesn't even give an

 9    answer.  So there is a difference, I think.

10            THE COURT:  You are correct.  Go ahead.

11            MR. SULKIN:  Thank you, your Honor.

12            (Video played, not reported.)

13    BY MR. SULKIN:

14    Q   And you weren't aware that the projected volumes with

15    Unilever under the new contract were going to result in

16    higher revenues to Portionables than those that would have

17    been under the previous contract?  You didn't know that, sir,

18    did you?

19    A   I did not have the figures in front of me.

20            MR. FISHER:  Your Honor, can I object that it assumes

21    facts not in evidence?

22            THE COURT:  Overruled.

23    BY MR. SULKIN:

24    Q   Mr. Calliari didn't share that information with you, did

25    he, sir?
```

1   A    I cannot recollect.  I knew that we were -- the prices

2   were lower, that's for sure.  But I didn't have the details

3   of the contract.

4   Q    And so you wrote Exhibit 13, or your lawyers wrote that,

5   without having a full understanding of what was going on at

6   Unilever, isn't that correct?

7   A    Even ourselves, we did not have elements in front of us.

8   But we knew that you were amending the prices of the

9   contract.  Personally, this is what I knew about it.  And we

10  talked about the principle of sending a letter saying you

11  don't have to modify the price, without going into too much

12  detail, because I didn't have all the details.

13  Q    I'm sorry if my question wasn't clear.  My question was:

14  You sent Exhibit 13 through your lawyers without having full

15  knowledge and understanding of the situation relating to

16  Unilever, isn't that correct?

17  A    No.  I wrote that we were amending, so I was aware that

18  you are changing the price.  That's all.  But going into

19  detail, I haven't got the contract in front of me to discuss

20  the offer you made.  I hadn't had it in my hand to be able to

21  answer you on facts and figures.  I knew that you were

22  amending and you were in negotiation with them.  I was

23  replying on the principle that you are not supposed to do it.

24  Q    And Unilever was a big percentage of the products being

25  manufactured at the Bellingham plant; you understood that,

1    did you not?

2    A    Yes.

3    Q    And if Portionables lost Unilever's business, that would

4    have been a significant problem for Portionables?

5    A    Of course, yes.

6         MR. SULKIN:   Your Honor, that's all the questions I

7    have.

8        Thank you, Mr. Ioannides.

9         THE COURT:   Any redirect?

10        MR. FISHER:   Just a few, your Honor.

11                      REDIRECT EXAMINATION

12   BY MR. FISHER:

13   Q    Mr. Ioannides, I would like to take you back to Exhibit 2,

14   which is the employment agreement that Mr. Sulkin showed to

15   you.

16   A    Yes.

17   Q    On page 2 of the employment agreement, about how things

18   would be run during the earnout period, towards the top of

19   the page, can you read into the record what the employment

20   agreement provides on that subject?

21   A    Executive officer of the corporation, until the contingent

22   payment due date under the purchase agreement, executive

23   shall serve as president of Portionables, and shall have

24   operational control of the Portionable business subject to

25   the limitations in the purchase agreement.

1   Q   What are the limitations in the purchase agreement under

2   operational control?

3   A   It's in 1B of the SPA, which states that any increase of

4   capital or selling shares or investing in heavy machinery,

5   they should have the consent -- there were six items which

6   limited the power of Mr. Calliari, meaning that he has to

7   refer to Sargento before taking a position in that direction.

8   Q   So your understanding is these limitations are the same

9   ones that were specified in the stock purchase agreement?

10  A   Yes, I do.

11  Q   Okay.  And there were some questions about your

12  recollection and the specifics of when you last spoke to

13  someone at Unilever.  Your deposition in this case was taken

14  a couple months ago, correct?

15  A   Yes.

16  Q   We're talking about events that took place a couple years

17  earlier, correct?

18  A   Yes.

19  Q   And so when you're talking about the last time you recall

20  discussing Unilever's plans or anything of that nature,

21  that's years earlier than what we're talking about here?

22  A   Yes.  But if you want to go into more details, even the

23  ex-CEO, who lives close to my place and we sit having dinner

24  together, so I know what's happening.  And I didn't want to

25  divulge information.

 1           MR. FISHER:  Okay.  Thank you, your Honor.  Nothing

 2    further.

 3           MR. SULKIN:  No further questions.

 4           THE COURT:  Ladies and gentlemen, do any of you

 5    jurors have a question for the witness?  If you do, please

 6    write it out and pass it to the end of the row.

 7        Thank you, sir.  You may step down.

 8        Next witness, please.

 9           MR. GOLDFARB:  Your Honor, the plaintiff calls

10    Mr. Gentine.

11           THE COURT:  Mr. Gentine, please come forward.

12           (Witness sworn.)

13           THE COURT:  Please have a seat, sir.

14                          LOUIS GENTINE,

15    being first duly sworn, the witness was called and testified

16    as follows:

17                        DIRECT EXAMINATION

18    BY MR. GOLDFARB:

19    Q   Good morning, sir.

20    A   Good morning.

21    Q   Would you state your full name for the record.

22    A   Louis P. Gentine.

23    Q   Where do you reside, sir?

24    A   Elkhart Lake, Wisconsin.

25    Q   How are you employed?

1   A    I'm employed at Sargento Foods, Incorporated, as the

2   chairman and chief executive officer of the company,

3   president.

4   Q    Sargento is a family-run business, is that correct?

5   A    It's a family-owned business, yes, and a family-run

6   business, since I'm the CEO and a member of the family.

7   Q    And a gentleman who is a witness in this case, Mr. McEvoy,

8   has married into your family; is that also correct?

9   A    Mike McEvoy is married to my brother Larry's daughter

10  Nicole.  So he's married not into my direct family but into

11  my brother's family.  But the entire Gentine family, I guess

12  you would be correct.

13  Q    He's married to your niece, is that correct?

14  A    My niece.

15  Q    And Mr. McEvoy is who you sent out to work with

16  Portionables after the acquisition and actually moved to

17  Bellingham, is that correct?

18  A    Yes.  We sent him out to help with the transition of the

19  acquisition, with Mr. Calliari's approval.

20  Q    Sir, let me start at the beginning.  The interest that

21  Sargento had in acquiring Portionables came from the Sargento

22  side, isn't that true?

23  A    Versus someone from Portionables calling us up and asking

24  if we would like to buy them?

25  Q    Yes, sir.

1   A    Absolutely, it came from our side.

2   Q    And what happened was that in the later part of 2006,

3   Sargento conducted a lengthy industry study and preliminary

4   assessment and identified Portionables as a desirable

5   strategic partner, isn't that true?

6   A    Yes.

7   Q    And at that time you understood that Portionables was

8   likely not for sale, isn't that also true, at the time you

9   made your first overture to the company?

10  A    We actually wouldn't have, I don't believe, understood

11  that.  But we didn't know that they were for sale, so we were

12  just asking whether they would be interested.

13  Q    And at that time your company had earmarked the sauce

14  business as a significant platform for future growth, isn't

15  that true?

16  A    Actually, yes, but our company was actively involved in

17  the sauce business through other operations already at that

18  time.

19  Q    You had a manufacturing plant in a location called

20  Hilbert, is that correct?

21  A    Yes, we did.

22  Q    And what you wanted to do was significantly expand your

23  presence in the sauce market, isn't that true?

24  A    Presence and capabilities.

25  Q    And you saw the combination of Portionables and Sargento

1  as something which was one plus one might be worth more than

2  two, isn't that true?

3  A   Yes.

4  Q   And you had your CFO, Mr. George Hoff, initially try to

5  contact Mr. Calliari to set up a meeting to see if there

6  would be interest on Mr. Calliari's part in selling the

7  business, isn't that true?

8  A   Yes.

9  Q   And Mr. Calliari didn't respond to those initial calls.

10  And the next thing that happened was that you had another

11  employee named Bob Clouston try to reach out and contact

12  Mr. Calliari, isn't that also true?

13  A   Yes, that's true.

14  Q   And Mr. Clouston you selected to contact Mr. Calliari

15  because you understood that they had done business in the

16  past together, isn't that correct?

17  A   Bob had told us that, yes, he had had a relationship and

18  knew Patrick Calliari.

19  Q   So if someone were to come to this court and say that what

20  happened in this case was that Portionables reached out and

21  found Sargento, that's simply not what happened here, isn't

22  that true?

23  A   I would say that's true.

24  Q   Sargento found --

25  A   Oh, they ended up finding us, but because of our inquiry.

1    Q    You found them is what happened?

2    A    Yeah, uh-huh.

3    Q    Let me talk to you for a moment about the basic

4    transaction here in very general terms so that we can make

5    sure that we can all understand it.

6         The first thing that Sargento agreed to do was pay 19

7    million dollars for the purchase of Portionables, plus a

8    contingent payment, correct?

9    A    Well, I don't want to say it's the first thing, but it's

10   part of the agreement, that we would pay them 19 million

11   dollars plus a contingent payment.

12   Q    Okay.  And just to be clear, what I'm saying is the

13   purchase price had two parts to it.  It was 19 million in

14   cash plus this contingent payment, correct?

15   A    A potential contingent payment, correct.

16   Q    And the contingent payment could be up to 25 million

17   dollars, is that also correct?

18   A    Yes.

19   Q    And how did you arrive at the sum of 19 million dollars

20   for the cash portion of the transaction?

21   A    Well, we looked at the opportunity that Portionables

22   provided us, again, looking at expanding our capabilities, et

23   cetera, the fact that they had some business with people that

24   we weren't dealing with, but potentially business with some

25   others that we were.  And although their earnings were pretty

1   insignificant and disappointing at that time, we felt that,

2   bringing the two companies together, that we felt we could

3   justify a price of 19 million dollars.

4   Q   And, in fact, you were aware while you were negotiating

5   with Portionables that there was a French company that was

6   also interested in buying it, isn't that true?

7   A   We had heard from them that there was a French company.

8   And I think it was mentioned the other day in somebody's

9   opening, that there was a French company that was also

10  negotiating with them.  And we were never privy to any

11  documentation to prove that was true or anything like that.

12  It's just what we were told.

13  Q   Well, in point in fact, you asked to see the terms of that

14  transaction, did you not?

15  A   I don't recall asking, that I personally asked to see the

16  terms of the transaction.  I could have.  I don't know that I

17  ever saw them.

18          MR. GOLDFARB:  Your Honor, move for the admission of

19  Exhibit 15, which is on the plaintiffs' list and for which I

20  understand there's no objection.

21          MR. SULKIN:  No objection, your Honor.

22          THE COURT:  15 will be admitted.

23          (Exhibit(s) 15 admitted.)

24  BY MR. GOLDFARB:

25  Q   Sir, Exhibit 15 you have before you?

1    A    Yes, I do.

2    Q    And this is an e-mail from a William Beard to Mr. Clouston

3    and yourself.  Do you see that?

4    A    Yes.

5    Q    And it's dated January 29 of 2007.  Do you see that?

6    A    Yeah.

7    Q    And does this document assist you in recollecting that you

8    were furnished by Mr. Beard the terms of the proposed

9    purchase which he identifies as an industry buyer?

10   A    Again, I didn't see the terms from the company.  Mr. Beard

11   in this memo told us what we were to believe were the terms.

12   I do see that.  And, actually, I didn't recollect this.  But

13   I didn't receive the terms from the company.

14   Q    Okay.  But you asked Mr. Calliari and his representatives

15   to provide you the terms of that transaction, and you got

16   this e-mail, isn't that correct?

17   A    Yes, apparently so.

18   Q    And you concede from this that the other buyer was

19   proposing a purchase price of 20 million dollars plus an

20   earnout.  Do you see that?

21   A    Yes.

22   Q    Now, the transaction that happened here, you paid in cash

23   19 million dollars, correct, plus the earnout?

24   A    Plus a signing and retention bonus to Packard.  But 19

25   million dollars was for the shares.

1   Q    So what happened, though, was that you matched the dollar

2   terms of the cash portion of the offer from the French

3   company by paying 19 million in cash to the shareholders and

4   an addition million dollars to Mr. Calliari under the

5   employment agreement as a signing bonus, isn't that correct?

6   A    Signing and retention bonus.

7   Q    And, in fact, isn't it true that the purpose of that

8   payment in part was because Mr. Calliari's employment

9   agreement was giving you a lengthy noncompetition agreement?

10  That was part of it, wasn't it, sir?

11  A    Actually, it was discussed in preliminary information

12  going back and forth.  But I believe that we actually covered

13  the noncompete portion for Mr. Calliari and all the

14  shareholders in the stock purchase agreement, assigning a

15  value of it of a couple hundred thousand dollars.  And it

16  covered for seven years, which in effect was the same length

17  of time we were asking for in the employment agreement, as I

18  remember.

19  Q    Do you not recall, sir, that the employment agreement also

20  contains a lengthy noncompetition agreement, along with some

21  additional restrictive terms?

22  A    It absolutely does.  But there wasn't a value attached to

23  it.  There wasn't a need for a value attached because we had

24  covered it in the stock purchase agreement, I believe.

25  Q    Let's talk about the contingent payment for a moment.  The

1   contingent payment was based upon an accounting formula, is

2   that correct?

3   A   Yes.

4   Q   And could you attempt to explain to the jury in layman's

5   terms, if you can, how that worked?  Just walk through the

6   mechanism of how the contingent payment was to be determined.

7   A   Yeah.  As Mr. Goldfarb indicated, we were paying cash of

8   19 million up front.  And we told Mr. Calliari that if he hit

9   an EBITDA, which is Earnings Before Interest, Taxes,

10  Depreciation, and Amortization, of 21 million dollars, not

11  20,999,999, but 21 million dollars, we would in effect pay an

12  additional 1 million dollars.

13      Anything above 21 million dollars, we would pay six times

14  that amount.  So, in effect, for the first 21 million

15  dollars, if you hit 21 and then hit that exactly that way, we

16  would have been paying a multiple of seven times.  For

17  anything above 21 million dollars, up to a maximum of 4

18  million dollars in additional EBITDA, we would pay a ratio of

19  six times.

20      The reason we did that is, quite honestly, when you look

21  at acquisitions that happen, it isn't uncommon for them to be

22  a multiple of EBITDA relative to cash flow.  It's based on

23  cash flow.  Six times, quite honestly, wasn't a very high

24  multiple to pay.  And yet, at the same time, we had to be

25  fair to Mr. Calliari and the other shareholders relative to a

1    price, or they wouldn't sell for us.

2        So we said, hey, if you can show us by concrete, real

3    performance that you can hit a number higher than that

4    number, really, higher than 19 -- if you got to 21, you got

5    an extra million, but above the 21, if you can show us that,

6    hey, we can hit these dollar amounts, we would be willing to

7    pay what we feel is a fair market price for that stream of

8    cash flow going forward.  And he indicated, based on his

9    projections, that those numbers could be far exceeded.

10       I am the chairman and chief executive officer of the

11   company, but we do have a board of directors.  And the board

12   of directors has four outside members on the board and three

13   inside members.  There's three shareholder members, myself

14   and my two brothers.

15       And it was their feeling that there was no way that we

16   should pay for a pig and a poke type of thing that, well,

17   this guy's promising this, because in acquisitions, generally

18   the person that's selling the company, people often use a

19   profit projection that they call hockey stick.  It's been

20   here, and suddenly it's going to start going up this way, and

21   you guys, by the way, should pay for the higher amount.

22       So they said, we can't pay for the higher amount.  But if

23   Mr. Calliari can show us by actually earning a higher amount

24   that he deserves more than the 19 million dollars, we should

25   be willing to pay it.

1   Q   All right.  So, Mr. Gentine, let me stop you there for a

2   moment and go back to the mechanics of the calculation,

3   because the numbers you've presented are inconsistent with

4   what I understand the document says.

5       So let me show you page 2 of the stock purchase agreement.

6           MR. GOLDFARB:  This is a part of Exhibit 3, your

7   Honor, which is admitted.

8           THE WITNESS:  Is that going to come on my screen

9   here?

10          THE COURT:  You'll get a hard copy as well.

11          THE WITNESS:  Okay.

12  BY MR. GOLDFARB:

13  Q   Sir, what's before you on the screen is Section 1.5(a) of

14  the stock purchase agreement.  And that explains the manner

15  in which the EBITDA payment is to be calculated.  Do you see

16  that?

17  A   Yeah.

18  Q   And your number, sir, confused me, because, as I

19  understand this formula, it works against a 3 million dollar

20  target, isn't that true?

21  A   The 3 million dollar target would be where they would have

22  earned the initial -- the added 1 million dollars.

23  Q   Right.

24  A   Right.  I thought you said that, 3.  And then above the 3,

25  up to a maximum of 4, meaning 7 million in total, they would

1   earn the --

2   Q    Let me start over, because I think you misspoke.  You were

3   talking about 21.  That's the number that doesn't compute

4   here.  But let me start over and walk you through this

5   calculation and make sure we're all on the same page about

6   how this works.

7   A    That's fine.

8   Q    The EBITDA calculation is a fancy word for permits,

9   correct?

10   A    As I said, it's Earnings Before Interest, Taxes,

11   Depreciation, and Amortization.  It's actually more of a cash

12   flow financial thing.

13   Q    Fair enough.  And it's a measure of the company's

14   performance, correct?

15   A    It's one measure of the company's performance, sure.

16   Q    And the idea was that you were willing to pay 19 million

17   in cash to the shareholders, plus if the company proved out

18   in this earnings period to generate a certain amount of cash,

19   that you would pay for that as well, correct?

20   A    Yes.

21   Q    And what the company had to do was produce this EBITDA

22   number during the earnout period of at least 3 million

23   dollars, correct, before anything would be earned?

24   A    Yes, the 3 million dollars.  And that's where the 21 came

25   from.  The 19, the additional 1 million we had paid, plus the

1   1 million for the signing and retention bonus, equaled 21.

2   That's where I came up with that.

3   Q   Right now, sir, I'm just focused on how this contingent

4   payment works, not any of the other payments.

5   A   All right.

6   Q   So what happens is the company tries to make the earnings

7   target during the period of 3 million dollars, correct?

8   A   Actually, the company would be trying to hit a number much

9   larger than that, so --

10  Q   Right.  But it starts to work, the contingent payment gets

11  triggered, at 3 million dollars?

12  A   Yes.

13  Q   Okay.

14  A   Above 3 million dollars.

15  Q   Okay.  At 3 million and 1 dollar, what happens is you owe

16  another million dollars, correct?

17  A   Actually, I believe it was 3 million, exactly 3 million,

18  that they would get the 1 million.

19  Q   Okay.  So if they get over the 3 million dollars, you

20  automatically owe another million to the shareholders,

21  correct?

22  A   Yes.

23  Q   And then for every dollar after that, you have to pay the

24  shareholders 6 dollars, correct?

25  A   Absolutely.

1    Q    Okay.  So just do the math here.  If what happened was

2    that the company had EBITDA in the period of 4 million

3    dollars, tell the jury what the amount would be.

4    A    We would have paid them the extra 1 million dollars, and

5    we would have paid them an additional 6 million dollars.

6    Q    So for every dollar during the earnings period that the

7    company exceeds 3 million dollars, it costs you another 6

8    dollars in payments to the shareholders, correct?

9    A    Yes, because, again, the multiple, we're not expecting it

10   to be a one-year performance level.  We're expecting that

11   that performance will continue forward.  And that type of

12   cash flow off of a 6 million dollar investment is looked at

13   in many acquisition circles as very favorable cash flow, and

14   it should very easily cover the cost of that added

15   investment.

16          THE COURT:  Counsel, can you come over to the sidebar

17   for just a minute?  Actually, we're going to take our recess

18   instead.

19      Ladies and gentlemen, why don't you pack up your

20   notebooks, and you may go for your coffee break.

21          (Jury leaves courtroom.)

22          THE COURT:  Please be seated.  Counsel, I'm concerned

23   that the witness may have misspoken or misunderstood your

24   question here.  The question was:  So for every dollar during

25   the earnings period that the company exceeds 3 million

1  dollars, it costs you another 6 dollars in payments to the

2  shareholders, correct?  Answer:  Yes, because, again, the

3  multiple, we're not expecting it to be a one-year performance

4  level.  We're expecting that that performance will continue

5  forward.  And that type of cash flow off of a 6 million

6  dollar investment is looked at in many acquisition circles as

7  very favorable cash flow.

8     That implies that for every dollar over 3 million, they

9  are going to pay 6 million.  Am I understanding that

10  correctly?

11         MR. GOLDFARB:  You are, your Honor.

12         THE COURT:  For every 1 dollar?

13         THE WITNESS:  No, no.

14         MR. GOLDFARB:  No, your Honor.  It's a multiple of

15  six.  So if they went 1 dollar over 3 million, they would owe

16  6 dollars.

17         THE COURT:  Well, he just said 6 million.

18         MR. GOLDFARB:  Against the 1 dollar.

19         THE COURT:  Against the 1 dollar.

20         MR. GOLDFARB:  So when we come back, your Honor, I'll

21  repose the question to make sure we get it clear.

22         THE COURT:  Okay.  Because as I understood it, they

23  would have to go a million dollars in order to get the 6

24  million dollars.

25         MR. GOLDFARB:  That's correct.

