1              UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3  PATRICK CALLIARI,          )
    individually and as       )
4  Representative of the     )  Case No. C08-1111MJP
    Former Shareholders of GCI  )  (Consolidated with
5  INVESTMENTS, INC., a      )  C08-1112MJP)
    Washington Corporation,   )
6                     )  SEATTLE, WASHINGTON
      Plaintiff,        )  December 9, 2009
7                     )
    v.                  )
8                     )
    SARGENTO FOODS, Inc.,     )
9                     )
10  Defendant/Counterclaim    )
    Plaintiff,          )
11                     )
    v.                  )
12                     )
    PATRICK C. CALLIARI, et   )
13  al.,                 )
                     )
14     Counterclaim Defendants.  )

15           VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE MARSHA J. PECHMAN
16         UNITED STATES DISTRICT JUDGE

17  APPEARANCES:

18   For the Plaintiff:    MR. MICHAEL GOLDFARB
                     MR. BRAD FISHER
19

   For the Defendant:    MR. ROBERT SULKIN
20                     MR. DAVID LINEHAN

21

   Reported by:          Kari McGrath, CCR, RMR, CRR
22                     Federal Court Reporter
                     206.370.8509
23                     kari_mcgrath@wawd.uscourts.gov

24

25  Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.

```
 1                          EXAMINATION INDEX

 2    EXAMINATION BY                                          PAGE
       LOU GENTINE        CONTINUED CROSS-EXAMINATION          5
 3                        BY MR. SULKIN
                          REDIRECT EXAMINATION                41
 4                        BY MR. GOLDFARB
                          RECROSS-EXAMINATION                 90
 5                        BY MR. SULKIN
                          REDIRECT EXAMINATION               105
 6                        BY MR. GOLDFARB
        PATRICK CALLIARI  DIRECT EXAMINATION                 125
 7                        BY MR. GOLDFARB
                          CROSS-EXAMINATION                  165
 8                        BY MR. SULKIN

 9

10

11                         EXHIBIT INDEX
       EXHIBITS ADMITTED                                     PAGE
12        270                                                 10
          203                                                 12
13        204                                                 14
          33                                                  36
14        43                                                 113
          49                                                 113
15        26                                                 115
          27                                                 118
16        61                                                 120
          28                                                 122
17        9                                                  151
          12                                                 157
18        207                                                159
          50                                                 169
19        10                                                 175
          257                                                179
20

21

22

23

24

25
```

PROCEEDINGS
_____

THE COURT:  Good morning.  Please be seated.  A couple of things before we begin.  Yesterday the plaintiffs used 172 minutes.  The defense used 100.  That leaves a balance for the plaintiff of 578, and for the defense, 668.

I understand that there is a stipulation we need to put on the record concerning a 10-2 decision by the jury, is that correct?

MR. SULKIN:  Yes, your Honor.

THE COURT:  Okay.  Are both parties in agreement that we should advise the jury that a 10-2 decision is acceptable?

MR. GOLDFARB:  Yes, your Honor.

THE COURT:  Okay.  Is there anything else we need to put on the record?

MR. GOLDFARB:  Not from this side, your Honor.

MR. SULKIN:  No, your Honor.  But at some point we want to make an offer of proof on the memorandum opinion of the mediator.  We can do it in our case or at a break.

THE COURT:  Okay.  Well, let's get our jury, please.

(Jury enters courtroom.)

THE COURT:  Please be seated.  Good morning.  So did anybody look at the sculpture in front of the courthouse yesterday?  Okay.  What is it?

JUROR:  It could be a lot of different things.

1          THE COURT:  Anybody got a guess?  No?  Just a blob

2    pointing down, huh?  There is one judge that says that it's a

3    black power fist.  But, actually, in fact, it's a cedar seed.

4    And the building has several architectural parts to it that

5    emphasize our Northwest and the timber industry and the

6    forest here.

7          So it is a cedar seed falling to earth.  And if you look

8    at the gates right at the bar, right behind Mr. Goldfarb, you

9    will see that there's some etchings there.  And the etchings

10   there, if you look at that, it's supposed to be a forest.

11         And if you go from the bottom of the building, the

12   etchings have the forest floor.  And at the top of the

13   building the etchings have the forest canopy.  We're on 14,

14   so we're just kind of in the middle.  But that's the

15   symbolism that you'll see.

16         On the top floor where the library is, all of the etchings

17   are repeated in a motif of timber, saws, and plant life.  So

18   that's your art lesson for today.  I'll give you another one

19   for tomorrow.

20         Okay.  Let's turn our attention back to the case.  And,

21   Mr. Gentine, could I please have you come back up again, and

22   we'll continue with our examination.

23         MR. SULKIN:  May I begin, your Honor?

24         THE COURT:  Yes, go ahead.

25                   LOU GENTINE,

1  being previously duly sworn, the witness was recalled and

2  further testified as follows:

3                     CONTINUED CROSS-EXAMINATION

4  BY MR. SULKIN:

5  Q    Good morning, Mr. Gentine.

6  A    Good morning.

7  Q    I want to backtrack just a little bit, okay, and look at a

8  couple of documents.  Let's start with Exhibit 201.

9          MR. SULKIN:  Your Honor, the computer just crashed.

10  Q    Okay.  Mr. Gentine, this is Exhibit 201.

11          MR. SULKIN:  Your Honor, I offer this.  I think

12  there's been a ruling already.

13          THE COURT:  If you turn on the overhead, we'll get a

14  clearer picture of it.

15          MR. GOLDFARB:  Excuse me.  Your Honor, I know it was

16  offered.  I didn't hear if your Honor ruled yet.  But the

17  understanding from yesterday is this would come with a

18  limiting instruction.

19          THE COURT:  Yes.  But let's take it off for just a

20  moment.  You are going to offer it.  Take it off the -- all

21  right.  Go ahead and offer it.

22          MR. SULKIN:  I offer 201, your Honor.

23          THE COURT:  Okay.  Ladies and gentlemen, 201 is going

24  to be admitted, but there is a limitation that comes with it.

25  The document is not offered for its truth, in other words,

1  what is outlined in it, but it is offered for the purpose of

2  notice.

3      So go ahead, Mr. Sulkin.

4  BY MR. SULKIN:

5  Q    Yesterday you testified that you learned on or about July

6  25 or 26 of Mr. Calliari's offer to Unilever to reduce the

7  price by 4 to 5 cents in late July?

8  A    Yes.

9  Q    Is this the document through which you learned that?

10  A    I think this would have to have been the document that I

11  learned, yeah.  I'm not aware of any other document, yeah.

12  Q    Take a look at the bottom e-mail.  It's July 23, 2007.

13  You write:  Patrick, can you send me the information-details

14  of our potential expanded role that we presented to Unilever?

15  It would help me be more aware of the various issues that

16  were addressed.  Thanks.  Lou.

17      Do you see that?

18  A    Yeah.

19  Q    At that point, on July 23rd, did you know what positions

20  Mr. Calliari had taken vis-a-vis the offer to Unilever?

21  A    I don't recall that I knew anything about it prior to that

22  day.

23  Q    And if you go to the middle e-mail, it's from Mr. Calliari

24  to you.  Do you see that?

25  A    Uh-huh.

1    Q    I need a "yes" for the record, sir.

2    A    Yes.

3    Q    Okay.  He writes you:  I discussed the following with

4    Steve Boland, slash, Unilever on June 8th after a conference

5    call between George Hoff, Mike Gordy, Larry Riley, Tom Kyle,

6    Ray Wyandt, and myself.

7         If you could, can you just briefly tell us who each of

8    these individuals are in sort of one sentence?

9    A    George Hoff is my chief financial officer.  We talked

10   about him yesterday.  Mike Gordy was in charge of new channel

11   development, was the person that was assigned to work with

12   Portionables during the integration of the company following

13   the acquisition.

14        Larry Riley was a Portionables controller.  Tom Kyle and

15   Larry Riley reported directly to Patrick.  And Ray Wyandt

16   also reported directly to Patrick.  Tom Kyle was head of all

17   production.  And Ray Wyandt was his primary.  In fact, at

18   that point in time, he was VP of sales.

19   Q    Okay.  And if we go down the list, the fourth one says

20   conversion costs, 35 cents a pound, do you see that?

21   A    Yes.

22   Q    And it says:  4 pounds cost savings from current pricing?

23   A    Uh-huh.

24   Q    Is that the first time you learned of that number?

25   A    Yes, I believe it was.

1   Q    Is there anything in this e-mail in which the offer to

2   Unilever had anything relating to a minimum purchase by

3   Unilever, any boundaries, let alone 20 million pounds?

4   A    No.

5   Q    All right.  If we could look at the top e-mail.  This is

6   from Mr. Calliari to you.  He says:  Just talked to Steve

7   Boland.

8        Now, who is Mr. Boland?

9   A    Steve Boland was the lead person at Unilever that we dealt

10  with.  He would be the one that we would deal with if there

11  was anything to do with the contract, changes to the

12  contract, et cetera.

13  Q    Okay.  He said:  Just talked to Steve Boland about the

14  increase volume project and meeting him next month.  He is

15  looking for an additional 5 to 6 cents a pound off from the

16  35 cents we proposed last June.

17       Do you see that?

18  A    Yes.

19  Q    And so on July 26th, is it fair to say that it was the

20  first time you learned there would be a 35 cents a pound

21  offer to Unilever and a counter-proposal of 30 cents by

22  Unilever?

23  A    Yeah.

24            MR. GOLDFARB:  Objection, your Honor.  Leading.

25            THE COURT:  Sustained.

BY MR. SULKIN:

Q   What did you learn by July 26th as to the various positions concerning price, relating to a reduction in price per pound at Unilever?

A   Well, I learned that we had already offered 4 cents a pound and that Steve Boland wanted more than that.

Q   Mr. Calliari then goes on to say:  Unilever has not approved the capital expenditures for an in-house yet.  Very expensive, obviously.  Then he says:  So there is room for negotiations, and Steve would like to discuss this project on the phone next August 2nd at 4 o'clock.

     Do you see that?

A   Yes.

Q   Did Mr. Calliari ever say to you that he did not want to continue negotiating with Unilever at this time?

A   No.

Q   Yesterday you took us through how we got from these numbers to the final numbers on August 16th.  And I'm not going to belabor that point.  But I do want to then go to Exhibit No. 270.  If you could look at it.  And without talking about the contents of it, is this a document you received, an e-mail from Mr. Calliari, dated August 16, 2007?

A   Yes, it came.  I was copied into an e-mail that he sent to my assistant, Deb Preder.

Q   And you were also CC'd on that?

1    A    Yes, I was copied in.

2    Q    And you would have seen it at the time?

3    A    Yes.

4    Q    And this was done as part of the business of Sargento?

5    A    Yes.

6         MR. SULKIN:  Your Honor, I offer 270.

7         MR. GOLDFARB:  No objection.

8         THE COURT:  270 is admitted.

9         (Exhibit(s) 270 admitted.)

10   BY MR. SULKIN:

11   Q    Why don't you blow up the bottom part, please.  First, it

12   reads:  Patrick, attached is the letter to Steve Boland at

13   Unilever.  A copy should go to Mike Pusterla, supply manager,

14   contract manufacturing, at the same address shown for Steve

15   Boland.  In addition, please send a copy to Lou for his

16   files.  Mike also asked that I request that you provide me

17   confirmation when the letter is sent.  If you have questions,

18   please let me know.  Thanks.  Debbie.

19        First, who is Debbie?

20   A    Debbie is my personal assistant/secretary.

21   Q    And why is she sending the letter?  First, what letter is

22   this, to your understanding, that she's sending to

23   Mr. Calliari?

24   A    This is the letter that has been referred to as the August

25   16th letter outlining our proposal to them.

1    Q    And why is it that she's sending a letter to Mr. Calliari

2    in Washington to sign as opposed to Mr. Calliari typing it up

3    himself, so to speak?

4    A    Well, because we had all worked together on defining what

5    the terms of the letter were.  It was more convenient for

6    Debbie to do this.  Debbie, as I mentioned, is my secretary.

7    Patrick honestly didn't have someone like that directly

8    attached to him.

9         He was very comfortable with Debbie putting it together.

10   Quite honestly, I think that Patrick would admit he's also

11   really not a detail type person, that he would not be the

12   best one to synthesize all of our discussions into that

13   letter.

14   Q    Okay.  Let's go down to the top part of the e-mail,

15   please.  Mr. Calliari reports back:  I sent an overnight

16   priority FedEx to Steve Boland and Mike Pusterla this

17   morning.  Thanks.

18        Do you see that?

19   A    Yes.

20   Q    Did Mr. Calliari ever voice any concerns about sending

21   that August 16th letter?

22   A    No, I don't believe he did.  I think it shows that he

23   appreciated that we got the letter out to him.  And he

24   thanked us for doing it, so.

25   Q    Let's take a look, if you would, at Exhibit 203.

1   A   What number?

2   Q   203.  Without getting into the contents, what is this

3   document?

4   A   This is a letter to Steve Boland, the gentleman I talked

5   about before, from Patrick Calliari, outlining the amendments

6   we were willing to make to the manufacturing agreement.

7   Q   And did you see this letter before it went out?

8   A   I absolutely did.

9        MR. SULKIN:  Your Honor, I offer 203.

10        MR. GOLDFARB:  No objection.

11        THE COURT:  203 will be admitted.

12        (Exhibit(s) 203 admitted.)

13   BY MR. SULKIN:

14   Q   Mr. Gentine, this is the letter sent to Mr. Calliari,

15   correct?

16   A   Yes.

17   Q   And if we could just go to the second page and then the

18   third page.

19        THE COURT:  Okay.  Let's have a clarification.

20        MR. SULKIN:  I will, your Honor, yes.

21   Q   This letter is not the one that Mr. Calliari sent to

22   Unilever.  This is an unsigned copy, is that right?

23   A   Yes.  This was the document that Deb transferred out to

24   him.  And I think he had it copied onto his letterhead or

25   whatever.  But he signed the letter out there.

1    Q    Did you receive a copy, the signed copy, that Mr. Calliari

2    sent to Unilever?

3    A    No, he never sent a copy of that back.

4    Q    Okay.  Let's look at this chart.  I certainly don't want

5    you to explain it.  But is this sort of the proposed -- just

6    briefly tell us what this chart is.

7    A    Yeah, this chart basically laid out the old pricing, the

8    new pricing, as a comparison between the two, and looking at

9    various volume levels what the net price to Unilever would

10   be.  If you went through it, it basically kind of lays out

11   what the savings were at varying levels for Unilever.

12   Q    Okay.  I want to show you a document that Mr. Goldfarb

13   showed you, Exhibit 20.

14        MR. SULKIN:  And I believe this has been admitted,

15   your Honor.

16   A    Exhibit 20, yes.

17   BY MR. SULKIN:

18   Q    Briefly, tell us what is happening here.  I'm more

19   concerned about that middle e-mail from Mr. Boland to you.

20   A    This was a letter from Boland to me.  And the

21   parenthetical remarks were our analysis of what he was

22   offering us as an alternative to the letter of August 16th.

23   Q    Okay.  Did you forward this e-mail with Unilever's sort of

24   concerns to Mr. Calliari?

25   A    Yeah.  I think I did it the next day.

1   Q   Let's take a look at Exhibit 204.  You'll notice -- first,

2   what is the middle e-mail?  What is that?

3   A   A difference between -- the one in the middle that says

4   from Mike Gordy to --

5   Q   Let's do it another way.  Let's first look at Exhibit 21,

6   okay?  Let's do that.  I think it will make it a little

7   easier.  I'm sorry.  What is Exhibit 21, without getting into

8   the contents?

9   A   It's a Bellingham Cold Storage lease expiration.  Did you

10  say Exhibit 21 or Exhibit 20?

11  Q   I made a mistake.  I'm sorry.  Let's go back to 204.  It

12  was my mistake.  Let's go to 204.  I misread that.

13      Is 204 an e-mail forwarding the proposal of January 29 to

14  Mr. Calliari?

15  A   Yeah.  Mike Gordy did that.

16  Q   Was this done as part of the business of the company?

17  A   Of course.

18          MR. SULKIN:  Your Honor, I offer 204.

19          MR. GOLDFARB:  No objection, your Honor.

20          THE COURT:  204 will be admitted.

21          (Exhibit(s) 204 admitted.)

22  BY MR. SULKIN:

23  Q   And look at that middle e-mail, please.  This is an e-mail

24  from Mr. Gordy to you explaining the differences between the

25  two proposals, is that right?

1   A   Exactly.

2   Q   And then the top e-mail, if we can go to that, please,

3   Mr. Gordy sends it to Mr. Calliari?

4   A   Yeah.  Yes.

5   Q   I need a "yes."

6       Did you have discussions with Mr. Calliari in the

7   January-February time frame about Unilever?  Was he kept up

8   to date?

9   A   Yes, he was kept up to date.

10  Q   Did he voice any concerns about the Unilever deal or say,

11  I don't want to do that?

12  A   No, he didn't.

13  Q   In that time period?

14  A   No, he did not.

15  Q   Did you have any -- let's go ahead and jump to March.  Was

16  there a time when the company got together and you discussed

17  various issues?

18  A   In early March we had a retreat for the executive team,

19  which includes all the division presidents and my direct

20  reports.  It includes a couple other persons, the head of our

21  R&D area, as well as the individual that's in charge of new

22  product development for the company.

23  Q   Where was this retreat held at?

24  A   Actually, in addition, there were a couple additional

25  people invited, Mike McEvoy, who was not on the executive

1    team, and Karl Linck, who was our vice president of

2    engineering.  Mike McEvoy reported to Mike Gordy.  Karl Linck

3    reported to Lee McCollum, who reported to Mark Rhyan, who was

4    our executive VP of operations, who reported to me.

5         It was held at St. Germain, Wisconsin, which is a northern

6    resort area.  We went up and actually utilized a lodge that

7    one of our board members has for business meetings he holds

8    for his company, totally unrelated to the business Sargento's

9    in, other than the fact that he's one of our board members.

10        We went up to St. Germain for strategic meetings,

11   particularly to look at how we were going to handle the

12   integration of Portionables following the earnout period,

13   which Patrick and everyone knew that after that point in time

14   we could work that any way we wanted to, after the earnout

15   period.

16        So that was the primary thing.  Plus we had a lot of fun.

17   We went snowmobiling.  Usually you do.  It's kind of like

18   obviously your people go golfing.  In Wisconsin, we go

19   snowmobiling.  Same type of a thing.  And we had a good time.

20        In addition, because of us all being together there, we

21   had the opportunity to sit down as a team relative to the

22   Unilever contract.  Mike had asked --

23   Q    I want to stop you just real quick and get a little bit of

24   background, if I may.

25   A    Okay.

1  Q    First, how long was this -- how long were you there at

2  St. Germain?

3  A    We were there a couple nights, three days and two nights.

4  Q    And was Mr. Calliari there?

5  A    Yes.  He arrived late the first night, as I recall.  The

6  first night was just social.

7  Q    And just ballpark, how many people are we talking about?

8  A    We're probably talking 15, give or take.

9  Q    Were there discussions about Unilever during this two- or

10  three-day period?

11  A    Again, the whole team, I don't believe, ever had the

12  discussions, the whole executive team, the audience that was

13  up there.  But we were able to break away.  I believe it was

14  the last day, where Patrick and I sat down with Mike Gordy

15  and Mike McEvoy and George Hoff and further discussed the

16  Unilever transaction, how it was coming and where we were

17  going with it.

18  Q    Did Mr. Calliari voice any disapproval with the proposal

19  that he had made to Unilever?

20  A    No.

21  Q    I want to jump to Exhibit 232.

22        MR. SULKIN:  Which I believe has been admitted, your

23  Honor.  That's the March 28th, 2008 letter from Mr. Weinstein

24  to Mr. Henkle.

25        MR. GOLDFARB:  Actually, I believe that's 13.  If I'm

1  not mistaken, this is the same document.

2          MR. SULKIN:  You're right.  Let's use 13.

3          THE WITNESS:  What's that?

4  BY MR. SULKIN:

5  Q    Let's use 13.

6  A    Got it.

7  Q    What was your reaction when you received this letter?

8  A    I was absolutely shocked.

9  Q    And why was that?

10 A    Well, because as I stated yesterday, Patrick and I had

11 a very open conversation network going back and forth.  I

12 thought he was communicating very well with me, as well as I

13 was with him.  It was a very comfortable relationship.  I'm

14 sure that, you know, there was never an issue about him

15 getting to me, contacting me.  The doors were always open

16 relative to the two of us.

17     So then suddenly out of the clear blue, with no indication

18 of anything happening in the past, he decides to lawyer up

19 and send me this letter about issues that he and

20 Mr. Ioannides as shareholders had with the way the

21 operational control or whatever was being handled at the

22 company.

23 Q    Now, the jury has heard that there was a meeting March

24 26th in Bellingham between Mr. Ioannides and Mr. Calliari and

25 others.

1   A   Uh-huh.

2   Q   Were you aware that Mr. Calliari had been asked by

3   Mr. McEvoy to send something in writing to you?

4   A   Yes.  Apparently on that day, Patrick and Mr. Ioannides

5   kind of made the rounds up at Bellingham talking to a number

6   of different executives about what was going on.  And when he

7   sat down --

8   Q   Just so we're clear, you weren't there?

9   A   I was not there.

10      MR. GOLDFARB:  Excuse me.  Move to strike the prior

11  answer as not responsive.  It's lacking foundation.

12      THE COURT:  Sustained.  The jury will disregard the

13  last remark made about who was there.  Let's begin again.

14  BY MR. SULKIN:

15  Q   I just want to be clear with you.

16  A   Uh-huh.

17  Q   You understood the writing was coming.  You were

18  surprised.  Why were you surprised by the writing when you

19  got it?

20  A   Well, I know that Mike McEvoy had suggested that he send

21  something to us in writing.  And he told me that.  But I was

22  just surprised that the writing came from an attorney as

23  opposed to himself or that Patrick didn't just call me and

24  say, Lou, these are the issues, even if you wanted me to send

25  them in writing.

1    Q    And you and Patrick had a relationship where you talked to

2    each other on the phone?

3    A    All the time.

4    Q    Why don't you take a look at the second page of the

5    letter.  Blow up the first full sentence for the jury.  The

6    first full sentence reads:  Sargento has excluded

7    Mr. Calliari from these discussions with Unilever, although

8    he negotiated the initial agreement with Unilever.

9         Do you see that?

10   A    Yes.

11   Q    Was that an accurate statement in your mind?

12   A    Absolutely not, no.

13   Q    Let's go down, if we could, to the paragraph with the

14   first bullet point.  And if we could go up and catch the

15   phrase, "other examples include."  Thank you.

16        Now, they also write:  Other examples include the refusal

17   of Sargento to allow direct shipment of goods from the cold

18   storage facility of Bellingham Cold Storage, resulting in a

19   substantial loss.

20        To your knowledge, was that an accurate statement?

21   A    That is absolutely an inaccurate statement.

22   Q    Let's go down to the next bullet point.  The apparent

23   decision by Sargento to implement an SAP System prior to the

24   end of the earnout period, which would be extremely

25   distracting to management and their ability to focus on the

1   operations of the business during this key period.

2       Please tell the jury what SAP is?

3   A   I don't know what SAP stands for, but it's basically an

4   integrated software accounting system that basically handled

5   or had the ability to handle all aspects of a business.  It

6   can be the financial statements.  It can be asset listings.

7   It can be inventory.  It can be production planning.  It can

8   be warehouse planning.  It can be loading product on trucks

9   and getting it shipped to customers.

10      It's just a total integration of all of the things that

11  you do in a business environment.  And it's a system that we

12  had in place at Sargento Foods.  And we had talked to Patrick

13  that we would want to get this implemented as soon as we

14  could at Portionables.

15  Q   Take a look, if you would -- well, first, did you back off

16  SAP installation during the earnout period?

17  A   Yes.  In that case we said, well, you know, if it's going

18  to be a big issue for you, we can back off of this.  In

19  reality, it wasn't a big issue to anyone meaningful up there.

20  But we backed off and said we'll wait.

21  Q   In fact, let's take a look just quickly at Trial Exhibit

22  3, which is the stock purchase agreement.  Just show the

23  first page, if you would.  And if you could turn to Bates No.

24  637.

25  A   Page what?

```
 1   Q    Bates 637.  Are you there?

 2   A    Yes.  Okay.  Maybe I'm not there.  Yeah, that's the one.

 3   Q    Schedule 2.14.  This is a schedule attached to Trial

 4   Exhibit 3 which lists various issues with conditions of

 5   assets.  Do you see that?

 6   A    Yes.

 7   Q    Could you read to the jury No. 2?

 8   A    The company believes that with continued growth the

 9   software used for manufacturing processes, financing, and

10   accounting may not be sufficient to meet the needs of the sub

11   and will need to be replaced.

12   Q    And that was something that was understood and agreed to

13   when the contracts were signed, right?

14   A    Yes.

15   Q    All right.  And this relates to SAP?

16   A    Well, that's what we were going to replace his -- the

17   antiquated systems of Portionables with.  And that's not to

18   diminish Portionables' last system.  It was probably adequate

19   for their time.  But it certainly wasn't going to be adequate

20   working integrated with us, nor with the expected high

21   volumes of sales that we were going to get in the future.

22   Q    In any event, you backed off SAP?

23   A    Yep.

24   Q    All right.  What happened next?

25   A    What happened next relative --
```

1   Q    Did you get a call or contact Mr. Calliari after receipt

2   of this letter of March 28th?

3   A    Yes.  On April 2nd, I asked Patrick to give us a call,

4   George Hoff, my chief financial officer and us a call,

5   really, for us to be able to communicate with him or discuss

6   the contents of this letter or what was going on, quite

7   honestly.

8   Q    Now, the letter, that is Exhibit 13, was from -- it was

9   from Mr. Calliari and Mr. Ioannides.  You understood

10  Mr. Ioannides was one of the shareholders, is that right?

11  A    Well, it was from the attorney writing on behalf of the

12  two of them, yeah.  That's what it says.

13  Q    Fair enough.

14  A    Yes.

15  Q    What did Mr. Calliari say to you in that call on April

16  2nd?

17  A    Well, obviously we had some introductory things.  And I

18  made it clear I was really confused on what was going on.

19  And he told me that he was conflicted relative to his role as

20  president and his role as shareholder representative and that

21  he just wasn't certain what he was going to be able to do.

22  And he wanted to protect -- you know, he wanted to protect

23  the interests of the shareholders as the shareholder

24  representative.

25  Q    At this time did you know that Mr. Ioannides was unaware

1  that Unilever had threatened to self-manufacture?

2  A   No, I was unaware.  I assumed that Patrick Calliari must

3  have shared all the details of the proposed agreement with

4  Antoine.

5  Q   At this time were you aware that Mr. Ioannides had not

6  been told that, under the proposed deal with Unilever, the

7  guaranteed level of production would be higher than under

8  their own projections?

9          MR. GOLDFARB:  Leading, your Honor.

10          THE COURT:  Overruled.

11  A   Yeah.  Again, you would have expected that if he looked at

12  the whole thing, he would have seen that there was now a

13  minimum of 20 million pounds, which was 20 million pounds

14  more of a minimum than they asked for.

15  BY MR. SULKIN:

16  Q   Mr. Gentine, I focused my question.  My question was

17  whether you knew this, okay?

18  A   Whether I knew what?

19  Q   Here it is.  Let me try again, okay?  Did you know during

20  that phone call on April 2nd that Mr. Ioannides did not know

21  that under the new deal with Unilever, Unilever had

22  guaranteed a minimum level of production that was higher than

23  the previous levels of production that had been projected?