```
 1              THE COURT:  Okay.  Well, your record doesn't say that
 2   right now.
 3       All right.  Anything else that we need to take care of
 4   before we recess?
 5              MR. GOLDFARB:  No, your Honor.
 6              THE COURT:  Okay.  We'll take our recess.
 7              (Brief recess.)
 8              THE COURT:  All right.  Are we ready to bring out our
 9   jury?
10              MR. GOLDFARB:  We are, your Honor.
11              THE COURT:  All right.  Let's have our witness come
12   back up and have a seat.
13              (Jury enters courtroom.)
14              THE COURT:  Please be seated.
15       Go ahead, Mr. Goldfarb.
16              MR. GOLDFARB:  Thank you, your Honor.
17   Q   Mr. Gentine, before the break we were talking about how
18   this EBITDA calculation worked.  And one of the things the
19   parties did here, to make sure everybody understands here, an
20   example is attached to the stock purchase agreement, isn't
21   that correct?
22   A   Yes.
23   Q   So if you go to page 000613 of the stock purchase
24   agreement, you'll see that.
25   A   And that's what's on the screen as well?
```

1    Q    It's what's on the screen as well, yes.  And this just

2    shows in shorthand how the calculation would be done, isn't

3    that correct?

4    A    Yes, it does.

5    Q    And what I've circled there is the math.  This isn't what

6    actually happened.  This is just an example that the parties

7    attached to the agreement at the time it was made, correct?

8    A    Yes.

9    Q    Okay.  What this shows us is, on the top line there, where

10   it says $4,337,000, if the company, Portionables, during the

11   earnout period brought in that much EBITDA, then you would

12   subtract the 3 million dollar target, correct?

13   A    Yes.

14   Q    And that would leave the sum of a million 337, correct?

15   A    Yes.

16   Q    And then the calculation would be based on that

17   difference, which is the amount over the target, correct?

18   A    Yeah.  You take that number times six.

19   Q    Right.  And then you add another million dollars to it?

20   A    Which again is the bonus of getting to that exact 3

21   million number, yes.

22   Q    So as soon as you get to the 3 million, you get the 1

23   million dollar bonus, correct?

24   A    Uh-huh.

25   Q    And then every time you get over the 3 million dollar

1   number, the amount you get over it gets multiplied by six,

2   correct?

3   A   Yes.

4   Q   And that is the amount of the contingent payment that

5   would have to be paid to the shareholders for the earnout

6   period, correct?

7   A   If indeed that was the results, that is what we would have

8   owed them as a contingent payment, yes.

9   Q   And it depended on what actually happened, correct?

10  A   Yes.

11  Q   And it could be zero, isn't that correct?

12  A   Yes.

13  Q   But it could also be up to 25 million dollars, isn't that

14  also true?

15  A   Yes.

16  Q   And it depended solely on the performance of Portionables

17  during this earnout period, that's true, right?

18  A   Yes.

19  Q   And if Portionables didn't get to the 3 million dollar

20  number, then you wouldn't have to pay anything at all,

21  correct?

22  A   Yes.

23  Q   And it doesn't take very much over the 3 million dollar

24  number, as we can see here, if you get over it by 1.33

25  million, it generates a contingent payment of over 9 million,

1    correct?

2    A    Yes.

3    Q    So it has a big impact.  Small changes in what happens

4    with EBITDA can cause big effects in terms of how much has to

5    be paid on the contingent payment because it's magnified by

6    six, correct?

7    A    Well, it wouldn't be small changes.  A million 337 is

8    still a big number for a lot of different people.  But, yes,

9    it would obviously go up at a ratio of 6 to 1.

10   Q    Now, we'll talk about this more as we go through your

11   examination today.  But it's true, isn't it, that in April of

12   2008, there was a disagreement between you and Mr. Calliari

13   about amending the Unilever contract, isn't that correct?

14   A    He raised an issue relative to the Unilever contract, yes.

15   Q    The state of play as of April of 2008 was that

16   Mr. Calliari did not want to sign the Unilever amendment and

17   you did, isn't that correct?

18   A    Yes.

19   Q    And at the time of that dispute, that disagreement between

20   you and Mr. Calliari, the earnout period was still open,

21   wasn't it?

22   A    We were in the midst of the earnout period.

23   Q    It wasn't over yet, was it?

24   A    No, it wasn't.

25   Q    It didn't end until the end of December, 2008.  That's

1   true, too, isn't it?

2   A   Yes.

3   Q   And as of April of 2008, you didn't know whether or not

4   Portionables would make the 3 million dollar target, isn't

5   that correct?

6   A   I didn't absolutely know that they weren't going to hit

7   the target.  But Patrick had conferred with our chief

8   financial officer, George Hoff, a name mentioned earlier, I

9   believe in January, and indicated that he didn't think there

10   was any way that they would hit any contingent payment due to

11   the projected performance.

12   Q   Sir, my question is slightly different.  Let's make sure

13   you understand it.  My question is:  As of April of 2008, you

14   did not know definitively one way or another whether or not

15   Portionables would hit that earnout target because you still

16   had another eight months to go, correct?

17   A   Definitively, that's correct.

18   Q   And some things happened in the spring and summer of 2008

19   that affected the EBITDA numbers at Portionables, isn't that

20   also true?

21   A   Well, I'm not certain which things you are speaking of.

22   Q   Let me be more specific.  It's true, isn't it, that

23   approximately April of 2008, Birds Eye gave a significant new

24   order to Portionables for new products, isn't that true?

25   A   We did receive an order from Birds Eye.  I didn't recall

1   when that was.  But, yes, we did pick up some additional

2   business from Birds Eye.

3   Q    Now, Unilever occupied most of the Bellingham facilities,

4   isn't that true?

5   A    Actually, I thought it was all of the Bellingham

6   facilities.

7   Q    All right.  Fair enough.  And the South Dakota plant,

8   which was the other plant, in the beginning of 2008 was

9   underutilized, isn't that true?

10  A    Severely underutilized.  The plant was built to handle

11  primarily General Mills at the time, I believe, which was a

12  prior account of Patrick Calliari.  But he lost that

13  business.

14  Q    And, by the way, when you bought the company, you knew the

15  status of General Mills, is that correct?

16  A    Yes.

17  Q    Okay.  And returning to my question, what happened in 2008

18  was that the South Dakota plant filled up with business,

19  isn't that also true?

20  A    It filled up partially with business.  I don't know that I

21  can say it filled up all the way with business because we had

22  some severe maintenance problems with the freezing piece of

23  equipment, that freezes the sauce.  That didn't allow us to

24  produce as much as we would like.

25  Q    Isn't it true, sir, that by the October time period of

1    2008, the Bellingham facility was running 20 hours a day,

2    which is full capacity, and the South Dakota facility was

3    running 20 hours a day, which was also full capacity?  That's

4    a fact, isn't it?

5    A    I can't recall the exact facts relative to tonnage through

6    the plant.  But it could very well have been at those levels

7    at that time.

8    Q    And it takes some number of months with customers like

9    Birds Eye to get them on line, isn't that true?

10   A    It can take more than a year to bring them on line.  We

11   talk to them about the concept.  They look at it.  They like

12   it.  And then they have to go through all of the issues to

13   determine whether they're going to come out with that

14   product, introduce it to the market.  We can be dealing with

15   the research people.  And they may like the product, and then

16   at the last minute the marketing people are, quite honestly,

17   often the CEO will say, no, we're not going to do that

18   project, and the whole thing falls through the cracks.

19   Q    And the lead time for the development of these customers,

20   what that means is that customers like Birds Eye that came

21   on line in 2008 were under development during the time that

22   Mr. Calliari was still with the company, isn't that true?

23   A    Certainly communications were begun with them while he was

24   still employed by the company, yes.

25   Q    Right.  So the companies that ultimately consumed all the

1    capacity of the South Dakota plant were all companies that

2    were being developed as customers by Portionables while

3    Mr. Calliari was still there, right?

4    A    Yeah.

5    Q    And it's a fact, isn't it, that by the last quarter of

6    2008, the South Dakota plant was so busy you were turning

7    away business?  Isn't that also true?

8    A    We were turning away business because the capacity of the

9    plant wasn't at the levels that we had been told it would be

10   prior to the acquisition.

11   Q    Sir, focusing specifically on my question, you couldn't

12   put any more business through the South Dakota plant; you

13   were turning business away?

14   A    Uh-huh.

15   Q    It was full.  That's my point, and it was true?

16   A    It was full, regardless of the reason.

17   Q    The plant was operating at full capacity, isn't that

18   correct?

19   A    Uh-huh.

20   Q    Let me talk to you a little bit now about the history of

21   the negotiations, getting to the stock purchase agreement and

22   the employment agreement.  First, I understand that you have

23   a son that's also in the business?

24   A    Yes.

25   Q    And what's his name?

1    A    He's Louis P. Gentine, II, known as Louie.  But we can

2    call him Louie.

3    Q    Okay.  And your son operates one of the divisions for you,

4    is that correct?

5    A    He did.  Up until this month he operated the -- he led the

6    consumer products division.

7    Q    Okay.  Now, your son had nothing whatsoever to do with the

8    transaction with Mr. Calliari, isn't that true?

9    A    Actually, no.  He didn't have a major role, but he did

10   attend the meeting that was talked about up at the Northwest

11   World Club offices, or whatever you call them, in

12   Minneapolis.  I think he came along as a learning

13   opportunity.  And he certainly was involved in internal

14   discussions relative to that also as a learning opportunity.

15   So he is certainly aware of things.

16   Q    Okay.  But as far as the considerations of your

17   negotiations with Mr. Calliari and Portionables, your son

18   wasn't going to be running the Portionables business or

19   involved with it after the acquisition, correct?

20   A    No.  Yes, yes, that's correct.

21   Q    Okay.  And he wasn't involved in any way in selling any

22   part of that business.  He really had nothing to do with it,

23   isn't that correct?

24   A    He wasn't involved in selling?

25   Q    Selling.  He had no part to do with Portionables before

1  the acquisition, correct?

2  A   Okay.  Did you mean did he have anything to do with buying

3  the business or selling product for the business?

4  Q   My question was confusing.  Let me withdraw it.

5     My point is simply that the only involvement that your son

6  Louie had with the Portionables acquisition was as a learning

7  experience, isn't that correct?

8  A   Yeah.

9  Q   Okay.  And the deal you made with Mr. Calliari and the

10 Portionables shareholders was a deal struck after extensive

11 negotiation over the specific terms of that deal, isn't that

12 also true?

13 A   Yes.  There was back and forth about different issues

14 during that process of negotiation leading up to the

15 acquisition date.

16 Q   And in those negotiations, it's fair to say, isn't it,

17 that at no time did you ever say to anyone, you know, my son

18 has control of one of these divisions, and the way he does

19 that is the way we're going to do this deal, correct?  That

20 had nothing to do with the negotiations?

21 A   I guess I didn't mention my son, but he did take -- in the

22 negotiations, we did set the parameters of Patrick's position

23 as that of a division president, which would be similar to my

24 son and at that time two other division presidents that we

25 had.

1  Q   And I'm going to come to that, sir.  But my question is a

2  very simple one again for you.  You never mentioned your son

3  in these negotiations as some measure or example of what

4  operational control meant or did not mean?

5  A   I can't say I didn't, because I'm sure that in talking to

6  Patrick I probably mentioned who were the current division

7  presidents at the time, and I certainly could have mentioned

8  my son.

9  Q   But you never said anything like, you know, Mr. Calliari,

10 I'm never going to give you more control over something than

11 I've given my own son?  You never said anything like that to

12 Mr. Calliari, did you?

13 A   Probably not directly.  But I would have told him that he

14 didn't have any more control than a division president.

15 Q   Okay.  Again, sir, we'll come back to that.  But you never

16 used your son as some yardstick in this negotiation?

17 A   I don't recall doing that, no.

18 Q   Okay.  Now, my understanding is that there were three

19 in-person meetings between you and Mr. Calliari to talk about

20 this deal.  Is that consistent with your recollection?

21 A   Well, is that prior to -- does that include the first time

22 we met?  Which would have been, I believe, on a trip in

23 December or somewhere around that, late '06.

24 Q   Let me do it this way.  My understanding of the first

25 meeting that you had with Mr. Calliari, your first meeting

1   with him, was either in late 2006 or early 2007, isn't that

2   correct?

3   A    That was our introductory meeting.

4   Q    Okay.  And you came over to the Portionables facility for

5   that meeting, correct?

6   A    In Bellingham.

7   Q    Right.

8   A    Yes.

9   Q    The second meeting occurred in Plymouth, Wisconsin, isn't

10  that also true?

11  A    Yes, I believe it was.

12  Q    And the third meeting occurred at this boardroom at the

13  Minneapolis airport, isn't that correct?

14  A    Yes.

15  Q    And the purpose of that third meeting was to iron out the

16  specifics of the transaction and to get the lawyers producing

17  final documents, isn't that true?

18  A    Well, it was certainly to discuss the interests of both

19  parties.  I don't know that the whole thing was ironed out at

20  that meeting.  But certainly that's where we were trying to

21  gather this all in and start to reach a point of agreement.

22  Q    But the sequence of events were these three meetings, and

23  then the lawyers did the dotting the I's and crossing the T's

24  pursuant to the instructions of both you and Mr. Calliari,

25  correct?

1  A    I don't believe we had any other face-to-face meetings,

2  but I don't recall 100 percent.  We may have also had, by the

3  way, some telephone calls or communications back and forth

4  and e-mails or other type of communication.

5  Q    All right.  And I was going to ask you that.  In addition

6  to that, you recall talking to Mr. Calliari from time to time

7  on the phone about this deal?

8  A    Oh, sure.

9  Q    Okay.  And your company is represented for business

10  matters by a Milwaukee firm that's called Reinhart Boerner,

11  isn't that correct?

12  A    Yeah.  It might have a few other names after it, like most

13  law firms, but Reinhart Boerner, yes.

14  Q    And that's been your company's law firm for many years,

15  isn't that true?

16  A    Yes.

17  Q    That's one of the nation's 250 largest law firms.  I read

18  that on the Internet this morning.  Isn't that right, sir?

19  A    Well, if you read it on the Internet, doesn't it have to

20  be correct?

21  Q    I think it does.

22        THE COURT:  I just told them I don't want them going

23  on the Internet.

24        MR. GOLDFARB:  But you didn't tell me.

25        THE COURT:  I didn't tell you, no.  Go ahead,

1    Mr. Goldfarb.

2    BY MR. GOLDFARB:

3    Q    Let me ask you to now look at the stock purchase

4    agreement, which is Exhibit 3, at Section 1.6.

5    A    Yeah.

6    Q    Do you have 1.6 before you, sir?

7    A    In two places, yeah.

8    Q    And 1.6(a) is the section that talks about the grant of

9    operational control in the stock purchase agreement, isn't

10   that right?

11   A    Yeah, that is one place, I guess, it's discussed, yeah,

12   uh-huh.

13   Q    That's the agreement that we're talking about right there,

14   correct, what I've circled?

15   A    What you've circled is 1.6(a).

16   Q    All right.  And what Sargento agreed to in 1.6(a) was

17   that, prior to the contingent payment due date, the company

18   and sub -- do you see that?

19   A    Uh-huh.

20   Q    And when it says company and sub there, that's legalese

21   for Portionables, correct?

22   A    Yeah, uh-huh.

23   Q    Is that a yes?

24   A    I believe that's why it said that, yeah.

25   Q    Okay.  First off, why is it that it's prior to the

1   contingent payment due date?  What difference would that

2   make?

3   A    Well, between the acquisition date and the contingent

4   payment due date, that would be the period of time where the

5   earnout was.

6   Q    Right.

7   A    There would be 12 months within that 20-month period of

8   time.

9   Q    Okay.  And the objective was that during that earnout

10  period, Mr. Calliari would have operational control over

11  Portionables, correct?  That's what the idea was?

12  A    Yes.  But you can't read it alone, because you can't

13  ignore the other parts of the document that incorporate the

14  employment agreement as part of it.  So this alone doesn't do

15  that by itself.

16  Q    Trust me, sir, I'm going to get there.

17  A    Good.

18  Q    Okay.  But I want to start with this agreement first.

19  This is the agreement that you made with the shareholders,

20  including Mr. Calliari, correct?

21  A    If we look at it independently from everything else, the

22  answer would be yes.  But, again, I would just say that one

23  can't do that.

24  Q    All right.  And we're going to look at the employment

25  agreement one step at a time, all right?

1    A    Uh-huh.

2    Q    So what you say here is, prior to the contingent payment

3    due date, Portionables will be operated in a manner

4    consistent with past practice.  Do you see that?

5    A    Yes.

6    Q    And that's something that you negotiated specifically with

7    Mr. Calliari, isn't that correct?

8    A    Yes.

9    Q    And it also says here that the company will be operated

10   under the operational control of the shareholders'

11   representative.  Do you see that?

12   A    Yes.

13   Q    And the shareholders' representative, everyone understood

14   that was going to be Mr. Calliari, isn't that correct?

15   A    It was Mr. Calliari, yes.

16   Q    Right.  This says shareholders' representatives.  But

17   everybody knew that he was the person who was going to be

18   appointed as the shareholders' representative under this

19   agreement, right?

20   A    Yes.

21   Q    Okay.  And it also says here that the calculation of

22   EBITDA for purposes of determining the contingent payment

23   shall be appropriately adjusted for any deviations from this

24   general understanding to the extent of the impact the

25   understandings (sic).  Do you see that?

1   A    To the extent of the impact of such deviations, it says,

2   yeah.

3   Q    All right.  That meant that if there was an infringement

4   of operational control by Sargento, that the EBITDA would be

5   adjusted accordingly for any such deviation.  Isn't that what

6   that means, sir?

7   A    Yes, subject -- as it said right above it, subject to

8   specific agreements to the contrary contained in this section

9   and elsewhere in this agreement.

10  Q    Okay.  And, again, one thing at a time.  We're going there

11  next, okay?

12  A    Okay.

13  Q    Now, what it says here, this section, what it's talking

14  about is Section 1.6, correct?

15  A    Yeah, I assume that's 1.6, yes, uh-huh.

16  Q    And what happened was, when you were in the boardroom at

17  Northwest Airlines in Minneapolis, you and Mr. Calliari had a

18  discussion about operational control, didn't you?

19  A    You know, I don't recall the intimate discussions in the

20  boardroom.  But I would guess that would have been an issue

21  that he was interested in.

22  Q    And the tenor of the discussion was Mr. Calliari saying, I

23  want complete operational control, and you saying, I'm

24  concerned about the expenditure of certain funds or things

25  which might change the economics of the company.  Do you

1    recall that?

2    A    No.

3    Q    All right.  So let's look at Section 1.6(b), which is

4    called purchase or consent matters.  Do you see that?

5    A    Yeah.

6    Q    Okay.  And we'll talk about these in more detail in a

7    second.  But what happened here is that Sargento and

8    Mr. Calliari agreed that there were certain specific things

9    that, if he wanted to do them, he had to ask you first,

10   correct?

11   A    Yes.

12   Q    And these were prepared by the lawyers.  It's the whole

13   rest of this paragraph 1.6(b).  And it covers six specific

14   situations, isn't that right?

15   A    Yes.

16   Q    Now, looking at the first one -- I'm now looking at where

17   the first item starts.  Do you see that?

18   A    Yes.

19   Q    Okay.  One of the things that Mr. Calliari had to ask your

20   permission to do was to enter into, terminate, or materially

21   amend any consent contract.  Do you see that?

22   A    Yes.

23   Q    Okay.  And consent contract is defined in another place in

24   this agreement.  But if I recall correctly, it was any

25   contract over a certain amount of money, isn't that right?

1    A    You would have to show me the agreement.  I will assume

2    that that's right.

3    Q    Okay.  Now, focusing on Unilever for a second,

4    Mr. Calliari wanted to keep the Unilever contract as it was,

5    correct?

6             MR. SULKIN:  Objection as to time, your Honor.

7             MR. GOLDFARB:  Let me clarify, your Honor.

8    Q    As of the point in time that you and Mr. Calliari had a

9    dispute about Unilever -- so I'm in the March-April time

10   frame of 2008 -- Mr. Calliari's position was:  I do not want

11   to amend the Unilever contract, correct?

12   A    Actually, Mr. Calliari said that he had been pressured by

13   a shareholder who was very uncomfortable with it, and as the

14   shareholder representative, he was conflicted as to how to go

15   forward with that.  I don't recall that he specifically said

16   he didn't want to do it.  Because we had a conversation, and

17   I asked him:  What are you going to do?

18   Q    Well, you actually received a letter from his counsel

19   representing him saying that Unilever was not to amend that

20   contract, isn't that correct?

21   A    We did get a letter from his attorney.  I thought you were

22   talking about direct conversation.

23   Q    You got a letter from his attorney, so you knew that was

24   the position being advanced by Mr. Calliari and his counsel,

25   correct?

1  A    Yeah.

2  Q    We'll come back.  We're going to talk about this in some

3  more detail, too.  But for my purposes right now,

4  Mr. Calliari, as set forth in the letter, did not want to

5  amend the Unilever contract, correct?

6  A    Yes.

7  Q    Okay.  You did want to amend the Unilever contract, isn't

8  that also true?

9  A    Yes.

10  Q    And that's what the difference of opinion was.  He wanted

11  to keep the original contract as it was; you wanted to amend

12  the contract and change it, correct?

13  A    Actually, my feeling was the contract had already been

14  amended by a letter sent by Mr. Calliari under his signature

15  to Unilever outlining a deal that he agreed with back in

16  August of 2007.

17  Q    Mr. Gentine --

18  A    And he never indicated at that time objection to that.  He

19  never objected to that happening or suggested there was any

20  issue.  Our company has a -- our company works maybe

21  differently than other big companies, since we've been

22  labeled a big company.  And, you know, we consider a

23  handshake a handshake.  Our word's our bond.  And after that

24  letter went out, we were moving towards that agreement with

25  Unilever.

1  Q    All right.  And, sir, again, I will come to that also in

2  this examination.

3  A    Okay.

4  Q    What I really want to do is focus right now on paragraph

5  1.6(b) --

6  A    Okay.

7  Q    -- and understand exactly how the proposed Unilever

8  amendment fits within the things that Mr. Calliari has to

9  clear through you, okay?

10  A    Okay.

11  Q    Now, to be clear, your position was you wanted to change

12  the Unilever contract.  His position was he did not, right?

13  A    Yes.

14  Q    Okay.  Now, looking at 1.6(b)(i), one of the things

15  Mr. Calliari has to do is get your consent if he wants to

16  enter into, terminate, or materially amend any consent

17  contract.  Do you see that?

18  A    Yes.

19  Q    Okay.  But Mr. Calliari didn't want to do any of those

20  things here, did he?

21  A    Not at that time.  He had changed his mind.

22  Q    Sir, he didn't want to do any of those things; therefore,

23  he didn't need to ask you for permission to terminate, amend,

24  or enter into a contract, because that's not what he wanted

25  to do.  He wanted to keep the existing contract, right?

1   A   Yes, other than the fact that this doesn't suggest that I
2   want to have the opportunity to do those things.  This didn't
3   restrict me from those type of activities.
4   Q   Sir, again, one thing at a time.
5   A   Okay.
6   Q   We'll get there.  I care what the written words are that
7   your lawyers prepared in this section that talks about when
8   he does or does not have to take his operational control and
9   ask you first.
10   A   Okay.
11   Q   And all I want to clarify right now is that amending the
12   Unilever contract was your idea of what you wanted to do.  He
13   was opposed to it.  But this section here that talks about
14   entering into, terminating, or materially amending a contract
15   doesn't apply because Mr. Calliari didn't want to do any of
16   those things, right?
17   A   I don't want to be picky, but you said it was my idea.
18   Q   Let me rephrase.
19   A   And it was our idea initially.  But relative to that, he
20   did not want to do it at that time, yes.
21   Q   Okay.  So just, again, we'll do this as carefully as we
22   need to.
23   A   Okay.
24   Q   But 1.6(b)(i) doesn't apply here, right?
25   A   From that perspective, yes, right.

1    Q   Okay.  And 1.6(b)(ii) has to do with selling capital

2    assets in excess of $100,000.  That didn't apply here either,

3    did it?

4    A   Are you saying relative to Unilever?

5    Q   Yes.  Thank you.

6    A   No, that didn't apply either.

7    Q   Okay.  And 1.6(b)(iii), entering into an agreement with

8    any related person, that didn't apply to Unilever?

9    A   No, that didn't apply.

10   Q   Okay.  And (b)(iv), entering into a loan or a guarantee,

11   that didn't apply, correct, to Unilever?

12   A   No.

13   Q   Okay.  And 1.6(b)(v), selling or transferring any equity

14   or profit interest in the company, that didn't apply to the

15   Unilever amendment, did it?

16   A   No.

17   Q   And the same for (vi), such other matters as may be agreed

18   in writing by the purchaser and shareholders' representative?

19   And there was no agreement in writing between Mr. Calliari

20   and Sargento relative to changing paragraph 1.6(b), correct?

21   A   I don't know that that's exactly correct, because I think

22   the letter sent by Mr. Calliari in August of 2007 would have

23   been something in writing.

24   Q   But what this says, sir, is it has to be a matter agreed

25   to in writing by the purchaser and the shareholders'

1  representative.  And there was never any agreement or

2  amendment to Section 1.6 that had to do with Unilever; that's

3  true, isn't it?

4  A   Are you saying that this would suggest -- this would have

5  been a change, that we agreed to change 1.6(b), or was it

6  another -- I'm confused on what you're saying.

7  Q   Let me rephrase my question.

8  A   Okay.

9  Q   There was never a letter from Mr. Calliari or a written

10  agreement between him and you that said that whether or not

11  the Unilever amendment would be modified was something that

12  fell within this paragraph?

13  A   Again, I can't say that for sure, because I would think

14  the letter he sent, which we both approved of, was in effect

15  that type of a document.  But it may not apply.  I'm just not

16  certain that it doesn't.

17  Q   Okay.  But there was no agreement that was entered into

18  between you and Mr. Calliari where you said now modification

19  to the Unilever contract is something that needs to go

20  through paragraph 1.6 and it's subject to your direction,

21  correct?

22  A   Well, again, I'm saying that the letter that he sent on

23  August 16th is a manifestation of the fact that we had

24  agreed, a manifestation in writing that we had agreed to make

25  changes to the contract.

1   Q   Okay.  And, again, sir, that's not what I'm asking.  This

2   is a consent paragraph.  And there are six different things

3   that are called out here for consent.  What I want to do know

4   is if there is any written document where Mr. Calliari agreed

5   that you had the right to consent or order him what to do

6   with regard to the Unilever amendment?

7   A   Okay.  If that's what that means, yes.

8   Q   Yes, there is such an agreement?

9   A   No.  I'm saying that, yes, there wasn't such an agreement.

10  Q   Okay.  Now, in the stock purchase agreement, did the

11  shareholders and Sargento agree on certain things that might

12  happen if Mr. Calliari left Portionables during the earnout

13  period?

14  A   You know, I believe that there were such instances in both

15  the stock purchase agreement and the employment agreement,

16  and they had to be looked at in combination with each other.

17  Q   Sir, let me show you page 5 of the stock purchase

18  agreement.

19  A   Uh-huh.

20  Q   This is the fundamental changes section that appears, I

21  believe, at Section 1.6(d) of the agreement, correct?

22  A   Uh-huh.

23  Q   Okay.  And you see there the part that I've highlighted?

24  A   On that whole upper section, yeah, uh-huh.

25  Q   That talks about what happens if, prior to the contingent

1   payment due date, Mr. Calliari resigns for good reason.  Do

2   you see that?

3   A   Well, actually, I'm not certain that it isn't an

4   exception, without clause or by the shareholders'

5   representative for good reason --

6   Q   Well, what it says is that if, prior to the contingent

7   payment due date, the employment of the shareholders'

8   representative as the executive of the purchaser or the

9   president of the sub is terminated directly or indirectly by

10  the purchaser, that's Sargento, without cause or by the

11  shareholders' representative for good reason.  Do you see

12  that?

13  A   Either of those cases, yeah.

14  Q   Right.  And you know there's a claim in this case that

15  Mr. Calliari resigned for good reason, correct?

16  A   Yes.

17  Q   Okay.  And what I want to do is make sure that you

18  understand and we're communicating about what happens in that

19  event.  And what the parties agreed was that that would be a

20  fundamental change to the stock purchase agreement, isn't

21  that correct?  That's why that heading is called fundamental

22  change?

23  A   The heading says fundamental change.  And where?  Do you

24  want me to read down farther?

25  Q   No.  The question really is just this:  That the

1    resignation of Mr. Calliari for good reason during the

2    earnout period was such a significant event that the parties

3    agreed to call it a fundamental change of the agreement.  Do

4    you see that?

5    A    Right.  The heading of that section is fundamental change,

6    yeah.

7    Q    Right.  And that's because if Mr. Calliari resigned for

8    good reason, he wouldn't be running the company anymore,

9    correct?

10   A    Uh-huh.

11   Q    Okay.  And what you agreed to in that situation is what

12   I've highlighted in the middle of the section?

13   A    Okay.

14   Q    Okay.  Which is if that happened, that there would be a

15   rebuttable presumption that would arise that the entire

16   contingent payment would be owed, isn't that correct?

17   A    That's not my understanding of a rebuttable presumption.

18   My understanding of that is that it would still go to

19   arbitration, and we would have to prove that, regardless of

20   the fact that that happened, that the contingent -- the

21   calculation that we looked at before would have or would not

22   have reached some level or another.

23   Q    Okay.  And I appreciate that.

24   A    So that's my understanding of it, so.

25   Q    Right.  So --

1  A    So it wouldn't mean that necessarily the entire amount

2  would have to be paid.

3  Q    Okay.  But what it meant was that in the arbitration it

4  would be Sargento's responsibility or burden to prove --

5  A    Yes.

6  Q    -- that a higher amount wasn't owed, is that correct?

7  A    Yeah, it would be our burden of proof to show that, yeah.

8  Q    And that was built in as protection requested by the

9  shareholders when they negotiated this agreement, correct?

10  A    I would guess so, yes.

11  Q    Okay.  Because that doesn't help Sargento.  This is a

12  provision that benefits the shareholders, correct?

13  A    It would appear to, yes.

14  Q    And the purpose of this provision is to address what

15  happens if for good reason Mr. Calliari leaves Sargento's

16  employment -- I'm sorry -- Portionables' employment?

17  A    Actually, I believe he was employed by Sargento.

18  Q    But he was the president of Portionables, correct?

19  A    Uh-huh.

20  Q    Okay.  And the purpose of this is to protect the

21  shareholders if he doesn't have operational control for the

22  whole earnout period because he's gone.  That's why this is

23  there?

24  A    Yeah, yes, uh-huh.  I don't know for the whole earnout

25  period, but it was if he didn't have -- operational control,

1   of course, was their issue.

2   Q   Let me ask you to look next at the employment agreement,

3   which is Exhibit 2.

4        MR. GOLDFARB:  Your Honor, I'm not sure this has been

5   formally moved for admission at this point in time.

6        MR. SULKIN:  No objection.

7        THE COURT:  2 is admitted.

8        (Exhibit(s) 2 admitted.)

9   BY MR. GOLDFARB:

10  Q   Mr. Gentine, before we get into the details of this

11  agreement, let me see if I can capture what your position is

12  about how this works.  Your view is that, regardless of --

13  well, your view is that you had a right at all times during

14  the employment of Mr. Calliari as the president of

15  Portionables to trump his decisions if you so chose, correct?

16  A   Well, he was serving as a division -- a division

17  president.  And somebody that is subordinate to me, I would

18  have the ability to override a decision that he wanted to

19  make.  And I've done that many times.

20  Q   So your interpretation of the employment agreement and the

21  stock purchase agreement, your personal interpretation, was

22  that those documents gave you a right to overrule

23  Mr. Calliari, as you've just said, correct?

24  A   Yes, in combination with each other.

25  Q   All right.  So let's look first at the employment

1   agreement.  And if you could look at paragraph 2, which is

2   the term.  Do you see there, sir, that the term of the

3   agreement was through December 31, 2012?

4   A   Yes.

5   Q   So it was a five-year agreement, is that right?

6   A   Yeah.  Actually, more than five years, because it was from

7   April 30th of 2007.  So it was probably an extra eight

8   months, 68 months maybe.

9   Q   And then unless the parties gave notice to each other, it

10   actually would automatically renew from there.  So it could

11   even be longer than five years, right?

12   A   Yeah.

13   Q   Okay.  The next section of the agreement addresses duties,

14   isn't that right?

15   A   Following the term, yes, duties.

16   Q   Section 3.  Okay.  So we'll look at this page first, and

17   then we'll look at the next page.

18   A   Good.

19   Q   All right.  Now, this duty section draws a distinction for

20   two periods of time, doesn't it?  There's a time before the

21   contingent payment due date, and there is a time after the

22   contingent payment due date, correct?

23   A   There is reference in some of the phrases here to before

24   and after, yes.

25   Q   And the reason that there's a distinction between the

1    before the contingent payment due date and after the

2    contingent payment due date is that Mr. Calliari's rights

3    under this agreement were different during those two times,

4    isn't that so?

5    A   Well, to some degree, yes, yeah, because we had the

6    earnout period during part of it.

7    Q   Right.  And just to be clear, Mr. Calliari's rights under

8    the employment agreement were different during the earnout

9    period than they were afterwards, isn't that so?

10   A   Well, actually, they could be.  I think the comment is --

11   I don't think it's on this first page, where he said that the

12   performance duties as assigned by the president, chief

13   executive officer, meaning me.  But on the second page --

14   maybe you're going to get to it, but throughout the

15   employment agreement, executive shall have duties and

16   responsibilities and obligations that are not inconsistent

17   with that of a division president or executive officer of the

18   corporation, except where his position prior to the

19   contingent payment date as Portionables president might

20   result in greater duties and responsibilities.

21   Q   Okay.  And I want to --

22   A   So if that's what you're talking about, that, I guess,

23   would to be differentiation.  But it's only a might, not a

24   will.

25   Q   All right.  And that makes a difference, doesn't it, might

1  versus will?

2  A    I think so.

3  Q    Okay.  Will means shall, doesn't it?

4  A    Does will mean shall?

5  Q    Yes.

6  A    I'm not a grammatician, but.

7  Q    But might and will, might and shall, those are different,

8  aren't they?

9  A    Yeah.

10  Q    Okay.  So let's look at the bottom of the first page as it

11  carries over to the second page.  So the first highlighted

12  sentence there, where it starts with "after," do you see

13  that?

14  A    Uh-huh.

15  Q    Okay.  After the contingent payment due date, which is

16  after December 31, 2008, you can change Mr. Calliari's

17  reporting obligation, isn't that correct?

18  A    Yes.

19  Q    And that's what you and he agreed to, right?

20  A    Yes.

21  Q    Okay.  Then what's highlighted in blue here talks about

22  what happens until the contingent payment due date, isn't

23  that so?

24  A    Yes.

25  Q    And it says there that until the contingent payment due

1    date under the purchase agreement, executive, that's

2    Mr. Calliari, right?

3    A    Yes.

4    Q    Shall serve as president of Portionables and shall have

5    operational control of the Portionables business subject to

6    the limitations in the purchase agreement, isn't that

7    correct?

8    A    Yes.  But the limitations in the purchase agreement, which

9    recycle back to this agreement, relative to what his role was

10   here.  So, yes, it would, in that light.

11   Q    Now, we just looked at Section 1.6(b) of the purchase

12   agreement, which were those six items.  Do you recall that?

13   A    Yes.

14   Q    Yes.  And those six specifically negotiated items in the

15   purchase agreement don't apply here, do they?

16   A    Yes.  But this wasn't -- this isn't written to be only

17   those six limitations.  It's talking about limitations in the

18   purchase agreement.  So those six limitations, we went

19   through those, and I think we determined, yes, they don't

20   apply here.  But that isn't the total limitations in the

21   purchase agreement.

22   Q    Okay.  We'll come to that, too.

23   A    Okay.

24   Q    Those six that are specifically negotiated that go right

25   after the operational control provision in the purchase

1   agreement, those don't apply, right?

2   A   I think that's what we said, yes, uh-huh.

3   Q   Okay.  Then the next sentence is the one that you read to

4   me, right?

5   A   Uh-huh.

6   Q   And that applied for the whole term, five and a half

7   years, of the employment agreement, correct?

8   A   Uh-huh.

9   Q   Okay.

10  A   Yes.

11  Q   But, in addition, it's enhanced for the period during the

12  contingent payment due date?

13  A   It's potentially enhanced, that it might result in greater

14  duties and responsibilities.

15  Q   Okay.  You'd agree that Portionables was going to be

16  operated in a manner as it had before?  We went over that

17  language earlier today.  Do you recall that?  It's in the

18  stock purchase agreement.  It said:  Mr. Calliari shall have

19  operational control of the company and it will be operated in

20  a manner consistent with the way it had been before.  Do you

21  recall that?

22  A   That is definitely part of that agreement.  But, again,

23  you can't look at that independently without looking at his

24  exact role that's defined in the employment agreement as that

25  of a division president.  So I think what ends up happening

1  is you would expect that, because of the two agreements being

2  together, that how he operated in the past would be similar

3  to that of a division president, with similar

4  responsibilities, obligation, and duties.

5  Q    In the past, there had been an original Unilever contract

6  signed in 2004, correct?

7  A    Yes.

8  Q    And Mr. Calliari negotiated all of the terms of that

9  agreement, did he not?

10  A    I can only say we weren't involved.  But I don't know if

11  others were involved with Mr. Calliari.

12  Q    You have no reason to believe that Mr. Calliari didn't

13  negotiate that agreement on behalf of Portionables, do you?

14  A    I have no reason to believe that he wasn't intimately

15  involved.  And I don't know if he was the sole negotiator.

16  Q    And he signed that agreement on behalf of Portionables?

17  A    He absolutely did.

18  Q    And so the past practice was that any contract with

19  Unilever would be signed by Mr. Calliari, isn't that true,

20  because that's what had happened in 2004?

21  A    I'm confused on that question.

22  Q    I'll restate it.  I'm sorry.  The question is:  It's true,

23  isn't it, that the past practice with regard to Unilever was

24  that Mr. Calliari signed the contractual documents, and

25  that's exactly what happened in 2004?

1   A    Yes, he definitely did sign it in 2004.

2   Q    Sir, if you would now turn to page 7 of Exhibit 2.   Under

3   the employment agreement, you had a right to terminate

4   Mr. Calliari for cause, correct?

5   A    Yes.

6   Q    And this definition for cause tells you the different ways

7   that you can do it, correct?

8   A    Yes.

9   Q    And the last one here is the material failure to perform

10  the duties set forth in the employment agreement to the

11  reasonable satisfaction of the president, chief executive

12  officer.   That's you, correct?

13  A    Yes.

14  Q    Okay.   Which failure continues for a period of 30 days

15  after receipt of notice from Sargento specifying the details

16  of such alleged failure.   Do you see that?

17  A    Yes.

18  Q    And no notice was ever provided to Mr. Calliari under this

19  section, correct?

20  A    Well, I don't know if no notice was provided.   We

21  obviously had discussions relative to his performance levels.

22  And I think there was a letter where his performance was

23  related to sometime in March or April.

24          MR. GOLDFARB:   Your Honor, may I approach?

25          THE COURT:   You may.

1         MR. GOLDFARB:  Your Honor, I would like to request to

2    open and publish Mr. Gentine's deposition.

3         THE COURT:  All right.

4         MR. GOLDFARB:  May I proceed, your Honor?

5         THE COURT:  Go ahead.

6         MR. GOLDFARB:  Thank you.

7    Q    Mr. Gentine, you gave a deposition in this case under oath

8    on the 24th of August of this year, is that correct?

9    A    Yes.

10   Q    And you promised at that time to answer questions

11   truthfully, did you not?

12   A    To the best of my ability.

13   Q    And, sir, directing your attention to page 36 of your

14   deposition, beginning at line 2.

15   A    Uh-huh.

16   Q    Sir, was this --

17   A    Line 2?

18   Q    Page 36, line 2 to line 10.  Sir, was this your testimony

19   at your deposition?  Question:  Okay.  And so no such notice

20   was ever provided to Mr. Calliari, isn't that true?  Answer:

21   Notice that he would be terminated if he didn't?  Question:

22   If he didn't cure certain conduct within 30 days, he would be

23   terminated for cause?  No such notice.  Some letters were

24   written, but no notice was ever given under the employment

25   agreement, no 30-day notice?  Answer:  No, I don't believe

1    there was a notice given.

2        And that was your testimony, correct?

3    A    Yes.

4    Q    Now, under the employment agreement, Mr. Calliari also had

5    the right to terminate for good reason under certain

6    circumstances, isn't that correct?

7    A    Yes.

8    Q    And that provision is on page 8 of the employment

9    agreement at small i.  Do you see that?  Good reason?

10   A    Small ii.

11   Q    I'm sorry.  You are correct.  Small double i.  And it

12   indicates there that termination for good reason shall mean a

13   termination of executive's employment by executive following

14   a material breach by the corporation of any provision of this

15   agreement which failure continues for a period of 30 days

16   after the corporation's received written notice.

17       Do you see that?

18   A    Yes, I do.

19   Q    Okay.  And such a notice was received by Sargento on May

20   23rd of this year -- or I'm sorry -- 2008, correct?

21   A    Yes.

22   Q    Okay.  And when it says, following a material breach of

23   any provisions of this agreement, you would agree with me

24   that the operational control provisions are provisions of the

25   employment agreement?