24  A   No.

25  Q   Okay.  Did you know in that call on April 2nd that

1  Mr. Ioannides did not know that the projected volumes under
2  the new proposed contract were going to result in higher
3  revenues to Portionables than under the existing contract?
4  Did you know that?
5  A    No.
6  Q    Did you believe in fact that Mr. Ioannides knew those
7  things?
8  A    Well, I would expect that if Patrick had sat down with him
9  and discussed this contract because Mr. Antoine Ioannides was
10 concerned with it, that he would have provided him all the
11 details of the contract.  So, yeah, I was surprised.
12 Actually, there was --
13 Q    When did you first learn that Mr. Ioannides did not know
14 these things?
15 A    I believe I first learned of this whenever Mr. Ioannides
16 was up here.  I know he was deposed a month ago, but I
17 certainly didn't read his deposition.
18 Q    Did you write a letter to Mr. Calliari?
19 A    Following this phone call, I did write a letter to
20 Mr. Calliari.  I believe it was on April 4th.  I think it
21 went out two days after the phone call.
22         MR. SULKIN:  Your Honor, Trial Exhibit 8 has been
23 admitted.  That is the letter.  Trial Exhibit 208 has the
24 attachment to it which we agreed to substitute but haven't
25 yet.  May I use 208?  However you want to do it.  I'll do it

1   either way.

2          THE COURT:  Why don't we just have Ms. Miller take

3   the attachment and put it in 208 -- excuse me -- put it in 8.

4          MR. SULKIN:  May I approach, your Honor?  Oh, she has

5   a copy there.  I'm sorry.

6          THE COURT:  Does that work?

7          MR. SULKIN:  That's just fine.

8          THE WITNESS:  So which one should I use, your Honor?

9          THE COURT:  Use 8, with the attachment in 208.

10          THE WITNESS:  I should move it?

11          THE COURT:  Move it.

12          MR. SULKIN:  Your Honor, may I proceed?

13          THE COURT:  Go ahead.

14   BY MR. SULKIN:

15   Q   Showing the first page of 208, is this the letter you sent

16   to Mr. Calliari?

17   A   Yes, it is.

18   Q   You wrote in the third line:  In light of the March 28

19   letter from Joe Weinstein to Bob Henkle on which Sargento was

20   copied, asserting claims under the Portionables purchase

21   agreement, we need to know specifically and soon how you

22   intend to proceed on the proposed amendment to the Unilever

23   manufacturing agreement.

24       Do you see that?

25   A   Yes.

1  Q   Let me just go to the next page, page 2.  You write at the

2  top:  Please get back to me no later than Monday.

3      Do you see that?

4  A   Yes.

5  Q   Did Mr. Calliari get back to you by Monday?

6  A   No, he did not.

7  Q   Did he call you between April 4th and April 11th?

8  A   No.

9  Q   Did you try calling him?

10 A   Several times.

11 Q   And he did not return your calls?

12 A   No.

13 Q   Is it common for division heads at Sargento to not return

14 your calls?

15 A   It's not common at all.  Generally they know that if I

16 have a reason to call them, that they need to call, or if I

17 direct them to call me, they're calling me.

18 Q   You write, six lines from the bottom on page 1:  I can

19 understand, given the disappointing sales results to new

20 customers, why the former shareholders of Portionables might

21 be willing to take a bet the company approach to Unilever,

22 feeling that they have nothing to lose.

23      Did you talk to Mr. Calliari about disappointing sales

24 results?

25 A   Yes.

1    Q    And what did he say about that?

2    A    What did he say about disappointing sales?

3    Q    Yes.

4    A    Well, he was disappointed about the sales results as well.

5    Q    We can go now to -- please stay there.  I'm sorry.  It

6    says, last line:  Not surprisingly, though, that is not the

7    deal we signed up for, which was intended to promote

8    long-term profitable growth in accordance with sound business

9    practices.

10        Do you see that?

11   A    Yes.

12   Q    Now, would you take a look again at Trial Exhibit 3, which

13   is your contract purchase agreement.  And if you could turn

14   to Bates No. 611.

15   A    Uh-huh.

16   Q    Do you have that?

17   A    Uh-huh.

18   Q    This is a schedule to the purchase agreement, part of the

19   deal?

20        MR. GOLDFARB:  Objection, your Honor.

21   Mischaracterizes the document.  It's an exhibit, which is an

22   important distinction.

23        MR. SULKIN:  Fair enough.

24   Q    This is an exhibit to your agreement, your purchase

25   agreement, is it not, sir?

1    A    Yes, it is.

2    Q    All right.  And it does refer to the company's business to

3    be operated in a manner consistent with the following.  What

4    does A say?

5    A    Long-term profitable growth.

6    Q    Thank you.  I'd like you to look at the third page of the

7    document, which is that chart.

8    A    Are we back to Exhibit 8?

9    Q    Yes.

10   A    Got it.

11   Q    Now, this was sent to Mr. Calliari?

12   A    Yes.

13   Q    Could you blow that up a little bit?  Now, just to get

14   some background here, were you provided every e-mail that

15   related to the negotiations with Unilever?

16   A    I'm sure I wasn't.

17   Q    Was or was not?

18   A    Was not.

19   Q    Was Mr. Calliari on every e-mail relating to Unilever?

20   A    I'm sure he wasn't as well.

21        MR. GOLDFARB:  Objection, your Honor.  Lack of

22   foundation.

23        MR. SULKIN:  Let me rephrase.

24        THE COURT:  Sustained.  The jury will disregard the

25   last question and the last answer.

BY MR. SULKIN:

Q   Do you believe that Mr. Calliari was on every e-mail relating to Unilever?

A   No, I would not believe that.

Q   Okay.  That said, do you believe he was involved in the course of communications with Unilever?

A   Yes.

Q   Okay.  What is this chart?

A   This basically is a chart that lays out a lot of the communications and a lot of the activities that went on from the time Unilever contacted us relative to wanting relief on their pricing that was in the manufacturing agreement on March 26th, over a long period of time.  It kind of tracks a lot of things that happened during that period of time.

Q   Did Mr. Calliari or his lawyers ever write back, taking issue with the veracity of this chart?

A   No.

Q   So the next event that happens is you wrote a letter -- or your lawyer wrote a letter on April 4th of '08.  I'm sorry. On April 11th, your lawyer wrote a letter to Mr. Calliari's lawyers, is that correct?

A   Yeah, because my letter was on, I believe, April 4th. Yes, our lawyers wrote a letter a week later.

Q   Had you heard anything in that time frame from Mr. Calliari?

1    A    No.

2    Q    All right.  Let's take a look at Exhibit No. 16.

3    A    Uh-huh.

4    Q    To orient us, April 4th, you wrote:  You have a conflict.

5    Let us know if you can fix it.

6         Did he respond to that request?

7    A    No.

8    Q    All right.  This is from your lawyer.  Did you approve it

9    before it went out?

10   A    I'm sure I did, yes.

11   Q    In the second paragraph, the first page --

12   A    Uh-huh.

13   Q    -- there's a reference:  In face-to-face meetings over

14   several days, only weeks before the Weinstein letter,

15   Mr. Calliari gave no indication that he was opposed to the

16   Unilever amendment being concluded.

17        Do you see that?

18   A    Yes.

19   Q    What does that refer to?

20   A    That would be the meeting in St. Germain.

21   Q    Let's go to the second page.  In the middle of the page,

22   it's written:  In these circumstances, Mr. Gentine is

23   Mr. Calliari's immediate supervisor with respect to his

24   employment.  And Mr. Gentine and George Hoff, as directors of

25   Portionables, are directing Mr. Calliari as follows.

1    Do you see that?

2  A   Yes.

3  Q   All right.  First, I want to just go through each of

4  those, if I may.  Mr. Calliari shall take no further action

5  with respect to the discussions concerning the Unilever

6  amendment except after discussion and approval of such

7  actions by Mr. Gentine.  Any such approval must be in

8  writing.

9    Were you stopping Mr. Calliari from even talking to

10 Unilever at this point?

11 A   No.

12 Q   What were you asking of your subordinate?

13 A   I was asking him to get to me relative to making decisions

14 on this contract.  He could still stay involved.  But, again,

15 due to the fact that he said he was conflicted with his

16 shareholders -- he was also the president of the company

17 reporting to me.  We were paying him a great deal of money to

18 be the president.  And the president has to act in the best

19 favor of the company, what makes most sense.  And I was

20 concerned because he was conflicted.

21 Q   Would you have made the same request to any division

22 president, given these circumstances?

23 A   Certainly in these kind of circumstances.  But with any

24 significant action, there were many -- there's many actions

25 that my direct reports or indirect reports would be expected

1   to come to me for a final decision on.  It happens all the

2   time.

3   Q    No. 2 reads:  Mr. Calliari shall promptly provide to

4   Mr. Gentine a written summary of all actions he has taken

5   with respect to the Unilever amendment from the summer of

6   2007 to the present and shall include with such summary

7   copies of all related documentation, analyses, memoranda and

8   all information in his possession, including correspondence

9   and drafts whether in hard copy or in e-mail form or from any

10  other medium.

11       Do you see that?

12  A    Yes.

13  Q    Why did you want that information?

14  A    Well, I felt that in light of the situation after that

15  existed, I needed to have an absolute full understanding of

16  all the communications and all the issues that went back and

17  forth between Patrick Calliari and others relative to this

18  contract so at least I'd be able to totally understand his

19  point of view relative to the direction that he wished to

20  take.

21  Q    In the past, had you asked other division heads on

22  certainly different subjects for reports and summaries even

23  though they may think it's an annoyance?

24  A    All the time.

25  Q    Let's look at Trial Exhibit 14.

1       MR. SULKIN:  It's already been admitted, your Honor.

2   Q   This is the May 23, 2008 letter from Mr. Calliari's person

3   at Foster Pepper, Mr. Henkle.  Do you see that?

4   A   Yes.

5   Q   And I want to just make sure we all understand.  The first

6   letter on behalf of Mr. Calliari came from the law firm of

7   Davis, Wright & Tremaine.  To your understanding, who does

8   Davis, Wright & Tremaine represent?

9   A   The shareholders.

10  Q   And to your understanding, who was Foster Pepper --

11  A   They were representing Patrick, I assume.

12  Q   Now, had you had communications with Mr. Calliari prior to

13  receiving this letter?

14  A   "Prior" is a long time.

15  Q   Okay.  Fair enough.

16  A   I'm sorry.

17  Q   It was a bad question.  I don't want to get into the

18  contents of the communications.  Between April 11th and May

19  23rd of '08, had you had communications with Mr. Calliari?

20  A   Relative to the contents of this letter, I don't believe

21  so.

22  Q   Did you have communications with him on other subjects?

23  A   I think I had a conversation with him relative to a memo

24  Mike Gordy sent to the management team up at Bellingham.

25  Q   We'll get to that.

1    A    Okay.

2    Q    All right.  I want to just quickly go through portions of

3    this letter.  On page 2 -- let's start at page 1.  It starts

4    with Unilever negotiations.  We'll just quickly touch on

5    that.  Again, the claim was made that he was excluded.  Was

6    that accurate?

7    A    This is No. 1 at the bottom?

8    Q    Yes.  I don't want to go through the whole thing.  But was

9    it an accurate statement that Mr. Calliari --

10   A    I didn't see the "excluded" in what is up there.  That's

11   all.  I'm sorry.  Is that actually on page 2?

12   Q    Sorry.  Go to page 2, middle of the page.

13   A    In any case, it certainly was inaccurate that he had been

14   excluded.

15   Q    I want to touch on this.  Plaintiffs did not raise many of

16   these issues in the trial, so I'm not going to.  But let's

17   just kind of touch base on a few of them.  The Mike Gordy --

18   we're going to go to page No. 5, the top left.  It talked

19   about Bellingham Cold Storage, the Mike Gordy memorandum of

20   April 30, 2008.

21   A    Uh-huh.

22   Q    Did you have a discussion with Mr. Calliari about that

23   memo on or about April 30th?

24   A    Yeah, I believe I did, yes.

25   Q    And tell us what he discussed with you concerning that

1  memo.

2  A    He approved of the concept of the memo.

3  Q    And what was the concept of the memo, generally?

4  A    Well, by this time --

5  Q    Let's do it this way.  Let's take a look at Exhibit 33.

6  A    Exhibit 33?

7  Q    Yes.  Is this the memo that's referred to in the May 23rd

8  letter?

9  A    Yes, it is.

10  Q    And this is part of Sargento's documents, is that right?

11  A    Yes.

12       MR. SULKIN:  Your Honor, I offer Exhibit 33.

13       MR. GOLDFARB:  No objection.

14       THE COURT:  33 is admitted.

15       (Exhibit(s) 33 admitted.)

16  BY MR. SULKIN:

17  Q    Could you explain what this memo is about?

18  A    Well, by this period of time, since the attorneys -- since

19  the lawyering started with the letter from Patrick's

20  attorneys on March 28th, needless to say, the walls have

21  ears, and pretty soon we have the management team up in

22  Bellingham aware that there were issues going on here.

23       And, you know, that puts everyone in a position of:  Who

24  am I supposed to talk to?  Who am I not?  I don't want to get

25  in trouble with my current boss, Patrick Calliari.  I'm sure

1    I don't want to get in trouble with the people that bought

2    the company, et cetera, et cetera.  So they're ending up in a

3    position of feeling conflicted as well, would be my

4    perspective.

5        So what this letter was intended to do was to say this:

6    If Patrick Calliari comes to you and wants any type of

7    information, please let us know and provide us copies of that

8    same kind of information; and, likewise, if we come to you

9    and want any kind of information or have any discussions with

10   this, please inform Patrick Calliari of this as well so that

11   everything is very -- I hate to use the word because it's

12   used too often -- very transparent within the organization,

13   that everybody would be aware of things and there wouldn't be

14   a feeling that somebody was talking behind closed doors or

15   whatever and potentially getting themselves in trouble with

16   one party or the other.

17   Q    If you would take a look at the first full paragraph, the

18   last sentence.

19   A    Yes.

20   Q    It says:  Lou and Patrick have discussed and are aware of

21   these requests in advance to this mailing.

22       Do you see that?

23   A    Yes.

24   Q    And was that accurate?

25   A    Yes.

1   Q    All right.  Take a look at the second page of the

2   document, the second paragraph on the page.

3   A    Our intent?

4   Q    Yes.  Could you read that, please.

5   A    Our intent is to give the Patrick -- I don't know if "the"

6   -- it doesn't seem -- our intent is to the give the Patrick

7   and the Portionables' board equal access to information so

8   that if issues arise they will be in the best position to

9   deal with them.

10  Q    Everyone was trying to create a fair playing field?

11  A    Yes.

12  Q    All right.  Going back to page 5 of Exhibit 14, the May

13  23rd letter, we've talked already about SAP, right?

14  A    Yeah, yes.

15  Q    We haven't heard any evidence on No. 6 or 7 to this point.

16  At some point, Mr. Calliari and the company tried to mediate

17  their dispute?  That's a yes or no question.

18  A    Yes.

19  Q    And the company participated and he participated?

20  A    Yes.

21  Q    Okay.  I want to shift gears.  We saw in the early

22  negotiation documents your request that Mr. Calliari be a

23  long-term member of the company.  Do you recall that?

24  A    Yes.

25  Q    Didn't you want Mr. Calliari to be in a long-term

1   employment agreement?

2   A    Absolutely.

3   Q    Did you discuss that with him?

4   A    Absolutely we discussed it with him.

5   Q    And, first, tell us why you wanted him for a long-term

6   contract, and then we can get into some of those discussions.

7   A    Again, it's sort of repetitive, I believe, of what I said

8   yesterday.  But Mr. Calliari had brought this company up.  He

9   had a vision of where the company could go and the exciting

10  opportunities that lay ahead that were certainly manifested

11  in his projections for greater sales and profitability going

12  forward.

13      He was intimately familiar with the production processes,

14  which he had told us was proprietary.  So it was very

15  important to make sure that we had the lead guy who

16  understood how all of this worked.  And he had connections

17  with many customers that would help get us to that level of

18  profitability.

19      And he had -- as any entrepreneur would have, he had great

20  passion for the business that he had developed prior to our

21  acquisition, which I would expect he would have, and he

22  should have.

23  Q    How long of an employment contract did he sign?

24  A    68 months, five years, the end of 2012, plus there are

25  eight months in 2007.

1   Q   And could he leave at any time under the contract?

2   A   He could leave.

3   Q   And did you try to put mechanisms in the contract to

4   incentivize him to stay?

5   A   Absolutely.

6   Q   Tell us what those are.

7   A   First of all, we provided a lot of incentives relative to

8   the future long-term profitability of the company.  He would

9   have an opportunity to share in that profitability going

10   forward over those -- following the earnout period.

11   Actually, that would have begun in the beginning of 2009.  He

12   would have the opportunity to continue to share beyond his

13   salary, significantly beyond his salary, in the profitability

14   of the company.

15        And then, in addition, we provided him a signing and

16   retention bonus, which although he required that we pay it

17   all up front, it was another incentive for him to stay the

18   whole period.

19   Q   Now, I want to be clear.  Did you have specific

20   discussions with Mr. Calliari on this employment agreement?

21   A   Sure.

22   Q   Okay.  Did you have discussions with him about the

23   retention bonus?

24   A   Yes, that was part of the agreement.

25   Q   And what was discussed about the retention bonus?

1  A    Well, again, it was part of the package of what we were

2  offering him to have him stay with the company.

3  Q    Did you pay Mr. Calliari money for him perhaps -- let me

4  rephrase.

5      Did you pay Mr. Calliari money for a noncompete in the

6  stock purchase agreement?

7  A    Yes.

8  Q    Did the million dollar bonus relate to the noncompete

9  provided for in the employment agreement?

10  A    No.

11          MR. SULKIN:  That's all I have, your Honor.

12          THE COURT:  Any reexamination?

13          MR. GOLDFARB:  Yes, your Honor.

14                      REDIRECT EXAMINATION

15  BY MR. GOLDFARB:

16  Q    Mr. Gentine, yesterday when you testified, you were asked

17  some questions about the negotiations with Mr. Calliari over

18  the stock purchase agreement and the employment agreement.

19  Do you recall that testimony?

20  A    Yes, I do.

21  Q    And what you said was that you remembered generally having

22  conversations with Mr. Calliari, isn't that correct?

23  A    I don't recall the exact statement I made.  But, yeah, I

24  had conversations with him.

25  Q    But you are not able to recount today for us verbatim any

1    of the specific conversations that you had with Mr. Calliari

2    about either agreement, isn't that true, sir?

3    A    I would not be able to recount verbatim conversations that

4    I had with Mr. Calliari two and a half years ago.

5    Q    And in your conversations with Mr. Calliari specific to

6    this signing bonus, it is true, isn't it, that you never once

7    said that if he left the company sometime before the 68-month

8    term of the employment agreement, that you expected him to

9    return some or all of the signing bonus?  Isn't that true?

10   A    That is true.

11   Q    Sir, let me ask you to look next at Exhibit 201.

12   A    Yes.

13   Q    This is one of the early e-mails that was addressing

14   issues about possible changes to the Unilever agreement.  Do

15   you see that?

16   A    Yes.

17   Q    And some of these early discussions involved Unilever

18   potentially moving some of their production from Bellingham

19   to South Dakota, isn't that correct?

20   A    Yeah, I think that's true, yeah, uh-huh.

21   Q    And Mr. Calliari was indicating that if Unilever wanted to

22   expand their production into South Dakota, that that was

23   something that he might consider, isn't that also true?

24   A    I would have to believe that was true, yeah.  He would be

25   willing to consider that, because the South Dakota plant was

1  rather empty.

2  Q   And if Unilever was willing to make a multi-million dollar

3  investment in the South Dakota plant, that was something that

4  Mr. Calliari thought might be advantageous both to the

5  shareholders and to Sargento, correct?

6  A   I don't know if that's in the document, but it certainly

7  would be advantageous if a customer was going to make that

8  type of an investment.

9  Q   My point, sir, is that the early negotiations with

10  Unilever weren't necessarily focused just on the existing

11  contract, but on possibly changing the agreement in some way

12  where the manufacturing would move in whole or in part to

13  South Dakota, correct?

14  A   Yeah, that turned out to be an option that was discussed.

15  Q   That was a different deal than what ultimately was

16  discussed later, isn't that true?

17  A   It was a different deal than -- yes, because -- I assume

18  it was, because this was earlier in the process.

19  Q   Now if you would go to 270, please.

20  A   Got it.

21  Q   This is the e-mail that you just looked at a couple of

22  moments ago --

23  A   Yeah.

24  Q   -- with the enclosure to Mr. Calliari, correct?

25  A   Yes.

1  Q   Okay.  Now, the first thing is that this letter that was

2  currently sent to Unilever was of such importance that you

3  never actually obtained a copy of this signed document, isn't

4  that true?

5  A   Patrick never sent me a copy.

6  Q   And apparently you never asked him for one, isn't that

7  right?

8  A   Well, I don't know if I did or not.  I didn't do it in

9  writing.

10  Q   All right.  Well, you certainly don't have one, sir?

11  A   Well, Patrick didn't always do what I asked him to do.

12  Q   That's not my question, sir.  My question is a simple one,

13  which is:  Do you have a copy?

14  A   I do not have a signed copy, or a copy of the signed copy.

15  Q   Fair enough.  And this Debbie identified here, you've told

16  us, is your assistant, correct?

17  A   Yes.

18  Q   And isn't it true, sir, that the letter that we've been

19  talking about today was actually drafted at your corporate

20  offices?  The drafting of the letter occurred there?

21  A   Yes.

22  Q   And the drafting was done by, initially, Mike Gordy, isn't

23  that true?

24  A   That, I don't remember.

25  Q   Okay.  It was then reviewed by you, all before it went to

1   Mr. Calliari, isn't that a fact?

2   A    Because we wanted to make sure that it, again, synthesized

3   the discussions we had had with Mr. Calliari relative to what

4   we were going to offer Unilever.

5   Q    Okay.  Mr. Calliari didn't draft this letter.  You and

6   Mr. Gordy and your team did in Milwaukee, right, or at your

7   corporate office?

8   A    I believe we did it at our corporate offices, yes.

9   Q    Now, throughout this time frame, Mr. Calliari had told you

10  that he did not believe that Unilever would self-manufacture,

11  isn't that correct?

12  A    He believed that they would not self-manufacture.

13  Q    And his position was they were bluffing, correct?

14  A    Yes.

15  Q    And he told you he thought that it would be a better

16  approach not to renegotiate the contract, that is true, isn't

17  it?

18  A    No, I'm not certain I can exactly say that he didn't want

19  us to renegotiate the contract.  Obviously we started to

20  renegotiate it before this letter.  So I'm not certain what

21  you mean that he said that.

22       He did indicate that between his information -- and

23  whether he mentioned this or Mr. Ioannides or whatever, on

24  his close contacts with people that had previously worked for

25  Unilever, that they wouldn't self-manufacture.  As it turned

1    out, of course, they did.  And they are self-manufacturing in

2    Owensboro, Kentucky.  So they were wrong.

3    Q   Well, at the time that they were having the discussions

4    with Mr. Calliari, one of the things he told you was that,

5    even if they wanted to self-manufacture, it would take them

6    time to do that, isn't that correct?

7    A   Well, of course it would take them time.

8    Q   And he also told you that they made a 10 million dollar

9    investment in the Bellingham plant, isn't that correct?

10   A   They had done that back in, I believe, 2004, whenever the

11   contract had begun, yeah.

12   Q   All right.  And after Mr. Calliari left, at some much

13   later time, Unilever has ultimately decided to

14   self-manufacture, am I right about that?

15   A   No.  I think they decided to self-manufacture long before

16   Patrick Calliari left.  And they were -- I believe they were

17   self-manufacturing before the end of 2008 or early 2009.  I'm

18   not certain when their plant started up running.

19   Q   Well, is it a fact that today Unilever is

20   self-manufacturing and is phasing out or has ended buying

21   through Bellingham?

22   A   It is true that they're self-manufacturing.  And keep in

23   mind, they were always self-manufacturing, had the ability to

24   do that in their plant in Italy.  I don't know what the

25   status of the Italian plant is anymore, but they do have the

1  capability of self-manufacturing in Owensboro, as I mentioned

2  before.  But they are continuing to buy from us, because

3  there's now a contract in place that requires them to buy a

4  minimum of 20 million pounds, which wasn't in place before.

5  Q   And you can't do anything more than speculate as to what

6  would have happened if Mr. Calliari had remained at

7  Portionables and handled Unilever in the manner he saw fit,

8  isn't that true?

9  A   Speculate would seem a little incorrect, since I believe

10 that Unilever came to us, came to Patrick.  And the initial

11 discussions were that they were willing to do more production

12 with us if the prices were lower.  I guess, in that case, I

13 would assume that maybe they wouldn't be willing to do more

14 with us if the prices remained the same.

15 Q   Is Unilever the only customer, in your many years of

16 experience, that you ever talked to that wanted a lower price

17 from you?

18 A   Absolutely not.  It happens all the time.  And it happened

19 with Patrick, and because of that, he lost his first major

20 significant customer, General Mills, because he wasn't

21 willing to negotiate down to a price acceptable to his

22 customer.

23 Q   Well, you know, what goes on in particular transactions is

24 what goes on in transactions.  But customers will come up

25 with every possible reason and excuse for you to lower your

```
 1    price, right?
 2    A    Time to time.  Not all customers do that.  You have
 3    different relationships with different customers, different
 4    cultural styles of different businesses.  And if they're
 5    making a fair profit and they're happy with the service and
 6    the product they're receiving, we don't always get requests
 7    from customers to reduce prices.
 8    Q    All right.  But it happens frequently?
 9    A    It happens.  It's part of the business world.
10    Occasionally we go to our suppliers and ask for a lower price
11    if there's a way to get it.
12    Q    Okay.  And how and what prices you should set is a matter
13    of business judgment, right?
14    A    Yes.  In the end, you have to make a decision on what
15    those prices should be.
16    Q    And in this particular case, Mr. Calliari had years of
17    experience dealing with Unilever, correct?
18    A    Yes, he did.
19    Q    And Mr. Ioannides had extensive experience dealing with
20    Unilever and had done business with them for years in Europe,
21    correct?
22    A    Yeah, but the business -- I don't believe the business in
23    the United States, as large as Unilever is, would be
24    operationally controlled in any form or fashion by the people
25    over in Europe.  So I think that's probably somewhat
```

1  meaningless.

2  Q   Well, that was your business judgment.  But the business

3  judgment of both Mr. Calliari and Mr. Ioannides was that

4  Unilever was bluffing about the price, correct?

5  A   Going back to it, Mr. Ioannides never met Steve Boland.

6  He hadn't sold to Unilever since 2002.  He had a friend that

7  lived in his back yard that he had dinner with occasionally.

8  And I don't think that he would have been in any position to

9  make a judgment.

10      Relative to Patrick Calliari, yeah, his belief was you

11  don't have to do that.  And from our viewpoint, that was a

12  belief he had with General Mills.  And it cost the company

13  dearly.  So we weren't comfortable with his judgment in that

14  regard.

15  Q   So what we have here by the time we get to April and May

16  of 2008 is a disagreement in business judgment between you

17  and your team on one side and Mr. Calliari and Mr. Ioannides

18  on the other, correct?  They thought one thing; you thought

19  something different?

20  A   We had a lot more than that.  We have a transaction which

21  was moving along that Mr. Calliari never complained about,

22  never indicated that he had lost operational control, none of

23  those things were happening.  And he had signed the letter

24  that basically laid out the agreement that we signed the

25  following year.

1   Q   Again, sir, just focus on April and May of 2008.  There

2   was a disagreement between you and your team and

3   Mr. Calliari.  There was one business judgment on your side

4   about what might happen and what was best to do and a

5   business decision or judgment on the other side that differed

6   from what you thought.  That's true, isn't it?