```
 1   A   Operational control was both mentioned in the employment
 2   agreement and the stock purchase agreement.
 3   Q   But there is a specific provision of operational control
 4   --
 5   A   Uh-huh, I think we looked at it already.
 6   Q   But you agree that this paragraph of good reason, where it
 7   talks about a breach of any provision of this agreement,
 8   would include the operational control provisions?
 9   A   Uh-huh, yes.
10   Q   Now, in addition to your contractual right to terminate
11   Mr. Calliari for cause if you gave him notice, you also had a
12   contractual right to terminate the employment agreement on
13   the spot, didn't you?
14   A   Would that be the termination without cause?
15   Q   Yes, sir.
16   A   Yeah, there was an opportunity to do that as well, yeah,
17   uh-huh.
18   Q   That's this provision that I've just circled, is that
19   correct?
20   A   No.  I think that's the termination for cause.
21   Q   You're completely correct.  I apologize.
22       This is the termination without cause provision, correct?
23   A   Yes.
24   Q   And am I also correct in understanding that at no time did
25   you exercise this termination without cause provision?
```

1    A    No, we did not exercise that provision.

2    Q    But if you were dissatisfied with Mr. Calliari's

3    performance and you wanted to sign the Unilever contract and

4    just put an end to the disagreement, one thing, one choice

5    you had was simply to terminate him without cause.  You could

6    have done it in 24 hours, right?

7    A    I certainly would have, I guess, had the ability to

8    terminate him at any time without cause.

9    Q    But under this provision, there are consequences to doing

10   that, aren't there?

11   A    Yeah, I believe they are listed there.

12   Q    Right.  And the consequences are that if you do that, you

13   have to continue to pay him both his base salary and his

14   benefits throughout the term of the remaining agreement,

15   isn't that correct?

16   A    If we terminated him without cause, yes.

17   Q    And this whole time in April, May, June of 2008, when this

18   dispute ripened between you and Mr. Calliari, you were being

19   represented by your law firm, isn't that correct?

20   A    Yes.

21   Q    Sir, let's talk next a little bit about Unilever.  First,

22   when Sargento acquired Portionables, you were aware of the

23   existing Unilever contract, isn't that correct?

24   A    Yes.

25   Q    And you also were aware at that time that the Unilever

1    contract contained certain exclusivity provisions, were you

2    not?

3    A    Yes.

4    Q    And what those meant were that if Unilever stopped buying

5    product from Portionables, it couldn't buy it from anyone

6    else in the United States, isn't that correct?

7    A    Prior to the acquisition, I believe it was correct.  I

8    also think that once the company was acquired, those

9    exclusivity provisions disappeared.

10   Q    As a practical matter, Sargento made -- I'm sorry --

11   Unilever made similar products to what were being made in

12   Bellingham in Italy, isn't that correct?

13   A    Yes.

14   Q    Okay.  And it shipped some, but not all, of its U.S. need

15   from that Italian plant, isn't that correct?

16   A    You are saying prior to Portionables' existence?

17   Q    Let me rephrase.

18   A    Yeah, because obviously some needs were coming from

19   Portionables, correct.

20   Q    It is true, is it not, that Unilever had invested over 10

21   million dollars in the Portionables' plant in Bellingham?

22   That's true, isn't it?

23   A    That's what we were told, yes.

24   Q    And you also knew that Unilever was a key customer of

25   Portionables, isn't that correct?

1   A    Absolutely.

2   Q    And, in fact, in the stock purchase agreement, Exhibit 2,

3   there's a list of key customers, is there not?

4   A    I would have to look at it, but I assume you're going to

5   bring that up.  The stock purchase agreement is Exhibit 3,

6   isn't it?

7   Q    Yes, sir, you are correct.

8   A    It's amazing how often that happens.

9   Q    So, sir, attached to the stock purchase agreement were a

10  variety of schedules.  This is one that was called key

11  customers.  Do you see that?

12  A    Yes.

13  Q    And Unilever was listed as number 1, isn't that right?

14  A    Yes.

15  Q    And what that means, amongst other things, is that

16  Unilever was key to the shareholders making their earnout,

17  correct?

18  A    I don't know all the reasons for that being in there.

19  They were listed number 1.  I'm not aware that that was

20  listed in an orderly fashion.  But they were the largest

21  customer when we acquired the company.  And I don't think

22  that all the people that were actually on that exhibit were

23  customers, as it turned out.

24  Q    And my point in showing that to you was that, if Unilever

25  wasn't the most important of Portionables' customers, it was

1    right up at the top of the list, correct?

2    A    Yes.

3    Q    And so reductions in the amount of profits that would come

4    from the Unilever agreement would potentially impact EBITDA,

5    correct?

6    A    Yes, as would the elimination of the business if they

7    chose to go elsewhere.

8    Q    The original Unilever contract, the one signed by

9    Mr. Calliari in 2004, had some price points, didn't it?  The

10   first amount of quantity was at 38 and a half cents per

11   pound, and then it dropped down.  And then everything over 20

12   million pounds, I believe, was at 37 cents per pound?  Is

13   that your recollection?

14   A    I'm not certain about the over 20 pounds, but I know it

15   got to 37 cents.  And that might have happened at over 10,

16   but I don't recall exactly.

17   Q    The amendment proposed to change the pricing on anything

18   that was sold to Bellingham over 20 million pounds, correct?

19   A    Huh?

20   Q    The proposed amendment would reduce the price to Unilever

21   for any product sold over 20 million pounds?

22   A    Yes, it did.

23   Q    And from what to what?

24   A    It would drop it from 37 cents down to 23 cents.

25   Q    So it's approximately a 14 cent difference, is that

1   correct?

2   A    Yeah, I guess it would be approximately a 14 cent

3   difference.

4   Q    And what happened in this case was that in calendar year

5   2008, Unilever ended up doing about 29 million pounds,

6   correct?

7   A    Yes, uh-huh.

8   Q    So there was about 9 million pounds that the pricing would

9   be different under the original contract versus the

10  amendment, isn't that correct?

11  A    Assuming they would have purchased the same amount of

12  product if we hadn't signed the amendment, you could look at

13  it that way.

14  Q    Right.  And that difference between the old contract and

15  the new contract, looking at it based on the number of pounds

16  that Unilever actually did, affected EBITDA by about 1.3

17  million dollars, approximately, isn't that true?

18  A    If you would look at the information in a vacuum as you

19  are presenting it, there would be 1 point -- whatever that

20  number the math would turn out to.

21  Q    The math is about 1.3 million dollars' worth of

22  difference, isn't it?

23  A    Yes, but you can't look at it as you're presenting it.

24  But as you're presenting it, the math is approximately 1.3

25  million dollars.

1   Q   Right.  And so if the shareholders were at the EBITDA

2   threshold of 3 million dollars and you added another 1.3

3   million, so it became 4.3 million, under the EBITDA formula

4   in the stock purchase agreement, approximately how much money

5   would be owed to the shareholders?

6   A   Well, we'd take that 1.3 times six.  If that 1.3 drove

7   them 1.3 above the 3 million -- the actual performance was

8   well under that.  But if it drove it from 3 million to 4.3

9   million, it would be 1.3 times six, 7.8 million dollars.

10  Q   Right.  And then you would add another million dollars to

11  that?

12  A   Well, yeah, but you're assuming that it was already at 3

13  million as you presented it.  They would have earned that

14  when it hit 3 million.

15  Q   Okay.  Fair enough.  So it's a 7.8 million dollar swing

16  based on the pricing differential between the old Unilever

17  contract and the new Unilever contract on 20 million pounds,

18  correct?

19         MR. SULKIN:  Objection, your Honor.  Misstates the

20  testimony about EBITDA.

21         THE COURT:  Overruled.  I'm assuming that this is a

22  hypothetical.

23         MR. SULKIN:  Thank you, your Honor.

24         MR. GOLDFARB:  Yes, your Honor.

25         THE COURT:  Go ahead.

1    A   You want to phrase that again?  I think we agreed that it

2    would be 7.8 million dollars, yeah.

3    BY MR. GOLDFARB:

4    Q   Now, between the discussions with Unilever that happened

5    in the fall of 2007 and the spring of 2008, was there a

6    period of time when Unilever did not respond?

7    A   Depends what you mean by respond.  First of all, the

8    discussions with Unilever started in May or June of 2007,

9    almost immediately after when Unilever came to Portionables

10   and said they wanted a reduction in price.

11       But so, you know, on August 16, after a different

12   response, after Patrick offered them 4 cents a pound less

13   than the current price, which would take -- he was going to

14   offer them all the product at 35 cents a pound.  So that's

15   where that 1.3 isn't a rational number.  But after he did

16   that, we all sat down together and mutually agreed to a

17   proposal, an agreement, with Unilever to do the 38 and a half

18   cent/23 cent deal.

19   Q   I guess my question wasn't clear.

20   A   No.

21   Q   My question was:  Wasn't there a gap in the discussions

22   with Unilever that started in approximately August of 2007

23   and continued until January of 2008 when Unilever did not

24   respond to any proposal?  That's a fact, isn't it?

25   A   Well, actually, I wouldn't say that.  That's not how I

1   would read it, Mr. Goldfarb, because during that period of

2   time, Unilever was making visits to our facility to see how

3   they could increase the production to take advantage of that

4   new agreement.  They had engineers out there.  They had

5   probably marketing people, purchasing people.  They were

6   working with our plant production people to see how they

7   could generate more volume.  So there was activity going on

8   relative to that offer that we had made, the deal that we had

9   made, during that period of time.

10  Q   Let me try one more time.

11  A   Okay.

12  Q   As far as proposals were made for contract amendments,

13  there was a big gap in time between August or September of

14  2008 -- I'm sorry -- 2007 and January of 2008 before Unilever

15  ever responded to the letter that Mr. Calliari sent, correct?

16  A   Yeah, you could say that there was -- they didn't respond

17  to it, but they were doing their homework.

18  Q   Okay.  But as far as putting some counterproposal on the

19  table, that didn't happen for about four months, isn't that

20  right?

21  A   Following the homework that they did, yeah.  They came

22  back with something, but they had to review the whole thing.

23  We totally understood.  That's how these companies work.

24  Q   Again, sir, there was a gap between the time Mr. Calliari

25  sent his initial letter, right?

1   A   Well, between that and, yes, there was a period of time,

2   reasonable on my part, from my point of view.  But, yeah,

3   there was a period of time before they --

4   Q   That's all I'm asking.  There was a period of time of

5   about four months between the letter and the response,

6   correct?

7   A   Yes.

8   Q   Okay.  And when Unilever responded, they didn't say, we

9   accept, did they?

10  A   When they responded, they said they wanted to make some

11  slight tweaks to the agreement, none of which impacted the

12  earnings during the earnout period.

13  Q   Well, one thing they wanted to do was shorten the term

14  from five years to three years, 40 percent, right?

15  A   They wanted to.  And that was not what the final agreement

16  ended up to.  But three years wouldn't make any difference

17  because the earnout agreement would have been completed at

18  the end of 2008, and that was less than three years.

19  Q   But Mr. Calliari at this point in time, spring of 2008,

20  still worked for Portionables, correct?

21  A   Yes, he did.

22  Q   And he had incentive provisions at Portionables in his

23  employment agreement, too, didn't he?

24  A   Yes, he did.

25  Q   Okay.  So he might view that Unilever amendment in a

1  particular way in light of his incentive provisions, correct?

2  A    Well, if you looked at just the pricing portion of the

3  amendment.  But along with it we, number one, had a risk that

4  Unilever was going to self-manufacture.  We had been made --

5  they had told us that this was a possibility.  And, by the

6  way, it ended up being a reality.  They were preparing their

7  plant in Owensboro, Kentucky, to self-produce.

8      So, anyway, we had that risk sitting there when they said,

9  we can self-manufacture.  There was not a -- there was not a

10 minimum that they could -- they had to buy from us, which was

11 included in the amended agreement, which in fact made the

12 amended agreement much stronger than what Patrick offered

13 them in early June or whenever he did, when he offered a

14 reduction in price from 39 to 35 or whatever those numbers

15 were.

16 Q    Let me see if I can cover this quickly before the break.

17 The ultimate amendment with Unilever was not signed until

18 July of 2008, correct?

19 A    I believe it was, yeah.

20 Q    It was still under negotiation in April when Mr. Calliari

21 was there, correct?

22 A    Somewhere in that period of time we locked in on what the

23 agreement was.

24 Q    Okay.

25 A    I don't know.  It didn't take us until the end of June.

1  Q   But the agreement was still under negotiation and was not

2  signed in April of 2008, that's true?

3  A   I can't say it was under negotiation, but it wasn't signed

4  yet.

5  Q   Okay.  Were you in charge of those negotiations?

6          THE COURT:  Mr. Goldfarb, we have to find a place to

7  stop.

8          MR. GOLDFARB:  Now is as good as any, your Honor.

9          THE COURT:  All right.  Sir, you may step down.

10      Ladies and gentlemen, I'm going to send you to lunch.  Did

11  anybody want to know what you were doing at the courthouse

12  yesterday when you got home?  Yes?  No?  Some of you, yes.

13  All right.  Well, I'm going to remind you again before I send

14  you to lunch to please remember that special position you

15  hold as jurors, not only to be fair, but to give the

16  appearance of fairness as well.  And, remember, we don't talk

17  about the case until you deliberate.

18      And, finally, I don't care what Mr. Goldfarb does.  If he

19  wants to use the Internet, that's his business.  But I care

20  about what you do, which is no outside information, please.

21      Have a good lunch.  We'll see you back at 1:25.

22          (Jury leaves courtroom.)

23          THE COURT:  Okay.  Let's talk a moment about this

24  deposition.  I had a chance to read the designations over the

25  break.  So I believe I understand why it is the defense does

1   not want it to be read at all.  But let me hear from the

2   plaintiffs as to what issue this goes to.

3           MR. FISHER:  Your Honor, from our perspective, and

4   this is in the -- you know, this issue is in the pretrial

5   order and is raised there because this is one of the things

6   we were going to be presenting.  And, again, there was no

7   suggestion that there was a relevance issue with respect to

8   this deposition until last night.  I think we got the e-mail

9   this morning on that.

10      But, your Honor, the point is this:  Per the testimony, in

11  fact, the designated portions of the deposition testimony of

12  Karl Linck, he is an officer of Sargento.  We asked him the

13  foundational question.  His job duties include responsibility

14  over the plants, the licensing, and compliance issues.

15      And right up front in that deposition, I asked him:  Did

16  you take over those responsibilities for the Portionables'

17  plant on May 1, 2007, after the sale?  And he said:  No, I

18  did not, because Patrick Calliari had full control over

19  Portionables.

20      That was his testimony.  He's an officer of the company.

21  It is within his sphere of responsibility.  It's specific to

22  the engineering issues.  And that testimony is an admission

23  of a party opponent in this context.

24      We then went on.  What we found out when he testified was

25  that Sargento identified an issue, which has been resolved

1   for purposes of their warranty claim under the SPA, that

2   Sargento believed that the plant in South Dakota might be out

3   of compliance with the legal requirements imposed by the

4   state of South Dakota.

5       And what happened was there began to be a series of

6   discussions among the management of Sargento about how to

7   respond to that and what the consequences of responding to

8   that would be.  And there is testimony in there that this was

9   going to open a Pandora's box.  The executive vice president

10  of Sargento said:  We shouldn't touch this until January of

11  '09.  They went ahead and did it anyway.

12      Mr. Calliari was essentially, in the main, excluded in all

13  discussions on how to handle that issue.  At the end of this

14  testimony in his deposition, he said that in April and May of

15  2008 they were in an adversarial position.  They were

16  building a case against the shareholders for a breach of the

17  warranty claim, and they were actually retaining consultants

18  for this purpose, and that there were e-mails that were going

19  from Mr. Linck on this issue.  Mr. Calliari was still

20  allegedly running the company.  There were issues about how

21  to deal with these regulatory issues, when to do it, how to

22  do it, and he was completely excluded from those discussions.

23      So, your Honor, from our perspective, the relevance and

24  admissibility of this testimony is testimony about his

25  understanding which wasn't from Mr. Calliari that

1   Mr. Calliari had full control of those two plants, his

2   testimony that he was instructed not to communicate directly

3   with Mr. Calliari, that everything was filtered through

4   Mr. Gordy, and the fact that he was not even asked or allowed

5   to participate in decision-making on what they described as

6   opening a Pandora's box during the earnout period.

7       We submit, your Honor, it's evidence that supports our

8   case.  It's not going to take more than 15 minutes to read it

9   into the record.  It's admissible under the evidence rule as

10  an admission of a party opponent.  And he was designated at

11  one point as their most knowledgeable person on this

12  engineering area.  And we would submit, your Honor, that the

13  testimony should come in.

14          MR. LINEHAN:  Your Honor, may I briefly respond?

15          THE COURT:  Yes, go ahead.

16          MR. LINEHAN:  I disagree with a number of things

17  Mr. Fisher said.  But I think the most important thing is

18  that this is a question of unfair prejudice to Sargento.  We

19  asked in his deposition:  Please, tell us everything that

20  constitutes your claim for interference of operational

21  control.

22      And I have the pages of his deposition where he walks

23  through those issues.  No mention of South Dakota.  And that

24  deposition took place a year and a half after South Dakota

25  arose.

1    It's also not in the notice letter that he provided on May

2  23 stating his good reasons for resigning.

3         THE COURT:  Is it part of the pretrial statement?

4         MR. LINEHAN:  They included that as one of their

5  contentions in the case, your Honor.

6         THE COURT:  Okay.

7         MR. FISHER:  And, your Honor, he didn't have any of

8  this --

9         THE COURT:  Just a minute.  Are you finished?

10         MR. LINEHAN:  I am, your Honor.

11         THE COURT:  Okay.  Go ahead.

12         MR. FISHER:  Your Honor, he didn't know about this

13  evidence at the time.  He believed they had in fact hired

14  lawyers, who were the Reinhart lawyers, who were looking out

15  for Sargento's interests.  Mr. Calliari didn't even have any

16  of this until discovery took place in this case.  It's not

17  possible to include it in there because he didn't know the

18  machinations that were going on behind the scenes with

19  respect to this regulatory issue.  So it can't be in the

20  letters.

21    But aside from that, the issue of control, if what these

22  folks are arguing is if it's a contract issue within the four

23  corners of the agreement, which was our argument, if the

24  issue is what's their understanding of the scope of

25  operational control, then it's an admission.