7   A   Again, I would have to say, no, that's not exactly true,

8   because interweaved in that was a shareholder who was putting

9   pressure on Patrick.  And I think his judgment -- in fact, he

10  said his judgment was conflicted.  He didn't know what to do

11  because he had shareholder issues and he had company issues.

12       And he has a fiduciary right, a fiduciary responsibility

13  as the president of Portionables to act in the best interests

14  of the company.  And we believed he wasn't able to do that.

15  Q   Well, you knew from the moment that Mr. Calliari came on

16  board under the employment agreement and under the stock

17  purchase agreement, you knew that he was the shareholder

18  representative, correct?

19  A   Absolutely.

20  Q   And you knew from the very beginning that he was going to

21  represent the shareholders' interests in the transaction,

22  correct?

23  A   He was going to be the representative of the shareholders

24  so that the shareholders would be cognizant, I suppose, of

25  what was going on.

Q    And --

A    But he certainly -- as the president of the company, we weren't paying him $450,000 a year to represent the shareholders' interests.

Q    Well, actually, he had full operational control of the company to exercise the interests of the shareholders to maximize the earnout.  That was all a transaction, wasn't it, sir?

A    No, he did not have full operational control.  He had operational control, limited by his role as a division president of the company.

Q    All right.  Let's look at 204, please.  We looked at this before.  This is the e-mail from Mr. Gordy, forwarded to Mr. Calliari.  Do you recall that testimony?

A    Yes.

Q    And what's indicated, by the time this is forwarded to Mr. Calliari, apparently yourself, Mr. Hoff, and Mr. Gordy already have a call set with Unilever, isn't that correct?

A    We have a call set with Steve Boland.  Steve Boland, it appears, preferred to talk to me as the CEO of Sargento.  I can't control what a customer wants to do.  But it was typical of what he would do.  He would call me.

Q    Well, again --

A    Or request me to call him.

Q    But you don't have to take that call.  You can say:

1   Mr. Calliari is in charge of this negotiation, call him.  But

2   that's not what happened here, is it?

3   A    That is also not what a prudent businessman would do when

4   a customer is calling.

5   Q    So you went ahead and took over the negotiations --

6   A    I didn't take over the negotiations.  I was willing to

7   accept a call and listen to Steve Boland.

8   Q    And then you had a number of calls and e-mails with

9   Mr. Boland that went from January through actually July, when

10  you finally got the amendment signed, isn't that true?

11  A    I talked with Mr. Boland in 2007 as well.  He wished to

12  talk to me.  I'm sure he saw where the company was going.

13  And he was more concerned about Sargento's position, I'm

14  sure, than probably Mr. Calliari.

15       It doesn't mean we didn't keep Mr. Calliari totally

16  involved.  And it doesn't mean that Mr. Calliari wasn't

17  generally involved or knowledgeable about the fact that I

18  might be calling Mr. Boland or he might be calling me.

19  Q    Mr. Calliari was not in a single phone call with

20  Mr. Boland in 2008; that's a fact, isn't it?

21  A    I can't say whether he was or not.  But if you say it's a

22  fact, it may have been a fact.  But it may have also been

23  related to what the wishes were of our customer.

24  Q    Well, Mr. Calliari wasn't in any phone call with you and

25  Mr. Boland in 2008; you know that much, don't you?

1    A    I can't --

2         (Interruption in proceedings.)

3         THE COURT:  Ladies and gentlemen, this is going to

4    continue, which means that we cannot continue with the trial.

5    And I assure you that if they tell you that you are on a safe

6    floor, they don't want us to move.  So how would you like to

7    stand up and take a stretch while we get through this?

8         (Jurors leave courtroom.)

9         THE COURT:  Counsel, I'm going to get off the bench.

10   The jurors are sequestered.  I don't want anybody leaving the

11   floor.  In other words, don't get on the elevators.

12        (Brief recess.)

13        THE COURT:  All right.  Let's bring them back out and

14   let's start again here.

15        (Jury enters courtroom.)

16        THE COURT:  Please be seated.  Sorry about that.

17   Let's turn our attention back to the case at hand.

18      Mr. Goldfarb, go ahead.

19        MR. GOLDFARB:  Thank you, your Honor.

20   Q    Mr. Gentine, if I could get you to turn to Exhibit 203,

21   please.

22   A    Yes.

23   Q    And this again is the letter that Mr. Calliari -- that was

24   drafted by your office and sent by Mr. Calliari in August of

25   2007, correct?

1    A    Yes.

2    Q    And on the second page, sir, Mr. Calliari and you have

3    indicated what the terms of this proposed offer was.  I've

4    highlighted a section that talks about tonnage and

5    exclusivity and duration.  Do you see that?

6    A    Yes.

7    Q    And what this letter is looking for is a minimum tonnage

8    guarantee, correct?

9    A    Yes.

10   Q    A five-year contract, correct?

11   A    Yes.

12   Q    And exclusivity for North American production, correct?

13   A    Yes.

14   Q    All right.  And the term would have started when?  At the

15   beginning of the next year?

16   A    You know, without looking at it, I thought it was the

17   beginning of 2008.  But it might have been sooner than that.

18   I don't recall.

19   Q    If it was the beginning of 2008, the five-year term would

20   take it then to 2013, correct?

21   A    It would take it to the end of 2012, I believe.  8, 9, 10,

22   11, yeah, 12, the end of '12.

23   Q    The end of 2012?

24   A    Yes.

25   Q    Sir, if you would turn to Exhibit 59.

1  A    Yep.  Yes.

2  Q    And on the second page, sir -- I'm sorry.  Just so we're

3  all clear, 59 is the actual signed amendment that was signed

4  after Mr. Calliari left that we looked at yesterday, correct?

5  A    Yes.

6  Q    Okay.  And on the second page under term --

7  A    Yeah, uh-huh.

8  Q    -- the term that was ultimately agreed to by Sargento

9  after Mr. Calliari left was different from what was in

10  Mr. Calliari's letter, correct?

11  A    Yes.  The term was reduced by one year.

12  Q    And in addition to that, the exclusivity provisions were

13  different as well, weren't they?

14  A    I don't recall.  The exclusivity provisions went back and

15  forth.  They wanted to be able to obviously produce product,

16  as I recall, in their Owensboro facility.  They wanted to be

17  able to self-manufacture.  But other than that, I'm not aware

18  of any substantial changes to it.

19  Q    Well, Mr. Calliari's proposal had asked for North American

20  exclusivity, isn't that correct?

21  A    Yes.

22  Q    And what was ultimately signed allowed Unilever to

23  manufacture for itself, isn't that correct?

24  A    Purchaser shall be entitled to acquire a product from

25  foreign affiliate or otherwise manufacture a product

1    themselves.

2    Q    Isn't that right?

3    A    Yes.  They would not have signed it otherwise.

4    Q    Right.  But Mr. Calliari's proposal called for North

5    American exclusivity, period, didn't it?

6    A    Yes, it did.  But what we ended up getting was far better

7    than not having any exclusivity at all.

8    Q    But what this still allows Unilever to do anytime it wants

9    is self-manufacture product, correct?

10   A    After they give us 20 million pounds of production.  They

11   had to give us a minimum of 20 million pounds of production a

12   year.  Above that level, they could self-manufacture.

13   Q    And my point, sir, is simply this:  This proposal that was

14   ultimately signed allowed Unilever to self-manufacture.  The

15   letter that was drafted by your office and signed by

16   Mr. Calliari some eight or nine months before this called for

17   North American exclusivity, period.  That's the difference,

18   isn't it?

19   A    Well, I'm not certain, Mr. Goldfarb, because they had the

20   ability to self-manufacture in the 2004 agreement as well.

21   So it was probably -- I don't know that it wasn't assumed

22   that they would be able to self-manufacture.

23   Q    Well, we just looked at it, sir.  That's not what

24   Mr. Calliari's letter said, is it?  His letter said that

25   there would be North American exclusivity.  That's the one

1  that he signed, isn't that right?

2  A   Yes.  But, again, I believe we were talking about

3  exclusivity from other manufacturers of the product.  And as

4  I mentioned earlier, there were other people that were

5  capable of producing a very, very similar product for

6  Unilever.

7  Q   This is the August 2007 letter.  It says, exclusivity for

8  North American production, does it not?

9  A   It says:  Include a continuance of our exclusivity for

10 North American production.

11 Q   Right.

12 A   Which I think, if you were looking at their former

13 contract, they did have the ability to produce product

14 themselves.  I don't have the details of that.  But I think

15 that's what that means.

16 Q   Let me ask you to look next at Exhibit 13, please.

17 Exhibit 13, we've talked about a couple of times, including

18 you discussed it earlier this morning.  You said that you

19 were surprised that Mr. Calliari had his attorneys write your

20 attorneys.  Do you recall that?

21 A   Yes.

22 Q   But there's certainly nothing wrong with that, is there?

23 A   Well, again, it's just a matter of relationships.  But he

24 certainly would have the absolute right to have his attorneys

25 communicate with me on an issue.

1   Q   All right.  And you certainly knew that he was taking

2   these issues seriously when a letter came from his counsel,

3   isn't that also true?

4   A   He was certainly taking a position on it, yeah.

5   Q   And at the top of the second page of this letter,

6   Mr. Sulkin asked you about this this morning, about the

7   exclusion of Mr. Calliari from the negotiations with

8   Unilever.  It's a fact, isn't it, that in the spring and

9   summer of 2008, calls were being scheduled with Unilever

10  without telling Mr. Calliari, correct?

11  A   I don't know that we were not telling Mr. Calliari.  But,

12  again, we talked earlier that Steve Boland wanted us to call

13  him.  He was the customer.  It's crazy.  The customer is not

14  always right, but he's always the customer.

15  Q   And it's also true, isn't it, that e-mails were being sent

16  by you and others at Sargento to Mr. Boland during the spring

17  and summer of 2008?

18  A   I'm sure there were e-mails going back and forth between

19  Sargento people and Mr. Boland during that period of time.

20  Q   And you never pre-cleared any e-mail that you sent to

21  Mr. Boland about Unilever in 2008 with Mr. Calliari, did you?

22  A   Mr. Calliari worked for me.  I wouldn't normally feel I

23  have to pre-clear something with Mr. Calliari.

24  Q   So the answer to my question is, no, you never went to him

25  and said:  You know, Portionables is under your operational

1  control.  This is an e-mail I would like to send.  Is this

2  approved by you?

3       You never did that, correct?

4  A   Well, I don't know that I didn't discuss the content of

5  e-mails with him prior to sending them.  I may have done

6  that.  I'm sure that after the lawyering letter landed on our

7  desk on March 28th, obviously we had a lot of issues.  He was

8  conflicted, et cetera, et cetera.

9       So there may have been times where I sent something

10  without showing it to him.  But, actually, he wasn't even

11  returning my calls.  It was hard to communicate with him at

12  that time.

13  Q   Looking at the middle of this letter, sir --

14  A   Sure.

15  Q   -- about the direct shipment, you were generally aware

16  that Mr. Calliari had an idea that he would like to direct

17  ship out of the Bellingham Cold Storage facility, correct?

18  A   Yes, he had a concept about direct shipping, a mental

19  concept.

20  Q   And the idea of that concept was that they could save

21  money with the landlord if they didn't put things in and out

22  of the Bellingham Cold Storage warehouse.  You are aware of

23  that, correct?

24  A   Yeah.  Again, we're looking at it in a vacuum, because he

25  couldn't do that based on the contract that we had with

1   Bellingham Cold Storage.  He would like to do it.

2   Q   Hold on, sir.  I'm just asking if that was a concept.

3   A   Well, I'm just saying yes.

4   Q   Okay.  Now, this was another area where there was a

5   disagreement concerning business judgment, isn't that right?

6   Mr. Calliari thought under the lease he was entitled to

7   direct ship; that's true, isn't it?  He believed that?

8   A   Yes, apparently he believed he could do that.

9   Q   And so did Mr. McEvoy, by the way, didn't he, that at

10   least technically permitted direct shipping?  Isn't that

11   true?

12   A   I don't recall the views of Mr. McEvoy in that regard.

13   Q   Mr. McEvoy was the one that was much closer to that

14   situation than yourself, isn't that correct?

15   A   He was the one that actually Patrick Calliari asked for

16   help in negotiating this arrangement with Bellingham Cold

17   Storage.  And first, I think, he asked for help from George

18   Hoff, our chief financial officer.  And then we provided,

19   with his approval, Mike McEvoy as well, because he had an

20   adverse relationship with the CEO of Bellingham Cold Storage.

21   He felt it was better that somebody else get involved.

22      But his own production manager, Tom Kyle, was actually

23   leading the project for Pat Calliari.  And Tom Kyle gave Pat

24   Calliari also his opinion that direct ship was not a good

25   idea.

1    In the end, after Calliari decided not to do that, he

2    basically told Mike McEvoy to sign a contract, which we

3    helped develop with Tom Kyle, that resulted in a savings of

4    approximately $130,000 a year.

5    And it was without any of the logistical issues, product

6    quality issues, or potential lawsuit issues with Bellingham

7    Cold Storage that we knew would develop if we pursued that

8    direct ship.  Even though there was a chance we could do it,

9    we were putting a great deal of business in harm's way.  And

10   his own production manager felt it was inappropriate to

11   direct ship.

12   Q   Let me try to refocus you on my question.  Mr. Calliari

13   had an idea for direct shipping that he wanted to pursue;

14   that's true, isn't it?

15   A   Yes.  I said that before.

16   Q   And your company had a contrary view and thought direct

17   shipping was not a good idea; that's also true, isn't it?

18   A   Our company and his production manager, who reported

19   directly to him, that he asked to investigate the concept and

20   see whether it would work, both of us felt that it was not a

21   good idea.

22   Q   Okay.  Mr. Calliari thought that it was an appropriate way

23   to proceed, right?

24   A   Yes, he did.

25   Q   And there was a difference of business judgment again, not

1   getting to the merits of it at this point, but just there was

2   a disagreement about what was the best way to proceed between

3   your company on one hand and Mr. Calliari on the other;

4   that's true, isn't it?

5           MR. SULKIN:  Your Honor, I'd just object as to time.

6   There's testimony that Mr. Calliari signed off on the

7   agreement.  The question is, at what point in time are we

8   talking about?

9           MR. GOLDFARB:  I'll rephrase, your Honor.

10  Q   What happened was that Mr. Calliari ultimately gave up on

11  direct shipping because it had taken so long in the

12  discussions between Bellingham Cold Storage and your people

13  that there was no way to implement it and still save money

14  under the earnout, isn't that true?

15  A   No, I don't think that's true.  I think when his direct

16  subordinate, Tom Kyle, also believed that direct ship was not

17  an advisable way to do it, Patrick Calliari, I guess, saw the

18  light and said, we're not going to move forward.  And we

19  ended up signing an agreement that gave us some savings,

20  which by the way, accrued to the benefit of the shareholders

21  at a ratio of 6 to 1.

22  Q   Is that something that Mr. Kyle told you?

23  A   What's that?

24  Q   Did Mr. Kyle tell you that?

25  A   No.  I believe that probably came from either Mr. Hoff or

1   Mr. McEvoy.

2   Q   Let me ask you to look next at Exhibit 1.  You were asked

3   some questions about this yesterday.  Do you recall that this

4   is your letter to Mr. Calliari before the contract was

5   signed, talking about the transaction?  Do you recall that?

6   A   Yes.

7   Q   Your letter used the words "primary operational control,"

8   isn't that right?

9   A   Yes.  It was a reduction from the former concept proffered

10  by Bill Beard, which was full operational control and the

11  duties of CEO.

12  Q   And the words "primary operational control" don't exist

13  anywhere in either the employment agreement or the stock

14  purchase agreement, isn't that correct?

15  A   Yeah.  It ended up that we ended up settling at

16  operational control and the role as a division president,

17  duties, responsibilities, and obligations.

18  Q   And I don't want to reargue all that language with you

19  again today, sir.

20  A   Okay.

21  Q   But the deal that the parties made ultimately is the exact

22  verbiage that's set forth in the stock purchase agreement and

23  the employment agreement, correct?

24  A   Right.  And it wasn't primary operational control.

25  Q   And you didn't get the words "primary operational control"

1    into either agreement, did you?

2    A    No.

3    Q    I think you were asked some questions about Mr. Calliari's

4    incentives under the employment agreement.  If you could go

5    to Exhibit 2 briefly.  On page 3, sir, there is a section

6    headed "incentive compensation."  This also contains a fairly

7    complex formula.  I'm wondering if you could translate this

8    for us into basic English about what the incentive

9    compensation was?

10   A    At this point I have not looked at this paragraph for a

11   long, long time.  So I'm not certain that I would be able to

12   do it total justice.  But, in effect, after 2008, there was

13   an opportunity for the executive to share in 5 percent of the

14   profit number.  I don't -- I've got to see what the number

15   was.  Let me just see.  Oh, 5 percent of Portionables' pretax

16   profit.  Thus it became known as PPP.

17   Q    And to recap this, sir, what happened was in the

18   negotiations between yourself and Mr. Calliari, one of the

19   things he told you was that if the company was going to be

20   sold, he wanted to retain an interest in it, isn't that

21   correct?

22   A    When he sold the company to us?

23   Q    Yes.

24   A    He wanted to retain an ability to continue to benefit from

25   the growth of the company over and above that.

Q    The French company had, as you understood it, offered
Mr. Calliari 5 percent of the acquired entity, isn't that
true?

A    Again, I'm not 100 percent certain.  But I'm sure if we go
to the document and you are saying it's true, that's probably
what it was.

Q    That rings a bell, though, doesn't it, that the French
company would provide some equity to Mr. Calliari?

A    Yes, uh-huh.

Q    And you are not a public company.  You didn't have stock
that was available to Mr. Calliari.  So you had to structure
something that was like stock, but wasn't, correct?  And
that's what this section was about?

A    To some degree.  This was basically -- I would have looked
at this more as a bonus to Mr. Calliari for ongoing
performance.  And, again, I made a mistake.  It wasn't 5
percent of Portionables' pretax profit.  It was 5 percent of
their pretax profits over and above, I believe, the pretax
profit earned during the earnout period, because he was
already benefiting from that.

     But I think I would have looked at this, I believe, more
as a bonus; that he would be paid a bonus of that amount over
the period of his contract following the earnout.

Q    Okay.  So this is another example where the employment
agreement is distinguishing between the earnout time period

1  and things that would happen afterwards, isn't that correct?

2  A   Yes.

3  Q   And this section of the agreement only kicks in after

4  December 31, 2008, isn't that right?

5  A   I believe so.

6  Q   Okay.  And if the company performed well after December

7  31, 2008, there's some potential for Mr. Calliari to receive

8  significant payments under this provision, isn't that right?

9  A   Well, yes.  If he had hit the numbers he was talking

10  about, it could be significant.  He was projecting numbers

11  that were significantly higher.  This would be a wonderful

12  bonus.

13  Q   So he would have to be at the company after December 31,

14  2008, in order to recover this, correct?

15  A   He would have to be working for the company, yes.  I

16  believe he would, yes.

17  Q   So by resigning before then, he shot himself in the foot

18  in terms of recovering anything under this provision, isn't

19  that right?

20  A   Yes, I believe so.

21  Q   It was against his personal interest to do that, right?

22  If he had stayed, he might have qualified for this?

23  A   Well, I don't think that he did it because he was going to

24  lose the incentive compensation.  So, no, I guess I can't say

25  that.  He obviously felt that there was an opportunity for

1    him to make more if he could convince somebody along the way

2    that he should have some other contingent payment created for

3    his benefit.

4    Q    This provision, you can agree with me, provided an

5    incentive for Mr. Calliari to stay past 2008, right?

6    A    Yes, which is what we wanted him to do.

7    Q    And in addition to the incentive compensation, there is a

8    another provision called a value award that's different,

9    isn't that right?

10   A    Yes.

11   Q    And he had to stay through 2009 in order to qualify for

12   that, correct?

13   A    Yes, that's what it says.

14   Q    And I don't want you to go through this in terrible

15   detail, but can you explain to the jury in, again, basic

16   terms what the value award was?

17   A    Quite honestly, I would have a heck of a time today being

18   real specific on it.  So I'm glad you are not asking me to do

19   that.  But I think basically it was a way to provide him a --

20   if the value of the company was determined in some way or

21   fashion according to this thing went up at the end of the

22   earnout period and when he left the company, that he would

23   share in 5 percent of that value.  I suspect that's kind of

24   what that was about.

25   Q    So kind of like if you owned Microsoft stock and it went

1  up, you would share in that value as it went up?

2  A    Sort of, except I suspect in this case this was an

3  ordinary income.  It wasn't a capital gain that you would

4  receive from a stock.

5  Q    Right.  But in terms of the idea, it was that, if the

6  company grew, he would grow with it?

7  A    Yes.

8  Q    And this was another incentive for him to stay past 2009,

9  correct?

10  A    Yes, it was.

11  Q    Sir, if you would look at page 8.  Looking at section 70,

12  which relates to termination by executive, under that

13  provision, if Mr. Calliari were to voluntarily terminate

14  after December 31, 2009, he would still receive the value

15  award, isn't that correct?

16  A    That's what it says, yes.

17  Q    I would like you to turn to the testimony that you gave

18  this morning about the phone call that you had with

19  Mr. Calliari on April 2nd of 2008.  This is the call you

20  talked about that was several days after receiving the letter

21  from the attorneys.  Do you recall that?

22  A    Yes, with George Hoff.  George Hoff and I had called.

23  Q    In that call, sir, isn't it true that Mr. Calliari told

24  you that Antoine Ioannides has over 25 years of dealing with

25  Unilever and that Mr. Calliari had over 20 years of dealing

1   with Unilever?

2   A   I don't recall those details.  But I'm sure that he could

3   have very easily have told us that, yes.

4   Q   Would you please look at Exhibit 234?

5   A   Okay.  I got it.

6   Q   Sir, are Exhibit 234 notes of a conversation prepared by

7   Mr. Hoff on April 2nd, 2008?

8   A   Yes, it is.

9   Q   And, sir, do these notes refresh your recollection that in

10  the call Mr. Calliari said:  Antoine has over 25 years of

11  dealing with Unilever, paren, intimate knowledge, closed

12  paren, and I have over 20 years of dealing with Unilever?

13  A   Yeah, I see that here.  Yeah, so he did say that.

14  Q   And, in addition, Mr. Calliari said in that call:  From

15  the beginning, I registered my disagreement with giving them

16  any price concessions, as I told you they were bluffing and

17  they had no intention of going to self-manufacturing.

18      Mr. Calliari said that in the call also, did he not?

19          MR. SULKIN:  Your Honor, it's improper refreshing of

20  recollection.  I have no problem with him doing it the proper

21  way.

22          THE COURT:  Sustained.

23  BY MR. GOLDFARB:

24  Q   Do you recall, sir, in the conversation with Mr. Calliari

25  on April 2nd, 2008, that he told you that from the beginning

1    he had registered his disagreement with giving any price

2    concessions to Unilever and that they were bluffing and had

3    no intention of going to self-manufacture?

4    A    Clearly that's what's written.  But clearly they weren't

5    bluffing, because they went into self-manufacture.

6    Q    Sir, my question is very focused.  Is that what

7    Mr. Calliari told you --

8    A    Yes.

9    Q    -- on April 2nd, 2008?

10   A    Yes, that is absolutely what he told me.

11   Q    And he also told you that his contacts in Europe supported

12   his view, correct?

13          MR. SULKIN:  Same objection, your Honor.

14          THE COURT:  Sustained.

15   A    Uh --

16          THE COURT:  Wait.

17          MR. GOLDFARB:  I'll rephrase, your Honor.

18          THE COURT:  Okay.  The objection is to the manner

19   that you are refreshing.

20   BY MR. GOLDFARB:

21   Q    So put the document to one side for a moment.  Isn't it

22   true that in the conversation on May 2nd, Mr. Calliari said

23   to you that both he and Mr. Ioannides knew more about

24   Unilever than Sargento did, but that no one was listening to

25   them?

1  A   Do you mean April 2nd?

2  Q   I'm sorry.  I mean April 2nd, 2008.  I apologize.

3  A   I don't know if he said that.  But, obviously, in the

4  notes that --

5  Q   No, I'm not asking about the notes, sir.  I'm asking --

6  A   Yeah, he said something to that effect, yeah.

7  Q   And he told you in that conversation, didn't he, that

8  although he had signed the proposal to Unilever, he disagreed

9  with it?  Do you recall that?

10  A   I'd have to go back and look at the notes relative.  Am I

11  allowed to do that?

12  Q   Would you now please look at Exhibit 234 and tell me if

13  that assists you in recalling your conversation with

14  Mr. Calliari?

15  A   And is that on the first page?

16  Q   It's on the first page, the paragraph that starts with the

17  word "although."

18  A   Where he said:  Although I signed a proposal to Unilever,

19  even though I disagreed with it, too much time has

20  transpired?

21  Q   Does that refresh your recollection?

22  A   Yes, he's saying that.

23  Q   And he said those words to you on April 2nd, 2008, didn't

24  he?

25  A   Yes, he said those words to me.

1   Q   Okay.  And he also said to you in that call that too much

2   time has transpired from the date of the letter.  He said

3   that, didn't he?

4   A   Yes, he did say that.

5   Q   And he said that he thought it was appropriate, since

6   Unilever hadn't responded until January of 2008, to tell them

7   that the world has changed and that you would not honor the

8   original proposal.  Do you recall that?

9   A   Yes, he did say that.

10  Q   And do you recall him also telling you in that

11  conversation that the entire process regarding Bellingham

12  Cold Storage and direct shipment was unsuccessful?  He used

13  the words "a bunch of BS," didn't he?

14  A   He said:  Regarding BCS, the entire process was a bunch of

15  BS.

16  Q   And then what he told you in the call was:  No one ever

17  had any intention of seriously working on my plan to direct

18  ship, which would have resulted in substantial savings to the

19  shareholders.  Isn't that correct?

20  A   It's confusing to me, because the guy working on it was

21  his direct report.  And if he was the president of the

22  company, he should have had higher expectations for that

23  gentleman to do the job properly if he didn't think he was.

24  Q   The person working on it was Mr. McEvoy?

25  A   No.  I believe the person assigned to it was Tom Kyle.

1   And Mr. McEvoy was assisting him at Patrick's approval.

2   Q   The person negotiating with Bellingham Cold Storage over

3   these issues of cost savings was Mr. McEvoy and Mr. Gordy,

4   isn't that true?

5   A   Well, as I recall, Tom Kyle led the study for him.  Who

6   was actually doing the negotiating with Mr. -- I forget the

7   gentleman's name at BCS --

8   Q   The owner's name is Doug Thomas.  Isn't it a fact, sir,

9   that it was Mike McEvoy and Mike Gordy that were negotiating

10  directly with Doug Thomas?

11  A   Again, all I can say is they may have been negotiating.  I

12  don't -- my understanding is that Tom Kyle was involved in

13  the process.  Whether he was attending all negotiation

14  sessions, I do not know.  All I know is that Mike McEvoy and

15  -- and, quite honestly, I wasn't certain Mike -- did you say

16  Mike Gordy?

17  Q   Yes.

18  A   Yeah.  I don't recall necessarily if Mike Gordy was

19  involved.  I know Mike McEvoy was and that for a period of

20  time George Hoff was at Patrick's insistence.

21  Q   Mr. Calliari told you on April 2nd, 2008, he said:  The

22  lease, which is the lease with Bellingham Cold Storage,

23  allows us to direct ship.  And everyone was dragging their

24  feet.  That's something Mr. Calliari told you in that call

25  also, isn't that correct?

A    Yes, he did.

Q    Okay.  And he also told you in that call that by the time
he finally got a plan to direct ship out of Bellingham Cold
Storage in mid-December 2007, it was too late to execute for
2008, isn't that correct?

A    Obviously that's what he said.