```
 1            THE COURT:  Okay.  The request to exclude the

 2   deposition is denied.  The timing issue makes it important.

 3   He doesn't note it in the complaint because he doesn't know

 4   that it's happening.  And it has been made part of the

 5   pretrial statement that this is some evidence that Sargento

 6   has decided to cut him out of the decision-making process.

 7        Now, when you read the statements, they aren't as bold as

 8   Mr. Fisher wants to argue them.  In other words, it could

 9   simply be interpreted as Mr. Linck was simply told that the

10   chain of command was through Mr. Gordy.  There's nothing in

11   these designations that say that Mr. Linck was authorized to

12   talk to anybody except Mr. Gordy, which doesn't mean that

13   Mr. Calliari was necessarily excluded.  But that's a weight

14   issue, not an admissibility issue.

15            MR. FISHER:  And we did not designate the portion

16   where he said he sent some e-mails to him and not the others,

17   which may be a mistake.  But I understand the ruling and the

18   comment.

19            THE COURT:  Okay.  Let's take our lunch.  And I'll

20   see you back at 1:30.

21            (Lunch recess.)

22            THE COURT:  Good afternoon.  Are we ready for our

23   jury?

24            MR. SULKIN:  We are, your Honor.

25            MR. GOLDFARB:  Yes, your Honor.
```

1        THE COURT:  All right.  Let's bring them in.

2        (Jury enters courtroom.)

3        THE COURT:  Please be seated.  Good afternoon.  We'll

4   continue with the witness, so let's give Mr. Goldfarb back

5   our attention.

6        MR. GOLDFARB:  Good afternoon, your Honor.  Your

7   Honor, at this time we move the admission of Exhibit 4, which

8   is the original Unilever manufacturing agreement.  I believe

9   there's no objection.

10        MR. SULKIN:  No objection.

11        THE COURT:  4 is admitted.

12        (Exhibit(s) 4 admitted.)

13   BY MR. GOLDFARB:

14   Q   Mr. Gentine, you talked about it before lunch, but this is

15   the signature page from the original 2004 Unilever agreement.

16   This is a document you've seen before, is that correct?

17   A   Yes.

18   Q   And that's Mr. Calliari signing the document on behalf of

19   Portionables as the CEO, isn't that right?

20   A   That's what it says, yes.

21   Q   Sir, if I could have you turn in your book to Exhibit 20.

22   A   Turn in these here?

23   Q   Yes, sir.  Sir, can you identify for the record the e-mail

24   in the lower part of the exhibit?  Just tell the court what

25   it is, please.

1    A    Excuse me.  The e-mail in the lower part?  Oh, there's two

2    e-mails, yes, uh-huh.

3    Q    Yes.  Can you identify that for the record?

4    A    Yes.  It was an e-mail from Steve Boland at Unilever to

5    me.

6    Q    And this document has -- you'll see some different type on

7    it where there's some comments that had been interlineated.

8    I think I recognize that that is your style, is that correct?

9    A    I think that was -- I think the parenthetical remarks here

10   were how what he was talking about differed from what we had

11   presented in August.

12   Q    Okay.  You reviewed this document at or near the time that

13   it's dated, is that correct?

14   A    Yeah, I believe I did.

15   Q    Okay.  And this document was kept by Sargento in the

16   ordinary course of business?  Is that also true?

17   A    It was kept versus what?

18   Q    Kept in your files as a part of your business records?

19   A    Yeah, I expect it was kept in our files.

20        MR. GOLDFARB:  Your Honor, move the admission of

21   Exhibit 20.

22        MR. SULKIN:  Your Honor, we don't object.

23        THE COURT:  20 will be admitted.

24        (Exhibit(s) 20 admitted.)

25   BY MR. GOLDFARB:

1   Q   Mr. Gentine, I've put the exhibit up on the screen now.

2   Do you see where this is a January 29, 2008 e-mail from

3   Mr. Boland at Unilever?

4   A   Yes.

5   Q   And this e-mail appears to reflect some communication

6   between Mr. Boland and yourself, is that right?

7   A   Yes.

8   Q   And this e-mail in fact shows the time at which Unilever

9   responded to the letter that had been sent some months

10   earlier by Mr. Calliari, does it not?

11   A   Written response.

12   Q   Yes.  And there's some comments here that are in

13   parentheticals, isn't that also true?

14   A   Yes.

15   Q   And those parentheticals, weren't those added by yourself?

16   A   I believe they were.

17   Q   Yes.  And what those show are the variances between what

18   had originally gone out and what came back from Unilever,

19   isn't that also true?

20   A   Yes.

21   Q   And what came back from Unilever as a counterproposal was

22   different than what was sent out some months earlier, isn't

23   that a fact?

24   A   Yes.

25   Q   And there was no deal between the parties at this time,

1  isn't that true?  There was no amendment in place.  What

2  there was, was some discussion between you and Mr. Boland as

3  of January 2008, correct?

4  A   Well, we had made an offer to him, and he was coming back

5  with, as you would expect someone to do, with some suggested

6  twists to the offer.

7  Q   He was making a counterproposal, isn't that right?

8  A   You could read it as that, yeah.

9  Q   Sir, let me ask you next to look at Exhibit 13, which has

10  already been admitted.  This is the March 28 letter that came

11  from Mr. Calliari and Mr. Ioannides' attorney to your

12  attorney, isn't that correct?

13  A   Yes.

14  Q   And you saw a copy of this letter, isn't that also true?

15  A   Yes.

16  Q   And you learned from Mr. McEvoy after the fact that he had

17  requested that a letter be prepared setting forth the

18  concerns of the shareholders, isn't that also a fact?

19  A   Yes, I did learn from that, yes, that he suggested he

20  should do something like that.  I don't know that he

21  suggested it should come from an attorney.  I think he

22  suggested that it was something that he should discuss with

23  me.

24  Q   Mr. McEvoy specifically asked that the shareholders put

25  their concerns in writing, and that was reported to you,

1    wasn't it?

2    A    Yes.

3    Q    This letter, on the second page, indicated the view of

4    both Mr. Calliari and the shareholders that until the earnout

5    period was over, the Unilever contract should not be amended,

6    isn't that true?

7    A    This came from the shareholders, and they were suggesting

8    that it should not be amended, yes.

9    Q    Right.  So you were on notice as of this date in writing

10   what the shareholders' position was, correct?

11   A    Yes, I was informed at the time what the shareholders'

12   position was.

13        MR. GOLDFARB:  Your Honor, move the admission of

14   Exhibit 8.  I believe it's not opposed.

15        MR. SULKIN:  No objection.

16        THE COURT:  8 will be admitted.

17        (Exhibit(s) 8 admitted.)

18   BY MR. GOLDFARB:

19   Q    Exhibit 8, sir, is an April 4th, 2008, response to

20   Mr. Calliari, isn't that correct?

21   A    Yes.

22        MR. SULKIN:  Your Honor, if I may, I think Exhibit 8

23   that they have is missing the last page, which is a summary

24   of the chart.  We have the same document with the chart.

25   It's a different exhibit number.

```
 1              THE COURT:  Why don't you show it to --

 2              MR. GOLDFARB:  I think counsel is correct, your

 3    Honor.  We can connect that up later.  I have no opposition

 4    to the other exhibit also.  I don't intend to ask this

 5    witness about --

 6              THE COURT:  All right.  We'll make a substitution to

 7    include the last page.  But let's move forward.

 8              MR. GOLDFARB:  All right.  Thank you, your Honor.

 9    Q    Now, Mr. Gentine, this letter is on your company

10    letterhead, isn't it?

11    A    Yes.

12    Q    But this letter was, in fact, prepared with the advice of

13    your attorneys, isn't that true?

14    A    I would guess that I had the advice of the attorney.  Once

15    you receive a letter from somebody -- from an attorney, you

16    obviously enlist the help of your attorneys in future

17    communications.

18    Q    Right.  And there's nothing wrong with that.  But as a

19    factual matter, what happened is your attorneys either

20    drafted or assisted you in drafting this letter, correct?