Q    And in this call on April 2nd, Mr. Calliari also told you
that he felt he had been removed from the business issues and
treated by Sargento as a person that doesn't know anything.
Those were his exact words, isn't that right?

A    Those were his exact words.  They don't represent fact.

Q    It's not like you didn't know what his viewpoints were in
detail on April 2, 2008, because in that conversation, he
told you exactly the things that we just went over, correct?

A    Yes.

Q    Next, sir, looking at Exhibit --

       MR. SULKIN:  Your Honor, I move for the admission of
the document under Rule 612.

       THE COURT:  Any objection?

       MR. GOLDFARB:  I need to check the rule first, your
Honor.  I'm not sure what the basis would be to admit the
entire document, your Honor.

       MR. SULKIN:  Your Honor, if you like, we can take it
up at break.

       MR. GOLDFARB:  The rule indicates, as I understand

1   it, your Honor, that portions can be introduced under certain

2   circumstances that relate specifically to the testimony of

3   the witness.

4         THE COURT:  Go ahead and take it up later.  Let's

5   push on, please.

6   BY MR. GOLDFARB:

7   Q   Sir, if you could turn next to Exhibit 8.  This was the

8   April 4, 2008 letter that Mr. Sulkin had talked to you about

9   earlier.  Do you recall that?

10  A   Yes.

11  Q   There was a schedule that was prepared to go with the

12  letter, isn't that true?

13  A   Yes.

14  Q   Okay.  And this recounts the dates when various things

15  happened with Unilever, correct?

16  A   Yeah.  I talked to him later.  I don't know if it's

17  everything that happened.  But it certainly was a time line

18  of the many things that did happen.

19  Q   And what I've circled there, sir, that's the date when

20  Mr. Calliari's letter that you had prepared and he signed

21  went out, August 16, 2007, correct?

22  A   Yes.

23  Q   And the Unilever response to that proposal was January 29,

24  2008, isn't that also correct?

25  A   Well, other than you can't exclude all the activities they

1   were doing in order to measure what they could do with that

2   in between.  There were a lot of trips by Unilever people in

3   between there in order to judge the appropriateness of the

4   offer.  And then, yes, written responses suggesting some

5   tweaks to it were provided during that period of time.

6   Q   I'm not talking about what other things Unilever was

7   doing.  I'm talking about when they formally responded.

8   A   Yes.

9   Q   Okay.  And that was a period of five and a half months,

10  wasn't it, between August 16 and the end of January?

11  A   Yeah, it's either four and a half or five.

12  Q   I have to count.  I'm sorry.  September, October,

13  November, December, January, plus two weeks.  Five and a half

14  months went by --

15  A   Yes.

16  Q   -- between the original letter and the response from

17  Unilever, isn't that correct?

18  A   Uh-huh, yeah, that's correct.  In the meantime, our

19  business went on.

20  Q   And that was the gap Mr. Calliari was talking about on

21  April 2nd when he called you.  He said:  I think too much

22  time has gone by here.  That's what he was referring to?

23  A   Well, he said the world had changed, which I assume he

24  meant his shareholders now didn't like it.

25  Q   And over on the right-hand side of this exhibit, there are

1    two columns.  One says PC copy and one that says PC in

2    attendance.  Do you see that?

3    A   Yes, I do.

4    Q   And looking at the PC in attendance column, this was

5    prepared by your office, is that correct?

6    A   I'm not certain of it.  I assume it probably was.

7    Q   But this indicates that Mr. Calliari was not in attendance

8    at any of the events that are listed here, other than the one

9    at the very bottom, isn't that correct?

10   A   Not by -- he wasn't there because he very seldom came to

11   Bellingham to participate in the management of the company.

12   So he chose not to be there.  It certainly wasn't that he

13   couldn't.  He only lives 70 miles away.

14   Q   I only want the facts, sir.  The fact was that he wasn't

15   present at any of the times listed here?

16   A   Well, the ones that say NA, I assume -- and I don't know

17   if that means not available or what it means, but apparently

18   that means he wasn't in attendance.  Not attending, I suppose

19   that means.  I'm sorry.

20   Q   And then down toward the bottom I see one there that says

21   3/4/08.  That's March 4, 2008.  Do you see that?

22   A   Yes.

23   Q   And what's written there are concerns expressed by

24   Patrick.  Do you see that?

25   A   Yes.

1  Q    So the suggestion that you hadn't heard any concerns from

2  Patrick about this particular amendment until you got the

3  letter from the attorneys is inconsistent with what's

4  reflected in this exhibit, because according to this, he

5  expressed some concerns at some earlier time, isn't that

6  right?

7  A    I think what we were talking about was concerns about us

8  wresting operational control away from him.   In a

9  collaborative way of reviewing options on which way we would

10  go, people may input different types of concerns.   We work

11  through them, different viewpoints, and we arrive at a

12  consensus decision.   And everybody agreed on the decision

13  going forward.

14  Q    Let me just see if I'm clear.   This document indicates

15  Mr. Calliari expressed concerns about something on March 4,

16  2008, right?

17  A    Sure, it indicates that.   In fact, I think March 4th was

18  St. Germain.

19  Q    And the concerns that were expressed had to do with

20  Unilever, didn't they?

21  A    I'm going to assume that they had to do with Unilever.

22  Q    Exhibit 16, sir.

23  A    Got it.

24  Q    This is the April 11, 2008 letter that you talked about

25  earlier, correct?

1    A    Yeah, we've spoken to this.

2    Q    We talked about it yesterday.  And then Mr. Sulkin

3    addressed it this morning?

4    A    Uh-huh.

5    Q    So in the middle of the first page of this letter, which

6    is written by your attorneys, what they say is the letter

7    from Joe Weinstein on March 28 was the first formal

8    indication that Mr. Calliari's concerns went beyond the

9    normal give and take involved in making business decisions.

10        Do you see that?

11   A    Yes.

12   Q    Okay.  But, in fact, before the formal letter that came

13   from the attorneys, Mr. Calliari had on prior occasions

14   expressed concern, right?

15   A    Not beyond the normal give and take, as it says there.

16   Q    But he had expressed concerns, correct?

17   A    That went beyond the normal give and take, yeah, well,

18   involved in making business decisions.

19   Q    Maybe I misheard your testimony earlier today.  But I

20   thought what you were saying is Mr. Calliari had never said a

21   peep about being concerned about Unilever.  Isn't that what

22   you said this morning?

23   A    I don't believe that was meant to be in that form or

24   fashion.  It was above the offer that was being -- when we

25   made the offer, he was happy with it.  And he wasn't

1    expressing concerns about, again, us wresting operational

2    control away from him.

3    Q   But it's true, isn't it, that Mr. Calliari had expressed

4    concerns repeatedly about whether or not it made sense to

5    renegotiate with Unilever?  That's a fact?

6    A   I expressed concerns as well, back and forth.  We all did.

7    Q   I'm not asking you that.  I'm asking about Mr. Calliari.

8    A   Uh-huh.

9    Q   Okay.  So the statement that he had never expressed

10   concerns about renegotiating Unilever, that's just not true,

11   right?  He had expressed concerns?

12   A   Well, I wouldn't say it was -- I just think it's kind of a

13   picky type of reference here.  Obviously, everyone has issues

14   during a team meeting and discuss things.  And I'm sure they

15   all express some kind of concerns.  It wasn't meant in that

16   -- the statement wasn't meant in that manner.

17   Q   Second page of the letter.

18   A   Okay.

19   Q   It says here that Mr. Gentine and George Hoff, as the

20   directors of Portionables, are directing Mr. Calliari as

21   follows.  Do you see that?

22   A   Both myself as his immediate supervisor and George Hoff

23   and myself as directors.

24   Q   I'm just asking about the board part.

25   A   Sure.

1   Q   The fact is that there was no board action taken in this

2   time frame with regard to Mr. Calliari, isn't that true?

3   A   I don't know that this says there was action taken.  It

4   was just that we were -- we were, as the directors, directing

5   him to do something.

6   Q   Okay.  So you weren't trying to imply in this letter that

7   the Portionables board of directors had issued some or

8   approved some resolution or ruling that directed Mr. Calliari

9   to do something or other?

10  A   I don't recall what I was implying relative to that.

11  Q   But there was no board action in April of 2008 relative to

12  Mr. Calliari, isn't that correct?

13  A   I don't recall whether there was any board action at that

14  period of time.

15  Q   The first board action that happened with regard to

16  Portionables and Mr. Calliari was after his resignation, when

17  the board appointed Mike Gordy to run the company, isn't that

18  true?

19  A   Yes.

20  Q   And this paragraph 1 that Mr. Sulkin asked you about

21  earlier today, there is no question in this case, is there,

22  that as of April 11, 2008, you were going to make the

23  decision about the Unilever amendment whether Mr. Calliari

24  agreed or not, correct?

25  A   I can't say that.  That's not what this says.

1   Q    Okay.  I didn't ask you what this says.  I asked you, was

2   it a fact --

3   A    That there was a question?

4   Q    You had made up your mind as of April 11th that

5   Mr. Calliari was not going to decide this, you were, correct?

6   A    Because he was conflicted and was having trouble --

7   Q    Sir --

8   A    -- dealing with it, he needed to get my approval before

9   actions were taken.  That's what it says.

10  Q    Okay.  But in point of fact, you had decided to make the

11  decision here, not Mr. Calliari, correct?

12  A    I can't -- I can't say that in point of fact that was the

13  case.  I can only say what we put into the letter here.

14  Q    So at this point in time, you hadn't made up your mind

15  that you were going to approve the Unilever amendment?

16  A    Well, as it goes on to say in No. 2, I needed -- I wanted

17  to get all of the information from Mr. Calliari relative to

18  all of the discussions that he had, all of the back and forth

19  he had had with Unilever, because it would provide me more

20  insight into why he held the -- you referred to it as the

21  position he held relative to not amending the contract.

22  Q    Let me show you next Exhibit 33, which was discussed this

23  morning as well.  This is the memo you claim Mr. Calliari

24  agreed to, is that right?

25  A    Yes.

1  Q   And it is a fact that in the May 23, 2008 letter, where

2  Mr. Calliari asked for a cure, one of the things he asked was

3  that you would drop this memo, correct?

4  A   He asked that we change a lot of things that he approved

5  previously.  And this was one of them.

6  Q   And you were not willing to withdraw this memo, isn't that

7  also true?

8  A   I don't believe so.  We didn't respond to the -- we didn't

9  respond positively to the May 23rd letter in that regard.

10  Q   Now, just in terms of the timing and the sequence of what

11  happened here, after your April 11th letter, there was a

12  request for mediation, isn't that correct?

13  A   You know, I don't recall when the request came.  But there

14  absolutely was a request for mediation.

15  Q   And that came from Mr. Calliari, correct?

16  A   Or his attorneys, I suspect.

17  Q   Okay.  And that mediation process took a number of weeks

18  to get resolved, did it not?

19  A   I don't think the process -- the process itself was, I

20  believe, a day or a day and a half.  But then, of course, the

21  ruling judge or whatever you call the mediator needed time to

22  make a final decision relative to the issues.

23  Q   But my question, sir, is a different one.  It's just that

24  that process from the beginning to the end of the mediation

25  took a number of weeks, didn't it?

1   A    Are you saying the starting point was when they asked to

2   do it?

3   Q    Yes, and getting it scheduled and --

4   A    Oh, absolutely, it took weeks.

5   Q    Okay.  And it was shortly after that or near the end of

6   that process that the May 23, 2008 letter was delivered to

7   you, correct, the letter that demanded the cure?

8   A    You're asking if this came after that process was

9   complete?

10  Q    What I'm just saying is that there wasn't silence where

11  the parties weren't talking to each other for weeks and then

12  this May 23rd letter showed up out of the blue.  What

13  happened in the intervening time was that the parties were

14  involved in this mediation process, correct?

15  A    Yeah.  And I just don't know the dates off the top of my

16  head, Mr. Goldfarb, relative to when the mediation happened

17  and when it was completed.  So I don't want to misstate that

18  this document came before, after, during, or never.

19  Q    Okay.  But there was a period of time that was covered in

20  May and June of 2008, where the parties were involved in this

21  mediation process, right?

22  A    Absolutely, yeah, yes.

23  Q    And as we talked about yesterday, what was requested with

24  regard to Unilever was that Sargento stand down --

25  A    Excuse me.  Is there an exhibit I'm supposed to look at?

 1   Q   Oh, I'm sorry.  It's Exhibit 14.

 2   A   Okay.  I've got it.  Thank you.

 3   Q   At the bottom of the first page there is what's being

 4   requested by Mr. Calliari to cure the operational control

 5   issues with regard to Unilever, correct?

 6   A   At the bottom of the first page, or which page are we on?

 7   Q   Sorry.  It is the bottom of page 4.

 8   A   Oh, okay.  Under demand for a cure?

 9   Q   Yes.  And what Mr. Calliari through his counsel was

10   requesting was that Sargento stand down from any proposed

11   revision of the Unilever manufacturing contract, correct?

12   A   That appears to be what No. 1 is.  That's one of their

13   requests.

14   Q   And you were absolutely not willing to agree to that,

15   correct?

16   A   I was not willing to agree to that.

17   Q   And then there was this alternative, which was, if you

18   wanted to go forward, give the shareholders a credit for the

19   actual pounds sold for Unilever, using the old contract to

20   calculate the earnout, correct?

21   A   Yeah, that was an alternative offer.

22   Q   And that was not acceptable to you either, correct?

23   A   No, because we believe it was patently unfair and

24   inappropriate.

25   Q   Well, if you didn't think that they were going to make the

1    earnout anyway, what difference did it make to you whether

2    you gave them credit for it or not?

3    A    If I didn't think they were going to get the earnout?

4    Q    Right.  If you thought they were so far below the 3

5    million dollar threshold that it wasn't going to make any

6    difference, because what Mr. Calliari is saying here, he's

7    saying, look, if you change this contract, we're not going to

8    get the Unilever money because it will potentially be less,

9    right?  That was his view.  And if that happens, it's going

10   to affect the earnout.  And so what he's saying is, give us a

11   credit here so it's fair to the shareholders, and I don't

12   have a problem.  Isn't that what he's telling you here?

13   A    Well, that's what he's asking for.

14   Q    Right.  And you weren't willing to do that?

15   A    Because it wasn't appropriate.  It wasn't fair.  Because

16   you can't take that and segregate out the revenue portion of

17   this to the other values of the contract.

18   Q    So it was unacceptable to you, correct?

19   A    Yes.

20   Q    Okay.  You are familiar with someone named Dan Zinzer?

21   A    Dan Zinzer is a salesman for our food ingredient group.

22        MR. SULKIN:  Your Honor, object.  This is beyond the

23   scope of my direct.

24        MR. GOLDFARB:  Your Honor, the indication was made in

25   direct that there had been no complaints regarding

1    infringement on operational control.  And, in fact, there

2    were some, of which I'm about to speak briefly.

3            THE COURT:  Overruled.

4    BY MR. GOLDFARB:

5    Q    You are familiar with someone named Dan Zinzer?

6    A    Yes.

7    Q    Mr. Zinzer is employed by Sargento?

8    A    He was part of our food ingredients group which handled

9    industrial sales or sales to other food companies.

10   Q    And he was calling on certain customers that were also

11   customers of Portionables?  Birds Eye, being one in

12   particular, isn't that true?

13   A    Yes.

14   Q    And you received complaints from Mr. Calliari on more than

15   one occasion, did you not, that Mr. Zinzer was confusing the

16   process with regard to the sale of Portionables' products?

17   A    Again, you can probably point me to the documents, but I

18   did receive communications from Patrick that he was concerned

19   about how Mr. Zinzer was playing his role.

20   Q    Sir, at the time of the acquisition, did you have

21   conversations with other executives at Sargento about things

22   that might happen which would affect the EBITDA or the

23   earnout of Portionables?

24   A    I don't know what you mean by that.  So could you clarify

25   what you are asking?

1   Q   Yes.  Isn't it true, sir, that you had conversations with

2   Mr. Gordy in the April 2007 time frame, right at the time of

3   the acquisition, where you and he talked about strategic

4   steps that you might take or that the company might take and

5   how those would affect the earnout?

6   A   I don't recall a conversation like that.

7   Q   Do you recall Mr. Gordy telling you in April of 2007:  I

8   understand that there is a point where we don't want

9   significant efficiencies because of the earnout multiple?

10      Do you recall that?

11  A   Yeah, I think I can recall that, that he had concerns

12  there, because there were certain things that we didn't need

13  to include in the earnout thing, according to our agreement.

14  Q   And his concern was that if certain things were achieved

15  on the earnout, your company was going to have to pay 6

16  dollars for every dollar, correct?

17  A   Yes, I think that's probably what he's talking about.

18  Q   Right.  And managing this earnout was something that was

19  on his mind and yours from the beginning of the acquisition,

20  from the day it closed, isn't that true?

21  A   Well, actually, what was on our mind was to maximize the

22  earnout relative to efficiencies that Patrick could put into

23  place without capital investment on our part, because we

24  weren't going to invest meaningful capital in the company

25  during the earnout period.

1      THE COURT:  And, Mr. Goldfarb, can you clarify.  I'm

2  not sure I heard correctly.  Was it efficiencies or

3  deficiencies?

4      MR. GOLDFARB:  It was efficiencies, your Honor.  But

5  let me restate the question.

6  Q   Isn't it true that Mr. Gordy told you that there was a

7  point where Sargento doesn't want significant efficiencies

8  because of the earnout multiple?  In other words, he didn't

9  want to do things that were going to make Portionables more

10 profitable because of the earnout multiple?

11 A   What he's talking about are things that we could bring to

12 the party.  We didn't have to bring things to the party to

13 reduce their costs during the earnout period, because the

14 earnout was really based totally on top line performance.

15 That's where the profitability was going to be.

16     And we didn't have a responsibility or an obligation to

17 bring separate efficiencies into the organization that would

18 have been only achieved because of us, not because of the

19 improvements they made within Portionables.

20 Q   So the fact is that in April of 2007, even as this

21 acquisition was closing, you and Mr. Gordy were talking about

22 things that you maybe wouldn't do because it would make the

23 company more profitable during the earnout period, right?

24 A   Again, understanding that they were things that we didn't

25 need to do.  As an example, if their health insurance plan

1  cost more than our health insurance plan, we didn't need to

2  put our health insurance plan -- and this was agreed to by

3  Mr. Patrick Calliari -- we didn't need to put our less costly

4  health insurance plan into place at dura -- at Portionables

5  prior to the earnout period.  Those were the type of things

6  that would include.

7  Q   All right.  The fact is, you had conversation with

8  Mr. Gordy in April of 2007, talking about steps that you

9  might not take because if you did take them they would make

10  the company, Portionables, more profitable, correct?

11  A   Steps that we had agreed with Mr. Calliari we need not

12  take.

13  Q   Okay.  And, again --

14  A   Only those types of steps.

15  Q   That conversation with Mr. Gordy happened in April of

16  2007, correct?

17  A   Yes, because it was part of our understanding with Patrick

18  Calliari.

19          MR. GOLDFARB:  Nothing further, your Honor.

20          THE COURT:  Anything further, Mr. Sulkin?

21          MR. SULKIN:  I do, your Honor.

22                          RECROSS-EXAMINATION

23  BY MR. SULKIN:

24  Q   I want to focus on some questions Mr. Goldfarb asked you.

25  Take a look, if you would, at Exhibit 204.

1  A    Yes.

2  Q    Mr. Goldfarb asked you why you didn't tell Mr. Boland to

3  not call you.  And I think you gave an answer.  I have a

4  different question for you.

5      Do division heads have the power or authority to tell you,

6  as CEO, who you can accept calls from?

7  A    No.

8  Q    Did Mr. Calliari ever tell you:  Mr. Gentine, I do not

9  want you to accept a call from Mr. Boland?

10 A    No.

11 Q    Look at Trial Exhibit 59, please.

12 A    Excuse me.  What number?

13 Q    59.  That's the final agreement.

14 A    Okay.

15 Q    You recall that Mr. Goldfarb compared this document to the

16 offer letter of August 16th?

17 A    Uh-huh.

18 Q    And he pointed out two differences, right?  And let's just

19 get them right.  One was exclusivity, the parameters of

20 exclusivity, correct, and the other was whether it was going

21 to be a four-year deal or a five-year deal?  Do you recall

22 that?

23 A    Yes.

24 Q    All right.  Did Mr. Calliari, when he called you in the

25 spring of 2007, say to you --

1   A   Excuse me.   2007?

2   Q   I'm sorry.   Late for me now is the lunch hour.

3   A   I'm the one sitting up here.

4   Q   Mr. Calliari, did he ever say to you at any time,

5   Mr. Gentine, I'm against this deal because you are not giving

6   the exclusivity that we thought we were going to get?

7          MR. GOLDFARB:  Objection, your Honor.  Leading.

8          THE COURT:  I didn't hear you, Mr. Goldfarb.

9          MR. GOLDFARB:  Leading, your Honor.  I'm sorry.

10         THE COURT:  Sustained.

11  A   The question was did he do that?  No.

12         THE COURT:  It was sustained.  Sustained means you

13  don't answer.

14         THE WITNESS:  I'm sorry.  I get confused.

15         THE COURT:  The jury is going to disregard the last

16  answer given.

17  BY MR. SULKIN:

18  Q   Mr. Gentine, did Mr. Calliari ever mention to you any

19  particular concerns he had between the differences in the

20  final agreement and his August 16th letter as the basis for

21  his not agreeing?

22  A   No.

23  Q   Mr. Goldfarb talked to you about the phrase "business

24  judgment."  Do you recall that?

25  A   Yes.

1    Q    And just to resituate us, Mr. Goldfarb talked to you and

2    was questioning you about his view that there's a dispute

3    among business judgment over whether the Unilever deal should

4    be signed or not in the spring of 2008.  Do you recall that?

5    A    Yes.

6    Q    And he asked you about your understanding of business

7    judgment.  And I want to ask you about it, too.

8         Could Mr. Ioannides be exercising business judgment if he

9    did not have all the facts?

10            MR. GOLDFARB:  Objection, your Honor.  Argumentative.

11   Not relevant.

12            THE COURT:  Sustained.

13   BY MR. SULKIN:

14   Q    Do you believe that Mr. Ioannides -- do you believe that

15   someone could be exercising business judgment if they did not

16   know what the competing underlying offer was -- let me

17   rephrase it.

18        Do you believe someone could be exercising business

19   judgment if they didn't know what the new proposal was to

20   Unilever and the basis for it?

21            MR. GOLDFARB:  Objection, your Honor.  Speculative

22   and relevance.

23            THE COURT:  Sustained.

24   BY MR. SULKIN:

25   Q    Was Mr. Ioannides exercising business judgment in the

1  spring of 2008?

2  A   Well, Mr. Ioannides, as it turns out, was basing his

3  decision on the fact that -- I would believe Patrick Calliari

4  didn't exercise business judgment by providing Mr. Ioannides

5  all the details of what we were trying to do.  Mr. Ioannides

6  apparently didn't know that we were getting a 20 million

7  pound minimum, which was an extremely big improvement.  He

8  wasn't aware that we were now getting exclusivity as well,

9  over and above that.

10      So I would say if there's a business judgment issue, I

11  don't know that I can blame Mr. Ioannides.  Maybe he should

12  have asked, well, what else is in the contract?  But,

13  certainly, as the shareholder representative, I would think

14  that business judgment on Mr. Calliari's part would have been

15  to share that information with him.

16          MR. GOLDFARB:  Your Honor, move to strike as not

17  responsive to the question.

18          THE COURT:  Sustained.  The jury will disregard the

19  last answer.

20  BY MR. SULKIN:

21  Q   Mr. Gentine, take a look, if you would, at Trial Exhibit

22  8, the third page of the chart.

23  A   Yes.

24  Q   Mr. Goldfarb took you down the chart.  And there's a bunch

25  of NA's where Mr. Calliari was not present at meetings.  Do

1   you see that?

2   A   Yes, the things that he spoke of earlier.

3   Q   Okay.  Let's look at the 10/29 meeting, right there.

4   A   Uh-huh.

5   Q   It says, Tom Kyle.  Who is Tom Kyle?

6   A   He was the production manager at the Bellingham facility.

7   And I think he had some overlying responsibilities for North

8   Sioux City as well.

9   Q   So let's look at 3/26, Tom Kyle.  He's a Portionables

10  person?

11  A   Tom Kyle was a direct report of Patrick Calliari at that

12  time.

13  Q   Let's go to 9/4.  Is that Tom Kyle there?

14  A   Yes.

15  Q   If Tom Kyle was invited as Patrick's subordinate, is there

16  any doubt that Mr. Calliari would have had the opportunity to

17  go?

18          MR. GOLDFARB:  Objection, your Honor.  Lack of

19  foundation.

20          THE COURT:  Sustained.

21  BY MR. SULKIN:

22  Q   Did Mr. Calliari, after receiving this chart, claim that

23  he was denied opportunity to go to these meetings?

24          MR. GOLDFARB:  Objection, your Honor.  Argumentative.

25          THE COURT:  Sustained.

BY MR. SULKIN:

Q   Let's go to 9/14.  Was Tom Kyle at that meeting?

A   I don't know if that was a meeting or whether -- 9/14 says Tom Kyle completed capacity chart, including garlic sauce from Italy.

Q   So in any event, wherever Tom Kyle's name is mentioned, he is a Portionables person, is that right?

A   Well, you know, it seems to me, relative to my feelings on it, if a direct report of mine is at a meeting, he's basically representing me at the meeting, and if there's an issue that I'm going to be concerned about, that he'll bring it back to me.

So I'm assuming that it would have been a similar relationship.  I'm assuming that that would be a similar relationship that Mr. Calliari would have with his direct reports.

MR. GOLDFARB:  Move to strike, your Honor. Nonresponsive.  Lacking foundation.

THE COURT:  Sustained.  The jury will disregard the portion of the answer that concerns what he assumed about Mr. Calliari and Mr. Kyle's relationship.

BY MR. SULKIN:

Q   Was it your understanding that Mr. Calliari communicated with Mr. Kyle?

A   Again, yes.  He was his direct report.  I would assume

1    that he was -- I can only assume.  I wasn't there every time

2    he talked.

3    Q    Was it your understanding that if Mr. Kyle was at a

4    meeting, that Mr. Calliari would know that?

5              MR. GOLDFARB:  Objection, your Honor.  Lack of

6    foundation.

7              THE COURT:  Sustained.

8    BY MR. SULKIN:

9    Q    Let's take a look, if you would, sir, at Exhibit --

10             MR. SULKIN:  Your Honor, this might be a good time to

11   take up Exhibit 234.

12             THE COURT:  All right.  Ladies and gentlemen, it's

13   time to go to lunch.  Would you please close your notebooks.

14   Please remember those special admonitions that I have given

15   you.  Remember that you hold that very special place, a

16   unique position of being jurors, and that it's your job not

17   only to be fair, but to give the appearance of fairness.

18       Hope you have a good lunch.  We'll see you back this

19   afternoon at 1:25.

20             (Jury leaves courtroom.)

21             THE COURT:  All right.  Let's talk about the issue.

22             MR. SULKIN:  There may be a couple of other

23   evidentiary issues based on your rulings on my questions that

24   I would like to take up with you briefly.

25             THE COURT:  Okay.  Go ahead.

1     MR. SULKIN:  First, I don't believe it is a leading

2  question for me to ask if Mr. Calliari ever said to you:  I

3  don't want to do the deal based on exclusivity.  It doesn't

4  suggest an answer.  He can say yes or no.  There's no other

5  way.

6     Mr. Goldfarb opened up that issue, made it look like to

7  the jury that those were two concerns.  I don't know --

8     THE COURT:  Well, your belief is not what is of my

9  concern.  So when you ask "did" questions and use an

10  inflection that implies that you are supposed to get an

11  answer, then it's leading.  There is more than one way to

12  lead.  Both with the "did" and with your inflection, you

13  implied that he was supposed to give that answer.  So let's

14  move on to another issue.