21    A    Uh-huh.

22    Q    Is that a yes?

23    A    Yes.

24    Q    And in this letter, as of April 4th, what you say is:  You

25    need to know specifically and how soon you intend to proceed
```

1   on the proposed amendment to the Unilever manufacturing

2   agreement.  That "you" there is Mr. Calliari, isn't that

3   correct?

4   A   Yes, it is.

5   Q   That's the same party that had signed the original,

6   correct, the first original agreement?

7   A   Yes.

8   Q   It came to your attention, did it not, that Unilever was

9   planning to visit Bellingham on approximately April 15th?

10  A   I don't recall the date, but sometime in April, yeah.

11         MR. GOLDFARB:  Your Honor, move the admission of

12  Exhibit 24, which I also believe is not opposed.

13         MR. SULKIN:  Let me just take a quick look.  No

14  objection, your Honor.

15         THE COURT:  24 will also be admitted.

16         (Exhibit(s) 24 admitted.)

17  BY MR. GOLDFARB:

18  Q   Sir, I've got that exhibit up on the screen.  The lower

19  e-mail is from Mr. Calliari to Mr. Gordy.  Mr. Gordy works

20  for you, is that correct?  Well, he works for Sargento?

21  A   He works for Sargento.

22  Q   Okay.  And he had some involvement with Portionables,

23  correct?

24  A   Relatively significant involvement, yeah, uh-huh.

25  Q   All right.  And he has received this e-mail from

1   Mr. Calliari indicating that Mr. Calliari's intending to be

2   at the meeting with Unilever on the 15th of April, correct?

3   A   Yes.

4   Q   And that was forwarded to you, isn't that correct?

5   A   Yes.

6   Q   Okay.  And you have some concern about Mr. Calliari

7   attending that meeting because of the possibility that he

8   would say to Unilever that Portionables wasn't signing any

9   amendment, just like what had been put forth in the letter

10  you received a few days earlier, correct?

11  A   Well, actually, you can't read this letter by itself,

12  because Exhibit 8, which we've talked about before, had a lot

13  more writings in it.  And it was a discussion with -- it was

14  a communication to Mr. Calliari that, you know, I was

15  concerned about where he was going after we received the

16  letter.

17      You know, after we received the letter on the 28th, George

18  Hoff and I had a phone call with him on April 2nd.  And part

19  of the letter requested -- but it wasn't a request that he

20  would deny since he worked for me -- that he called me by the

21  following Monday.  So he hadn't called me yet.

22      So I really didn't know where he stood as the president.

23  The letter on the 28th was Patrick and Mr. Ioannides as

24  shareholders.  And that was how that letter came to us.  In

25  fact, it came to us from the attorney that represented the

1   shareholders, not Patrick's attorneys who represented him as

2   an employee, who I believe was Foster Pepper.

3   Q   My question again, sir, was a simple one.  Were you

4   concerned about the possibility that at this meeting on the

5   15th of April, Mr. Calliari would just simply tell Unilever

6   that there would be no amendment?  Yes or no?

7   A   I was concerned because I had no idea what he would be

8   saying at that meeting.

9   Q   You instructed your attorneys to send a letter to

10  Mr. Calliari's counsel a few days later, isn't that true?

11  A   Quite possibly.  I'm not certain what letter you're

12  talking about right this moment.

13          MR. GOLDFARB:  Your Honor, move the admission of

14  Plaintiffs' 16.  It's also unopposed.

15          MR. SULKIN:  No objection, your Honor.

16          THE WITNESS:  Which number is it?

17          MR. GOLDFARB:  16, sir.

18          THE COURT:  16 is admitted.

19          (Exhibit(s) 16 admitted.)

20          THE WITNESS:  Okay.

21  BY MR. GOLDFARB:

22  Q   Sir, Exhibit 16 is dated April 11, 2008, is that correct?

23  A   Yes.

24  Q   And it's on the letterhead of the law firm we talked about

25  earlier today?

1    A    Reinhart Boerner.

2    Q    Is that right?

3    A    Yep.

4    Q    That's your law firm, is that correct?

5    A    Uh-huh.

6    Q    This letter was written by your direction, with your

7    approval, isn't that correct?

8    A    Uh-huh.

9    Q    Is that a yes, sir?

10   A    Yes, yes.

11   Q    Sir, on this letter, on the second page, what I've

12   identified as paragraph -- or highlighted as paragraph 1,

13   your instruction was that Mr. Calliari shall take no further

14   action with respect to the discussions concerning the

15   Unilever amendment except after discussion and approval of

16   such actions by yourself, and that it had to be in writing,

17   isn't that correct?

18   A    That's what it says, yes.

19   Q    And that was issued at your specific direction, correct?

20   A    Yes.  Mr. Calliari worked for me.  And I felt that at this

21   point in time I needed to preapprove his actions, which often

22   is the case with other people that report to me directly or

23   indirectly.

24   Q    And, sir, there is no question, is there, that after this

25   letter, Mr. Calliari was removed from involvement with the

1  Unilever discussions?

2  A   No.  This didn't prevent his continued involvement.  It

3  just required him to discuss things with me and get my

4  approval.  So if he had, let's say, an alternate direction he

5  might want to go, it would require him to sit down, and we

6  could visit about it and make a determination on which way to

7  go.  So it didn't keep him from being involved in future

8  activities relative to Unilever.

9  Q   Isn't it true, sir, that after this letter was written, he

10 was excluded entirely from the Unilever discussion?

11 A   I can't say that that is true that he was excluded

12 entirely from the Unilever discussion.  There were

13 discussions that continued to go on.  And, of course, we also

14 were not aware of what his position was relative to those

15 issues.

16 Q   Is it a fact, sir, that on April 11th, 2008, the same day

17 that you had your law firm send this letter to Mr. Calliari's

18 attorney, that you also were in direct communications with

19 Unilever about the amendment?

20 A   I, personally?

21 Q   Yes, sir.

22 A   From time to time, going way back to actually visiting

23 with Steve Boland prior to the acquisition, I had

24 conversations directly with Steve Boland, who, I guess, had

25 been the lead person relative to any negotiations with

1    Unilever.

2    Q    Sir, if you could look at Exhibit 5, please.

3    A    Uh-huh.

4    Q    Can you identify Exhibit 5 for the record, please?

5    A    Exhibit 5 is a -- looks like, again, it's two, maybe three

6    e-mails.

7    Q    Sir, let me focus on just the first page of Exhibit 5, the

8    e-mail that takes up the bulk of the page.  Can you identify

9    that for the court, please?

10   A    That's where it says:  Mike, I spoke to Steve Boland this

11   afternoon.

12   Q    Don't read it into the record yet, sir.

13   A    Oh, I'm sorry.

14   Q    Just identify it for the record.

15   A    I see it, yeah.

16   Q    This is an e-mail from you to Mr. Gordy with copies to

17   Mr. Henkle and Mr. Hoff, isn't that correct?

18   A    Uh-huh.

19   Q    So this is an e-mail that you prepared, is that right?

20   A    Yes.

21   Q    And it's dated Friday, April 11, 2008, is that correct?

22   A    Uh-huh.

23   Q    This is an e-mail that you prepared in the course of your

24   work as the president and CEO of Sargento?

25   A    Uh-huh.

1        THE COURT:  Mr. Gentine, could I have you answer yes

2   or no?

3        THE WITNESS:  I'm sorry.  Yes.

4        THE COURT:  It's very hard to get a record of uh-huh,

5   uh-uh.

6        THE WITNESS:  I'm sorry.

7        MR. GOLDFARB:  Your Honor, move the admission of

8   Exhibit 5.

9        MR. SULKIN:  Your Honor, this e-mail has hearsay.  I

10  object on that ground.

11       MR. GOLDFARB:  Your Honor, I would show the witness

12  only the portion that we just identified.  And I'm happy to

13  delete the attached e-mail.

14       THE COURT:  With that limitation, is there an

15  objection?

16       MR. SULKIN:  I'm not sure exactly what you are

17  referring to, Mr. Goldfarb.

18       THE COURT:  He's intending only to show what was just

19  identified, which was Mr. Gentine's e-mail.

20       MR. SULKIN:  My concern is, even with that e-mail, it

21  does refer to discussions with Mr. Boland, what Mr. Boland

22  said.

23       MR. GOLDFARB:  These statements are a statement of a

24  party, your Honor.

25       THE COURT:  It's at least admitted for what

1    Mr. Gentine believes are the facts.  So the objection is

2    overruled.

3           MR. GOLDFARB:  Thank you, your Honor.

4           (Exhibit(s) 5 admitted.)

5    BY MR. GOLDFARB:

6    Q   Mr. Gentine, Exhibit 5 is an e-mail that shows the status

7    of the discussions that are ongoing between yourself and

8    Mr. Boland at Unilever, isn't that correct?

9    A   Uh-huh, yes.

10   Q   And it's dated April 11, 2008, the same day as your letter

11   to Mr. Calliari telling him to have no communication with

12   Unilever unless it's approved by you, isn't that true?

13   A   Same date, yes.

14   Q   And at the bottom of this exhibit, you indicate that you

15   expect to have the complete final drafts and have it done in

16   the next couple of weeks.  And that was the status as of

17   April 11, isn't that correct?

18   A   Yes.

19   Q   Mr. Calliari still worked for Portionables in April 2008,

20   did he not?

21   A   Yes, he did, but he was conflicted, he had told us, and

22   wasn't comfortable with his position relative to Unilever.

23   Q   Well, sir, in fact, what he told you was exactly what was

24   set forth in the March 28th letter, which was not to sign the

25   Unilever amendment and to let him operate the company per the

1   agreements, isn't that so?

2   A    Actually, I'm referring to the telephone conversation

3   George Hoff and I had with him on April 2nd.

4   Q    Sir, if I could ask you to next look at Exhibit 34?

5   A    I may not have 34, or else I've jostled it into another

6   position.  Is it right before 40 and after 29?

7   Q    It may be at the very bottom of your stack.

8   A    Okay.  There it is.  Thank you.  Okay.

9   Q    Sir, I'm looking just at the first page of Exhibit 34.

10  Can you identify the lower e-mail for the record?

11  A    An e-mail from George Hoff to Mike Gordy and myself, copy

12  to Jim Birenbaum, who was our corporate controller at

13  Sargento.

14  Q    And what's the date of that e-mail, sir?

15  A    April 15th.

16  Q    And did you receive this e-mail at or near the time that

17  it was prepared?

18  A    I'm not certain I can say that I received it at that time.

19  I could have been out of the office at 5:01 p.m.

20  Q    But it's your general practice to review your e-mails more

21  or less contemporaneous with their receipt, is that correct?

22  A    Generally, if I know that I have it.

23  Q    And the sender of this e-mail is George Hoff, is that

24  correct?

25  A    The sender, yes.

1    Q    Okay.  And Mr. Hoff is an employee of Sargento, is that

2    correct?

3    A    Yeah.  As I mentioned before, he's our chief financial

4    officer.

5         MR. GOLDFARB:  Your Honor, move the admission of

6    Exhibit 34.

7         MR. SULKIN:  No objection, your Honor.

8         THE COURT:  34 will be admitted.

9         (Exhibit(s) 34 admitted.)

10   BY MR. GOLDFARB:

11   Q    Sir, attached to Exhibit 34 are a series of Unilever

12   contract comparison revenue documents, isn't that correct?

13   A    Yeah, it says, Unilever contract comparison revenues.

14   Q    And this document was prepared about four days after the

15   letter you sent saying that Mr. Calliari was to have no

16   contact with Unilever unless you approved it, right?

17   A    The letter of April 11?  April 15th, yes, four days.

18   Q    Sir, it's true, isn't it, in this document, that Mr. Hoff

19   says not to share the data with anyone at Portionables except

20   Mac, of course?

21   A    Yes, but I don't believe that included Patrick.

22   Q    Well, Mac is Mr. McEvoy?

23   A    It's Mike McEvoy, right.

24        MR. GOLDFARB:  Your Honor, move the admission of

25   Exhibit Plaintiffs' 14.

1        MR. SULKIN:  No objection, your Honor.

2        THE COURT:  14 will be admitted.

3        (Exhibit(s) 14 admitted.)

4    BY MR. GOLDFARB:

5    Q   Mr. Gentine, Exhibit 14 is a May 23, 2008 letter to your

6    attorneys from the attorneys for Mr. Calliari, isn't that

7    true?

8    A   Yes.

9    Q   And you saw this letter approximately at the time it was

10   sent, isn't that also correct?

11   A   I don't know if I saw it approximately at the time.  But I

12   certainly, I am sure, saw it soon after it was sent.

13   Q   As of the date of this letter, the Unilever amendment

14   still had not been executed, isn't that true?

15   A   It hadn't been.  Yes, it hadn't been executed.

16   Q   And as of the date of this letter, Mr. Calliari was still

17   an employee of Portionables, isn't that right?

18   A   Actually, again, I think he was an employee of Sargento.

19   Q   I misspoke, sir.  I appreciate the clarification.  He was

20   still the president of Portionables pursuant to his

21   employment agreement, correct?

22   A   Yes, uh-huh.

23   Q   And this letter places Sargento on notice that

24   Mr. Calliari is invoking his right to resign for termination

25   for good reason under the employment agreement provision we

1  looked at this morning, correct?

2  A   Well, you know, at the time I didn't realize it, but now I

3  realize it.  Actually, this letter did not provide us proper

4  notice according to the stock purchase agreement or the

5  employment agreement.  So it intended to do that, but it

6  didn't follow the intended rules.

7  Q   Sir, you received this letter, did you not?

8  A   I did receive the letter.  Just saying that it didn't

9  follow the rules.  It was supposed to be sent to me.

10  Q   Do you understand what this letter is, that it provides

11  notice, is that correct?

12  A   I understand that's what they intended it to do.

13  Q   And do you know that before this letter was sent there was

14  a conversation between Jeff Miller, who's the center of this

15  letter, and Mr. Henkle, where Mr. Henkle requested that the

16  letter be sent by e-mail to expedite?

17         MR. SULKIN:  Objection.  Hearsay, your Honor.

18  A   I wouldn't have any idea about that conversation.

19         THE COURT:  Just a minute.  Whether or not he knows

20  is a yes or no answer.

21  BY MR. GOLDFARB:

22  Q   Are you aware of conversations between the attorneys where

23  there was a request made to e-mail this particular letter?

24  A   No.

25  Q   As I understand your testimony from this morning, you

1   personally thought that Portionables was not going to make

2   its earnout as of the date of this letter, is that fair?

3   A   I would say based on the trend for the year and et cetera,

4   et cetera, I didn't think it would make its earnout.

5   Q   But, of course, as we talked about this morning, you

6   couldn't know for sure until the earnout period was over,

7   correct?

8   A   Well, to some degree.  But as we talked about this

9   morning, if there wasn't solid discussions going with enough

10  customers to increase tonnage beyond a certain level, there

11  was no way that they were going to reach the earnout.  And

12  there wasn't enough of that at this point in time.  So I

13  think it had been a pretty good educated guess that they

14  weren't going to reach the earnout.

15  Q   Now, what we found out is that later on in the year, both

16  plants were working at capacity.  We talked about that this

17  morning, correct?

18  A   Working at their capacity at that time didn't necessarily

19  mean that capacity was going to generate them the

20  profitability necessary to get their earnout.

21  Q   Now, in the notice to cure that was sent on the 23rd with

22  regard to the Unilever contract, Mr. Calliari provided two

23  different options, did he not?

24  A   Which page is that on?

25  Q   I'm sorry, sir.  It is on page 4 of the letter.

1   A   Demand for cure.  All right.  I've got it here, uh-huh.

2   Q   Now, with regard to the Unilever contract, Mr. Calliari

3   said that you should do one of two things, either not execute

4   the agreement -- do you see that?

5   A   Yeah.

6   Q   -- or, if you wanted to do it, he would agree that you

7   could execute it as long as you would simply credit the

8   shareholders with the full value of the original contract.

9   Do you see that?

10  A   Uh-huh.

11  Q   And Sargento's response to this letter, Exhibit 14, was

12  that Mr. Calliari could resign if he wanted to, but that

13  Sargento would make no changes to its decisions, isn't that

14  right?

15  A   Yes.

16  Q   And with regard to Mr. Calliari's --

17  A   I don't believe we said he could resign for good reason.

18  He could resign if he wanted to.

19  Q   Understood.  But the core of my question is that, in

20  response to this letter and notice to cure, Sargento's

21  position was, no, we won't change a thing, correct?

22  A   We weren't willing to make those changes.

23  Q   And prior to making the proposal that's in Exhibit 14,

24  Mr. Calliari had also requested that the parties attend a

25  mediation, isn't that also true?

1    A    Yes.

2    Q    And the parties at that mediation were not able to resolve

3    their differences, isn't that correct?

4    A    I'm not certain how I'm supposed to answer that question.

5    Q    There was no resolution of the parties' differences at the

6    mediation, correct?

7    A    By resolution, what do you mean?

8    Q    A dispute continued after the conclusion of the mediation,

9    isn't that right?

10   A    Yes.

11   Q    The 30 days in the notice letter came and went without

12   Sargento changing its position, that's true, is it not?

13   A    Yes.

14        MR. GOLDFARB:  Your Honor, move the admission of

15   Plaintiffs' Exhibit 58.

16        MR. SULKIN:  No objection.

17        THE COURT:  58 is admitted.

18        (Exhibit(s) 58 admitted.)

19   BY MR. GOLDFARB:

20   Q    Sir, you received Exhibit -- or your counsel received and

21   furnished to you a copy of Exhibit 58, isn't that correct?

22   A    Yes.

23   Q    And you understood that in this letter Mr. Calliari was

24   asserting his right to resign for good reason, isn't that

25   true?

1    A    Yes, he was asserting his right.

2         MR. GOLDFARB:  Your Honor, plaintiffs move the

3    admission of Plaintiffs' 59.

4         MR. SULKIN:  No objection, your Honor.

5         THE COURT:  59 is admitted.

6         (Exhibit(s) 59 admitted.)

7    BY MR. GOLDFARB:

8    Q    Sir, Exhibit 59 is the amendment to the Unilever

9    manufacturing agreement, isn't that correct?

10   A    That's what it says.  I'm sure it is correct.  I haven't

11   seen this in many -- in a long time.

12   Q    Okay.  It says it's dated as of June 30, 2008.  Do you see

13   that?

14   A    Is that at the start of it?  Yeah, uh-huh.

15   Q    Now, the last page shows that it was actually signed on

16   July 10th, isn't that right?

17   A    Yes.

18   Q    And the person who signed it on behalf of Portionables was

19   Mr. Gordy, is that right?

20   A    Yes.

21   Q    And Mr. Gordy worked for Sargento, is that correct?

22   A    Yes.

23   Q    Sir, if I could get you to return to Exhibit 2, the

24   employment agreement.  On page 4, you see there's reference

25   to a signing bonus?

1   A   Signing and retention bonus, yeah, uh-huh, within the

2   document.

3   Q   And, in fact, was this signing bonus paid?

4   A   The signing bonus was paid to Patrick at closing.

5   Q   And that's what this agreement called for, is it not?

6   A   Yes.

7   Q   It says, payable as of the date hereof.  And the date

8   hereof is the date of closing, is that correct?

9   A   Uh-huh.

10  Q   And it says that it's in consideration for executive's

11  execution of the agreement.  Do you see that?

12  A   Shall pay him a signing and retention bonus, yes.

13  Q   But at the very beginning, sir, it says, in consideration

14  of executive's execution.  So what he had to do to get paid

15  was to sign the document, correct?

16  A   Well, I would say it was for him signing it and living by

17  the agreement, but, yeah.

18  Q   Now, other than this provision of the employment

19  agreement, are you aware of any other reference in the

20  document at all to the signing bonus?

21  A   Well --

22  Q   And let me be clear with my question.  Do the words

23  "signing bonus" or "signing and retention bonus" appear

24  anywhere else in the employment agreement other than on page

25  4 in Section 4(d)?

1    A    I might have to read through the whole document to see

2    that.  But assuming you have read through the document and

3    you are suggesting honestly that that's the situation, I

4    would agree with you.  I assume that would be the case.

5    Q    All right.  Now, if Mr. Calliari was to terminate his

6    employment at Portionables and terminate this agreement,

7    whether for good reason or for no reason at all, would he

8    still have continuing duties under this agreement?

9    A    Well, he would have continuing duties under this agreement

10   as well as the stock purchase agreement relative to

11   confidentiality and noncompetition.

12   Q    And right now, sir, I'm focused on this agreement.  If we

13   could go to page 6.

14   A    Okay.

15   Q    Section 6(b), sir, describes what Mr. Calliari's duties

16   are upon termination of employment.  Do you see that?

17   A    Uh-huh, yes.

18   Q    And it requires that for a period of 24 months he not

19   compete as it's defined in this agreement, isn't that

20   correct?

21   A    Yes.

22   Q    And the idea of a noncompetition agreement is something

23   you are well familiar with, are you not?

24   A    Pretty well familiar with it.  I don't know if I'm well

25   familiar at the level you would be, but.

1    Q    All right.  And so the concept of the noncompetition

2    agreement is that you have someone that works for your

3    company who has access to information, customers, things of

4    that nature, and if they're going to leave, you want them to

5    stay out of your business for some period of time.  That's

6    the basic idea, right?

7    A    Yes.

8    Q    And you had those sorts of arrangements with Mr. Calliari

9    in the employment agreement, correct?

10   A    As you just stated, in Section (b).

11   Q    So we look at Section 7 now.  I'm again on page 8 of the

12   agreement.  We looked at this this morning.  Termination

13   without cause, do you see that?

14   A    Uh-huh.

15   Q    And in the event of termination without -- strike that.

16       In termination without cause, there's also a section that

17   relates to resignation for good reason by the executive, is

18   there not?

19   A    There is reference -- can I just read what you are

20   thinking of here?  There's something that says resignation

21   for good reason within the document.

22   Q    I stated the question poorly.  It's my fault.  I'll try

23   again.

24       In the termination without cause section, it applies to

25   two different situations.  One is where the company decides

1   to terminate the executive without cause.  And the other is

2   where the executive terminates for good reason under the

3   agreement.  You understand that, correct?

4   A   You know, we discussed this during my deposition, I

5   believe.  And in this particular case, as I said in my

6   deposition, I may be wrong, but if executive employment is

7   terminated by the corporation without cause and not due to

8   the executive's death or disability or by the executive for

9   good reason, the corporation shall continue to pay.

10      So I look at that as being an exclusion, similar to the

11  executive's death or disability.  So I'm not certain that

12  we're reading it the same way, you and I.  And I think we

13  discussed this during our deposition.

14  Q   And is your decision not to pay Mr. Calliari any money in

15  this case resulting from his resignation based on that

16  reading you've just provided to the court of Section 7(c)?

17  A   Well, it's based on, number one, we don't think that he

18  terminated for good reason, which would be our best, I guess,

19  the one at the top, termination for good reason.  We didn't

20  believe he had good reason.

21      But down below, farther down, looking at it, even if he

22  had good reason, it wouldn't necessarily mean we would have

23  to continue to pay him, based on how I'm reading it.  I

24  didn't draft this part of the document.

25  Q   Sir, looking at Section 7(d), which is termination by

1    executive, do you see that?

2    A    Uh-huh.

3    Q    That covers the situation where Mr. Calliari simply

4    voluntarily resigns.  Do you see that?

5    A    Uh-huh, yeah.

6    Q    And in that section, what it says is that his base salary

7    shall be prorated to the date of termination.  Do you see

8    that?

9    A    Uh-huh, yes.

10   Q    It also says that if the termination occurs after December

11   31 of 2009, even if he terminates for no reason at all, you

12   will pay him something called a value award.  Do you see

13   that?

14   A    Yeah, yes.

15   Q    And Section 7(d) makes no mention whatsoever of the

16   signing bonus, isn't that correct?

17   A    No, there's no mention of the signing bonus in that

18   section.

19   Q    And there's no mention in that section of proration of any

20   signing bonus, isn't that correct?

21   A    Yeah.  But there is another place in the document where we

22   would get to that.

23   Q    And in the section right above termination without cause,

24   which we've just talked about, there's no reference there to

25   any signing bonus, correct?

1    A    No.

2    Q    And there's no reference there to any proration of any

3    signing bonus, right?

4    A    No, there isn't.

5    Q    But this section does address what it is that the

6    executive will receive in the event that this section

7    applies, correct?

8    A    Well, it addresses those issues.  But I believe somewhere

9    else in the document -- and I wouldn't be able to find it --

10   it indicates that we have the ability or we can look at other

11   remedies and we're not giving up the rights of those remedies

12   or something.  So there's still an opportunity for us to

13   address other issues, I believe.

14   Q    Let me ask you to look next at page 9 of this agreement.

15   I've got it on the screen for you, sir.  Section 7(f) of the

16   employment agreement talks about what happens if Mr. Calliari

17   leaves.  And this section also indicates that if his

18   employment terminates for any reason under Section 7, it

19   doesn't affect his obligations.  Do you see those?

20   A    I see where it says it shall not affect the executive's

21   obligations as described in Sections 6 and 8 and 11.

22   Q    And 6, 8, and 11 have to do with confidentiality of

23   information, noncompetition, and inventions, isn't that

24   correct?

25   A    I will have to look at it, but I'm going to just guess

1   that you're correct.  I see the inventions as well, yeah.

2   Q   Now, if I understand the arguments that are being advanced

3   by you and your company in this case, one of the things that

4   you are saying is that you think that Mr. Calliari should

5   have told you sooner what his views were about Unilever,

6   correct?

7   A   Absolutely.

8   Q   Okay.  So, sir, if you would look at page 11, paragraph 14

9   of the employment agreement.

10   A   Uh-huh.

11   Q   Paragraph 14 is a provision entitled "waiver," isn't that

12   correct?

13   A   Yes.

14   Q   And what it says is:  The failure of either party -- so

15   that would include Mr. Calliari, right?

16   A   Yes.

17   Q   -- to insist in any one or more instances upon performance

18   of the terms or conditions of this agreement shall not be

19   construed as a waiver or relinquishment of any right granted

20   hereunder or of further performance of any such term,

21   covenant, or condition.  Do you see that?

22   A   Yes.

23   Q   And that's the agreement that was made in writing between

24   your company and Mr. Calliari, isn't that true?

25   A   Yes.

1    Q   Looking at the last page of the agreement, at paragraph

2    22, you also agreed that what's in the document is what the

3    deal is?

4         THE COURT:  Excuse me.  I believe you just misspoke.

5    It's 21.

6         MR. GOLDFARB:  Oh, I'm sorry, your Honor.  You're

7    absolutely correct.

8    Q   Paragraph 21, sir, is entitled "entire agreement."  Do you

9    see that?

10   A   Yes.

11   Q   And in that paragraph your company agreed that what's

12   written down here in the employment agreement is the entire

13   agreement between the company and Mr. Calliari concerning the

14   subject matter of the agreement, isn't that right?

15   A   Yes.

16        MR. GOLDFARB:  Your Honor, that's all the questions I

17   have this afternoon.  Thank you.

18        THE COURT:  Okay.  Mr. Sulkin, do you wish to

19   examine?

20        MR. SULKIN:  I do, your Honor.

21        THE COURT:  How about, while you are getting to the

22   podium, why doesn't everybody stand up and stretch.

23        THE WITNESS:  The witness, too.

24        THE COURT:  Now you know why judges like to hear the

25   words "all rise."

1    Are you ready to go?

2         MR. SULKIN:  I am, your Honor.

3         THE COURT:  All right.  Please be seated.

4                    CROSS-EXAMINATION

5    BY MR. SULKIN:

6    Q   Good afternoon, Mr. Gentine.

7    A   Good afternoon.

8    Q   I would like to spend a little time on your background, a

9    little bit more than Mr. Goldfarb did.  First, I would like

10   to start with Sargento.  Could you give us a little bit of

11   background about Sargento, how it got started.  We don't want

12   a two-hour lecture, but just a short sort of synopsis of the

13   company.

14   A   My father started Sargento in 1953.  He was truly the

15   entrepreneur of the company.  He unfortunately passed away in

16   1996.  But my dad was a high school graduate, came from very

17   modest means in the city of Milwaukee and actually worked as

18   a machinist and had other types of jobs in Milwaukee in his

19   early years.

20       He enrolled in the Wisconsin Institute for Mortuary

21   Science and became an undertaker in the mid to later 1930's.

22   He and my mother moved to Plymouth in 1939, where he opened

23   up a funeral home.

24   Q   Just for the jurors who are not from Wisconsin, where is

25   Plymouth in relationship to Milwaukee?

A     I'm sorry.  Everyone doesn't know that.  Milwaukee is

located about two hours north of Chicago, basically on Lake

Michigan.  Plymouth would be about another 45 minutes to an

hour north of there, about 15 miles off of Lake Michigan.

And that's where Sargento's headquartered as well today.

Anyway, he was an undertaker.  Back in those times, he and

my mother happened to be Catholic.  And back in the '30s and

'40s, Catholics tended to get buried by Protestants and vice

versa.  You know, you can understand those things back at

that point in time.

So it wasn't a strong Catholic community, but he was

basically relegated to doing funerals for dead Catholics.  So

he was always looking for different things to do.  He tried

to raise mink for a while.  And he got involved in a couple

other preliminary businesses that were somewhat cheese

related.

He also started a cheese store in Plymouth, which was --

at that time, people from Milwaukee and Chicago would be

going up to northern Wisconsin, to some of the tourists areas

in northern Wisconsin.  And they would stop at the store.