15     MR. SULKIN:  Okay.  And I don't want to upset the

16  court, because I want to get --

17     THE COURT:  Counsel, I'm not upset in the least.  I'm

18  just trying to explain myself.  You're the one that appears

19  to be upset with what I'm saying.

20     MR. SULKIN:  I'm not upset at all.  I'm just trying

21  to learn.

22     So if I rephrase that question, that would be okay,

23  subject to his objection?

24     THE COURT:  Anytime I hear a question that doesn't

25  start with who, what, when, where, how, why, the hairs on the

1  back of my neck go up and tell me that somebody is trying to

2  lead.

3           MR. SULKIN:  Okay.

4           THE COURT:  So ask him what was said, ask him who

5  said it, and we won't have a problem.

6           MR. SULKIN:  Okay.  On the issue of business

7  judgment, it was a subject that Mr. Goldfarb again opened the

8  door as to what his view of business judgment was.  And I was

9  trying to explore that, given the fact Mr. Ioannides clearly

10 didn't have all the facts.  And I just wanted to understand

11 the basis of your sustaining the objection to see if I could

12 reformulate a better question.

13          THE COURT:  I sustained the objection based upon, the

14 first time, the basis of the fact that it was argumentative.

15 In other words, it doesn't further facts, but only is a point

16 of argument, asking one witness to comment upon another

17 witness' testimony or on the ability of the other witness to

18 form an opinion.

19    The second time I sustained it, it was because you asked

20 about Mr. Ioannides, and Mr. Gentine went off on what was

21 Mr. Calliari's business judgment.  So he was not responsive

22 to the question.

23          MR. SULKIN:  Okay.  I understand.  May we pick up

24 Exhibit 234 then?

25          THE COURT:  Sure.

1          MR. SULKIN:  Okay.  Your Honor, Evidentiary Rule 612,

2     I think, is pretty clear that you can't -- that if you use a

3     document on an adverse witness to refresh, it comes in as to

4     the relevant portions of that document, the entire document.

5     And that's exactly what happened here.  And what Mr. Goldfarb

6     did --

7          THE COURT:  Actually, take a look at the wording,

8     because I think you just switched around who is the adverse

9     party here.

10         MR. SULKIN:  May I, your Honor.

11         THE COURT:  Yes.

12         MR. SULKIN:  It says:  If a witness uses a writing to

13    refresh memory for the purpose of testifying, either while

14    testifying, or an adverse party -- the adverse party is

15    entitled to have the writing produced at the hearing with

16    respective cross-examination of the witness and to introduce

17    into evidence those portions which relate to the testimony of

18    a witness.

19         THE COURT:  The problem is, you are not an adverse

20    party.

21         MR. SULKIN:  Mr. Gentine is adverse.  Sargento is

22    adverse to him.

23         THE COURT:  But an adverse party to a witness is what

24    that refers to.  That rule is to make sure that somebody

25    hasn't reviewed the document with the witness, then

1   testified, then called it into question and the other side

2   doesn't know what has been reviewed.

3          MR. SULKIN:  Then I can use it to refresh Mr. Gentine

4   as to other portions of that conversation if it is

5   appropriate?

6          THE COURT:  If appropriate.  Refreshing recollection

7   can be used if he forgets.  If he doesn't forget, then

8   there's no need to refresh.

9          MR. SULKIN:  All right.  That's all I have, your

10  Honor.

11         THE COURT:  Anything else?

12         MR. SULKIN:  No, your Honor.

13         THE COURT:  Okay.  Counsel, you are putting our

14  jurors to sleep, and we're going to have to do something to

15  keep them awake.  You've got to at least -- you've got at

16  least three or four that are on the edge.

17      So I don't know whether you need more bells and whistles.

18  If you want me to take more breaks, I'll do so.  But they're

19  not taking notes.  They are not tracking real well, at least

20  by my observations.  Maybe yours are different.

21      So what would you like me to do?

22         MR. GOLDFARB:  I think, your Honor, the ultimate

23  solution is for us to bring this to a swift and certain

24  conclusion.  And it's my hope that the remaining witnesses

25  are going to be shorter.  At least for myself, the direct of

 1   Mr. Calliari is going to be significantly shorter than I had

 2   first planned, because I think this is sort of just what it

 3   is.

 4      So that's what we have in mind.  And I don't know how the

 5   crosses are going to be.  But I understand the rest of the

 6   witnesses are short.  So I think the best answer is for us to

 7   just get on with it.

 8            THE COURT:  This is just for my planning and my

 9   staff's planning purposes:  Are we likely to get to the end

10   of your case this afternoon, Mr. Goldfarb?

11            MR. GOLDFARB:  I think not, your Honor.

12            THE COURT:  Okay.  All right.  Okay.  Then let's have

13   a good lunch.  And I'll see you back this afternoon.

14            (Lunch recess.)

15            THE COURT:  Good afternoon.  Are we ready to go?

16            MR. SULKIN:  Yes, your Honor, with one caveat.  As I

17   told you this morning, we would like to do a quick offer of

18   proof, literally two minutes, on a memorandum.  We can do it

19   with Mr. Gentine right now before the jury comes in, or we

20   can do it later.

21            THE COURT:  Why don't we do it at the end of the day.

22   How's that?  That way I can release them.  They won't have to

23   wait for us.  We're going to be here anyway.

24            MR. SULKIN:  Okay.

25            THE COURT:  All right.  Let's go get them, please.

1              (Jury enters courtroom.)

2              THE COURT:  Please be seated.  Is it a nice day out

3    there?

4              JUROR:  If you like cold, yes.

5              THE COURT:  Sometimes I forget what the outside looks

6    like.

7         Okay.  Let's return back to our examination, please.

8    BY MR. SULKIN:

9    Q    Mr. Gentine, I would like to take you back to the April

10   2nd phone conversation with Mr. Calliari.  Mr. Goldfarb

11   refreshed your recollection on Exhibit 234.  As you sit here

12   now, does your memory need further refreshing?

13   A    Relative to what might be in that document?

14   Q    Relative to what was said in that document.

15   A    Yeah, I would guess so.

16   Q    Why don't you take a look at Exhibit 234.  And when

17   Mr. Goldfarb asked you to read, he was looking at page 1.

18   I'd like to just briefly look at the whole document just very

19   quickly.  And let me see what you recall after you read it.

20   A    I didn't hear what you said.

21   Q    Sure.  Just briefly flip through the document.

22   A    Just look through it?

23   Q    Yes.  And when you're done looking at it, let me know.

24   A    Okay.

25   Q    Does that help refresh your recollection as to that

1    conversation?

2    A   Yeah, at least somewhat so, quick reading.

3           MR. GOLDFARB:  Your Honor, thus far, it's improper

4    use of the exhibit.

5           THE COURT:  Sustained.

6    BY MR. SULKIN:

7    Q   Does the exhibit refresh your recollection, sir?

8    A   Yes.

9           MR. GOLDFARB:  Objection, your Honor.

10          THE COURT:  Sustained.

11   BY MR. SULKIN:

12   Q   What do you recall of that -- don't look at the exhibit.

13   What do you recall of that conversation on April 2nd relating

14   to Unilever?  I don't want to talk about any other issues.

15          MR. GOLDFARB:  Excuse me.  Objection, your Honor.

16   Just to be clear, what we believe is admissible here is what

17   Mr. Calliari said, the question I asked previously, but not

18   what this representative party may have said out of court.

19   BY MR. SULKIN:

20   Q   Just so the question is clear, what did Mr. Calliari say

21   concerning Unilever?

22          THE WITNESS:  May I answer?

23          THE COURT:  Yes, you may answer.  There's no

24   objection.

25   A   Patrick had said that he was fully involved in the

1   Unilever letter that went out on August 16th, that he, after

2   the process went forward, he agreed with it, and that it

3   absolutely didn't interfere with his operational control.

4          MR. SULKIN:  Thank you.  I have no further questions,

5   your Honor.

6          THE COURT:  Anything further?

7          MR. GOLDFARB:  I just have one, your Honor.

8                        REDIRECT EXAMINATION

9   BY MR. GOLDFARB:

10  Q   Mr. Gentine, in this meeting -- or in this phone call --

11  I'm sorry -- on April 2nd, Mr. Calliari told you that he

12  thought too much time had gone by with regard to Unilever,

13  correct?

14  A   I believe he did.  This was where he said the world had

15  changed?

16  Q   Yes.  Sir, I'm --

17  A   I'm only trying to remember what you said, because I'm not

18  looking at the document.

19  Q   Well, will it refresh or help refresh your recollection to

20  look at the document, sir?

21         MR. SULKIN:  Your Honor, this has been asked and

22  answered previously.

23         THE COURT:  Overruled.

24  A   Can you help me get to where I'm supposed to be reading or

25  finding this, recollecting it?

1   BY MR. GOLDFARB:

2   Q   The paragraph that starts with the word "although."

3   A   Yes.

4   Q   Just read the document, sir.  Let's focus on my question.

5   Mr. Calliari told you in that conversation that he thought it

6   was not -- that he thought not to sign the Unilever

7   amendment, correct?  And that position was made clear to you

8   again in this phone call?

9   A   In that paragraph that starts with "although," I don't

10  disagree with anything said in the paragraph.  Could I just

11  read it?

12  Q   No.  I just want -- here's my question --

13  A   Because in that paragraph it didn't say that he said that

14  he disagreed with it.

15        MR. SULKIN:  Your Honor, this is improper refreshing.

16  He's just reading from the document.

17        MR. GOLDFARB:  And I'm not asking the witness to do

18  it, your Honor.

19  Q   My question is this -- let me restate my question.  My

20  question is:  Isn't it true that on April 2nd, when you

21  talked to Mr. Calliari on the phone, he made it clear to you

22  in no uncertain terms that he opposed amending the Unilever

23  contract?

24  A   Yes.

25        MR. GOLDFARB:  Thank you, sir.

1      THE COURT:  Ladies and gentlemen, do any of you have

2  any questions that you wish to ask the witness before he is

3  excused?  If you do, please write them down and pass them to

4  the end of the row.

5      All right.  Thank you, sir.  You may step down.

6      THE WITNESS:  Thank you, your Honor.

7      THE COURT:  Next witness, please.

8      MR. FISHER:  Your Honor, the plaintiffs would read

9  excerpts from the deposition of Karl Linck.  We have a reader

10  outside, I believe.

11      THE COURT:  Ladies and gentlemen, let me explain what

12  we're doing.  Remember I told you what depositions were.

13  They are sworn statements by a witness in front of lawyers

14  for each side, and the witness is sworn, and they're answers

15  to the questions that are written down.  We have the

16  transcript, and we are going to read that to you because the

17  witness is unavailable.

18      You are to consider what you hear here in the courtroom

19  the same way as if the witness were able to appear.  The

20  person reading the transcript is merely a reader and is not

21  the witness.

22      Please come forward, sir.  Please have a seat.

23      MR. FISHER:  Your Honor, do I have permission to

24  approach?

25      THE COURT:  Yes.

1    MR. FISHER:  And I would ask to unseal and publish

2  the original transcript.

3    THE COURT:  And, ladies and gentlemen, when we say we

4  want to publish the transcript, that's a lawyer's way of

5  saying we want to open it up, because the transcript is

6  sealed until it comes to court.

7    MR. FISHER:  Your Honor, may I proceed?

8    THE COURT:  Go ahead.  Mr. Fisher, you are going to

9  be playing yourself, is that correct?

10    MR. FISHER:  That's true, your Honor.

11    THE COURT:  All right.

12    (Deposition read:)

13  Q    Good morning, Mr. Linck.  Would you please state your full

14  legal name?

15  A    Karl Leonard Linck.

16  Q    Are you currently employed?

17  A    Yes.

18  Q    Who is your employer?

19  A    Sargento Foods.

20  Q    And how long have you been employed by Sargento?

21  A    Since November of 1987.

22  Q    What is your current title?

23  A    Vice president, engineering.

24  Q    And how long have you been the vice president of

25  engineering?

1    A    Since about '92, in that area.

2    Q    What are your general duties as vice president of

3    engineering for Sargento?

4    A    I'm responsible for basically all of the engineering-

5    related technical activity, which would include plant

6    layouts, plant expansions, directing some new technology,

7    making -- I also have some responsibilities for compliance

8    and licensing, have some intellectual property

9    responsibilities.  Regulatory responsibilities that relate to

10   like EPA and OSHA are under my direction.

11   Q    Is the licensing of the Portionables facilities under your

12   jurisdiction?

13   A    It's one of my responsibilities that I've been working on,

14   yes.

15   Q    And did you pick up that responsibility in the spring of

16   2007, when the company was acquired?

17   A    No.

18   Q    Who was responsible for licensing on May 1st, the day

19   after the acquisition closed?

20   A    My understanding was that Patrick Calliari had full

21   control of the company until the end of 2008.

22   Q    Okay.  So let's be clear here.  So Patrick Calliari, your

23   understanding was that he had absolute control over

24   Portionables through 2008?

25   A    Yes, operating control, yes.

1   Q    So he would have been the one to make decisions about how

2   to respond to the SDDA on licensing issues?

3   A    Yes.

4   Q    If you were going to make a strategic decision about how

5   to approach, for example, the licensing issues related to the

6   South Dakota facility in 2008, those would have to be

7   approved by Mr. Calliari, correct?

8   A    They were sent through Mike Gordy.

9   Q    That's not really the question.  The question -- and I'm

10  asking for your understanding, not some absolute truism.

11  A    Right.

12  Q    Your understanding is any decisions that would be made

13  with respect to licensing of the South Dakota facility, any

14  decision like that would have to be approved by Mr. Calliari,

15  correct?

16  A    Through Mike Gordy, yes.

17  Q    Is there any reason not to include Mr. Calliari on

18  correspondence related to important issues of Portionables'

19  business?

20  A    That would be up to Mike.

21  Q    Did someone tell you not to include Mr. Calliari on

22  certain types of e-mails?

23  A    No.

24  Q    Were you involved in the purchase of Portionables?

25  A    No.

1    Q    Were you involved in the decision-making process as to

2    whether or not to purchase Portionables?

3    A    No.

4    Q    Did you have any involvement in negotiating the terms of

5    the acquisition of Portionables?

6    A    No.

7    Q    Did you have any role at all in negotiating the stock

8    purchase agreement that was ultimately signed?

9    A    No.

10   Q    As you sit here today, do you have any recollection of

11   seeing the stock purchase agreement before it was signed?

12   A    No, I did not.

13   Q    Okay.  You also mentioned when I was asking you questions

14   about Mr. Calliari's role at Portionables, you said that

15   things that were to be approved by or involved Mr. Calliari

16   went through Mike Gordy, or something to that effect.  Why is

17   it that you were sending information about Portionables

18   through Mike Gordy?

19   A    Basically, it was the way I was set up to do it.

20   Q    And when you say set up, what does that mean?

21   A    In terms of just the understanding, the understanding I

22   had of how to communicate through the organization of

23   Portionables.

24   Q    Mr. Calliari didn't tell you to send information about

25   Portionables through Mr. Gordy before it got to him, correct?

1   A   No, he did not.

2   Q   Did Mr. Gordy or anyone else at Sargento tell you that

3   that's what the line of communication should be?

4   A   I don't know who exactly told me, but that was the line of

5   communication I understood.

6   Q   So as you sit here today, your best recollection is that

7   someone in management at Sargento told you that

8   communications concerning Portionables should go through

9   Mr. Gordy?

10  A   Yes.

11  Q   Okay.  And Patrick Calliari was in charge of Portionables,

12  correct?

13  A   Up until some point in time.

14  Q   Patrick Calliari, you said he was the decision-maker in

15  2008 with respect to the Portionables business, correct?

16  A   I said he was supposed to have operational control.

17  Q   Mr. Linck, the reporter has handed you a two-page document

18  that's been marked as Exhibit 43 to the deposition.  Do you

19  recognize Exhibit 43?

20  A   Yes.

21  Q   Is this a document that you've prepared?

22  A   Yes.

23          MR. FISHER:  Your Honor, plaintiffs would offer

24  Exhibit 43.

25          THE COURT:  43 will be admitted.

```
 1              (Exhibit(s) 43 admitted.)
 2              (Deposition read:)
 3   Q   Why did you send this e-mail to all of these people at
 4   Sargento?
 5   A   It's basically the Sargento general staff involved with
 6   getting Portionables' plans kind of into Sargento.
 7   Q   Why didn't you send it to Patrick Calliari?
 8   A   Mike Gordy would have taken care of that.
 9   Q   So that's because the instruction you were under was to
10   communicate through Mike Gordy?
11   A   Basically, yes.
12   Q   Mr. Linck, the reporter has handed you an e-mail that has
13   been marked as Exhibit 49 to your deposition.  Do you
14   recognize Exhibit 49?
15   A   Yes.
16   Q   This is an e-mail that you authored?
17   A   Yes.
18          MR. FISHER:  Your Honor, plaintiffs would offer
19   Exhibit 49.
20          THE COURT:  49 will be admitted.
21          (Exhibit(s) 49 admitted.)
22          (Deposition read:)
23   Q   And then you go on in the second to last paragraph, you
24   talk about planning, sort of planning and strategic issues
25   for the South Dakota facility generally, correct?
```

1  A  Yes.

2  Q  Are these important issues with respect to the business of

3  Portionables?

4  A  It's important for every business.

5  Q  Why isn't Patrick Calliari included in the dialogue on

6  this?  Why didn't you send him a copy of this e-mail?

7  A  It was a request from George Hoff for the financial

8  returns.  So it was sent to George and copied to Mike to pass

9  on to Patrick, I guess.

10     THE COURT:  Mr. Fisher, I have skipped a page

11  somehow.  Can you give me the number?

12     MR. FISHER:  The page number?

13     THE COURT:  Yes.

14     MR. FISHER:  We're on page 128.

15     THE COURT:  Thank you.

16     MR. FISHER:  Line 7, I think we're picking up.

17     THE COURT:  I'm sorry.  Two of them stuck together

18  when I turned them too rapidly.  Go ahead.

19     (Deposition read:)

20  Q  Do you know if Mike passed it on?

21  A  No idea.

22  Q  Mr. Linck, the reporter has handed you a one-page e-mail

23  that's been marked as Exhibit 26 to the deposition,

24  previously marked as Exhibit 36, identified by the Bates No.

25  SAR 13400.  Do you recognize Exhibit 26?

1    A    Yes.

2    Q    This is an e-mail that you wrote to Mike Gordy and Mike

3    McEvoy on April 14, 2008, correct?

4    A    Yes.

5          MR. FISHER:  Your Honor, plaintiffs would offer

6    Exhibit 26.

7          THE COURT:  26 will be admitted.

8          (Exhibit(s) 26 admitted.)

9          (Deposition read:)

10   Q    And you state here that you wanted to give them a heads up

11   to a possible issue that is developing at Portionables in

12   South Dakota?

13   A    Yes.

14   Q    Did you consider this to be an important issue for the

15   management at Portionables?

16   A    Of course.

17   Q    Is there some reason that Patrick Calliari wasn't copied

18   on this e-mail?

19   A    I copied Mike Gordy, who would have taken that

20   communication forward.

21   Q    Did you know if he did take this forward?

22   A    No.

23   Q    How did you decide when you would include Patrick on

24   e-mails and when you wouldn't?

25   A    In general, I didn't include Patrick in my e-mails.

1   Q   As far as you knew, Patrick Calliari never approved

2   anything that you did with respect to your regulatory

3   analysis or communications, correct?

4   A   I don't know whether he approved or didn't approve.

5   Q   Right.  You just have no idea one way or the other?

6   A   Correct.

7   Q   Did someone tell you to start calling the regulatory

8   agencies about the South Dakota plant in the middle of April

9   of 2008?

10   A   The inquiries that I made in early -- I made earlier in

11   April 2008 were very broad inquiries that wouldn't really

12   point to Portionables.  They were broad inquiries coming from

13   Sargento and just in terms of asking about export service.  I

14   didn't make any contacts identifying Portionables' operation

15   until after, you know, we basically had discussed this.

16   Q   Did someone tell you to make -- start making the first

17   calls?  Did someone at management at Sargento approve that?

18   A   I approved it.

19   Q   Because you are the vice president?

20   A   Yes.

21   Q   So you decided to do that.  But, again, you didn't talk to

22   Mr. Calliari?

23   A   No.

24   Q   Mr. Linck, the reporter has handed you what has been

25   marked as Exhibit 12 to your deposition, an e-mail identified

1   as Bates No. SAR 2790.  Is this another e-mail you authored?

2   A   Yes.

3   Q   Why didn't you include Patrick Calliari on this?

4   A   Once again, I copied it to Mike Gordy.

5   Q   Right.  And you go on to say:  That might be a huge

6   Pandora's box?

7   A   Yes.

8   Q   But you think it's the right thing to do and it would buy

9   you a good relationship with the state?

10  A   Yes.

11  Q   So by Pandora's box, you are saying it would open up lots

12  of issues that might not otherwise arise?

13  A   If I, as a Sargento employee, contact the State of South

14  Dakota, South Dakota comes in and says:  Cease and desist

15  operations until you are in compliance.  And that has to do

16  with earnout, and I hurt, you know, Patrick's ability to do

17  his earnout because the plant is down.  Yeah, that's a huge

18  Pandora's box.

19  Q   Really, you were worried about the earnout?  That was your

20  concern here?

21  A   It was one of the things I was concerned about.

22  Q   In any event, it's an important decision whether you are

23  going to open a Pandora's box for Portionables, correct?

24  A   Of course.

25  Q   To your knowledge, was Patrick Calliari included in the

1    discussions and the decision-making about this?

2    A    I don't have knowledge of that.

3    Q    You ultimately did approach the South Dakota Department of

4    Agricultural about this issue, correct?

5    A    Yes.

6    Q    The decision was made you were going to go raise the issue

7    with them?

8    A    Yes.

9    Q    Do you have any idea whether Patrick Calliari participated

10   in that decision?

11   A    I don't have any idea.

12   Q    But it is your belief, again, just so we're clear, that he

13   was supposed to have operational control of this company in

14   April of 2008, correct?

15   A    Yes.

16   Q    Mr. Linck, you have in front of you -- in front of you,

17   you have Exhibit 27, SAR 2775.  Do you recognize this e-mail?

18   A    Yes.

19   Q    Is it an e-mail you wrote the following day, April 17,

20   2008?

21   A    Yes.

22        MR. FISHER:  Your Honor, plaintiffs would offer

23   Exhibit 27.

24        THE COURT:  27 will be admitted.

25        (Exhibit(s) 27 admitted.)

1          (Deposition read:)

2  Q   The paragraph towards the bottom of the page that starts,

3  "Although Mark suggested we may want to delay sitting down

4  with the state of South Dakota until after January," do you

5  see that?

6  A   Yes.

7  Q   Who is Mark?

8  A   Mark Rhyan.

9  Q   And, in fact, he did suggest you should wait until after

10  2008 to raise this issue with South Dakota, correct?

11  A   That's what I'm indicating here.

12  Q   Well, do you think that's an accurate statement of what

13  Mark was suggesting at this point in time?

14  A   Yes.

15  Q   Do you have any idea why January was an important date?

16  A   I suspect it had to do with the earnout.

17  Q   Right.  The earnout ended at the end of 2008, correct?

18  A   Yes.

19  Q   But you go on here to say that you wanted to address it

20  immediately, you didn't want to wait until January, correct?

21  A   Correct.

22  Q   And to your knowledge, Patrick Calliari wasn't involved in

23  any of this dialogue concerning this decision about how and

24  when to approach South Dakota about this issue?

25  A   I don't know if Mike talked to him or not.

1    Q    During the course of these discussions and these e-mail

2    exchanges, did anyone say:  This is an important issue.  We

3    should get Patrick's input on it?

4         Do you recall anyone saying that?

5    A    I don't know.

6    Q    So you don't recall that coming up?

7    A    I don't recall it, or I don't know if it happened.

8    Q    Do you think he was the ultimate decision-maker on whether

9    you should in fact be proactive and approach the state?  Was

10   that his decision to make in April of 2008?

11   A    I don't know if it was or it wasn't.

12   Q    Mr. Linck, you have in front of you Exhibit 61, a two-page

13   e-mail string identified by Bates Nos. 2772 to 2773.  Do you

14   recognize that e-mail chain?

15   A    Yes.

16        MR. FISHER:  Your Honor, plaintiffs offer Exhibit 61.

17        THE COURT:  61 will be admitted.

18        (Exhibit(s) 61 admitted.)

19        (Deposition read:)

20   Q    In the last sentence of the first paragraph of Mr. Ryan's

21   April 17, 2008 e-mail to this group, he says, quote:  We

22   should discuss this in the near future, as the plant has

23   issues without the licenses and the pursuit of same may very

24   well put us in a further adversarial position from the

25   standpoint of their earnout.

1        Do you see that statement?

2    A   Yes.

3    Q   Who is, quote, their, unquote?

4    A   I would imagine it's the people who are entitled to the

5    earnout.

6    Q   You received this e-mail.  Did you understand that

7    Mr. Rhyan was saying taking certain actions is going to put

8    us in an adversarial position with the stockholders of

9    Portionables with respect to their earnout?

10   A   With respect to whoever had interest in an earnout, yes.

11   Q   Did a copy of this e-mail, to your knowledge, go to

12   Mr. Calliari?

13   A   I wouldn't know that.

14   Q   Whose decision was it about what actions should be taken?

15   Do you know?

16   A   Actions in terms of -- what action?

17   Q   With respect to the issues raised in your e-mail that

18   starts at the bottom of page 1 of Exhibit 61.

19   A   Oh, whether or not to go to the state?

20   Q   Yes.

21   A   It was basically the executive group's decision.

22   Q   By that, you mean the executive group of Sargento?

23   A   Yes.

24   Q   And as far as you know, that does not include Patrick

25   Calliari?

1   A    I have no idea if Patrick was included or not.

2   Q    You were well aware, everybody was aware, that there was

3   an earnout in the stock purchase agreement, correct?

4   A    All the officers were, yes.

5   Q    But you do believe that Mr. Calliari was supposed to have

6   operational control over those kinds of decisions for

7   Portionables, correct?

8   A    I don't know what operational control included in total.

9   Q    So how did you know who was making decisions?

10  A    That's why I would correspond with Mike Gordy.

11  Q    And you would do whatever Mike told you?

12  A    Basically, yes.

13  Q    Mr. Linck, the reporter has handed you what's been marked

14  as Exhibit 28 to your deposition, SAR 2721.  Do you recognize

15  this e-mail from Mike Gordy?

16  A    Yes.

17  Q    Mr. Gordy was asking you to provide several regulatory

18  consultants familiar with South Dakota dairy regulations?

19  A    Yes.

20       MR. FISHER:  Your Honor, plaintiffs offer Exhibit 28.

21       THE COURT:  28 will be admitted.

22       (Exhibit(s) 28 admitted.)

23       (Deposition read:)

24  Q    And this is work that's going to be adverse to

25  Mr. Calliari and the other shareholders, correct?

1   A   Probably, yes.

2   Q   How did you know at this point when you were sending

3   e-mail, exchanging e-mails with Mr. Gordy, whether those were

4   things that were adverse to Patrick Calliari and were going

5   to be withheld from him and those things which related to the

6   management of Portionables that you expected Mr. Gordy to

7   pass through to him?

8   A   That was his decision.

9   Q   So you just expected that Mr. Gordy was going to filter

10  the stuff that was related to the management of the company

11  versus things that were adverse to Mr. Calliari.  That was

12  Mr. Gordy's decision, not yours?

13          MR. LINEHAN:  Objection.  Mischaracterizes his

14  testimony.  Assumes facts not in evidence.