And a lot of them went by bus at that time, by the way, not

so much cars.

They would stop at this store called the Plymouth Cheese

Counter, you know, which was right behind the funeral home in

an old carriage barn.  And my grandmother worked there as

1   well.  And they would buy product, generally on their way

2   home, or maybe take some up to the northern lakes of

3   Wisconsin.

4        He noticed that there was a growing interest in Italian

5   style cheeses.  Now, today most people in this room would

6   think pizza was around forever in the United States.  But,

7   quite honestly, prior to 1950, there were very, very few

8   pizza houses.  There certainly weren't any Pizza Huts, things

9   like that.

10       But he saw a growing interest.  So he thought there was an

11  opportunity to provide retail-sized packages of Italian style

12  cheese, specifically parmesan, Romano, mozzarella, and

13  provolone, to retail supermarkets.  It was something that had

14  never been done before.  Again, you say, well, God, must have

15  done that forever, but not actually the case.

16       So he got together with a close friend of his who lived

17  across the street.  His name was Joe Sartori.  And Joe had a

18  family business that actually produced Italian style cheeses

19  in Plymouth.  And they combined their names, Sartori and

20  Gentine, Sargent, and added the O because that would make it

21  sound a little more Italian, Sargento.  And they came out

22  with packages of Italian style cheeses.  And that was the

23  start of the business.

24       My father was absolutely an entrepreneur.  And that's how

25  our business took off.  And over the years it grew due to

1    innovation.  We were the first company to market shredded

2    cheese.  And if any of you shop in the stores, there's plenty

3    of choices of shredded cheeses out there today.  That was a

4    category that didn't even exist prior to Sargento and prior

5    to us developing that category.

6        Today we produce shredded cheese, sliced cheeses, snack

7    cheeses, and a few other varieties as well.  Our largest

8    division is the consumer products division.  And as I

9    mentioned earlier in my testimony, up until a week or two ago

10   was headed most recently by my son Louie.

11       We also have a food service division that focuses on

12   restaurant chains and things such as that.  And there you

13   might find things like breaded mozzarella sticks, as an

14   example, that we produce for restaurants that they would

15   serve in restaurants, so other things besides the other kind

16   of styles of cheese I mentioned earlier.

17       And then we have what we call our food ingredient group.

18   And that's basically industrial, where we would sell other

19   food companies cheese for whatever needs that they need it.

20   Q    And when did you get involved in the company, sir?

21   A    With the family business, again, back in the '50s, you

22   could get involved much earlier than you can legally get

23   involved today.  My dad had his kids working in the plant

24   probably by the time we were nine or ten, doing the most

25   menial of jobs because it was a family business.

1       I worked there through high school.  I also worked there

2    summertimes through college.  I then went off, worked for --

3    after I graduated, I went to the University of Notre Dame.  I

4    went to work for Pricewaterhouse, an accounting firm in

5    Hartford, Connecticut, for three years.  And then I returned

6    to the company in '73 in accounting and financial roles for a

7    number of years.

8       I shared the responsibility of what we call the office of

9    the president, which was really three presidents, my brother,

10   myself, and one nonfamily member, for a year or two.  And in

11   1981, the board appointed me as the president and chief

12   executive officer, which was a position I've held ever since

13   1981.  I guess I may be one of the longest standing

14   presidents and chief executive officers around the country at

15   this point.

16      And I became the chairman following my father's death in

17   1996.  He was very inactive, but he was the founder, and we

18   maintained his role of chairman until he died of Parkinson's

19   disease.

20   Q   Are you married?

21   A   I am married to my wife, Michelle.  We're celebrating our

22   40th anniversary this year.  We have -- we had four children.

23   We unfortunately lost our third son at a very, very early

24   age.  But our oldest son, Tony, is a teacher, lives in our

25   general vicinity, ten miles from our house, has four

1   children.  Louie, who we mentioned earlier, obviously lives

2   in the same area.  He and his wife also have four children.

3   And then I have a daughter, Kelly, who is still single and

4   involved in marketing and living in Colorado at this time.

5   Q   I want to take us now to sort of how you got interested --

6   you, meaning your company -- in Portionables.  Could you tell

7   us about how that came about?  I know you talked a little bit

8   to Mr. Goldfarb about it.  But if you could expand on why you

9   were interested in Portionables and what you saw in that

10  company?

11  A   Well, as I mentioned, you know, we're in the natural

12  cheese business.  In fact, we always talk about the fact that

13  our focus is cheese, cheese based and other culinary

14  solutions.  And we were looking at ways to provide added

15  value to the consumers or to our customers by making it

16  easier for them to use our products.

17      A lot of our products are clearly all about quality and

18  all about convenience for the consumer or the customer, how

19  can they use these things easier.  So we felt that the sauce

20  area was an area that provided a lot of opportunities.  And,

21  in fact, we had had some discussions with other sauce

22  companies prior to getting involved with Patrick and his

23  company.

24      But we did a study.  There was a research firm; I believe

25  it was called Technomics.  They do this kind of stuff.  They

1    helped us research the various companies that were active in

2    the field of sauces.  And then basically they did sort of a

3    sorting, I guess, similar to what went on with the jury thing

4    earlier, to say, well, which ones made sense, which ones

5    didn't.

6        You know, if the company was involved in nothing but soy

7    sauce, it really wouldn't fit cheese.  But they might have

8    some products like that.  And, quite honestly, I think

9    Portionables probably does some sauces that aren't cheese

10   sauces.  But we were looking for companies that had, you

11   know, a little more of a relationship to what we do at

12   Sargento.

13   Q   And in some --

14   A   And Portionables was one of the companies that this

15   organization, research company, suggested would be something

16   we'd want to look more closely at.

17   Q   Now, did you have discussions early on with Mr. Calliari

18   about purchasing Portionables?

19   A   Yeah, we had discussions after I met him, obviously.

20   Q   And tell us about the first discussion you had.  Did you

21   get into any details with him about a potential purchase?

22   Were you just looking at the company?  How did that come up?

23   A   Well, the initial discussion was -- it was actually

24   somewhat of a visit to Bellingham where we got to see a

25   little bit of the facility.  Patrick was understandably

1    guarded about what he would show somebody that's interested

2    in getting into the sauce business, because if he didn't sell

3    to us, he certainly didn't want to give us too many clues

4    about what he was doing there.

5        But we went out to visit, myself and, I believe, Bob

6    Clouston.  And at that time Kevin Delahunt was the president

7    of our food ingredients group, or that group that services

8    other food companies.  And the three of us went out and

9    visited with Patrick.  I'm sure we had dinner with him.  And

10   it was our initial visit.

11       And then obviously we let him know of our interest and

12   wanted him to get back to us if he had an interest in talking

13   further.

14   Q   At some point you received a letter -- I think it was

15   shown to you -- from Mr. William Beard.  Would you look at

16   Exhibit No. 15.

17       MR. SULKIN:  I think it's already been admitted, your

18   Honor.

19   A   Bill Beard was a, as I understand it, was like a company

20   sales consultant that was being used by Patrick Calliari,

21   because, as it was mentioned by Mr. Goldfarb, I believe it

22   was Mr. Goldfarb before, as it turns out, we weren't the only

23   company looking at Portionables at that time.

24   Q   Now, Mr. Goldfarb showed you portions of this document.

25   I'd like to show you a different paragraph that wasn't shown

1    in your earlier examination.  The issue of operational

2    control, we've been talking about that for a few days now.

3    He addresses it, does he not, in the third paragraph of his

4    e-mail to you?

5    A    Yes, he does.

6    Q    And I'll read it to you.  It says:  Operational control:

7    Mr. Calliari would have full operational control of

8    Portionables during the earnout period, continuing his title

9    and duties as CEO in accordance with the employment

10   agreement.  Do you see that?

11   A    Yes, I do.

12   Q    So this was January 30th of '07, which is three months

13   prior to the deal being signed?

14   A    Uh-huh.

15   Q    We need a "yes."

16   A    Yes.

17   Q    Okay.  I will be interrupting you, as I remember, to

18   answer yes or no.

19   A    Yes.

20   Q    Okay.  Were you willing to give him at this time full

21   operational control?

22   A    I wasn't comfortable with either full operational control

23   or duties of CEO.  No, absolutely not comfortable with that.

24   But this was a proposal they were making us.

25   Q    And did you send a letter back countering that?

1    A    Yeah, I did.  I sent a letter back that countered, I

2    believe, not just the issue of full operational control and

3    him being the CEO.  I think at that second stage we got to

4    the point I said I would be willing for him to have primary

5    -- I think I used the term "primary operational control."

6        But I think at that time also -- well, no, I think that

7    later on, following that, we had one more thing.  We got down

8    to just calling it operational control and that he would be a

9    division president.

10   Q    Why did you not want him to have full operational control

11   and duties of a CEO?  What was the problem with that?

12   A    Well, the problem with that was we were paying 19 million

13   dollars for the company.  It was going to be our company.  19

14   million dollars was a significant premium over what the

15   company was worth if it didn't earn any more than it had been

16   doing over the last number of years, where I had earlier

17   stated that it wasn't particularly successful.

18       So we were giving him a nice kicker with the 19 million

19   dollars.  And, of course, he had the opportunity for this

20   contingent payment as well.  So we weren't willing to do

21   that.

22       Added to that, I am the CEO of the company.  And I'm

23   certainly not going to give control to somebody that -- a

24   company that we just met, to give them that type of control.

25   Q    Take a look, if you would, at Exhibit No. 1.

1    A    Okay.

2    Q    Without getting into the contents, is that your signature

3    at the bottom of the letter?

4    A    Yes.

5    Q    And you sent this to Mr. Calliari?

6    A    Yes, to Patrick Calliari.

7    Q    On or about February 7th?

8    A    Uh-huh, yes.

9         MR. SULKIN:  Your Honor, move for the admission of

10   No. 1.  I don't think there's any objection.

11        MR. GOLDFARB:  It's actually our exhibit, your Honor.

12   No objection.

13        THE COURT:  1 is admitted.

14        (Exhibit(s) 1 admitted.)

15   BY MR. SULKIN:

16   Q    First, why did you write this letter?

17   A    Well, again, this was to talk about a proposal on how we

18   could -- we were responding to the letter from Bill Beard

19   with changes that we felt were necessary.

20   Q    Take a look, if you would, at the third bullet point that

21   begins with:  It would be our expectation.

22   A    Yes.

23   Q    You wrote:  It would be our expectation that during the

24   earnout period, the Portionables business would remain

25   largely segregated from Sargento's other businesses and you

1    would retain primarily operational control.  Do you see that?

2    A    Yes.

3    Q    And how did you see primary operational control different

4    from full operational control?

5    A    Well, I think full operational control would be full.

6    Primary would mean that there wouldn't be -- there would be

7    some issues that he would be having such control of.

8    Q    And did you have discussions at this time with

9    Mr. Calliari about the issue of operational control?

10   A    About this time, or following this letter?

11   Q    Let's talk about first at this time.

12   A    Well, I think we had discussions.  I don't recall exactly

13   the details of the discussions back and forth.  This was on

14   February 7th.  I'm quite certain he came to visit us back in

15   Plymouth again.  I'm not certain on the details on that.

16   Q    Take a look, if you would, at the next bullet point.  It

17   reads -- and this is what you were requesting from him?

18   A    Uh-huh.

19   Q    All right.  The requirement that you agree to a multiyear

20   employment agreement, including a noncompete agreement, that

21   would provide appropriate incentives for your continuing role

22   and significant long-term incentives tied to the performance

23   of Sargento's overall business through its phantom stock

24   plan.

25        I'm going to stop there.  What were you trying to convey

1    here?  Why did you want that as part of any deal with

2    Mr. Calliari?

3    A    Well, because Patrick, although the company wasn't doing

4    financially well, but we're somewhat familiar with that

5    because, quite honestly, Sargento didn't do all that

6    financially well in its earlier years, as hard as my dad

7    struggled with it for many, many years, but at the same time,

8    we respected the fact that Patrick had come up with a good

9    idea here and that there was potential for that idea.

10       But we didn't believe that potential could be, let's say,

11   totally -- I don't want to use the word mine, but we wouldn't

12   get the full potential of the company without Patrick's input

13   and involvement going forward.

14   Q    At some point did you have a discussion with Mr. Calliari

15   concerning the financial performance of the company?

16   A    Yeah, we had, I'm sure, a number of conversations relative

17   to the past financial performance of the company, as well as

18   what he projected the financial performance of the company

19   could be going forward.

20   Q    And what did you come to learn from him about that?

21   A    Well, the company was struggling when we talked to him.

22   They had the Unilever agreement for Bellingham.  And as was

23   stated earlier, it appeared to be the only product that was

24   being produced, or only meaningful product being produced in

25   Bellingham.

1    They had built a new facility in South Dakota, North Sioux

2  City, South Dakota.  I believe there's a South Sioux City,

3  North Dakota, too, which is interesting, but North Sioux

4  City, South Dakota, which they built primarily to service two

5  other major companies, Con Agra and General Mills.

6    I think General Mills was probably his first big account.

7  But after or during the construction -- I'm not certain what

8  the exact timing of that plant was -- General Mills came to

9  Patrick and wanted price concessions.  And he told us he had

10  offered them price concessions, but apparently not enough to

11  keep them as a customer, and they left him as a customer.

12    So because of that -- and, apparently, I believe that Con

13  Agra, that it was a similar situation, where they were also

14  asking price concessions.  And he offered price concessions

15  to Con Agra as well.  In that case he may have saved part of

16  the business by those price concessions.

17    But because of that reduction in business -- and, again, I

18  think the General Mills business may have been larger than

19  Unilever -- suddenly they had a new plant ready to go and

20  nothing to run down the lines.

21    And the term "burden" is used a lot in financial

22  statements.  They had a great deal of burden with the North

23  Sioux City plant and virtually no products to run on it.

24  Q    Did Mr. Calliari address what he believed the future

25  looked like concerning sales for Portionables at that time?

1  A   Yes, he did.  He had -- and, again, I mentioned earlier

2  the whole concept of hockey stick projections.  But he had

3  projections where he felt that the company could grow to

4  levels of over 70 million pounds of product, which would have

5  been, I believe, probably three times what they were at this

6  point in time.

7  Q   Would you take a look --

8        THE COURT:  We need to find a place to stop.

9        MR. SULKIN:  This would be a good place, your Honor.

10        THE COURT:  All right.  Ladies and gentlemen, why

11  don't you close up your notebooks, and you may be excused to

12  the jury room.

13        (Jury leaves courtroom.)

14        THE COURT:  Okay.  Anything we need to take care of

15  before we recess?

16        MR. SULKIN:  Not from us, your Honor.

17        MR. GOLDFARB:  Just one thing, your Honor.  Motion in

18  limine No. 5 is about to come into sharp relief.  And I'm

19  happy to address some of that now outside the presence of the

20  jury if the court thinks that is more appropriate.  But we

21  got their exhibits over lunchtime, and there were a number of

22  related documents that are going to be a problem, and if we

23  could get that clarified.

24        THE COURT:  Well, let's sit down.  What's going to

25  come up here?

1              MR. SULKIN:  Your Honor, the next document I intend

2    to show him is Exhibit 215.  These were projections given to

3    them during the negotiation period.  And what I'm interested

4    in is just showing comparisons, the last four columns, 2005,

5    2006, 2007, 2008, in which Mr. Calliari does make certain

6    projections as to what will happen.

7         We had testimony that they brought out on this very issue.

8    It's part of the negotiation process.  And it explains why

9    they paid what they did.  And it gives background to the

10   calculation.

11        I don't intend to go into EBITDA.  I will say that

12   Mr. Goldfarb already has, to a certain extent, by explaining

13   it and asking him questions about it and how it works and

14   everything else.  And so I certainly don't intend to go that

15   deeply into it.  But I find it appropriate for us to provide

16   documents that were part of the negotiation process and why

17   this sale took place, through this witness.

18              THE COURT:  Mr. Goldfarb.

19              MR. GOLDFARB:  Your Honor, I think, if you start at

20   the back and look at Exhibit 288, this is the most extreme

21   example, your Honor, but this is the contingent payment

22   report that is the subject.  It's discussed at some length in

23   our dispute over the motion to compel arbitration.  But this

24   is prepared nine months after Mr. Calliari leaves.

25        And if your Honor recalls the motion in limine, the

1    position was that we could have no discovery whatsoever into

2    this subject, that their view was it had to be done in the

3    arbitration.  So there's been no discovery into this document

4    at all.

5        There are other subsidiary documents leading up to this.

6    But it's just horribly unfair if we're going to litigate now

7    the EBITDA questions.  And, again, this is not of our making.

8    We tried to get this discovery, and they absolutely refused

9    to provide it.

10            THE COURT:  Okay.  So you haven't seen 288

11   previously?

12            MR. GOLDFARB:  No, your Honor.  We've seen 288.

13            THE COURT:  But you weren't allowed to ask questions

14   about it?

15            MR. GOLDFARB:  Right.  And let me tell you what 288

16   is.  288 is their report that they provided under the stock

17   purchase agreement where they say this is what EBITDA turned

18   out to be.  And then it attaches these schedules.  And I can

19   go on for 45 minutes about just preliminarily what the

20   disputes are about this, how they didn't raise prices during

21   some of this EBITDA period once Mr. Calliari was gone, that

22   they shut down the plant to do maintenance.  Those are the

23   arbitration disputes that aren't for here.

24       But this trial takes on a very different complexion if

25   your Honor's going to allow these sorts of documents, and

1   this one in particular.  But this whole financial story --

2   and it's just, you know -- I mean, we really tried to get

3   these documents in discovery in this case, and they were

4   adamant that they weren't coming in.  So that's why we set

5   the motion.

6           THE COURT:  Okay.  So right now I've got 215 in front

7   of me.  Is there an objection to 215, Mr. Goldfarb?

8           MR. GOLDFARB:  Well, there is, your Honor, on two

9   fronts.  One is just how is it relevant to what we're doing

10  here?  And the second is that, without the whole financial

11  discovery into the company, we can't really explain or

12  address it.

13          THE COURT:  Except 215 is your client's projection.

14  So certainly you had that.

15          MR. GOLDFARB:  That's true.  But the next question is

16  going to be:  What happened?  And as soon as that door swings

17  open, I'm in the dark.

18          THE COURT:  All right.  So let's assume the next

19  question is not what happened.  What's the problem with 215?

20          MR. GOLDFARB:  Okay.  Then the only question at that

21  point is how is it relevant to the dispute between the

22  parties?

23          THE COURT:  Well, we certainly have a lot of

24  information about the French coming after this company, about

25  what the offers were, how 19 million was going to go to the

1    shareholders, 1 million was going to go to Mr. Calliari,

2    where they met.  You know, we've heard about the airport.

3        To be perfectly honest, I don't know why anybody is going

4    into any of that.  But you certainly have talked plenty about

5    how you got to negotiations.  I mean, I know where they had

6    their dinners.

7        So I guess what I'm saying is, how does this hurt you, and

8    why does it not complete the picture that everybody's

9    puffing?  One side wants the price lower, one side wants the

10   price higher, and they come to an agreement?

11           MR. GOLDFARB:  If it stops there, your Honor, and

12   doesn't turn into what happened to these numbers, I

13   understand that approach.  What I'm concerned about is we

14   really have not been allowed to depose or get any kind of

15   documents to drill down inside the performance of the

16   company.

17           THE COURT:  All right.  Now, Mr. Sulkin, tell me

18   about 288.

19           MR. SULKIN:  Your Honor, I probably shouldn't say it

20   this way, but I don't feel all that strongly about it.  The

21   only point I wanted to use it for is for the sales numbers.

22   But I'm willing to withdraw 288.

23           THE COURT:  Okay.  288 isn't here.  And if you want

24   to use 215, it's simply:  These are what everybody hoped for.

25           MR. SULKIN:  Exactly.

1          THE COURT:  Period.

2          MR. SULKIN:  Exactly right.  That's all I intend to

3     do.

4          THE COURT:  But we're going to stay out of the

5     earnout calculations.  We all know the formula.  But we're

6     not going to lay in front of this jury what anybody thinks

7     they are or were.  You decided to take that elsewhere.

8     You've got to take it elsewhere.

9          MR. SULKIN:  I do not intend to raise that issue with

10    this witness, your Honor, other than there was some allusion

11    made by Mr. Goldfarb as to why you would pay 6 dollars for

12    one.  In other words, why would you pay so much in an

13    earnout.  I intend to ask him why that makes sense.  But I

14    don't intend -- it's a theoretical question.  You're paying

15    for a stream of income.  That's why it makes sense to us,

16    period.

17        I think the implication they are trying to draw, your

18    Honor, is that we had incentive to stop them from making the

19    earnout.  And that's why they raise the subject.  All I want

20    is for this witness to explain that wasn't true.  In fact, we

21    wanted to make the earnout.  And the financial stream of

22    income would more than cover that.  And that's the only issue

23    I intend to raise.

24          THE COURT:  Then you talk about his rationale.  You

25    don't talk about his numbers.

1          MR. SULKIN:  Fair enough.

2          THE COURT:  Okay.  Everybody clear on that?

3          MR. GOLDFARB:  We are, your Honor.

4          THE COURT:  Okay.  Then let's take a break.  We'll be

5     at recess.

6          (Brief recess.)

7          THE COURT:  Okay.  Are we ready to go?

8          MR. GOLDFARB:  Yes, your Honor.

9          MR. SULKIN:  Yes, your Honor.

10         THE COURT:  All right.

11         (Jury enters courtroom.)

12         THE COURT:  Okay.  Ladies and gentlemen, please be

13    seated.  This is the end of the 7th inning stretch, coming up

14    at the end of the day.  Let's continue.

15         MR. SULKIN:  Thank you, your Honor.

16    Q   Mr. Gentine, we just went from full operational control of

17    the CEO, Exhibit 15.  And Exhibit 1 was primary operational

18    control.  And we're going to get to Exhibit 2.  The jury has

19    seen it plenty of times.

20        I want you to tell us, if you can recall, what was -- any

21    discussions you had on the subject with Mr. Calliari.  But

22    before I do, I want to ask you this question:  Do you, as you

23    sit here today, specifically remember when these particular

24    discussions took place among the three or four you had with

25    Mr. Calliari?

1    A    No.

2    Q    Okay.  So what I want you to do is tell the jury as best

3    you can what you do recall about these discussions relating

4    to how we get to the language that's in the contract

5    concerning the issue of operational control.

6    A    Well, the letter I sent, where I said primary operational

7    control, there were different issues there that weren't

8    agreed upon by, obviously, both sides.  And we ended up with

9    a -- Patrick and I, I believe, met somewhere in Plymouth.  I

10   think he came, and we had discussions on operational control.

11        And I said:  You know, I think what makes the most sense

12   here is that we put in just operational control and that you

13   will serve as a -- in the same role as a division president.

14   And if you have any issues with whether or not your

15   operational control is being hindered, then come to me.  I

16   have an open-door policy.

17        I have an open-door policy with everybody in the company.

18   I meet regularly with employees in our factories and

19   everywhere else where they have an issue with this or that.

20   That's what a family business is really all about.

21        I told him:  You can come at any time.  And, quite

22   honestly, up until the letter on March 28th, I think Patrick

23   and I had a great relationship relative to communicating back

24   and forth.  But included in that relationship, there wasn't

25   any notice that I was doing anything wrong.

1    I think that, in discussing it, it probably was with

2    attorneys involved again following our discussions that there

3    was a discomfort with just come and talk to me.  And that's

4    where the language was put in relative to termination for

5    good reason, where we actually put language in the document

6    beyond just coming to me and talking to me.

7    Q    Let's jump to Exhibit No. 2.  I'll show the first page to

8    the jurors so they know where we're at.  And if you could, if

9    you could turn first to page No. 7, which is the termination

10   provision at the bottom.  And then if you could turn the page

11   to page 8, pull out the good reason provision.  Is this what

12   you were referring to, Mr. Gentine?

13   A    Uh-huh, right.

14   Q    Okay.  And what it says here is, if I may read it:  Good

15   reason.  Termination for good reason shall mean the

16   termination of executive's employment by executive following

17   a material breach by the corporation of any provisions of

18   this agreement, which failure continues for a period of 30

19   days after the corporation's receipt of written notice from

20   executive specifying the details of such alleged failure.

21        Do you see that?

22   A    Yes.

23   Q    Okay.  Is it your testimony that this came out of -- this

24   was a lawyered version of a discussion you had with

25   Mr. Calliari?

1  A   Yes.

2  Q   Okay.  Now, I'm just going to ask you a series of

3  questions about that issue, okay?  At any point prior to

4  March 28, 2008, that is the Weinstein letter, did

5  Mr. Calliari send you notice pursuant to this provision?

6  A   No.

7  Q   At any point prior to March 28, 2008, did Mr. Calliari

8  walk into your office, your open-door policy, and say that

9  you were taking his operational control on any issue?

10  A   No.

11  Q   At any point prior to March 28, 2008, did Mr. Calliari

12  send you an e-mail --

13        MR. GOLDFARB:  Excuse me, your Honor.  These

14  questions are highly leading in nature.

15        THE COURT:  They are.  Sustained.

16  BY MR. SULKIN:

17  Q   Mr. Gentine, at any point did you receive notice from

18  Mr. Calliari relating to this issue concerning operational

19  control prior to March 28, 2008?

20        MR. GOLDFARB:  Same objection, your Honor.

21        THE COURT:  Overruled.

22  A   I never received any objection from him at all relative to

23  any issue about operational control.  And Patrick and I

24  visited regularly, primarily on the phone.  We obviously had

25  e-mails going back and forth from time to time.  I think he

1   was much more comfortable with telephone, or we visited in

2   person from time to time as well.  It never came up.

3   BY MR. SULKIN:

4   Q   Okay.  I want to now go back to the first page of Exhibit

5   No. 2.  And the jury has seen this plenty of times.  So we'll

6   try and go through it a little bit quicker if we can.  The

7   duty section, paragraph No. 3, if you could pull that up for

8   me, down at the bottom, last paragraph.

9       In your mind, did this make it clear what Patrick's role

10  was?

11          MR. GOLDFARB:  Objection, your Honor.  Witness'

12  subjective view of the subjective contract is not relevant.

13          THE COURT:  I'm sorry.  I did not hear you,

14  Mr. Goldfarb.

15          MR. GOLDFARB:  I'm sorry, your Honor.  I said that

16  the witness' subjective view of the meaning of this language,

17  if it's not objectively manifested, it is in violation of the

18  objective manifestation rule.  So it's not relevant.

19          THE COURT:  Okay.  Pose the question again, please.

20  I want to hear it before the answer.

21          MR. SULKIN:  Let me rephrase it.

22  Q   Mr. Gentine, did this provision capture accurately the

23  discussions you had with Mr. Calliari, at least in part,

24  relating to where he stood vis-a-vis you in the hierarchy

25  within Sargento?