15          THE COURT:  Overruled.

16          (Deposition read:)

17  A   Mike Gordy was the person I passed communications through.

18  Q   Okay.  But by this point in time, some of them are hostile

19  and adverse to Mr. Calliari.  And then there's other e-mails

20  that relate to the management of Portionables, correct?

21  A   I don't know if I'm hostile.  I think it's just factual.

22  We're in a problem here, how do we get out of it, and

23  starting to support our case.  So from that standpoint, the

24  communications went through Mike Gordy.

25          MR. FISHER:  Thank you, your Honor.  That concludes

 1    the reading of the excerpts.

 2            THE COURT:  Thank you.  You may step down.

 3       Next witness, please.

 4            MR. GOLDFARB:  Plaintiffs call Patrick Calliari.

 5            THE COURT:  Okay.  Ladies and gentlemen, how would

 6    you like to stand up and take a stretch before we start the

 7    next witness?

 8            (Witness sworn.)

 9            THE COURT:  Please have a seat, sir.

10            MR. GOLDFARB:  Your Honor, before we begin, I have a

11    brief question.  I have a couple of samples of the product

12    that I was going to have Mr. Calliari explain, as a

13    demonstrative.  I think Mr. Sulkin has no objection to them.

14    Because of their nature, I prefer not to mark them, just

15    because the court will have to deal with them in that

16    fashion.  But I leave that to your Honor's discretion.

17            THE COURT:  Is it your intent that they get to sample

18    the wares?

19            MR. GOLDFARB:  Well, I didn't think that far ahead,

20    your Honor.

21            THE COURT:  Okay.  That's fine.  Go ahead and show

22    them when you are ready.

23            MR. GOLDFARB:  May I approach now?  I'll bring them

24    up.

25            THE COURT:  Sure.

1        MR. GOLDFARB:  May I begin, your Honor?

2        THE COURT:  Yes, go ahead.

3                       PATRICK CALLIARI,

4    being first duly sworn, the witness was called and testified

5    as follows:

6                       DIRECT EXAMINATION

7    BY MR. GOLDFARB:

8    Q    Sir, would you state your full name for the record?

9    A    Yeah.  My name is Patrick Calliari.

10   Q    And where are you from?

11   A    I was born and raised in Paris, France.

12   Q    I think if you get a little farther back from that

13   microphone, it may be easier to understand you.

14   A    What about now?

15   Q    That's good.  What is your current residence address?

16   A    I live in Kirkland, Washington.

17   Q    Is English your first language?

18   A    No.  It's my third language.

19   Q    What is your native language?

20   A    French.

21   Q    Where did you grow up?

22   A    In Paris.

23   Q    How long did you live in France?

24   A    About 25 years, 24 years.

25   Q    What is your educational background?

1  A    I've got a college degree in business administration with

2  a major in international marketing techniques, also

3  accounting and economies.

4  Q    And where did you obtain your degree?

5  A    In France.

6  Q    And approximately when did you do that?

7  A    1978.

8  Q    And after your education, what did you do next?

9  A    I went to the Army for one year.

10  Q    And what did you do in the Army?

11  A    I was learning how to fly planes.

12  Q    And after your time in the French Army, what did you do

13  next?

14  A    I started -- I was self-employed.  I was pilot, and I did

15  some charter flights.

16  Q    And did you move into a different business?

17  A    Later on in life, yes.

18  Q    Okay.  Tell us, after you were in the airplane charter

19  business, what business did you enter into?

20  A    I entered into import and export of food products.

21  Q    Okay.  And where were you located when you did that?

22  A    I started that when I was in South America and afterwards

23  when I moved to the United States.

24        THE COURT:  Mr. Calliari, could I have you sit back

25  just a little?

```
 1              THE WITNESS:  Oh, sure.
 2              THE COURT:  I'm getting some feedback from the
 3   microphone.
 4              THE WITNESS:  Is it better like this?
 5              THE COURT:  Yes, that's better.  Thank you.
 6   BY MR. GOLDFARB:
 7   Q    Would you tell us a little bit about how you came to form
 8   the company called Portionables?
 9   A    I had met Mr. Ioannides a long time ago.  And I was in the
10   import/export of food products.  And I saw what he was doing
11   in France.  And I thought that we had good opportunities here
12   in the United States.  He was also looking at the United
13   States.  So I said we will put together a great company here.
14   And we entered into a technology agreement.
15   Q    So were you one of the founders of Portionables?
16   A    Yes.  Antoine Ioannides and myself, yes, we were the
17   founders.
18   Q    And then were there some other shareholders as well?
19   A    More shareholders came around, yes.  We had somewhere like
20   23 shareholders.
21   Q    And then at the time of the stock purchase agreement
22   that's the subject of this case, there were less
23   shareholders?
24   A    Yeah, much less.
25   Q    Tell us again in brief fashion what was the business of
```

1  Portionables?

2  A   Portionables is a company that was making the sauce

3  component of many of the meals in the market.  So if you

4  don't mind me showing you, just for example, this is a

5  company owned by Con Agra, and we were making the sauce

6  component.

7      And the difference between Portionables and most of the

8  other meals in the market, you know, I don't know if you

9  recall, if you buy these kind of meals, the sauce would come

10  in a block, and you will have to put the block in the boiling

11  water and burn your fingers trying to pour it.

12      With Portionables, it was a system where we would freeze

13  the sauce and make a small portion like ice cubes.  And we

14  could do it in about two, two and a half minutes.  So it was

15  a much better product and much better quality and much

16  friendly -- much friendlier to use.

17      So today in the market this is -- we're talking about

18  Unilever a lot.  This is the product that we make for

19  Unilever.  If you see these meals in the market, you will see

20  inside you have the sauce with the pasta, with chicken, with

21  vegetables.  So it's all mixed together.

22      So these are the kind of products.  Like this one, Birds

23  Eye, if you buy this.  Healthy Choice is also owned by Con

24  Agra.  So these are the kinds of meals that carry the

25  Portionables sauce.

1   Q    Approximately when did you found the company?

2   A    1995.

3   Q    And over time, was there expansion?

4   A    Yes.  In 2005, we build a new facility in South Dakota.

5   Q    And at some point, was there interest expressed by any

6   other company in buying Portionables?

7   A    Yes.  We were contacted in late 2006 by a French company.

8   They wanted -- they had an office already here in Virginia,

9   in the United States, marketing of this here.  They had been

10  trying to penetrate the U.S. market.  And they had some

11  difficulties.  So they decided to look at a similar business

12  in the United States as the business they had in France.

13       And so they decided to look for a company in the U.S.

14  where they could buy in the same line of product.  So they

15  found us.  And they approached me, they approached Antoine

16  Ioannides, and they expressed interest.  They want to buy

17  their way into the U.S. market.

18  Q    Did representatives from that company travel to the United

19  States?

20  A    Yes.  We had several.  We have the CEO and president of

21  the company come to Bellingham.  We went to South Dakota.

22  And they were very interested.

23  Q    And did you go to France in connection with that possible

24  transaction?

25  A    Yes.  Before we received a formal offer, I did travel to

1  France.  And Mr. Ioannides and myself went to Versailles.  It

2  was a formal meeting.

3  Q    And toward the end of 2006, what was the status of those

4  discussions?

5  A    We were moving towards a commitment, a formal commitment,

6  a letter of intent.  But it's also a commitment that someone

7  is very interested in buying your company.  They write the

8  terms that they want to buy the terms.  And they want to pay

9  so much, these are the terms.

10      And but, of course, it's only a letter of intent, because

11  they have to do what we call their due diligence.  They have

12  to make sure the company is what they think it is.  So they

13  reserve their right basically to buy the company until they

14  make sure that the company is sound.

15  Q    Are you familiar with the term "earnout"?

16  A    Yes.

17  Q    And could you tell the jury your understanding, again, in

18  a brief description, of what you understand earnout is?

19  A    Well, earnout in the case of when you purchase a company,

20  you have someone who is going to pay you some amount up front

21  and afterwards you are on earnout.  The earnout is your right

22  to earn a certain amount if you perform.

23      So if there is going to be tenure, but you have to

24  basically keep it under certain guidelines.  If you do that,

25  you have a right to an amount, to a lump sum.  So this is the

1   way I understand it.

2   Q   Was an earnout something that was under discussion with

3   the possible French buyer?

4   A   Yes.

5   Q   And was an earnout something you were willing to consider?

6   A   Of course.

7   Q   Were there any conditions that you thought you would want

8   if you were going to agree to an earnout?

9   A   Well, the basics, I think it works with every transaction.

10  If you agree to an earnout, in order to -- an earnout is

11  based on a certain amount if you perform.  So in order to be

12  able to have a chance to perform, you must have the control

13  of the company during a certain time.  If your earnout is

14  going to take two years, you must be able to have control of

15  the company for two years, because basically your own destiny

16  is in your hands.

17  Q   If I can get you now to look at Exhibit 15?

18          MR. GOLDFARB:  I believe this has been admitted, your

19  Honor.

20  Q   Exhibit 15 appears to be from a gentleman named William

21  Beard.  Do you see that?

22  A   Yes.

23  Q   Could you tell the jury who that is, please?

24  A   Bill Beard was hired.  I hired Bill Beard.  Bill Beard was

25  a consultant, a specialist in merger and acquisitions.  He

1  has been doing that for about 25 years.  And I felt that

2  myself and the shareholders needed the assistance of someone

3  that is in this line of business, in order to give us good

4  advice about what to do, what not to do, and make sure that

5  we understand what a merger acquisition is all about.

6  Q   And was Mr. Beard involved with the discussions with the

7  French company?

8  A   Yes, he was.

9  Q   And was Mr. Beard asked to provide information to Sargento

10  about the general terms that were under discussion with the

11  French company?

12  A   Yes.

13  Q   And are those what are reflected in Exhibit 15?

14  A   Yes.

15  Q   Okay.  With regard to the discussions -- and what was the

16  name of the French company?

17  A   Cap Diana.

18  Q   And in those discussions, had you advanced a position

19  about operational control?

20  A   Yes.  We had asked for full operational control.

21  Q   Is that reflected in Exhibit 15?  That's what you reported

22  to Sargento, or Mr. Beard did?

23  A   Yes.

24  Q   And I've circled it.  Is that where it's located in the

25  exhibit?

1  A   Yes, it is.

2  Q   How was it that you came into discussions with Sargento

3  about the sale of Portionables?

4  A   I had received a correspondence, but I barely looked at

5  it, because I receive -- over the years, I always receive

6  from companies that were interested in buying Portionables.

7  But, personally, I was not really interested in selling the

8  company.  I had started the company.  You know, it was like

9  my baby, you know.  And I was in my 40's.  And so I envision

10 for the company and I wanted to carry the vision forward.

11      So I never -- I was never interested in selling the

12 company.  But I got a letter from Sargento, and I didn't

13 really pay attention to it.  And a month later --

14 Q   Let me stop you for a second.  So you got a letter from

15 Sargento?

16 A   Yeah.

17 Q   And was the letter about possibly buying the company?

18 A   I think this is what it was --

19      MR. SULKIN:  Objection.

20 A   -- because when I received it, there was a brochure

21 inside.

22      THE COURT:  Just a moment.  There's an objection.

23      MR. GOLDFARB:  I'll rephrase it, your Honor.

24 Q   What was the letter about, sir?

25 A   I think there was a letter inside, and it was a brochure.

1  And I thought it was someone trying to sell cheese.  So I

2  give it to Ray Wyandt, who is in charge of sales and

3  marketing.  I thought it was someone that wanted to sell some

4  cheese.  And he came back to me and said, I think this is a

5  company that wants --

6          MR. SULKIN:  Objection, your Honor.  Hearsay.

7          THE WITNESS:  That's fine.

8          THE COURT:  Sustained.

9  BY MR. GOLDFARB:

10 Q   After receiving the letter that you've described,

11 Mr. Calliari, did you then have communication by telephone

12 with anyone from Sargento about a possible purchase?

13 A   Yeah.  A gentleman by the name of Bob Clouston called me.

14 Q   And did you know Mr. Clouston?

15 A   I knew him, yes.

16 Q   And what did Mr. Clouston say to you when he called?

17 A   First of all, I was surprised.  I had not talked to him

18 for a long time.  But he mentioned that he was working for

19 Sargento and Sargento was very interested or would be

20 interested in talking to me about purchasing the company.

21 Q   And what happened as far as Sargento?  What was the next

22 step in the process?

23 A   The next step was to -- he convinced me that I should meet

24 Lou Gentine and they should come over and we should meet and

25 I should give them a chance to present their case.  So we set

1    up initially a meeting for December, but Lou couldn't make

2    it.  He had an emergency.  So it was postponed until January.

3    Q    The transaction at issue between Portionables and Sargento

4    closed at the end of April of 2007.  Counting this first

5    meeting that you've described, how many face-to-face meetings

6    do you recall having with Mr. Gentine?

7    A    I would say four.

8    Q    Okay.  And we'll go back through these in a little more

9    detail, but could you just list for the court what the four

10   meetings were?

11   A    The first meeting, Mr. Gentine, Bob Clouston, and another

12   executive by the name of Kevin came to Bellingham to visit

13   me.

14   Q    Okay.  Why don't we do it this way:  Did anything happen

15   at that meeting other than a tour and introductions?

16   A    It was a tour and introduction.

17   Q    And what was the second face-to-face meeting that you had

18   with Mr. Gentine?

19   A    The second face meeting was in Plymouth, at the

20   headquarters of Sargento.

21   Q    And that's Plymouth, Wisconsin?

22   A    Yes.

23   Q    And approximately when did that meeting take place?

24   A    In February.

25   Q    Now, before that meeting, had there been negotiations or

1    discussions between Portionables and Sargento about an

2    acquisition?

3    A    Yes.

4    Q    And what, generally, was the state of those discussions

5    when you went to the Plymouth meeting?

6    A    When I was in Plymouth, we visited the facility, and we

7    started to get into more details about my employment

8    agreement.

9    Q    What was the third meeting that you had face to face with

10   Mr. Gentine?

11   A    It was in -- at the airport in Minneapolis, in a small

12   meeting room.

13   Q    And what was the fourth meeting?

14   A    When we signed the sale of the company in Milwaukee,

15   Wisconsin.

16   Q    Now, at the first meeting, there were no significant

17   business discussions, is that true?

18   A    Yes.

19   Q    And at the last meeting, that was for signing?

20   A    Yes.

21   Q    And so the deal was already done and the paperwork had

22   been finalized at that point?

23   A    Yes.  I made the trip to sign the documents.

24   Q    So the meetings there, the discussions about the

25   transaction, took place at the second and third meeting, the

1   one at Plymouth and the one at the airport?

2   A   Yes.

3   Q   Now, in those meetings, did you have conversations between

4   you and Mr. Gentine about an earnout?

5   A   Yes.

6   Q   Could you tell the court what you recall about those

7   conversations?

8   A   Well, we discussed the earnout and the mechanisms of the

9   earnout, the control, the operational control during the time

10  of the earnout, and my employment agreement.

11  Q   All right.  Did you and Mr. Gentine talk about the

12  purchase price that would be paid up front for the company?

13  A   Yes, we did, yeah.

14  Q   Okay.  And how much was that?

15  A   19 million.

16  Q   And did you also talk about an amount that would be paid

17  separately to you under the employment agreement?

18  A   Yes.  We talked about the million that would be paid to me

19  as a noncompete.

20  Q   In these discussions that you were having with

21  Mr. Gentine, was operational control important to you?

22          MR. SULKIN:  Objection, your Honor.  Leading.

23          THE COURT:  Overruled.

24  A   Yes.  If myself and the other shareholders will accept an

25  earnout, this was it.  I will retain the operational control

1    during the time of the earnout.

2    BY MR. GOLDFARB:

3    Q    And why did that matter to you to maintain operational

4    control?

5    A    Well, if you don't, you are not in charge of your own

6    destiny.

7    Q    And with regard to operational control, did you have

8    specific discussions with Mr. Gentine about how that would

9    work?

10   A    Well, originally I requested full operational control.

11   And Mr. Gentine narrowed it to some conditions, or some

12   restrictions, I should say, restrictions in the agreements.

13   Q    And what specific discussion do you recall having with

14   Mr. Gentine about any restrictions on operational control?

15   A    Restrictions are in the agreement.  It would put a cap on

16   what I can spend, on capital expenditures, or if I were to

17   enter an agreement with family members or friends, for

18   example.

19   Q    And were those things all set forth in the document, the

20   stock purchase agreement, that you signed?

21   A    Yes.

22   Q    And we looked with another witness, but you were here and

23   heard the testimony, at six items identified in the stock

24   purchase agreement.  Were those the things that you discussed

25   with Mr. Gentine?

1   A    Yes, these are the six.

2   Q    Did Mr. Gentine and you ever discuss that after the

3   transaction closed he would have the authority under the

4   contract to overrule any decision that you would make?

5        MR. SULKIN:  Objection.  Leading, your Honor.

6        THE COURT:  Sustained.

7        MR. GOLDFARB:  I'll rephrase, your Honor.

8   Q    Other than what you've told us, did Mr. Gentine tell you

9   that there were any other restrictions that he wanted on your

10  operational control?

11  A    No.

12  Q    And in these two meetings that you identified for us, you

13  also had conversations with Mr. Gentine about the employment

14  agreement?

15  A    Yes.

16  Q    Did you and Mr. Gentine talk about how long the employment

17  agreement would last?

18  A    Yes.

19  Q    What do you recall about that conversation?

20  A    It was a minimum of five years.

21  Q    Did you and Mr. Gentine talk about the salary and benefits

22  that you would receive under the employment agreement?

23  A    Yes, of course.

24  Q    And how did you arrive at what those salary and benefits

25  would be?  Do you recall that discussion?

1   A    Yes.  The salary would be the salary I had at

2   Portionables.  So this would be a continuation.  And benefits

3   probably similar.  And also, for me, in my employment

4   agreement, I have 5 percent on the future profitability of

5   the company.

6   Q    Okay.  I want to ask you about that also.  Did you have a

7   conversation with Mr. Gentine about future incentives under

8   the employment agreement?

9   A    Yes, I did.

10  Q    Okay.  And tell the court what you recall about that

11  conversation.

12  A    Well, for me, if you look at -- I don't know.  Maybe you

13  have the offer from the French company.  I really wanted to

14  be a part of the future, because, for me, I know where the

15  company was when we sold it, you know.  But I knew what I

16  could do in the future.  And at the time, I was 49.  So I

17  wanted to keep working for the company.  I wanted to be a

18  part of the future success of the company.

19       So the French company that was offering to purchase

20  Portionables was offering me to retain 5 percent ownership.

21  So when I started the negotiation with Sargento, I say, for

22  me, if I sell my interest in Portionables, I need to carry

23  forward with same salary, with same benefits, but also I want

24  a part of the future.

25       And Sargento didn't -- they couldn't give me 5 percent of

1   equity because it's a family-owned company, and they didn't

2   have shares available.  So they said, we will come up with a

3   formula where you will have a reward for the long-term profit

4   of the company.

5   Q   Did you and Mr. Gentine talk about a signing bonus?

6   A   Yes, we did.

7   Q   Tell us what you recall about that conversation.

8   A   Well, I ask, and again I learn through Bill Beard that

9   it's very common in that position that you get a lump sum for

10  a noncompete.  And I had a noncompete.  A noncompete is if I

11  decide to leave or if I leave a company, I cannot work

12  anymore in the food industry.  And it has been over 20 years,

13  so it's difficult for me afterwards to find a job somewhere

14  else.  So I requested a million dollars for the noncompete.

15  Q   And is that something you discussed with Mr. Gentine?

16  A   Yes, I did.

17  Q   And what was his response to that?

18  A   They came up with a different term.  That would be a

19  signing bonus.  At the time, you know, I didn't care what

20  they want to call it, because I had a noncompete in my

21  employment agreement, so.

22  Q   Did you and Mr. Gentine talk about what would happen if

23  there was a problem with operational control later, after the

24  agreement was signed?

25  A   Yeah, we talk about the resigning for cause -- for good

1   reason.  Sorry.

2   Q    Tell the court what you recall about those conversations.

3   A    Well, if I resign for good reason, Sargento would still

4   pay my salary and my benefits, and I will have a reasonable

5   presumption on the earnout.

6   Q    And did you feel that those provisions were important to

7   the transaction?

8        MR. SULKIN:  Objection.  Leading.

9   A    Of course.  This was the --

10       THE COURT:  Sustained.

11  BY MR. GOLDFARB:

12  Q    Why did you want to have those provisions in the

13  agreement?

14  A    Well, if you don't have these provisions, you can tell me

15  to leave, and I have no way of -- you know, you give up.

16  It's not anymore what you negotiate.  You've give them a way

17  to tell me where to go.  And basically I lose everything.

18  Q    Did Mr. Gentine agree to your conversation about resigning

19  for good reason?

20  A    Yes, he did.  We signed the contract.

21  Q    Let me ask you to look next at Exhibit 3, please.  Exhibit

22  3 is the employment agreement?

23  A    Yes.

24  Q    And we've been through this agreement a lot in this case,

25  so I'm not going to go through it again with you in detail.

1   Did you sign this agreement?

2   A   Yes, I did.

3   Q   Does this agreement and what's written accurately reflect

4   the agreements that you reached with Mr. Gentine?

5   A   Yes.

6   Q   And there is, as we've discussed in this trial, a

7   resignation for good reason provision in this agreement.  My

8   question is:  Have you been paid any amounts by Sargento

9   under the resignation for good reason provision?

10  A   No.

11  Q   Let me ask you to look at the stock purchase agreement.

12  That is Exhibit No. 3.

13  A   Yes.

14  Q   Do you have the stock purchase agreement?

15  A   Yes.

16  Q   Okay.  And did you sign the stock purchase agreement as a

17  shareholder of Portionables?

18  A   Yes.

19  Q   Does the stock purchase agreement as it is written

20  accurately reflect your conversations and agreements with

21  Mr. Gentine?

22  A   Yes.

23          MR. GOLDFARB:  Your Honor, I'm at a convenient

24  stopping place.  It doesn't matter, because my math is wrong.

25          THE COURT:  I'm afraid you've got to keep going

1    another 15 minutes.

2         MR. GOLDFARB:  I'm sorry, your Honor.  I confused

3    myself.

4    Q    I'd like to direct your attention now to what happened

5    after the transaction closed.  First, do you know a gentleman

6    by the name of Mike McEvoy?

7    A    Yes.

8    Q    And who do you understand Mike McEvoy to be?

9    A    McEvoy is a relative of Lou Gentine.

10   Q    And does he also work for Sargento?

11   A    Yes, he does.

12   Q    And did he have some involvement in the Portionables

13   business after the transaction closed?

14   A    Well, after the transaction, he was sent to be at

15   Portionables and live in Bellingham.

16   Q    So he relocated to Bellingham?

17   A    Yes.

18   Q    And how did you feel about that?

19   A    Well, I was surprised.  I didn't understand why Sargento

20   would send someone to be at Portionables.  We're not looking

21   at any -- we didn't need any executives.  We were already

22   operational.  We had everything covered.  We're a company

23   already working, in motion.

24   Q    Did you complain to Mr. Gentine about that?

25   A    Well, it's an awkward situation.  You just signed a stock

1   purchase agreement, and it was family related.  So, no, I

2   didn't.

3   Q    Do you know someone named Mike Gordy?

4   A    Yes.

5   Q    Would you tell the court who Mike Gordy is, please?

6   A    Mike Gordy is or was -- I don't know if he is still, but

7   he was senior management at Sargento.

8   Q    And did Mr. Gordy become involved in the Portionables

9   business?

10  A    Yes, he did.

11  Q    Would you describe for the court in general how that came

12  about?

13  A    Again, shortly after acquisition, Mike Gordy was

14  designated to enter -- basically to enter Portionables.

15  Q    And as time went forward in the fall of 2007, how did you

16  evaluate what Mr. Gordy was doing at Portionables?

17  A    Well, Mr. Gordy was getting more and more involved, more

18  demanding, more involved.  He was bringing his culture.  And

19  he wanted to challenge our price, our price structure.  He

20  didn't like the way we were doing marketing.  We were not

21  efficient enough.  He wanted more meetings, more staff

22  meetings, sitting, writing.  And it was very disruptive.

23  Q    Did he become involved in sales?

24          MR. SULKIN:  Objection, your Honor.  Leading.

25          THE COURT:  Overruled.

1    A    Yes, very much.

2    BY MR. GOLDFARB:

3    Q    Could you describe for the court briefly again how he

4    became involved in sales?

5    A    Well, he was selling sales calls anywhere, almost every

6    time.  Ray Wyandt was our salesperson at Portionables.  And

7    he would go along with him and bring all the salespeople from

8    Sargento along with them.  So, yeah, he was very much

9    involved.

10   Q    There's been some conversation in this case about

11   something called direct ship, or direct shipment.  Could you

12   explain to the court what direct ship was in connection with

13   Portionables?

14   A    Well, you have to understand that Portionables is in a

15   complex in Bellingham.  And the complex is called Bellingham

16   Cold Storage.  Bellingham Cold Storage provides cold storage

17   for customers.  And we decided to build the plant inside the

18   Bellingham Cold Storage facility.  So we took an empty

19   warehouse, and we converted it into a production facility.

20        And, initially, when we started the company, we thought

21   that we could have some savings.  And I will explain why,

22   because Bellingham Cold Storage, as a cold storage company,

23   has a lot of equipment that produce cold.  And when you are

24   in the frozen food business, you need cold ammonia to freeze

25   food product.

1       So we sold some synergy, okay?  We build.  We transform.

2   We can use their machines.  And at the same time, we don't

3   have to build our own cold storage.  And so for several years

4   we were using Bellingham Cold Storage.  So everything we're

5   producing, we'll take it across the alley, and we'll go into

6   the Bellingham Cold Storage.

7       But we have several customers.  After '05, when we built

8   the new facility in South Dakota, all the production that we

9   had in Bellingham went to South Dakota because Unilever took

10  100 percent of our facility in Bellingham.

11      So a year later, I was sitting with my financial officer.

12  I said, well, now we are utilizing Bellingham Cold Storage

13  only for one customer.

14          MR. SULKIN:  Your Honor, I object as hearsay.

15          THE WITNESS:  How?

16          THE COURT:  Overruled.  It's a narrative, but it's

17  not hearsay.  Pose a question.

18          MR. GOLDFARB:  Very well, your Honor.

19          THE WITNESS:  I want to explain what I mean, because

20  otherwise nobody understand.

21  BY MR. GOLDFARB:

22  Q   That's okay.  Let me ask you another question.  So after

23  the rest of the production went to South Dakota and you had

24  the single customer in Bellingham, which was Unilever, did

25  your needs for Bellingham Cold Storage change?

1    A    Of course, because --

2    Q    Excuse me.  How did they change?

3    A    Because everything we produced for Unilever will need

4    assembly.  So Unilever will have trucks waiting, because

5    we're working 24 hour around the clock.  So, basically, it

6    didn't make sense to me, logically, to make a product, to

7    send it to the cold storage, pay for cold storage, pay some

8    handling charges, and I would put the product into the truck.

9         So I said, well, if our lease agreement provides we can

10   legally do it, we're not going to use any more cold storage.

11   Let's put the trucks on our own bay and let's load them

12   directly.  And I had discussed this with Unilever, and they

13   were okay with it.

14   Q    Had you prepared any estimates of how much savings you

15   thought you might be able to achieve by doing that?

16   A    I didn't personally, but I have my financial officer to do

17   it.

18   Q    Did you have an understanding of what you thought it might

19   be possible to save with direct ship?

20   A    The number that was given to me was --

21        MR. SULKIN:  Your Honor, I object on what he might

22   have thought.  It's not relevant.

23        THE COURT:  Overruled.

24   A    It was about $500,000 a year.

25   BY MR. GOLDFARB:

1   Q    Was direct ship something that you had thought of before

2   the acquisition or after?