```
 1              MR. GOLDFARB:  Leading, your Honor.
 2   A    Yes.
 3              THE COURT:  Sustained.
 4              THE WITNESS:  I'm sorry.
 5              MR. GOLDFARB:  Your Honor, so my record is clear,
 6   move to strike.
 7              THE COURT:  The jury will disregard the last question
 8   and the last answer.
 9   BY MR. SULKIN:
10   Q    At any point did Mr. Calliari claim that he was not in the
11   role of a division head?
12   A    Not that I can recall.
13   Q    At any point did Mr. Calliari, prior to the dispute in the
14   spring of 2008, did he ever claim that you weren't his boss?
15   A    No.
16   Q    Did you have the right under this agreement to assign
17   duties to him?
18              MR. GOLDFARB:  Objection.
19   A    Yes, I did.
20              MR. GOLDFARB:  Objection, your Honor.  Calls for a
21   legal conclusion.
22              THE COURT:  Rephrase the question as to what he
23   thought his position was to be able to assign the duty.
24         And, Mr. Gentine, you've got to let me do my job.  Most
25   days I like my job.  But if you talk over the top of the
```

1    objection, I can't do my job.  So please --

2           THE WITNESS:  I was talking before I understood that

3    there was another objection coming up.  I'm sorry, your

4    Honor.

5           THE COURT:  So once the question is asked, please

6    take a deep breath.  Let me jump in if I need to.

7       Go ahead.

8    BY MR. SULKIN:

9    Q   Mr. Gentine, was it your understanding in this provision

10   that you had the right to assign duties to Mr. Calliari?

11          MR. GOLDFARB:  Your Honor, this examination is very

12   leading in nature.

13          THE COURT:  It is.  You have to not lead him.  Who,

14   what, when, how, why.

15          MR. SULKIN:  Okay.  Your Honor, I'll try it this way.

16   I don't intend to be leading.

17   Q   Mr. Gentine, how did this provision set forth the relative

18   roles in your mind between you and Mr. Calliari, that is,

19   paragraph No. 3 of page 1 of the employment agreement?

20          THE COURT:  Go ahead.  You can answer.

21   A   Well, as it's written, I was the president and chief

22   executive officer, and he was under my direction.  So that

23   gave me the ability to assign duties to him.  I asked him to

24   do different things that I would ask anybody else reporting

25   to me to do.

BY MR. SULKIN:

Q   I would like you to take a look now at Exhibit No. 3,
which is the stock purchase agreement.  What was your
understanding of the relationship between the stock purchase
agreement and the employment agreement to Mr. Calliari?

A   My view on the stock purchase agreement and employment
agreement with Mr. Calliari is that the two of them were sort
of sealed at the hip, whatever the term is, but basically
that they were together.  They depended on each other, and
they could not be read separately.

Q   Let's take a look at page 45, paragraph 9.9, of the stock
purchase agreement.  Could you read this paragraph for me,
please?

A   Entire agreement.  This agreement, together with the
additional agreements, the company disclosure schedules, the
exhibits, and other writings referred to herein or delivered
pursuant hereto constitutes the entire agreement among the
parties and supersedes any other agreements, whether written
or oral, that may have been made or entered into by or among
the company, the shareholders, or by any director or
directors or officer or officers of such parties relating to
the transactions contemplated hereby, or incident hereto.
And it says, no.

Q   Okay.  And if we could take a look at page 38, additional
agreements.  Do you see that?

1   A    Yes.

2   Q    And additional agreement, what was defined as one of the

3   additional agreements relative to your answer concerning the

4   relationship between Exhibit 2 and 3?

5   A    One of them means the escrow agreement, the Calliari

6   employment agreement, and then other things.

7   Q    Now, I'd like you to take a look, just to backtrack a

8   little bit, at Exhibit No. 215.  Did you receive a copy of

9   this document during the negotiations of the purchase of

10  Portionables?

11  A    At some point, yes.

12  Q    From whom did you receive it?

13  A    I would have received it, I assume, from Patrick or

14  possibly Bill Beard, who was the representing agent for

15  Patrick.

16       MR. SULKIN:  Your Honor, I move for the admission of

17  Exhibit 215.

18       MR. GOLDFARB:  No objection, your Honor.

19       THE COURT:  215 is admitted.

20       (Exhibit(s) 215 admitted.)

21  BY MR. SULKIN:

22  Q    Mr. Gentine, what was your understanding with this exhibit

23  when you received it from Mr. Calliari or Mr. Beard?

24  A    Well, it was the description of the potential of what

25  Portionables could be over the next couple of years, 2007 as

1   well as 2008.  As you saw -- and, again, this is that hockey

2   stick type of performance that we talked about earlier, that

3   based on 2007 there was a potential of --

4   Q   Let me see if I can take you through it.  Are you

5   referring to the sales line in the last, say, four columns,

6   in the years 2005, 2006, 2007, 2008?

7   A   Well, the sales were going to jump dramatically.  In fact,

8   I think I referred to those numbers before.  Somewhere in the

9   70's -- it was actually almost 75 million, compared to 26

10  million in 2006.  It was almost a tripling of sales.  So

11  there was great potential for sales increase, which would

12  drive EBITDA down at the bottom.

13  Q   Just so we're clear, 2006 you understood to be actual

14  sales.  In 2007, 2008, did you understand them to be actual

15  or projections?

16  A   Well, 2007 and 2008 would have been projections.  And I'm

17  not certain if 2006 was still somewhat of a projection based

18  on the time we would have looked at this.  They may not have

19  had final numbers yet for 2006.  But I'm sure they would have

20  been a very close approximation of what the results for 2006

21  would be.  Previous years, I would have guessed that those

22  were actual.

23  Q   Thank you.  Take a look, if you would -- I want to go back

24  now to Exhibit No. 3.  Go to paragraph 1.6(b).  That's on

25  page 4.  And Mr. Goldfarb went through this with you.  And he

1    went through the various six items there.  Do you see that?

2    A   Yes.

3    Q   He talked with you a little bit about, it says here -- let

4    me just read it, so I'll situate us.  It says:

5    Notwithstanding the understanding concerning control of the

6    company by the shareholders' representative described above,

7    the parties understand that certain actions which are likely

8    to have a material financial impact on the company after the

9    contingent payment due date will require the consent of the

10   purchaser.  And the purchaser is whom?

11   A   Sargento.

12   Q   And so if Mr. Calliari -- if one wanted to enter into

13   terminating or materially amending any consent contract, it

14   would mean you have to agree?

15   A   Yes.

16   Q   Is there anything in this provision that requires him to

17   agree if you decide to amend a contract?

18   A   Absolutely not.

19   Q   Is there anything in this provision that limits your

20   powers vis-a-vis him?

21   A   Not that I'm aware of, no.

22   Q   Mr. Goldfarb pointed out the provision here talking about

23   the company being run as it had been in the past.  Do you

24   recall that?

25   A   Yes.

1    Q    Let's take a look at 1.6(a), just up one paragraph.

2    A    Uh-huh.

3    Q    It reads:  The parties agree that prior to the contingent

4    payment due date, the company and the sub will be operated in

5    a manner consistent with past practice and under the

6    operational control of the shareholders' representative.

7         Do you see that?

8    A    Uh-huh, yes.

9    Q    I need a "yes" for the record.

10   A    Yes.

11   Q    Let's take under Mr. Calliari's version of his argument,

12   to your understanding, was there past practice at

13   Portionables for amending contracts?

14   A    Yes.  And I think I stated earlier that they needed to

15   amend the General Mills contract resulting -- because General

16   Mills wanted a reduction in price.  And they attempted that.

17   I'm not certain about the numbers relative to how far they

18   were willing to go down.  But they were willing to go down.

19   And it wasn't enough, and they lost that business.  Plus the

20   North Sioux City plant was laying empty.

21        They also had a situation, as I mentioned earlier as well,

22   with Con Agra, where they needed to reduce pricing in order

23   to maintain business.

24   Q    I think you testified that when you purchased, meaning

25   Sargento purchased Portionables, the exclusivity provision in

1    the Unilever contract went away.  Do you recall that

2    testimony?

3    A    Yeah, I do.  And --

4    Q    Can you explain what that means and how that works?

5    A    Well, again, up until we purchased the company, Unilever

6    could not procure these type of frozen sauce pellets from

7    anybody else.  I believe it was North America -- in North

8    America.  It may have been the United States.  They were able

9    to get them from their facility in Italy, where they had the

10   capability of producing these at any time.

11       So when we bought it, we lost that exclusivity, which

12   obviously exposed us to the potential they could buy from

13   someone else.  And there was at least one other company that

14   had, not identical, but somewhat similar technology that

15   could possibly take that business away from us.

16   Q    And --

17   A    So --

18   Q    Let me just get the question out.

19   A    I'm sorry.

20   Q    How did the, we'll call it the proposed amendment to the

21   contract affect the issue of exclusivity?

22   A    Well, the proposed amendment to the contract recovered

23   exclusivity for our benefit.  And, again, other than

24   self-manufacturing, they would not be able to buy product

25   from other suppliers such as the company I was mentioning

1   before that had a similar capability.

2       So it again protected us, number one.  But, actually, in

3   addition, it protected us a lot more because suddenly they

4   had to buy 20 million pounds from us a year.  Even the old

5   contract that Patrick signed in 2004 did not give him minimum

6   volumes to count on.  The only thing it gave him was, I

7   believe, Unilever would have to pay him up to a half million

8   dollars a year if they didn't reach those levels, as I

9   understand it.

10      So that was a nice improvement to the contract.  But we

11  definitely were able to reinsert exclusivity, which was

12  certainly part of the old contract and necessarily needed to

13  be part of our arrangement with them going forward.

14  Q   So that would have been, in your mind, consistent with

15  past practices?

16  A   Absolutely.

17  Q   Take a look at your discussion with Mr. Goldfarb about the

18  noncompete.  I'd like to take you to the provision in the

19  stock purchase agreement on that, which is again Trial

20  Exhibit 3, page 28.

21  A   Yes.

22  Q   And if you could pull up that first paragraph -- the 5.14.

23  I'm sorry.  Thank you.  What does this provision provide?

24  A   Well, basically, it's providing the shareholders 200 --

25  we're giving the shareholders as part of this purchase

1    agreement $200,000, which is being allocated to the covenant

2    not to compete.

3         So, therefore, we would be in a protected position that no

4    shareholder, be it Patrick or anyone else, but it included

5    Patrick as well, that no shareholder could compete with us

6    for a period of seven years from the date of this contract, I

7    believe.

8    Q   So you paid each shareholder, including Mr. Calliari,

9    $200,000 for a seven-year noncompete?

10        MR. GOLDFARB:  Objection.  Leading.

11   BY MR. SULKIN:

12   Q   What did you pay $200,000 to Mr. Calliari and the other

13   shareholders for?

14   A   It was an inducement to enter into an agreement in

15   consideration for the noncompete, $200,000.  I don't know if

16   we paid it to each of the shareholders, or it was just -- it

17   may have been paid in total for all of the shareholders.

18   Q   And how long was the noncompete?

19   A   A seven-year period.  That's noted in paragraph A, I

20   believe, during the seven-year period following the closing

21   date.

22   Q   I want to switch now to the Unilever discussions in the

23   spring and summer of 2007.  I would like to take a look at

24   Exhibit 2 00.

25   A   Okay.  I've got it.

1    Q    Do you have it?

2    A    Yes.

3    Q    All right.  Is this --

4         MR. GOLDFARB:  Excuse me, your Honor.  This wasn't on

5    the list.  I need to grab mine.

6         MR. SULKIN:  I'm happy to give him a minute or jump

7    to another subject while he's doing that, your Honor.

8         THE COURT:  Would you like us to move to another

9    topic, Mr. Goldfarb?

10        MR. GOLDFARB:  No.  I've got it.

11        THE COURT:  Go ahead.

12   BY MR. SULKIN:

13   Q    Without getting into the contents of this, what is this

14   document?

15   A    It's an e-mail from Mike Gordy to Pat Calliari, copying

16   George Hoff, myself, and Tom Kyle, who was at that time the

17   production manager at the Bellingham facility.  He may have

18   also had some production responsibility at North Sioux City,

19   oversight.  And then Larry Riley, their accountant or

20   controller.

21   Q    And was this a document that was created in the ordinary

22   course of Sargento's business?

23   A    I don't understand that question.

24   Q    Sure.  Was it done in relation to Sargento's business?

25   A    I think this related more to Portionables' business.

1   Q    And Portionables was a part of Sargento?

2   A    Yes.

3            MR. SULKIN:  Your Honor, I offer Exhibit 200.

4            MR. GOLDFARB:  Object to this exhibit, your Honor.

5   It contains hearsay statements.  These are not admissions of

6   a party.  These are statements of a party.  And it has

7   embedded in it additional hearsay from conversations with

8   third parties.

9            THE COURT:  Can you move to another area, and then

10   we'll take this up?

11            MR. SULKIN:  Yes, your Honor.

12            THE COURT:  Okay.

13   BY MR. SULKIN:

14   Q    Mr. Gentine, when did you first learn that Unilever wanted

15   a price reduction?

16   A    I would have learned that they wanted a price reduction

17   when I received a copy of this e-mail.

18   Q    Let me jump forward a little bit.  There's been testimony

19   about the 35 cent offer that Mr. Calliari made to

20   Portionables.  Do you recall that?

21   A    Yes.

22   Q    And I think the testimony was -- we'll see from

23   Mr. Calliari -- it was made on or about June 8th, okay?

24   A    Yes.

25   Q    When did you learn about that offer made by Mr. Calliari?

1   A    I believe that I learned about that offer later in July.

2   There was an e-mail that was sent that Patrick had made an

3   offer reducing it by four cents a pound.

4   Q    So to be clear, did you have any -- did you order

5   Mr. Calliari to make an offer of 35 cents a pound?

6   A    Absolutely not.  I believe that that offer was something

7   that Mr. Calliari, Mike Gordy, other members of the

8   Portionables' team got together and discussed the issue and

9   decided that, hey, we can knock 4 cents off, and we'll be

10  comfortable with that.  And they made that offer.

11  Q    And I'd like you to take a look at Exhibit 201.

12  Mr. Gentine, you've seen this document before?

13  A    Yeah, yes.

14  Q    And this is an e-mail from Mr. Calliari dated July 26 to

15  you?

16  A    Uh-huh.

17  Q    Was this made as part of Portionables' business with

18  Sargento?

19  A    Uh-huh.

20  Q    I need a "yes" for the record.

21  A    Yes, uh-huh.

22        MR. SULKIN:  Your Honor, I offer Exhibit 201.

23        MR. GOLDFARB:  Your Honor, I have fundamentally the

24  same problems with this document.  I think it makes sense to

25  address them both at the same time.

```
 1              THE COURT:  And can you push any further?

 2              MR. SULKIN:  My concern is it's going to keep coming

 3   up.  But I'll try, your Honor.

 4   Q   I want you just to tell the story, okay, how we got from

 5   34 cents a pound or the 35 cents a pound offer to Unilever to

 6   the offer made on August 16th.  I think it was 37 and a half

 7   cents on the first 20 million pounds and then 23 cents a

 8   pound after that.  So if you could just kind of take us

 9   through how that decision was made and who was involved, I

10   would appreciate it.

11              MR. GOLDFARB:  Excuse me, your Honor.  Objection to

12   lack of foundation to the degree to which this witness was

13   involved in that very broad question that was asked.  There

14   are a number of people involved apparently in these

15   discussions.  And what he knows or doesn't know, I can't tell

16   from this question that says:  Explain how this whole thing

17   happened.

18              THE COURT:  Why don't we talk about his involvement.

19   So limit it to his personal knowledge.

20              MR. SULKIN:  That's fine, your Honor.

21   Q   Could you limit your answer to your personal knowledge as

22   to how we get from 34-35 cents a pound to the offer that was

23   made on August 16?