3   A    No, it's something I started working on and I had

4   requested my team to look at in spring 2006, early.

5   Q    And at the time that you started the discussions with both

6   the French company and later Sargento, had direct shipping

7   been implemented?

8   A    No.  We were going to implement direct shipment in January

9   '07.  This was our projection.  This is what we wanted to do.

10  Q    And why did you not implement direct shipping at that

11  time?

12  A    Because we had concession with a French company for

13  interest in buying Portionables.  And Sargento expressed an

14  interest in buying Portionables.  So I requested to put the

15  direct shipment on hold until I figured out what's going on

16  with these acquisitions and if we were going to sell the

17  company.  I was getting a little bit too distracted, so I

18  didn't want to start direct shipment.

19  Q    After the transaction with Sargento closed, were you still

20  interested in direct shipment?

21  A    Yes.

22  Q    Did you share that with anyone at Sargento?

23  A    Yes.  And I think it's part of the -- I think we included

24  that also in the sale and purchase agreement, because this is

25  something that was in the works.

Q    And after the transaction closed, do you recall having

conversations with people at Sargento about it?

A    Yes.

Q    Did Mr. Gordy know that you were interested in direct

shipment?

A    Yes, he did.

          MR. SULKIN:  Objection.  Lack of foundation, your

Honor.

          MR. GOLDFARB:  I'll follow up, your Honor.

Q    How did Mr. Gordy know that you were interested in direct

shipment?

          MR. SULKIN:  Same objection, your Honor.

          THE COURT:  Overruled.

A    Well, first of all, it was part of the transaction.  It

was known before acquisition that this is what we had the

intention to do.

          MR. GOLDFARB:  I'll pose a different question, your

Honor.

Q    What ultimately happened with regard to direct shipment?

A    Direct shipment never happened.

Q    Why was that?

A    I wasn't given the chance to implement direct shipment.

Q    Were there negotiations after the transaction closed with

Sargento, were there negotiations with Bellingham Cold

Storage?

1    A    There were negotiations, but I wasn't included in the

2    negotiations.

3    Q    Who was included in the negotiations?

4    A    McEvoy and Mike Gordy.

5    Q    And when those two gentlemen commenced those negotiations,

6    did you know that they were taking that action?

7    A    Yes.

8    Q    Did they follow your desire with regard to direct

9    shipment?

10   A    No.

11        MR. GOLDFARB:  Your Honor, plaintiff moves the

12   admission of Exhibit 9, which I believe is not objected to.

13        THE COURT:  Any objection to 9?

14        MR. SULKIN:  No objection, your Honor.

15        THE COURT:  9 will be admitted.

16        (Exhibit(s) 9 admitted.)

17   BY MR. GOLDFARB:

18   Q    And, Mr. Calliari, if you could turn to Exhibit 9, please.

19   Exhibit 9, sir, are a couple of different e-mails.  The one

20   that's highlighted is September 5 of 2007.  Do you see that?

21   A    Yes.

22   Q    And did you send this e-mail to Mr. Gordy?

23   A    Yes, I did.

24   Q    And does this e-mail accurately reflect your concerns at

25   the time?

1   A   Yes.

2   Q   And what was it that had taken place at the time that

3   caused you to write this e-mail?

4   A   Because he was in contact with Bellingham Cold Storage and

5   trying to come up with -- or trying to convince me that he

6   could come up with some savings.  But he don't make sense.

7   Q   At some point in time, did you give up the idea of direct

8   ship?

9   A   Yes, I did.

10  Q   Would you tell the court why that was?

11  A   Because McEvoy and Mike Gordy made a new agreement with

12  Bellingham Cold Storage, and I wasn't involved.

13  Q   And how long did those discussions go on?

14  A   I believe for several months.

15  Q   If you had attempted to implement direct shipment in 2008,

16  would it have been impossible to do that in time to affect

17  the earnout?

18  A   I believe so.

19  Q   Did you have any concerns with regard to Sargento's

20  involvement on sales calls?

21  A   Yes.

22  Q   Could you explain to the court what those concerns were?

23  A   Well, first of all, Sargento hasn't been selling

24  Portionables products, ever, so first concern.  Second

25  concern, during the earnout period, I decide how to conduct

1    the sales of the company.  And having Mike Gordy coming and

2    telling us what to do, bringing Sargento salespeople on board

3    and having them making sales calls on our behalf, it's just

4    very disturbing.

5        And they don't know anything about the product.  They've

6    been selling cheese for years.  It's a totally different

7    universe.  So if they wanted to do that after the earnout,

8    well, they own the company, so they have a right to do it.

9    Q    Do you know someone named Dan Zinzer?

10            THE COURT:  Why don't we stop before we get into who

11   Mr. Zinzer is and take our break.

12            MR. GOLDFARB:  Very well.

13            THE COURT:  All right.  Ladies and gentlemen, let's

14   take our afternoon break.

15            (Jury leaves courtroom.)

16            THE COURT:  Okay.  Anything else we need to take care

17   of before recess?

18            MR. GOLDFARB:  No, your Honor.  I thought those

19   packages would brighten it up, but maybe not so much.

20            THE COURT:  Well, I don't know.  But if you feed

21   them, they'll really fall asleep all right.  So we'll have to

22   try something else.  I'll get them on their feet a couple

23   more times this afternoon.

24       All right.  Let's take our recess.

25            (Brief recess.)

```
 1          THE COURT:  Are we ready to bring them in?
 2          MR. SULKIN:  Yes, your Honor.
 3          THE COURT:  All right.  Please have a seat,
 4   Mr. Calliari.
 5          (Jury enters courtroom.)
 6          THE COURT:  Please be seated.
 7      All right.  Mr. Goldfarb, go ahead.
 8   BY MR. GOLDFARB:
 9   Q   Mr. Calliari, do you know the name Dan Zinzer?
10   A   Yes, I've heard of it.
11   Q   Okay.  At some point did you have concerns about
12   Mr. Zinzer in connection with Portionables?
13   A   Yes, I did.
14   Q   Could you tell the court briefly what those concerns were,
15   please?
16   A   He was interfering with the sales, with the sales process
17   with Birds Eye.
18   Q   Who does Mr. Zinzer work for?
19   A   He works for Sargento.
20   Q   And did you come to an understanding of something or
21   things that he was doing in connection with Birds Eye?
22   A   He was working with Mike Gordy.  And Mike Gordy was
23   involved with sales and marketing.
24   Q   And did you raise concerns about Mr. Zinzer with anyone?
25   A   Because Mr. Zinzer was -- he overstep over his boundaries.
```

1   He was making decisions and actions that we weren't even

2   aware of it.

3   Q    And did you raise concerns about that with Mr. Gentine?

4   A    Yes, I did.  I sent him an e-mail.

5   Q    I would like to talk to you next about Unilever.  The

6   original Unilever contract, when was that signed?

7   A    I believe I signed it in 2004, April 4, 2004.

8   Q    And did you negotiate that transaction or that contract?

9   A    Yes, I personally did.

10  Q    After the transaction closed, did you have conversations

11  with Unilever?

12  A    Right after the close, the closing of the transaction, I

13  made a call to Unilever to introduce -- to set up a

14  conference call between myself, between -- actually, I set up

15  a meeting with Unilever in order to introduce Sargento, Mike

16  Gordy and Lou Gentine.  But he don't make the meeting because

17  there was a blizzard in the East Coast, so the flight got

18  cancelled.  And we did the introduction over the phone.

19  Q    After that introductory phone call, what happened next

20  with regard to communication with Unilever?

21  A    I did not talk to them until I heard from Mike Gordy that

22  he had a conversation with Unilever.

23  Q    Had you authorized Mr. Gordy to have any conversation with

24  Unilever without you?

25  A    No.

1   Q    And what was your reaction when you found out that he had

2   had a conversation with Unilever?

3   A    I was surprised.  I was upset.  And basically he told me

4   that Unilever was looking at a price reduction.  So it was a

5   surprise, a total surprise to me.

6   Q    And what was your reaction to the idea of a price

7   reduction for Unilever?  What did you think about that?

8   A    My personal reaction was, it's out of the question.

9   Q    And why, sir?

10  A    Well, we had a five-year agreement with Unilever.  We were

11  a year and a half into the agreement.  It took us six months

12  in 2005 to build -- actually, to transform our facility in

13  Bellingham because we accepted to do business with Unilever.

14  Unilever had a cooking technology.  And I had some space

15  available so we could expand our facility in Bellingham.

16       So Unilever brought to us a lot of equipment.  We did some

17  constructions.  We had our plant in Bellingham that was shut

18  down for some time.  And at the end of the day, Unilever

19  invested 10 million dollars in our facility, in equipment, in

20  constructions.

21       And when I talk about equipment, I'm not talking about

22  equipment that you can roll in.  Once it's in place, it's in

23  place for good, otherwise you have to start to break walls

24  and break floors and break ceilings in order to take it

25  apart.

1    So I couldn't really make sense of why right after

2    acquisition, why Unilever, you know, is asking for price

3    reductions or why trying to frighten about

4    self-manufacturing.  They just invested, you know, in our

5    facility.  So it didn't make sense to me.

6    Q   And did you send Mr. Gordy an e-mail with regard to his

7    communication with Unilever?

8    A   I don't recall exactly.  I think I sent an e-mail out at

9    some point in time, yes.

10   Q   Let me ask you to look at Exhibit 12, please.

11        MR. GOLDFARB:  And, your Honor, at this point in

12   time, we move the admission of 12, which is unopposed on the

13   exhibit list.

14        MR. SULKIN:  No objection, your Honor.

15        THE COURT:  12 is admitted.

16        (Exhibit(s) 12 admitted.)

17   BY MR. GOLDFARB:

18   Q   Do you have Exhibit 12 before you?

19   A   Yes, I do.

20   Q   And this is an e-mail that you sent to Mr. Gordy in August

21   of 2007?

22   A   Yes.

23   Q   And in this e-mail, you talk about you don't want another

24   Unilever scenario?

25   A   Yes.

1    Q    Can you explain to the court what you meant by that?

2    A    Well, I didn't want another situation where Mike Gordy

3    makes contact with our customer and afterwards I have to deal

4    with the facts, you know, afterwards, because I have to deal

5    with problems.

6    Q    Were you asked at some point in August of 2007 to sign a

7    letter to send to Unilever?

8    A    I'm sorry.  I did not hear.

9            MR. SULKIN:  Objection.  Leading, your Honor.

10           THE COURT:  Overruled.

11   BY MR. GOLDFARB:

12   Q    Were you asked to sign a letter to Unilever in August of

13   2007?

14   A    Yes.

15   Q    Did you draft that letter yourself?

16   A    No.

17   Q    Did you agree with the business judgment of sending that

18   letter?

19           MR. SULKIN:  Objection.  Leading, your Honor.

20           THE COURT:  Sustained.

21           MR. GOLDFARB:  I'll rephrase, your Honor.

22   Q    What was your feeling about the merits of sending that

23   letter?  That's a bad question.

24       Did you think it was a good idea to send the letter?

25   A    No, it wasn't a good idea.  I would have never done it

1    myself.

2    Q    After sending that letter, how much time passed before you

3    understood that Unilever had responded to it?

4    A    A long time.  Several months.

5         MR. GOLDFARB:  Your Honor, at this time we move the

6    admission of Defendant's Exhibit 207.

7         MR. SULKIN:  No objection, your Honor.

8         THE COURT:  207 will be admitted.

9         (Exhibit(s) 207 admitted.)

10   BY MR. GOLDFARB:

11   Q    Do you have Exhibit 207?

12   A    I thought you were going to put it on the screen.

13   Q    I will in a second.

14   A    All right.  No, I don't have it here.

15   Q    I'll just put it on the screen.

16   A    Oh, okay.  It's here.

17   Q    Exhibit 207 is an e-mail from Mr. Gordy that you were

18   copied on, dated March 7, 2008?

19   A    Yes.

20   Q    And attached to it is a draft amendment of the

21   manufacturing agreement?

22   A    Yes.

23   Q    And prior to this e-mail, do you recall whether you had

24   seen any draft amendment?

25   A    No.

1  Q    When you got this draft amendment, what was your reaction

2  to it?

3  A    I was angry.

4  Q    Did you communicate with Mr. Ioannides about it?

5  A    Yes, I did.

6  Q    Is that the reason that he came over to the United States?

7  A    Yes.

8  Q    Did you attend a meeting at Portionables with

9  Mr. Ioannides and Mr. McEvoy on March 26 of 2008?

10  A    Yes.

11  Q    And what was the purpose of that meeting?

12  A    To explain to Mr. McEvoy and to have a chance to meet with

13  a representative from Sargento.  And McEvoy was a relative

14  from the Gentine family and was basically the representation

15  of Sargento at Portionables.

16  Q    And did Mr. McEvoy make any request of you and

17  Mr. Ioannides at that meeting?

18  A    Yes, that we should express our concern to Lou Gentine.

19  Q    Did he tell you to put it in a letter?

20  A    Yes, he did.

21  Q    And did you engage your attorneys to prepare that letter?

22  A    Yes.

23  Q    And is Exhibit 13 -- I'll just put it on the screen.  Is

24  Exhibit 13 the letter that you engaged your attorneys to

25  prepare?

| | |
|---|---|
| 1 | A   Yes. |
| 2 | Q   And did that letter accurately set forth your concerns at |
| 3 | the time? |
| 4 | A   Yes. |
| 5 | Q   Do you recall having a telephone conversation with |
| 6 | Mr. Gentine a few days later? |
| 7 | A   Yes. |
| 8 | Q   Did you share the same concerns with Mr. Gentine by phone? |
| 9 | A   Yes. |
| 10 | Q   Were you aware of a letter in April indicating that you |
| 11 | were not to have contact with Unilever without Mr. Gentine's |
| 12 | permission? |
| 13 | A   Yes. |
| 14 |        MR. SULKIN:  Objection.  Leading, your Honor. |
| 15 |        THE COURT:  Sustained. |
| 16 |        MR. GOLDFARB:  I'll rephrase. |
| 17 | Q   Could you look at Exhibit 16, please?  Exhibit 16 is an |
| 18 | April 11, 2008 letter to Jeffrey Miller.  Do you see that? |
| 19 | A   Yes. |
| 20 | Q   And was Mr. Miller representing you individually at that |
| 21 | time? |
| 22 | A   Yes. |
| 23 | Q   And were you made aware of this letter? |
| 24 | A   Yes. |
| 25 | Q   After this letter, were you included in any communications |

1  with Sargento relating to Unilever?

2  A   No.

3  Q   Did you know at the time of this letter whether the

4  amendment had been signed or not?

5  A   No.

6  Q   Did you request mediation?

7  A   I did.

8  Q   And what was your purpose in doing that?

9  A   Trying to resolve these issues.

10  Q   And after mediation, did you authorize the submission of

11  an additional letter to Sargento?

12  A   Yes, I did.

13  Q   And is Exhibit 14 that letter?

14  A   Yes.

15  Q   And this letter was prepared by your counsel?

16  A   Yes.

17  Q   And authorized by you?

18  A   Yes.

19  Q   And you understood in this letter that you were requesting

20  that Unilever cure -- I'm sorry -- that Sargento cure certain

21  defaults that you were claiming under the employment

22  agreement?

23  A   Yes.

24  Q   And to your knowledge, were any of those defaults cured by

25  Sargento?

1    A    No.

2    Q    Did you resign your employment from Portionables?

3    A    Yes, I did.

4    Q    And is Exhibit 58 your letter of resignation?

5    A    Yes.

6    Q    Do you know a gentleman by the name of Karl Linck?

7    A    Yes, I do.

8    Q    And who do you understand Mr. Linck to be?

9    A    He is in charge of, generally, Sargento.

10   Q    In 2007, did you have some dealings with Mr. Linck?

11   A    Very limited dealings.  At the request of Lou Gentine, I

12   took him to Sweden with me to meet the executive for

13   Frigoscandia.  Frigoscandia is the equipment manufacturer

14   that makes freezers for Portionables.  So Mr. Gentine wanted

15   me to have him introduced to them since they were all in the

16   company.

17   Q    In 2008, did you have any dealings whatsoever with

18   Mr. Linck, that you recall?

19   A    I don't recall.

20   Q    Were you aware of any regulatory issues in South Dakota?

21   A    No, I wasn't.  I just came across a few e-mails, but I

22   wasn't.

23   Q    Did Mr. Gordy communicate with you about Mr. Linck in

24   connection with South Dakota?

25   A    No.

1  Q    Did Mr. Gordy tell you that Mr. Linck was planning to go

2  and meet with representatives of South Dakota in connection

3  with regulatory issues there?

4           MR. SULKIN:  Objection.  Leading, your Honor.

5           THE COURT:  Sustained.

6           MR. GOLDFARB:  I'll rephrase, your Honor.

7  Q    Did Mr. Gordy tell you anything about activities Mr. Linck

8  was engaged in in South Dakota?

9  A    No.

10  Q    Did you have any knowledge that Mr. Linck was meeting with

11  representatives in South Dakota on behalf of Portionables?

12  A    No.

13  Q    Did you know that Sargento had retained attorneys in

14  connection with Portionables' issues in South Dakota?

15           MR. SULKIN:  Objection.  Leading.

16           MR. GOLDFARB:  I'll rephrase again, your Honor.  I'm

17  sorry.

18  Q    Were you aware that Sargento had retained any attorneys to

19  look out for interests of Portionables?

20           MR. SULKIN:  Same objection, your Honor.

21           THE COURT:  Sustained.

22  BY MR. GOLDFARB:

23  Q    Did you know whether Sargento had retained counsel for

24  Portionables?

25  A    No.

1      MR. GOLDFARB:  I have no further questions, your

2  Honor.

3      THE COURT:  Ladies and gentlemen, how would you like

4  to stand up and take a stretch here?

5    Okay.  Ready to go?

6      MR. SULKIN:  I am, your Honor.

7      THE COURT:  All right.  Please be seated.

8    Go ahead, Mr. Sulkin.

9                    CROSS-EXAMINATION

10 BY MR. SULKIN:

11 Q    Good afternoon, Mr. Calliari.

12 A    Good afternoon.

13 Q    It's fair to say you did not ask Mr. Gentine to agree in

14 writing to direct ship as part of the stock purchase

15 agreement?

16 A    Can you rephrase the question, please?

17 Q    You did not ask Mr. Gentine to agree in writing to direct

18 ship?

19 A    No.

20 Q    And you did not ask Mr. Gentine to agree in writing to

21 credit instant earnout if Sargento decided to not direct

22 ship?

23 A    I'm sorry.  Your first question, was it prior to

24 acquisition or after?

25 Q    Let me rephrase.  At the time of the stock purchase

1   agreement, you did not ask Mr. Gentine to agree in writing to

2   credit against the earnout if Sargento decided to direct

3   ship?

4   A    No.

5   Q    Now, you raised the issue of direct shipping with

6   Mr. Thomas, the president of Bellingham Cold Storage, didn't

7   you?

8   A    Yes.

9   Q    He was angry when you told him that you were thinking of

10  direct shipping, wasn't he?

11  A    Yes.  And I wasn't surprised.

12  Q    He told you that under the contract you did not have the

13  right to direct ship?

14          MR. GOLDFARB:  Hearsay, your Honor.

15          THE COURT:  Sustained.

16          MR. SULKIN:  Your Honor, if I may respond.  One, it

17  goes to his state of mind.  And, two, he testified about it

18  in his deposition, which I can just play.

19          THE COURT:  Well, then maybe that's what you should

20  do.

21          MR. SULKIN:  Okay.  That's fine, your Honor.

22          THE COURT:  But it still has the same effect whether

23  he says it here or he says it in his deposition.

24          MR. SULKIN:  But --

25          THE COURT:  It's still hearsay, if it's

1   Mr. Calliari's deposition we're talking about.

2        MR. SULKIN:  It is Mr. Calliari's deposition, but it

3   goes to -- my point is that it goes to Mr. Calliari's state

4   of mind.  That's why I asked the question.  But I'll move on.

5   Q   You claim that while you owned Portionables you had Betty

6   Crouse and David Riley do an analysis of direct shipping?

7   A   Yes.

8   Q   You claim they did this analysis in 2006?

9   A   Yes.

10  Q   And it's fair to say, sir, that if there was a storm and

11  the trucks could not get to Portionables, that would be a

12  real problem?

13  A   It's possible.  I'm not a logistic specialist.

14  Q   And if that happened, you'd need Plan B, wouldn't you,

15  sir?

16  A   Yes.

17  Q   And you had no Plan B?

18  A   I thought we did.

19  Q   In fact, sir, you knew you had no Plan B?  You did not

20  know if one had been developed or not?

21  A   Well, I had people working on the plan.

22  Q   You had not seen a Plan B; isn't that the truth?

23  A   I had seen several plans.

24  Q   You had seen several plans.  You don't know whether Plan B

25  was ever developed, do you, sir?

1    A    Again, you know, I just have talked and seen many

2    different scenarios from my plant manager.

3          MR. SULKIN:  Your Honor, may I approach?

4          THE COURT:  Yes.

5          MR. SULKIN:  Your Honor, is my copy okay for you?

6          THE COURT:  Well, aren't you going to need it?

7          MR. SULKIN:  I have notes pretty well in my --

8          THE COURT:  Okay.

9    BY MR. SULKIN:

10   Q    Would you take a look, sir, at page 90, lines 12 through

11   15, and page 90, 16 through 23.

12         MR. SULKIN:  Your Honor, I would like to play those

13   clips after you have had a chance to read those questions and

14   answers.

15         THE COURT:  Go ahead.

16         MR. SULKIN:  Play clip 34, please, and clip 35.

17         (Video played.)

18   BY MR. SULKIN:

19   Q    Sir, you never saw a final typed-up version of a plan

20   regarding shipping, did you?

21   A    As I told you, I saw several scenarios.  This is what I

22   saw.

23         MR. SULKIN:  Let's take a look at page 88, lines 13

24   through 15, your Honor.

25   A    Which page, please?

```
1   BY MR. SULKIN:

2   Q   I'm sorry.  Page 88, lines 13 through 15.

3           THE COURT:  Go ahead.

4           MR. SULKIN:  Please play 36.

5           (Video played.)

6   BY MR. SULKIN:

7   Q   Do you recall, sir, Mr. Jim Hart?

8   A   Yes.

9   Q   And who is Jim Hart, sir?

10  A   Jim Hart used to be the quality assurance manager.

11  Q   I'm sorry.  I didn't hear that.

12  A   Jim Hart used to be the quality assurance manager.

13  Q   At Portionables?

14  A   At Portionables.

15  Q   Did you see a plan that he drew up?

16  A   He was working in collaboration with Tom Kyle.

17  Q   Take a look at Exhibit 50.

18  A   I don't have it.

19  Q   It's one I added during Mr. Goldfarb's examination.  I

20  apologize.  Take a look at the second page of the document.

21          MR. SULKIN:  I don't believe there's any objection to

22  its admittance, your Honor.

23          MR. GOLDFARB:  No objection.

24          THE COURT:  50 will be admitted.

25          (Exhibit(s) 50 admitted.)
```

1   BY MR. SULKIN:

2   Q   Had you seen this document before, sir?

3   A   I may have, but I don't recall.

4   Q   Well, let's just quickly go through it.  Page 1, C,

5   options, do you see that?

6   A   Yes.

7   Q   It says:  Product risk high.  Shutdown risk high.

8       That's not good, is it?

9           THE COURT:  I'm sorry.  Where are you reading?

10          MR. SULKIN:  I'm sorry, your Honor.  It's the second

11  page of the document, the first page of the analysis,

12  paragraph C, options, paragraph No. 1.

13  Q   It's fair to say, where it says, product risk high,

14  shutdown risk high, that's not good?

15  A   Well, this is -- whose assessment is this?

16  Q   It's Mr. Hart's.  Well, let's go to the first page.

17  McEvoy writes:  I'm doing some digging and I found this

18  assessment done by Jim Hart on 5/22/07.

19      The question is:  It's fair to say that if product risk is

20  high and shutdown risk is high, that's not good?

21  A   There's always a risk when you try something new.

22  Q   I'm sorry if my question wasn't clear.  My question was:

23  Is it good if the product risk is high and the shutdown risk

24  is high?  Is it good or is it bad or is it somewhere in the

25  middle?

1    A    I would say somewhere in the middle.

2    Q    Okay.

3    A    The way we look at it.

4    Q    Next, it says, in paragraph 2:  Take the risk that a

5    trailer be loaded off the line and maintain temperature well

6    enough until it is sealed.  And it goes on, and it says:

7    Product risk high.  Shutdown risk low.

8         Was that good to have a high product risk, sir?

9    A    No.  But, again, you are using -- this is probably one

10   scenario of -- one possibility that Mr. McEvoy found at the

11   plant.  I'm pretty sure we had more than that.

12   Q    Well, we've been through your documents, and we didn't

13   seen anything else, sir.

14   A    Well, you own Portionables.  It's at the plant.

15   Q    And your lawyers went through the documents, and they

16   haven't found anything, sir.  Let's move on.

17        The fact is, isn't it, sir, Mr. Kyle -- first, who is

18   Mr. Kyle?

19   A    Mr. Kyle used to be the plant manager.

20   Q    Worked for you?

21   A    Yes.

22   Q    And he told you it would be a real challenge to direct

23   ship, didn't he?

24   A    Yes.  A challenge doesn't mean it is impossible.

25   Q    And you owned Portionables in 2005, is that right?

1    A    Excuse me?

2    Q    You owned Portionables in 2005?

3    A    Yes.

4    Q    Did you direct ship?

5    A    No.

6    Q    You owned Portionables in 2006.  Did you direct ship?

7    A    No.

8    Q    You owned Portionables the first three months of 2007.

9    Did you direct ship?

10   A    No.

11   Q    Take a look, if you would, at Exhibit 271.  This is an

12   e-mail dated July 31 from Mr. Hoff to you.  Do you have any

13   doubt you received it, sir?

14   A    If this is what it says, I did receive it.

15   Q    This was during the ordinary course of business.  We'll

16   focus just on that top e-mail, sir, during the ordinary

17   course of business, right?

18   A    Yeah.

19            MR. SULKIN:  Your Honor, I move to admit at least the

20   top portion of Exhibit 271.

21            MR. GOLDFARB:  Hearsay, your Honor.

22            MR. SULKIN:  Your Honor, it goes to his state of mind

23   since he received it.  He just claimed that Bellingham Cold

24   Storage was taken from him, and this just goes to notice to

25   him on the issue.

1          THE COURT:  Sustained.

2    BY MR. SULKIN:

3    Q    You were told on July 31 through an e-mail, were you not?

4    You were informed in an e-mail on July 31 by Mr. Hoff that --

5          MR. GOLDFARB:  Excuse me, your Honor.  This seems

6    like the same hearsay problem.

7          MR. SULKIN:  It's not hearsay to ask him what he was

8    told by my people.

9          MR. GOLDFARB:  How is that different from what they

10   said?

11         THE COURT:  Sustained.

12   BY MR. SULKIN:

13   Q    Did you know in July -- did you know that people at

14   Sargento -- did you ask Mr. Hoff to get involved in

15   Bellingham Cold Storage negotiations?

16   A    I don't recall that I asked him to get involved in the

17   negotiations.  I had a conversation with Mr. Hoff.  And I say

18   that my legal counsel are of the opinion that we can legally

19   do direct shipment, but it would not hurt if you ask your

20   legal counsel, Bob Henkle, to get his opinion before we

21   proceed.  This is the extent that I asked Mr. Hoff to be

22   involved.

23   Q    You didn't know that Mike McEvoy was negotiating with

24   Mr. Thomas of Bellingham Cold Storage?  Is that what you're

25   telling me?

1   A    I learned after the fact.

2   Q    You didn't know from July 31, 2007, forward, that Mr. Hoff

3   and Mr. McEvoy and Mr. Gordy were negotiating at your behalf

4   at your request with Bellingham Cold Storage?