24   A   Well, at that point I did get involved, because obviously

25   there was a great concern that the pricing on Unilever was
```

1  going to drop dramatically, impacting long-term performance

2  of the company, obviously impacting the performance during

3  the earnout period.  So I was involved.  And Patrick and I

4  and others sat down and discussed it.  And, quite honestly --

5  Q   May I interrupt for one second, just to set the scenery?

6  A   Yes.

7  Q   Patrick made an offer of 34-35 cents a pound.  Did you

8  learn of a counteroffer by Unilever to that?

9  A   Yes.

10  Q   What was that counteroffer?

11  A   That they felt they needed another five or six pounds

12  (sic) less than the 35 cents.

13  Q   5 or 6 cents less per pound?

14  A   Yes.

15  Q   So less than Mr. Calliari's 35 cents.  Now, at least I can

16  understand your involvement in the discussion.  So excuse me.

17  Please go ahead.

18  A   Okay.  So in any case, I looked at more of the broad

19  strategic need to maintain Unilever as a client.  Again, as

20  has been stated earlier, they were our primary, almost our

21  only client, in Bellingham.  And we didn't have hardly

22  anybody as a client in North Sioux City.

23      Needless to say, we paid 19 million dollars for this

24  company, minimally 19 million dollars, and beginning to look

25  at the potential that we would have no clients.  That would

1    be a very bad acquisition at that point.

2         So we needed to come up with something that worked for all

3    parties.  So what we decided to do -- and Patrick and I and

4    George Hoff, I believe Mike Gordy were involved in this.  I

5    suspect we got numbers cranked by Larry Riley, who is a

6    controller out at Portionables, as well as maybe some of our

7    financial people as well, looked at, well, how could we come

8    up with something better?

9         So, basically, again, I told you I was with

10   Pricewaterhouse.  I'm sort of an accountant by, you know,

11   education, et cetera.  I was a CPA, et cetera.  I came up

12   with the concept that, hey, why don't we try to do something

13   that's better for us and potentially better for Unilever as

14   well.

15        And that's where we came up with, number one, let's get a

16   minimum in there that guarantees us a floor level of

17   production over a longer period of time.  So we set that

18   minimum at 20 million dollars.

19   Q    20 million dollars?

20   A    20 million pounds.  I'm sorry.  20 million pounds.  And we

21   said that 20 million pounds is going to be at the 38 and a

22   half cent price that we currently have.  However, because if

23   we do 20 million pounds, the calculations that were provided

24   suggested that all of the burden and the overhead for the

25   plant in Bellingham was really covered by that and we

1    wouldn't need to continually charge Unilever for those type

2    of costs over and above the 20 million pounds.

3        So we said, over 20 million pounds, we'll give you just a

4    dandy price, that is, 23 cents a pound.  And, in fact, as a

5    real encouragement for them to buy a lot more than 20 million

6    pounds from us and not go to self-manufacturing or not go to

7    other customers, because at this point they no longer had --

8    we no longer had an exclusive with them.

9        And, you know, they were talking about volumes of anywhere

10   between 30 and 40 million pounds that they might be able to

11   produce if we gave them savings.  Well, if we used 40 million

12   pounds -- and they needed to make changes to the plant to get

13   up to those levels of production -- under my deal, we were

14   first of all guaranteed, or my suggested deal that we all

15   agreed on, we were guaranteed the 20 million at 38 and a

16   half.  If we did another 20 million at 23, the average of 38

17   and a half and 23 is somewhere between 30 and 31 cents a

18   pound.

19       So Steve Boland from Unilever could feel good about

20   getting down to that 31 cents a pound, but we wouldn't be

21   giving it to them on pound number one, because what we could

22   have ended up with is just them continuing at the volumes

23   they were at before, and it would have been a reduction in

24   price of 8 or 9 cents a pound right off the top, or they

25   could just buy 5 million pounds.  And we would have been in

1  deep trouble.  And the shareholders, the former shareholders,

2  would have been in severely deep trouble.

3      So in any case, looking at the numbers the way they were,

4  we got -- versus what Patrick had initially proposed to them,

5  which was the 35 cents a pound, we received, on the first 20

6  million, an extra 3 and a half cents a pound, 35 versus 38

7  and a half, on the first 20 million pounds.  Plus it was

8  guaranteed.  Plus we had exclusivity back.  Wonderful.

9      So 3 and a half cents a pound, the delta being what I

10  described before, times 20 million, was an additional

11  $700,000 that we would benefit on those first 20 million

12  pounds.  Granted, over that price, going forward, there would

13  be 23 versus his proposal of 35 cents a pound.  So we would

14  have 12 cents a pound that we would be making less than they

15  would have had they gotten up to those levels.

16      So if you take 700,000 and divide it by 12 cents a pound,

17  it would mean that the break-even point, where it would be

18  revenue and income neutral for Portionables as well as for

19  Portionables' shareholders, it would have been a number that

20  was approximately 26 million pounds.  You take the 700,000 we

21  saved, divided it by the 12 cents a pound difference, it's

22  between 25 and 26 million pounds.  It was a good deal for

23  everyone.  Plus we had a lock-in.

24  Q   So if I understand, if they ordered 40 million pounds, it

25  comes to Boland's number, 31 cents a pound?

1    A    Right.

2    Q    In fact, if Unilever ordered 26 million pounds, it comes

3    out to Mr. Calliari's number, about 35 cents a pound average?

4    A    Exactly.  That would be the break-even point.  After that,

5    it would have been lower.  But obviously it would have been

6    great tonnage for us.  We would have been thrilled.

7         And looking again at that 25 to 26 million pounds, the

8    year before, they did 19.  And, quite honestly, in the

9    projections that Patrick had provided us going forward in

10   those hockey stick projections for 2007 and 2008, Unilever

11   was never projected to do more than 20 million.  They weren't

12   going to be adding a meaningful incremental amount to hit

13   that 74 million in 2008 or the 46 or 47, whatever the number

14   was in 2007.

15        The fact is, they also would have never bought -- and as

16   they mentioned --

17   Q    I'm going to get to that in a minute.  I'm going to stop

18   you there.  Was this meeting, you said, between you,

19   Mr. Hoff, Mr. Calliari, perhaps Mr. Riley and Mr. Gordy, was

20   that an in-person meeting or was this over a phone call?

21   A    I believe we had the meeting in our conference room at

22   Sargento.

23   Q    So Mr. Calliari, to your recollection, flew in for that

24   meeting?

25   A    Yeah.

Q   Okay.   Now, you were answering Mr. Goldfarb relating to,

well, gee, didn't you lose 1.3 million dollars on this.   And

I think your answer was:  Well, in a vacuum, yes.   But I

think the word was fuzzy math.   I may be wrong.   More fully

explain your answer to the question Mr. Goldfarb asked, which

I think was:  Look.   You gave up 1.3 million dollars by

reducing the price from the original price of 39 cents to 23

cents.

A   Yeah, I think it was 37 cents down to 23 cents.   It was 14

cents a pound.   And if you just looked at it like that,

that's fine.   However, we were going to make -- based on what

Patrick said, we were going to make 3 and a half cents less

for the first 20 million, and then for the next volume above

that, as I said, the 12 cents a pound I just described.

     So that is part of it.   You can't look at it that way

because he had already made a proposal to them at a lower

amount, being the 35 cents.   He couldn't really compare it to

the 37.   And then, in addition, the fact of the matter is

that Unilever was telling us they're going to go into

self-manufacturing.

     And, therefore, if we didn't get that price down to a

lower number, there was no way that they were going to be

buying more than the 18, 19, 20 million pounds they had done

in the past, because it would have not been efficient for

them.

```
1          MR. GOLDFARB:  Excuse me, your Honor.  Move to strike
2     the nonresponsive portions of that answer, particularly the
3     hearsay that had to do with what Unilever might or might not
4     have done.
5          MR. SULKIN:  Your Honor, if I may respond.
6          THE COURT:  Go ahead.
7          MR. SULKIN:  Mr. Goldfarb asked a hypothetical
8     question about the 1.3 million.  And all I asked was:  I want
9     you to more fully explain your answer.  And so it's in that
10    vein the question was asked.  And I think the answer should
11    stay.
12         THE COURT:  The motion to strike will be granted.
13    The jury should disregard the comments concerning what
14    Unilever was going to do or not do.
15    BY MR. SULKIN:
16    Q    Did Mr. Calliari say he was against that proposal?
17    A    No.  And, in fact, he signed the proposal, which he
18    wouldn't have had to do.  He could have came back and said,
19    hey, I'm against this proposal.
20         MR. SULKIN:  Your Honor, this is probably a good time
21    to take up those other issues.
22         THE COURT:  Okay.  Ladies and gentlemen, we're going
23    to send you home a little early today.  And I wish I could
24    say you're going to enjoy the sunshine, but there's not much
25    left out there.
```

1        When you go home tonight, there's still going to be

2   interest in what you are doing at the courthouse.  In fact,

3   you may have some more questions today.  And you still have

4   to persevere.  Tell them next week you will be happy to tell

5   them anything they want to know about cheese or Portionables

6   or how contracts are negotiated.  And tell them that you are

7   not going to talk about it, okay?  I've explained why before.

8        And I hope that you can see that everything needs to come

9   to you here all at the same time so we all hear the same

10  thing.  So please remember those admonitions that I've given

11  you.  And remember that your obligation is not only to be

12  fair, but to give the appearance of fairness.

13       Tomorrow I would like to tell you a little bit about this

14  courthouse when you come in.  When you walk out tonight, I'd

15  like you to take a look at the artwork that's down in the

16  lobby and also what's out on the lawn.  There is a big

17  sculpture out on the lawn.  And I'm going to ask to see if

18  any of you know what it is.  So that's the only homework you

19  get to do.

20       All right.  Any questions?  We're going to start at the

21  same time tomorrow.  Have a good evening.

22           (Jury leaves courtroom.)

23           THE COURT:  All right.  Let's talk about these two

24  exhibits.

25       You can step down, sir.

```
1          MR. SULKIN:  And there's actually a third we might as
2     well take up.
3          THE COURT:  Well, let's take it all up at once.  And
4     what's the third one?  We've got 200.  We've got 211, and --
5          MR. SULKIN:  I have 200, your Honor, 201.  And we're
6     going to get to the August 16th, which I think is in.
7          THE COURT:  Oh, 202, yes.  I'm looking at the case
8     number, which is interesting.  It's 1111.
9          MR. SULKIN:  So 200, 201, and 203.
10         THE COURT:  Okay.  Can I have 203, please, as well?
11    All right.  This is your objection, Mr. Goldfarb.  Why don't
12    you explain to me what the issues are.
13         MR. GOLDFARB:  I'm not sure that the documents are
14    all in exactly the same frame, your Honor.  But as I look at
15    201, it seems to me that it reflects right at the top --
16         THE COURT:  Mr. Goldfarb, could I have you go over to
17    the microphone?  I'm having a very hard time hearing you.
18    And I don't exactly know why.  The microphone on your table
19    might be out or something.  No?  Okay.
20         MR. GOLDFARB:  So, your Honor, 200 just appears to be
21    full of conversations between, I think, Mr. Gordy and this
22    Mike Pusterla at Unilever.  I point out to the court that
23    they took Mr. Boland's deposition, which is what it is.  But
24    they shouldn't attempt to get this type of information in
25    about what Unilever was or was not saying through the
```

1    document.

2         THE COURT:  Well, let's figure out who the declarant

3    is.  This is from your client.

4         MR. GOLDFARB:  I'm looking at 200, your Honor.

5         THE COURT:  Oh, I'm sorry.  I'm looking at 201.

6    Excuse me.  Okay.

7         MR. GOLDFARB:  So the declarant in 200 appears to be

8    Mr. Gordy, who is a Sargento employee.  And he appears to be

9    repeating the conversation that he had with Mr. Pusterla.  So

10   that would seem straightforward as hearsay.

11        THE COURT:  Why does this matter?  Let me understand

12   the context of this.  Why does this matter to you?  In other

13   words, is there a contest over whether or not these

14   negotiations took place, or --

15        MR. GOLDFARB:  You know, your Honor, I'm glad you

16   asked that question.  It only matters to me because it

17   matters to them, to be very candid.  I have never thought

18   that this was really the issue of this case.

19       You know, conversations were what they were.  But they

20   ended up in a contract.  You know, this process went on.  But

21   at the end of the day, Mr. Calliari asserted certain rights.

22   He either had a contractual right to do that or he didn't.

23   And, you know, that turns on what the agreement is saying.

24       That said, they are going to enormous efforts here to say

25   that Mr. Calliari backtracked and he did this and he didn't

1    do that.  If that story is going to be told in detail, then,

2    you know, we're put in a position we need to litigate it.

3    And the way it's being presented is really not completely

4    accurate in terms of what happened.  That's why.

5           THE COURT:  So you are saying that they ought to be

6    putting Mr. Pusterla on to say what the offer was that he was

7    making or what it is that he was going after?

8           MR. GOLDFARB:  Well, you know, there appears to be

9    these negotiations going back and forth between the Sargento

10   people and the Unilever people.  And those conversations in

11   these documents are hearsay to the extent that they're coming

12   from the Unilever folks.

13          THE COURT:  Does it matter whether or not what they

14   are saying is true or accurate?

15          MR. GOLDFARB:  Well, it does if you listen to the

16   witness' testimony about what a great deal it was because of

17   the pricing and so forth, so it kind of does matter.

18          THE COURT:  Okay.  And does it make a difference

19   whether it's a good deal or not?  I mean, I'm trying to get

20   at the crux of whether or not it makes a difference whether

21   the deal that was struck is good, bad, or indifferent.

22   Aren't we here to talk about who had the right to make it

23   under the contract?

24          MR. GOLDFARB:  I fully subscribe to that view, your

25   Honor.  But what's being currently argued to the jury is

1   something quite different than that.  And to the extent

2   evidence is coming in to further arguments that I don't

3   understand what's going to ultimately happen to them, I'm

4   trying to protect my client's interests as best I can.

5           THE COURT:  All right.  So you think the first --

6           MR. GOLDFARB:  I think 200 is hearsay, yes, your

7   Honor.

8           THE COURT:  You think 200 is hearsay from beginning

9   to end?

10          MR. GOLDFARB:  Yes.

11          THE COURT:  And it's hearsay because it's one of --

12  Mike Gordy is one of Sargento's employees, so anything that

13  he says cannot be put in by the defendant?

14          MR. GOLDFARB:  That's true enough.  And further to

15  that, it also repeats conversations by Mr. Pusterla.  So

16  there's at least two levels there.

17          THE COURT:  Okay.  All right.  Mr. Sulkin, your

18  response, please.

19          MR. SULKIN:  Okay.  Your Honor, this is offered.  It

20  is notice to Mr. Calliari.  Really, all I'm interested in, we

21  can just focus really on one sentence.  It's after that

22  darkened thing there.  Go down to those two lines under

23  there.  There's a sentence.  This is Mr. Calliari:  I told

24  Mike that I would have to defer to you and your team on the

25  request, that is, the request concerning Unilever.

1          THE COURT:  All right.  Orient me, please.

2          MR. SULKIN:  Sure.  It's kind of the third paragraph,

3     if you count that darkened line in the paragraph, the

4     darkened sentence.  It's the third one, last line, where it

5     begins:  I told Mike.

6          THE COURT:  Yes.

7          MR. SULKIN:  It reads:  I told Mike I would have to

8     defer to you and your team on the request.  Well, one issue

9     in this case is were we taking his control.  What we want to

10    use this for, quite candidly, is to say that Mr. Calliari

11    never claimed that, because it really goes to notice to him,

12    that this isn't true, you aren't deferring to me.

13         And so it goes to that, just to that issue.  It's not

14    being offered for the truth of the matter asserted at all.

15    It's being offered as evidence of notice and the fact that

16    Mr. Calliari didn't respond, didn't say, that isn't true,

17    that in fact you are taking my control on this subject.

18         THE COURT:  How do you get around the fact that it's

19    hearsay?

20         MR. SULKIN:  Because it's not being offered for the

21    truth of the matter asserted, your Honor.  It's being offered

22    as notice to Mr. Calliari.  It may be untrue that they

23    deferred to the team.  That's not the point.  The point is,

24    he's being told that.  And so what we want to get to is what

25    his reaction is.  So whether it's true or not is not

```
 1    relevant.  So it isn't hearsay.
 2              THE COURT:  Mr. Goldfarb, do you accept that, if it's
 3    offered to the jury for the limited purpose of notice that
 4    Mr. Calliari was notified that they wanted feedback from him?
 5              MR. GOLDFARB:  Yes, your Honor.
 6              THE COURT:  Okay.  Can you live with that,
 7    Mr. Sulkin?
 8              MR. SULKIN:  Yes, your Honor.
 9              THE COURT:  All right.  We have a deal.  Next.
10    What's the next issue?
11              MR. SULKIN:  201.
12              THE COURT:  201.  All right.  This one is from your
13    client.
14              MR. GOLDFARB:  Right.
15              THE COURT:  So is it an admission of a party opponent
16    if your client says it?
17              MR. GOLDFARB:  When he's simply repeating factual
18    information provided to him by somebody else that may or may
19    not be true and it is not independently verifiable.
20              THE COURT:  Well, if it's not offered for the truth,
21    but only the fact that he said it --
22              MR. GOLDFARB:  Okay.  And, again, I think to move
23    this along, I can live with that conclusion as well.
24              THE COURT:  All right.  That one will come in with
25    the same limitation.  It's not offered for the truth, but
```

1    only to show that Mr. Calliari made the statement.

2         MR. SULKIN:  203.  If I can give a little background

3    on 203, your Honor.

4         THE COURT:  Okay.

5         MR. SULKIN:  I think you also need to look at 270.  I

6    don't know if you have that in front of you or not.

7         THE COURT:  Well, let's get it.  270.  Okay.

8         MR. SULKIN:  Look at 270 first.  This is the August

9    16th draft letter.  And I don't know if Mr. Goldfarb has a

10   problem with it.

11        THE COURT:  So the first is simply a transmittal

12   letter saying attached is a letter that's going to go out.

13        MR. SULKIN:  Correct.

14        THE COURT:  Is there a problem there, Mr. Goldfarb?

15        MR. SULKIN:  I don't think he objected to 270.

16   Mr. Calliari says:  I sent it back.  I sent it to Boland, is

17   what he writes back at the top of that.  There's no objection

18   to 270.

19        THE COURT:  Well, hold on.  I haven't heard that out

20   of Mr. Goldfarb's mouth yet.  Is there an objection to 270?

21        MR. GOLDFARB:  No.

22        THE COURT:  Okay.

23        MR. SULKIN:  Now, 203, your Honor, is already in to

24   the extent, as you recall in my opening, in his deposition

25   Mr. Calliari already testified that he saw this document and

1   he signed it.  So he hasn't objected to it.  And I presume

2   it's in.  But I didn't want to waste time tomorrow.

3           THE COURT:  Okay.  This is the one that nobody can

4   find the signed copy.

5           MR. GOLDFARB:  This is the one where they went out to

6   Unilever and apparently didn't ask them for it.  They don't

7   seem to have a copy of it.  We don't have one.  So what we

8   have before the court is this unsigned draft, which may or

9   may not be what was actually sent.  I don't have any idea.

10  I've never seen the signed original of this letter.  So I

11  just don't know.

12          MR. SULKIN:  This is the one, your Honor, that -- we

13  can do it one of two ways.  Mr. Calliari -- we can just play

14  his tape -- testified that he signed this draft.  I mean,

15  Mr. Goldfarb was right.  I asked him:  Did you sign this

16  draft, this exhibit number? He said:  Yes.  So that's how we

17  got around the problem of not having the original.

18      So I can have Mr. Calliari -- do it with him tomorrow, and

19  then call Mr. -- so it's into evidence, and then call

20  Mr. Gentine back and say:  Is this the document you sent to

21  him?  Or I can just do it tomorrow with Mr. Gentine.  And I

22  prefer to do it just in order with Mr. Gentine.

23          THE COURT:  Is there an objection to this one?

24          MR. GOLDFARB:  It's just not signed, your Honor.

25  That's all.  It's not the letter that was sent.  It's a

1    draft.  That's all.

2            THE COURT:  Well, what's the rule when you've got

3    something that's unsigned?

4            MR. SULKIN:  We're going to offer it, your Honor.

5    And we will explain to the jury this isn't the original, that

6    this is the draft, the original was signed, so this is the

7    original document in that regard.  And they can argue if they

8    want that it wasn't signed.  But Mr. Calliari testified it

9    was.

10            THE COURT:  Well, Mr. Goldfarb, give me the rule that

11   you are relying upon that I should exclude it.

12            MR. GOLDFARB:  Your Honor, if it comes in with the

13   instruction that the original has not been located, I think

14   that, to move this along, we can live with that.  And it's up

15   to them to establish what was and was not sent.  The record

16   will be what it is.

17            MR. SULKIN:  He can argue that.  That's fine, your

18   Honor.  We're not claiming this is the original.  We will not

19   claim that.

20            MR. GOLDFARB:  I don't know if this is the right

21   letter or not.  My instinct says it's just some unsigned

22   draft.  I would like to see the actual letter that went out.

23   This seems to be a big issue in the case.  I don't understand

24   why it's not here.

25        But that said, this draft made its way to Mr. Calliari.

1    So for that purpose, you know, I think that much is true.

2    And then they're going to prove or not prove that it was sent

3    or some version of this was sent.

4            THE COURT:  Well, what difference does it make?  Is

5    Mr. Calliari going to say:  I didn't make Unilever an offer

6    in August?  He's going to say:  I made Unilever an offer.

7            MR. GOLDFARB:  I presume so.

8            THE COURT:  Then --

9            MR. GOLDFARB:  Very well.  I withdraw any objection

10   to this exhibit.  I'm now worried about our Monday deadline

11   again.  I just want to keep this moving.  And I understand

12   your Honor's point.

13           THE COURT:  Mr. Goldfarb, don't let me beat you down.

14   I haven't said a thing.

15           MR. GOLDFARB:  No, your Honor, I just --

16           THE COURT:  My husband tells me I've got a look that

17   can stop a truck.  But that doesn't necessarily mean I'm

18   trying to stop your objection.  If you want to make an

19   objection, make it.  I'll rule on it.

20           MR. GOLDFARB:  No.  I've made enough today.  That's

21   fine.

22           THE COURT:  And if you tell my husband I said that,

23   I'll deny it.

24           MR. SULKIN:  Believe me, I will never say that.

25           THE COURT:  All right.  Are we ahead or behind where

1   we need to be?

2          MR. SULKIN:  My guess is we're going to finish this

3   week, your Honor.

4          MR. GOLDFARB:  We're still ahead, but not as ahead as

5   we were yesterday.

6          THE COURT:  Okay.  Who's coming tomorrow?

7          MR. SULKIN:  From what I understand, we'll finish

8   Mr. Gentine.  Mr. Calliari is going to be called.  And our

9   present intention is to call two witnesses, Mr. Hoff,

10  Mr. McEvoy.  It should be reasonably short.  I think under an

11  hour each.  And depending on what Mr. Calliari says, it's

12  possible that Mr. Gentine may come to rebut, literally, just

13  to rebut a few points he makes, if necessary.  And that would

14  be it for us.

15         MR. FISHER:  And, your Honor, we do have that short

16  deposition reading before we rest.  And I'm sorry,

17  Mr. Sulkin.  Did you say you were calling Mr. McEvoy?

18         MR. SULKIN:  We are going to call Mr. McEvoy and

19  Mr. Hoff.  We're not waiving our right to call Mr. Thomas and

20  the Birds Eye guy.  But from my discussion with Mr. Goldfarb,

21  he wasn't going to go too deeply into those issues.  And if

22  he doesn't, our present intent is to not call them.

23         THE COURT:  All right.  Well, look, for tomorrow,

24  we're going to finish up with Mr. Gentine.  We're going to

25  call Mr. Calliari.  And if we keep working at this pace,

1   we're -- well, I'm not as hopeful about how far ahead we'll

2   stay.  But I'm assuming that most of the documents that we're

3   going to be working with are already in.

4              MR. SULKIN:  That's right, your Honor.

5              THE COURT:  Okay.

6              MR. GOLDFARB:  And, your Honor, the deposition of

7   Michael Gordy was taken and was going to be presented by

8   Sargento.  I'm hearing now that they may not do that.  There

9   are some very small pieces of that deposition that we're

10  probably going to want to put in.  But it's a matter of a few

11  minutes.

12             THE COURT:  Okay.  All right.  Can I go?

13             MR. SULKIN:  Yes.

14             THE COURT:  All right.  Have a nice evening.  We'll

15  see you tomorrow.

16             (Proceedings adjourned.)

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4          I, Kari McGrath, CCR, CRR, RMR, Official Court

 5  Reporter for the United States District Court in the Western

 6  District of Washington at Seattle, do hereby certify that I

 7  was present in court during the foregoing matter and reported

 8  said proceedings stenographically.

 9          I further certify that thereafter, I have caused

10  said stenographic notes to be transcribed under my direction

11  and that the foregoing pages are a true and accurate

12  transcription to the best of my ability.

13

14

15                        /S/  KARI McGRATH

16                        Kari McGrath, CCR, CRR, RMR

17                        Official Court Reporter

18

19

20

21

22

23

24

25
```