5   A    Not at my request.  If you show me a document that says

6   that I requested these three gentlemen to go to Bellingham

7   Cold Storage and to negotiate on my behalf, I would --

8   Q    Did you know that Mr. Hoff was talking to Mr. Thomas?

9   A    No, I did not know.

10  Q    Take a look at Exhibit 271.  I'll ask you if that

11  refreshes your recollection as to whether you knew?

12  A    Which exhibit is it, please?

13  Q    271.  Does that refresh your recollection that you knew in

14  July of 2007 that Mr. Hoff was involved with Bellingham Cold

15  Storage?

16  A    Well, it says here:  Patrick, please accept my apologies.

17       MR. GOLDFARB:  Excuse me.  Not proper use of the

18  document to refresh recollection, your Honor.

19       THE COURT:  I don't believe there was any question in

20  front of him.  So why don't you wait, Mr. Calliari, until

21  there's a question or you are asked to do something.  Just

22  take a look and read it to yourself.

23  BY MR. SULKIN:

24  Q    And when you're done, let me know, sir.

25  A    Okay.  Go ahead.

1    Q    Does that document refresh your recollection as to your

2    knowledge concerning the involvement of Mr. Hoff and others

3    relating to Bellingham Cold Storage?  That's a yes or no

4    question.

5    A    Yes.

6    Q    And tell me what you now recall.

7    A    Can I read what it says?  This is my recollection.

8    Q    I want to know what your recollection is.

9    A    Oh.  Well, it's just I didn't read.  You asked me if I

10   recall about these documents, so.

11   Q    I understand that it's a long time ago.  So now that you

12   do remember, what is it that you remember about that subject?

13   A    Well, Mr. Hoff says he has been working with Mike Gordy

14   and Mike McEvoy on the subject.  And he was sorry, apologetic

15   that he get back to me so late.

16   Q    And so by July, you knew that.  Did you tell Mr. Hoff:

17   Don't do that anymore?

18   A    We had conversations, I'm pretty sure, but.

19   Q    Take a look at Exhibit No. 10, sir.

20        MR. SULKIN:  I don't believe there's any objection to

21   this.  May I publish to the jury, your Honor?  I offer 10.

22        MR. GOLDFARB:  No objection, your Honor.

23        THE COURT:  10 will be admitted.

24        (Exhibit(s) 10 admitted.)

25   BY MR. SULKIN:

1  Q   This is an e-mail from Mike Gordy to Mr. Gentine, you,

2  Mr. Hoff, Mr. McEvoy, dated September 27, '07, correct?

3  A   Yes.

4  Q   Blow up the bottom.  And the subject:  Notes from a

5  meeting from Bellingham Cold Storage, 9/25/07.  Do you see

6  that?  That's in the subject line.

7  A   Yes.

8  Q   Now, did you, when you received this, complain about

9  Mr. Gordy's involvement?

10  A   I complained in several phone calls, several times, you

11  know.  I should have been the one involved since day one.

12  Q   Mr. Calliari, as I see it, this was sent to you?

13  A   Yes, of course it's sent to me.  It doesn't mean that I

14  should not be involved.  I should be the one to send it.

15  Q   Now, Mr. Calliari, isn't it true that you believe

16  Mr. Thomas did not want to talk to you anymore about this

17  subject?

18  A   Yes, he was upset.

19  Q   And that's why you wanted Mr. Gordy and others to help you

20  get a deal with Mr. Thomas, because he wouldn't talk to you

21  anymore, isn't that right?

22  A   Sargento wanted to restore communication on behalf of

23  Portionables with Bellingham Cold Storage.

24  Q   And you put nothing in writing to Mr. Gordy by e-mail,

25  napkin, letter, or anything telling him to stop, did you?

1    A    I talk.

2    Q    You put nothing in writing to Mr. Gentine asking him to

3    step in, did you?

4              MR. GOLDFARB:  Excuse me.  Objection.  Argumentative.

5              THE COURT:  Overruled.

6    A    I did express my concern.  I'm pretty sure I did talk over

7    the phone or in person with this gentleman.

8    BY MR. SULKIN:

9    Q    I'm sorry if my question wasn't clear.  My question was:

10   Did you put anything in writing to Mr. Gentine on this

11   subject?

12   A    If you don't have it here, then, no, I didn't.

13   Q    Did you put anything in writing to Mr. Hoff or Mr. McEvoy

14   on this subject?

15   A    No.

16   Q    All right.  Let's go through this document.  You testified

17   that you could save $500,000 a year by direct shipping.  Do I

18   have that right?

19   A    These were the figures my financial officer gave me.

20   Q    Mr. Gordy -- let's look at the first bullet point.  He

21   writes:  We discussed the current proposed savings available

22   if we were to ship to Unilever direct by bypassing Bellingham

23   Cold Storage.  Savings of 26 million pounds equals $384,000

24   in gross savings.  Do you see that?

25   A    Yes.

1   Q   Gross savings means it's not profit, you still have costs

2   involved there, right?

3   A   Yes.

4   Q   Okay.  And if we go down to the fifth bullet point,

5   Mr. Gordy writes:  If we don't get concessions at the desired

6   level from Bellingham Cold Storage, we agree to initiate a

7   detailed plan from Portionables on how they would execute

8   direct shipments, including but not limited to additional

9   costs incurred, spotting of trailers, base available for

10   trailers, equipment, contingency plans, et cetera.  Mike

11   McEvoy and Tom Kyle would lead this effort.

12       Do you see that?

13   A   Yes.

14   Q   So you understood that Sargento would look at direct

15   shipping if it couldn't cut a reasonable deal with Bellingham

16   Cold Storage, isn't that true, sir?

17   A   This is what he may have suggested.

18   Q   And you didn't write back and say something along the

19   lines of, gee, stop, I don't want you to try to negotiate a

20   deal with Bellingham Cold Storage?  You didn't do that, did

21   you, sir?

22   A   No, but I had conversations with Lou Gentine about it.

23   Q   You had conversations with Mr. Gentine about it.  And if

24   he says they didn't occur, that's just someone's memory's

25   wrong?

1    A    Of course.

2    Q    Take a look, if you would, at Exhibit 257.

3         MR. SULKIN:  I don't believe there's any objection to

4    this one, your Honor.

5         MR. GOLDFARB:  No objection, your Honor.

6         THE COURT:  257 is admitted.

7         (Exhibit(s) 257 admitted.)

8    BY MR. SULKIN:

9    Q    This is an e-mail from Mr. McEvoy to you dated January 7,

10   2008, is that right?

11   A    Yes.

12   Q    Subject:  BCS rebate incentive addendum.  Do you see that?

13   A    Yes.

14   Q    And go to the second page of that document, please.  That

15   is sort of a draft deal that had been reached with Bellingham

16   Cold Storage?

17   A    Yeah.

18   Q    So he was sending it to you.  It hadn't been signed yet.

19   He was sending it to you for your review, isn't that right?

20   A    Yes.

21   Q    Okay.  Go to the first page.  Mr. McEvoy writes:  Happy

22   New Year, Patrick.  Tom -- is that Mr. Kyle?

23   A    Yes.

24   Q    Told me that you have decided to forego the direct ship

25   project.  Simultaneously, we were working on the attached

1   addendum to BCS to implement the volume-based rebate

2   incentive that they had presented to us a few months back.

3   BCS drew up the addendum, and Bob Henkle reviewed the

4   document and recommended several changes that are now part of

5   the final draft.  Please review the document at your earliest

6   convenience.  We'll also need your signature to proceed.

7   Please call with any questions.

8       Do you see that?

9   A   Yes.

10  Q   In fact, you did tell Mr. Kyle that you decided to forego

11  the direct ship project, didn't you?

12  A   I did.

13  Q   And, in fact, you directed Mr. McEvoy to sign the deal

14  with Bellingham Cold Storage, didn't you?

15  A   I did.

16  Q   And that deal saved Portionables $130,000 a year, didn't

17  it?

18  A   Well, this is what it was intended.  I don't know the

19  final number.

20  Q   And just so we're clear, Mr. McEvoy was sent to

21  Bellingham, is that right?

22  A   Yes.

23  Q   His salary, though, was not being charged to Portionables;

24  it was being charged to Sargento, is that right?

25  A   Yes.

1   Q   And the work Mr. Gordy was doing, whether you agreed with

2   it or not -- and we're going to get into it -- his salary was

3   not being charged to Portionables; it was being picked up by

4   Sargento, isn't that right?

5   A   Yes.

6   Q   I would like you to take a look, if you would, at Trial

7   Exhibit 12.  Let me know when you have it in front of you,

8   sir.

9   A   I do have it.

10  Q   Okay.  Mr. Goldfarb showed you that top part.  If we could

11  just blow that up.  There.  I would like to show you the

12  bottom part, okay?  Please include the August 15, 2007, the

13  line above.

14      Mr. Gordy writes back:  Good morning, Patrick.  I was

15  thinking about your phone call yesterday and wanted to follow

16  up.

17      Do you see that?

18  A   Yes.

19  Q   Now, this phone call from Mr. Gordy would have happened on

20  August 14th, correct?  His e-mail was August 15th.  We can

21  presume it happened August 14th?

22  A   Yes.

23  Q   And your conversation with Mr. Ioannides happened two days

24  before that, didn't it, on August 12th?  Take a look at

25  Exhibit 233 real quickly.  I think it's on your monitor, if

1   you want to just look at it.  Fair enough, it was sent on

2   August 12, just two days earlier?

3   A   Yes.

4   Q   Okay.  I want to look at what Mr. Gordy wrote to you.

5   Let's go to the bottom of the page.  Pull up that second to

6   last paragraph, please, beginning with "finally."  We're back

7   to 12.

8       Mr. Gordy writes:  Finally, the most concerning point of

9   the conversation was your indication that I would be

10  negotiating prices on Portionables' behalf on both calls.  I

11  don't know what prior action on my part would prompt this

12  concern.  I will advise you on pricing and communicate

13  customer concerns, if any, over price quotes.  As I

14  explained, it is not my role to negotiate pricing.  It is

15  your role.

16      He wrote you that, did he not, sir?

17  A   That is what he said.

18  Q   And then he writes, on the last -- go down to the third to

19  the last line.  He writes:  The value -- the one service --

20  I'm sorry.  The one value I bring to Portionables is my sales

21  management experience and advocacy of superior customer

22  support and service.  Whether you choose to use me as a

23  recourse -- I think he meant resource -- is your decision.

24      He wrote you that, did he not, sir?

25  A   Yes, he did.

1   Q   So are you telling me, sir, that after telling you it was

2   up to you whether you wanted to use him or not, that you

3   called Mr. Gordy and said, I don't want to use you, and he

4   kept doing it?

5   A   Well, actions speak louder than words.

6   Q   I agree.  Let's take a look at the last paragraph.  Now,

7   who is Mike Pusterla?  He's with Unilever?

8   A   Yes.

9   Q   Now, you testified to Mr. Goldfarb that you were concerned

10  that Mr. Gordy had gotten involved with Unilever.  Do you

11  recall that testimony?

12  A   Yes.

13  Q   Mr. Gordy wrote you back:  Finally, for the record, after

14  you and I discussed Mike Pusterla's role, I directed all

15  conversations regarding the new opportunity to you.  There

16  was a call from Mike after the conference that he initiated.

17  I have made no calls to Unilever other than an e-mail to Mike

18  requesting Steve's contact information and if they received

19  the meeting notes.  I will forward that e-mail to you.

20      Do you see that?

21  A   Yes, I see it.

22  Q   And you have no doubt he did that?

23  A   This is what he said.  This whole e-mail is very

24  defensive.  Why be so defensive if you have no guilt?

25  Q   I appreciate that.  Let's go to the third paragraph.  You

1   testified about your concern regarding Birds Eye.  Do you

2   recall that, sir?

3   A   Yes.

4   Q   And Mr. Gordy addressed that concern with you, didn't he,

5   your phone call and this letter.  And he writes:  In regards

6   to making the Birds Eye call, I was asked to make that call

7   with Dave in Ray's absence.

8       Who is Dave?

9   A   I'm going to assume it's Dave -- I don't know.

10  Q   If you don't know, that's okay.  And Ray is Ray Wyandt?

11  A   Ray Wyandt, yes.

12  Q   I was working off of the agenda provided for the Sargento

13  portion of the meeting, the very short overview of Sargento

14  that leads into why we purchased Portionables and what the

15  benefits will be to Birds Eye.  I read my outline to you and

16  have attached a copy for your review.  This is not a Sargento

17  call, it's a Portionables call, with the Sargento portion

18  adding credibility.

19      Did you write Mr. Gordy and tell him:  I don't want you

20  doing that anymore?

21  A   No.

22  Q   I'd like you to take a look at Exhibit 13, sir.  This is

23  the letter your lawyer wrote setting forth your concerns of

24  loss of control, is that right?

25  A   Yes.

1   Q    And is it fair to say that this is the first written

2   statement you made claiming you had loss of control?

3   A    Yes.

4   Q    Now, I wrote this down.  At 3:15 you were asked whether

5   this letter, quote, accurately sets forth your concerns.  And

6   your answer was yes, is that fair?

7   A    Yes.

8   Q    Okay.  Can you show me in this letter where your concern

9   about Mr. McEvoy that you talked so much about earlier is set

10  forth?

11  A    It is not in the letter.

12  Q    Can you show me where in this letter the concern that you

13  talked so much about with Mr. Goldfarb is set forth in this

14  letter?

15  A    Mr. Goldfarb?

16  Q    I'm sorry.  I'm sorry.

17          MR. SULKIN:  You've done nothing wrong, Mike.

18          MR. GOLDFARB:  I'll have to get a lawyer.

19          MR. SULKIN:  The cheese is getting to me, and I have

20  one more question left.

21  Q    Is there anywhere in this letter where you set forth the

22  concerns you talked to Mr. Goldfarb about this morning

23  related to Mr. Gordy?

24  A    No.

25  Q    And you were trying to be accurate in this letter, were

1   you not, sir?

2   A    I was raising the main points.

3   Q    This letter is written on behalf of you and Mr. Ioannides

4   as shareholders, is it not?

5   A    Yes.

6   Q    And you did not tell Mr. Ioannides that Unilever had

7   threatened to self-manufacture, did you, sir?

8   A    Not directly, no.

9   Q    You did not tell Mr. Ioannides that under the new deal

10  Unilever guaranteed a minimum level of production that was

11  higher than the previous levels of what production had been,

12  did you, sir?

13  A    No.

14  Q    And you didn't tell Mr. Ioannides that the projected

15  volume under the new contract would result in higher revenues

16  to Portionables than you had projected?

17  A    The new contract was not finalized, so I couldn't be

18  accurate.

19  Q    So did you tell Mr. Ioannides that the projected volumes

20  in your August 16th letter were going to result in higher

21  revenues to Portionables than under the existing contract?

22  A    I'm afraid I do not understand the question, sir.

23  Q    I'm sorry.  I'll try it again.  The August 16th letter you

24  sent, which we're going to get to, that you signed, did you

25  tell Mr. Ioannides that the volumes projected under that

1   contract were going to result in higher revenues to

2   Portionables than under the existing contract?

3   A   The offer?  You are talking about the offer, not the

4   contract?

5   Q   Yes.

6   A   There is a big difference.  The offer, yeah.

7   Q   Did you tell him that?

8   A   I don't recall exactly what I told him.

9        MR. SULKIN:  Your Honor, this would be a good place

10  for me to stop.

11       THE COURT:  All right.  Thank you, sir.  You can step

12  down.

13   All right.  Ladies and gentlemen, it's time to go home.

14  Two nights with the friends and relatives.  Did they keep

15  after you last night asking questions?  No?  Anybody yes?

16  No.  Okay.  It takes about three days before they give up.

17  But sometimes they come back around and sneak up on you.

18   So, please, remember no talking about the case, no

19  research, no investigation.  Clear this case completely out

20  of your mind.  I don't want anybody stalking the frozen food

21  cases to pick out product, none of that, okay?

22   Go home.  Do something else.  Enjoy yourself.  Come back

23  to us tomorrow refreshed, having kept your promise to us that

24  you will remember the most important position you can hold is

25  to be fair and to give the appearance of fairness.

1    Hope you have a nice evening.  We'll see you tomorrow,

2  same time.

3           (Jury leaves courtroom.)

4           THE COURT:  Okay.  Let's talk about where we are.

5  Ahead?  Behind?  On time?

6           MR. SULKIN:  We will finish, I think, certainly this

7  week.  So in that sense, we're ahead.  I had hoped that we

8  could end perhaps as early as tomorrow.  And it may be that

9  we can get all the testimony in tomorrow.

10           MR. GOLDFARB:  I think so.

11           THE COURT:  Okay.  You think so?

12           MR. GOLDFARB:  I do.

13           THE COURT:  Then I need for you to get me any

14  additions to your jury instructions by tomorrow so that we

15  can have a final set put together.  We've made a lot of

16  changes, and you've entered into a lot of agreements since we

17  put together the verdict form.

18     So I need a new run at your verdict form.  Just what is it

19  that you want to get out of the jury?  What questions do you

20  want them to respond to?  So if you could do that for me, is

21  tomorrow morning too soon?

22           MR. SULKIN:  We will do that, your Honor.

23           THE COURT:  Okay.  Well, tell me if it's not, because

24  what I'm going to try to do is, you know, if you are looking

25  at getting done tomorrow, then we would be arguing on Friday.

1    So we need some time to look at these things.

2          MR. SULKIN:  Yes, I think there's a decent chance the

3    evidence will be done tomorrow and we will do closing Friday

4    morning and they would be deliberating in the afternoon, at

5    least that's my goal.

6          THE COURT:  All right.  Then I need some time to see

7    what your proposals are.  Now, it's fine for you to come back

8    and say:  We have nothing new.  We'll go off what we've got.

9        But I'm assuming we're going to face some half-time

10   motions.  And the verdict forms need some work.  And you know

11   what happens if I don't like what you turn in; I just write

12   them myself.  So save me from that, huh?  Give me some ideas.

13       All right.  Anything else we need to take care of?  What

14   are we going to do tomorrow?

15         MR. SULKIN:  Your Honor, I'd like to do literally a

16   one-minute offer of proof on this document.

17         THE COURT:  This document, meaning?

18         MR. SULKIN:  I'm sorry.  The mediator's nonbinding

19   recommendation.  I just want to put it in as an offer of

20   proof.

21         THE COURT:  Okay.

22         MR. SULKIN:  I have a little bit more time, but

23   Mr. Calliari, I don't think, a ton more time.  And then I

24   believe they intend to call Mr. McEvoy.

25         MR. GOLDFARB:  Mr. McEvoy, which is a short to medium

```
 1    witness.  And then we plan to read a short bit of Mr. Gordy.
 2              MR. SULKIN:  And then we would call Mr. Hoff.  I
 3    think he will be an hour.  I don't think we'll call back
 4    Mr. Gentine.  It's possible, depending on what comes in here,
 5    but it will be very short.
 6              MR. LINEHAN:  Doug.
 7              MR. SULKIN:  Oh, and it possible, again, depending on
 8    what happens, that Mr. Thomas will testify.  Again, I think
 9    that would be relatively short.
10              THE COURT:  And Mr. Thomas is Bellingham Cold
11    Storage?
12              MR. SULKIN:  Correct.
13              THE COURT:  All right.  That's still quite a bit of
14    stuff to get to.
15              MR. GOLDFARB:  We have a full day tomorrow, I think.
16    But I think if we push --
17              THE COURT:  You keep telling me it's little, and, you
18    know, you don't move like little, okay?
19              MR. SULKIN:  No fire alarm.
20              THE COURT:  The fire alarm took a little time away,
21    but not much.
22              MR. GOLDFARB:  If it wasn't for that, your Honor.
23              THE COURT:  If it wasn't for that, you'd be done,
24    huh?  Okay.  All right.  Give me your offer of proof.
25              MR. SULKIN:  What I want to do, your Honor, I was
```

1   going to put Mr. Gentine on to say that this is it.  But

2   that's all right.  I just want to provide this for the court

3   for the record.  This, your Honor, is the mediator's

4   nonbinding recommendation, signed by Mr. Sullivan on June 20,

5   2008.

6           MR. GOLDFARB:  I don't have any objection to the

7   making of the offer of proof, certainly.  But --

8           THE COURT:  So you are making an offer of proof.  But

9   this is the mediator's nonbinding --

10          MR. SULKIN:  Recommendation.

11          THE COURT:  A "doesn't matter" recommendation?

12          MR. SULKIN:  Exactly.

13          THE COURT:  All right.  You've told me that this is

14  what it is.  Now, I don't know if you've completed your

15  record as to why it is you think you ought to be able to use

16  it.

17          MR. SULKIN:  I think it goes to two issues, your

18  Honor.  One, we believe it goes to the issue of our good

19  intent that we went to the mediation process and won.  I

20  mean, I don't fault Mr. Goldfarb, but he keeps referring to

21  this.  And I think what he's trying to do is to create the

22  impression that it was a positive result here.

23          THE COURT:  Well, you don't get good intent from

24  winning.  You get good intent from trying.

25          MR. SULKIN:  Well, I don't know that that's right.  I

1   mean, I think what we did was, we won, and we had a finding

2   by a mediator.  We were right that there was no loss of

3   operational control.

4       Moreover, the contract itself, we would argue, the

5   shareholders in the March -- let me step back.

6       There are two issues going on here simultaneously.  You

7   have the March 28th letter, which is the shareholders' letter

8   under 1.6(b).  You then have the May 23rd letter, which is

9   under the employment agreement.

10      The employment agreement asserts good reason.  1.6(b)

11  asserts loss of operational control.  And under that

12  provision, 1.6(b), I think it's double ii, the remedy, we've

13  argued to you -- and you denied it.  I don't want to reargue

14  the motion, but I'm just explaining why we want it in.

15      The remedy, we believe, is this:  We won under that

16  provision.  And, therefore, certainly the shareholders'

17  claims should be thrown out.  And so we're just putting this

18  in the record for that reason.

19      I'm not asking that it be admitted.  We accept your

20  ruling, your Honor.  But just in the case there's a verdict

21  against us, we want it in the record for the Court of

22  Appeals.

23              THE COURT:  Anything you want to say, Mr. Goldfarb?

24              MR. GOLDFARB:  Yes, your Honor.  One is that we

25  briefed this to you in motions in limine.  You granted the

1    motion.  And I would reincorporate here on the record all of

2    the points that we set forth.

3        But I have one other sort of procedural concern.  The

4    parties here have agreed that this was a confidential

5    mediation.  They signed one of those agreements.  Putting

6    this confidential mediator's recommendation in the court file

7    without sealing it has the effect of making it a public

8    record, directly contrary to the agreement of the parties

9    and, I think, Washington arbitration statutes.  Although I

10   need to go back and check that before I represent it to the

11   court.  But I think that's correct.

12       And so we don't think it should come in at all.  We think

13   you've ruled on it.  But to the extent you were going to

14   embrace it in the court record, it shouldn't be made into a

15   document that would be accessible to the public.

16            THE COURT:  Okay.  Well, let's understand what we're

17   doing.  I thought we were marking it as an exhibit, one that

18   the court was going to refuse based upon prior rule.  It then

19   becomes an exhibit.  The exhibits are not posted on the court

20   record.  After the case is finished, after your time for

21   appeal has run, you get it all back.  So it isn't open to the

22   public for review.

23            MR. GOLDFARB:  Very good.

24            THE COURT:  So is there some other safeguard that you

25   want me to use?

```
1          MR. GOLDFARB:  No, there's not.  I would just
2    reincorporate our substantive arguments, but I won't trouble
3    the court with making them again on the record here.
4          THE COURT:  All right.  I think we had a reporter
5    running at the time I made the prior ruling.  But in case we
6    didn't, the contract called for a mediation.  You went to a
7    mediator.  You signed an agreement saying that it was
8    confidential.  The mediator provided a nonbinding
9    recommendation to you.  The court rule indicates that any
10   settlement discussions should not be brought before the
11   court.
12      And so as I see it, I'm enforcing what it is you agreed to
13   do, which is keep it to yourselves.  And whether or not the
14   mediator sided with one side or the other, once you bring it
15   to a jury trial, doesn't have any influence on that.  And
16   I've let you put into the record that you fulfilled the steps
17   that you were to take.  Whether you followed the mediator's
18   recommendations or not is neither here nor there.
19      So maybe someday, a different time, a different place,
20   you'll explain to me why anybody would pay for a nonbinding
21   mediation.  But that's not for me to decide.
22         MR. SULKIN:  I'm not sure I could either.  The only
23   other request I would have, your Honor, is to get back my
24   marked up, ugly Calliari transcript.  I'll bring you a clean
25   one tomorrow.
```

1          THE COURT:  I think I gave it back.

2          MR. SULKIN:  Did you give it back?  Thank you.  I

3    appreciate it.

4          THE COURT:  Yes, I don't want it either.

5       All right.  So let's give this a number, please.

6          THE CLERK:  289.

7          THE COURT:  All right.  289 has been offered and

8    rejected for the reasons stated.

9       Okay.  Anything else we need to take care of before

10   tomorrow?

11         MR. GOLDFARB:  If we were to finish, hypothetically,

12   tomorrow with the evidence and whatever tweaks there were on

13   the documents, just in terms of time, when would the court

14   want to sit down and talk about that, or would the court want

15   to do that at all?

16         THE COURT:  Oh, talk about the tweaks on your jury

17   instructions?

18         MR. GOLDFARB:  Yes.

19         THE COURT:  Well, I mean, I can't do it at the same

20   time I'm running a trial.  So, you know, we would finish.  We

21   would figure out a time to do it.  You know, I can't remember

22   whether there's a lunch hour -- I think I have a meeting

23   tomorrow during lunch tomorrow.  So we just have to find some

24   time to do it.

25         MR. GOLDFARB:  It's just that it would be easier to

```
1    get the closing argument thoughts together if we knew.
2            THE COURT:  I have another pretrial conference coming
3    up tomorrow at 4 o'clock.  So we'll find the time to do it.
4    Maybe we're going to do it Friday morning.  Maybe you're
5    going to tell me you don't have any changes.
6            MR. GOLDFARB:  It's possible.  If we got this done
7    mid-afternoon, could we work in a few minutes tomorrow
8    afternoon, if the evidence was concluded?
9            THE COURT:  I don't know what you mean.
10           MR. GOLDFARB:  If we get all the testimony in
11   tomorrow before your pretrial conference, that might be a
12   window for us to address this.
13           THE COURT:  What, are you worried I'm going to go hit
14   a bucket of balls or something instead of working with you?
15   Counsel, I'm going to work straight through, okay?  I'll be
16   getting here early in the morning, and I'm sitting here with
17   you all today.  I've only got so many hours.  But you have
18   them all until 4 o'clock tomorrow.
19       When I've got the crew in, please don't tell them that you
20   finished early, because I bumped their trial because you told
21   me you weren't going to finish early.
22           MR. SULKIN:  Not a peep.
23           THE COURT:  Not a peep.  All right.  Have a good
24   evening.  We'll see you tomorrow.
25           (Proceedings adjourned.)
```

1                    C E R T I F I C A T E

2

3

4            I, Kari McGrath, CCR, CRR, RMR, Official Court

5     Reporter for the United States District Court in the Western

6     District of Washington at Seattle, do hereby certify that I

7     was present in court during the foregoing matter and reported

8     said proceedings stenographically.

9            I further certify that thereafter, I have caused

10    said stenographic notes to be transcribed under my direction

11    and that the foregoing pages are a true and accurate

12    transcription to the best of my ability.

13

14

15                        /S/  KARI McGRATH

16                        Kari McGrath, CCR, CRR, RMR

17                        Official Court Reporter

18

19

20

21

22

23

24

25