1        UNITED STATES DISTRICT COURT

2     WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    PATRICK CALLIARI,                )
     individually and as              )
4    Representative of the            )   Case No. C08-1111MJP
     Former Shareholders of GCI       )   (Consolidated with
5    INVESTMENTS, INC., a             )   C08-1112MJP)
     Washington Corporation,          )
6                                     )   SEATTLE, WASHINGTON
        Plaintiff,                    )   December 10, 2009
7                                     )
     v.                               )
8                                     )
     SARGENTO FOODS, Inc.,            )
9                                     )
                                      )
10   Defendant/Counterclaim          )
     Plaintiff,                       )
11                                    )
     v.                               )
12                                    )
     PATRICK C. CALLIARI, et          )
13   al.,                             )
                                      )
14      Counterclaim Defendants.     )

15            VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE MARSHA J. PECHMAN
16            UNITED STATES DISTRICT JUDGE

17   APPEARANCES:

18    For the Plaintiff:    MR. MICHAEL GOLDFARB
                            MR. BRAD FISHER
19
      For the Defendant:    MR. ROBERT SULKIN
20                          MR. DAVID LINEHAN

21
      Reported by:          Kari McGrath, CCR, RMR, CRR
22                          Federal Court Reporter
                            206.370.8509
23                          kari_mcgrath@wawd.uscourts.gov

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by Reporter on computer.

```
1                          EXAMINATION INDEX

2    EXAMINATION BY                                         PAGE
      PATRICK CALLIARI     CONTINUED CROSS-EXAMINATION        9
3                          BY MR. SULKIN
      MIKE MCEVOY          DIRECT EXAMINATION                75
4                          BY MR. FISHER
                           CROSS-EXAMINATION                128
5                          BY MR. LINEHAN
                           REDIRECT EXAMINATION             157
6                          BY MR. FISHER
                           RECROSS-EXAMINATION              161
7                          BY MR. LINEHAN
      GEORGE HOFF          DIRECT EXAMINATION               165
8                          BY MR. LINEHAN
                           CROSS-EXAMINATION                191
9                          BY MR. GOLDFARB

10

11

12                          EXHIBIT INDEX
     EXHIBITS ADMITTED                                     PAGE
13      260                                                  28
        259                                                  29
14      63                                                   69
        41                                                   84
15      51                                                  115
        31                                                  123
16      211                                                 144
        47                                                  151
17      271                                                 178

18

19

20

21

22

23

24

25
```

```
 1                    PROCEEDINGS
 2   _____

 3        THE COURT:  Please be seated.  Counsel, I understand

 4   there's some issues you want to take up with me before we

 5   bring our jury out?

 6        MR. GOLDFARB:  Yes, your Honor.

 7        MR. SULKIN:  Yes, your Honor.  I had one relating to

 8   the questioning of Mr. Calliari.  And I wanted to play a tape

 9   for substantive evidence and wanted to get a pre-ruling from

10   you.  And I can give you the line.  There were interposed

11   objections, your Honor.

12        THE COURT:  Okay.

13        MR. SULKIN:  The question is at page 54, lines 2

14   through 4, and the answer is at line 19 and 20.  And there

15   was some colloquy between Mr. Goldfarb and myself between.

16        THE COURT:  Page 54, lines 2 through 4.

17        MR. SULKIN:  And 19 through 20.

18        THE COURT:  All right.  Let me read that.

19      All right.  I've read it.  Mr. Goldfarb.

20        MR. GOLDFARB:  Yes, your Honor.  I finished that

21   section with a motion to strike, which I would renew before

22   the court now.  Risk was not defined in the question.  You

23   know, it could be a fifty dollar issue or it could be a 5

24   million dollar issue.  And that objection was clearly noted

25   at the time.
```

1    I tried to specify it for Mr. Sulkin.  He didn't want to

2    talk about it.  Moved to strike.  But I think the question

3    was defective in form because of the breadth of it.

4         THE COURT:  So the question is that it's vague?

5         MR. GOLDFARB:  Yes, your Honor.

6         THE COURT:  Okay.  Anything you want to say,

7    Mr. Sulkin?

8         MR. SULKIN:  I do, your Honor.  The question is not

9    vague.  It didn't matter whether it was a dollar or five

10   million.  His answer was:  I did not have the obligation to

11   put Portionables at risk for the benefit of the shareholders.

12      And so, in effect, it works the other way.  I mean, it

13   didn't matter.  And he understood the context of the

14   question, your Honor.

15        THE COURT:  The objection is overruled.

16        MR. SULKIN:  Thank you, your Honor.

17        MR. GOLDFARB:  The other issue, your Honor, is this:

18   In opening statement and briefly in Mr. Gentine's testimony

19   there were references to whether the May 23, 2008 letter was

20   served properly to constitute notice under the employment

21   agreement.  Does your Honor recall that?

22        THE COURT:  Yes.  They wrote directly to the lawyers

23   rather than to --

24        MR. GOLDFARB:  Yes, your Honor.  And I think it was

25   done by e-mail.  I was frankly surprised to hear that in

1   opening statement, because throughout this litigation, to my

2   knowledge, that had never been asserted as any sort of

3   defense or issue.  And specifically in the pretrial order,

4   under defenses, it's not identified under facts.  It's not

5   identified under legal issues.  It's not identified.  So it

6   is a surprise to us that that's being asserted as a defense.

7       It's come in before the jury, and you'll see in the

8   supplemental instructions that were provided, we offer some

9   clarification on that.  But I checked with Mr. Sulkin this

10  morning to find out if he thought it was a live issue in the

11  case.  He indicates that it is.  So I'm bringing it to the

12  court's attention to see if we can get closure on where we

13  were on that.

14          THE COURT:  So you've proposed a -- which instruction

15  is it that you are asking for?

16          MR. FISHER:  It looks like you had it printed off.  I

17  brought additional paper copies.

18          THE COURT:  I have a copy here.  Just tell me what

19  page it's on.

20          MR. GOLDFARB:  It's on page 3, your Honor.

21          THE COURT:  Can I take a look at the e-mail itself?

22  Because if I recall correctly, it says something like, please

23  accept this as our notice of --

24          MR. FISHER:  It's Exhibit 14.

25          THE COURT:  Okay.  I've got it.  Anything else you

1    want to say about it?

2              MR. GOLDFARB:  No, your Honor.

3              THE COURT:  Okay.  Mr. Sulkin.

4              MR. SULKIN:  Your Honor, the issue of notice is not a

5    defense.  It's part of their claim.  I mean, in order to

6    prove a breach, they have to prove that they in fact gave

7    proper notice.  They didn't.  Under the terms of the

8    agreement, it has to be by registered or certified mail and

9    to Mr. Gentine personally.

10        Now, there may be other reasons not to deal with it.  The

11   other issue is, we've been trying the issue.  And to raise it

12   the last day of trial seems to be a little unfair.  As you

13   know, once parties agree to try an issue, whether or not it's

14   in the pretrial order, it's in the case.

15        They have an affirmative obligation to prove notice, which

16   is why they put the letter in in the first place.  And then

17   we have a right to say that that's not notice under the terms

18   of the contract.

19        And as far as taking this as our acceptance, Mr. Gentine

20   said:  We never waived our right to notice.  Now, they can

21   argue it to the jury one way or another.  But there isn't

22   evidence that Mr. Henkle or Mr. Gentine waived their right to

23   the notice provision under the contract.

24              THE COURT:  Anything else, Mr. Goldfarb, that you

25   want to say?

1    MR. GOLDFARB:  Yes, your Honor.  It was mentioned in
2    opening statement.  We certainly didn't consent to that.  And
3    then Mr. Gentine volunteered it in his testimony.  And we are
4    not trying that issue by consent, which is one of the reasons
5    why I'm raising it, to make sure there's clarity on it.
6       Now, there's nothing in the pretrial order about it, and
7    they accepted the letter, and the case proceeded accordingly,
8    you know, since the time of this notice letter without this
9    ever being asserted, to my knowledge, until opening
10   statement, which is the very first time I ever heard that.
11      THE COURT:  This isn't a viable issue.  If it had
12   been a viable issue, it should have been litigated.  It
13   should have had some notice as to what is going on.
14   Mr. Goldfarb could have Mr. Henkle deposed as to whether or
15   not the lawyers made some agreement by saying, please accept,
16   and nobody speaks up.  It seems to me that there's some
17   obligation.  You can't contend that everybody didn't know
18   what the allegations were and how they were doing it.
19      MR. SULKIN:  Okay, your Honor.
20      THE COURT:  All right.  We're done.  Anything else?
21      MR. GOLDFARB:  Not from us, your Honor.
22      THE COURT:  Okay.  Then let's talk about what we have
23   in the bank.  Plaintiffs used 169 minutes yesterday, for a
24   balance of 409.  And defendants used 111, with a balance of
25   557.  And we lost about 22 minutes that the court absorbs.

1        Okay.  Are we ready to bring out our jury?

2            MR. SULKIN:  Yes, your Honor.

3            THE COURT:  Okay.

4            MR. GOLDFARB:  May Mr. Calliari return to the stand?

5            THE COURT:  Sure.  Please come up, sir.

6            (Jury enters courtroom.)

7            THE COURT:  Please be seated.  Good morning.  Did

8    anybody notice the murals that are in the building on the

9    first, second, and third floor?  Yes?  No?  What do they

10   represent?  Anybody got a guess?

11           JUROR:  The general populous, I guess.

12           THE COURT:  Okay.  Well, in fact, that's correct.  I

13   mean, the pictures that are on the first floor are real

14   people who live in the Western District of Washington.

15       And what about the chairs on the second floor?  Anybody

16   take a look at those?  Okay.  Well, at noon today, you go

17   take a look and see what you think.  If you stand back in the

18   lobby, you can see all three floors.  And, actually, there's

19   a poster in the jury room of the murals that are actually

20   quite famous.  Many people come to look at them.

21       And, in addition, when you look at them, the people on the

22   first floor, which are in color, that painting was done by

23   spray can paint.  So if you look at it, when you think of the

24   detail that's there, how do you do that by tagging?

25       All right.  Just a little bit about our courthouse.  Let's

```
 1   return to our matter at hand.  Mr. Sulkin.
 2                     PATRICK CALLIARI,
 3   being previously duly sworn, the witness was recalled and
 4   further testified as follows:
 5                     CONTINUED CROSS-EXAMINATION
 6   BY MR. SULKIN:
 7   Q   Good morning, Mr. Calliari.
 8   A   Good morning.
 9   Q   Prior to your selling Portionables to Sargento, it's fair
10   to say that Portionables was not making a profit to your
11   knowledge in 2006?
12   A   Yes.
13   Q   Were you making profits in 2007?
14   A   No.
15   Q   In other words, I'm correct?
16   A   I beg your pardon?
17   Q   I am correct; you were not making profits in 2007, prior
18   to the sale?
19   A   That's what I said, yes.
20          THE COURT:  I'm sorry.  We still don't have a clear
21   answer to that question.  Mr. Sulkin, let's try again.
22   BY MR. SULKIN:
23   Q   Was Portionables making profits in 2007?
24   A   No.
25   Q   Thank you.  And that was because the South Dakota plant
```

1   did not have enough customers, isn't that right?

2   A    Yes.

3   Q    And Unilever was a major customer at the time?

4   A    Yes.

5   Q    In fact, it was taking 100 percent of the product out of

6   Bellingham?

7   A    Yes.

8   Q    And that was important to Portionables?

9   A    Yes.

10  Q    Take a look, if you would, at Exhibit 215.

11          MR. SULKIN:  This has already been admitted, your

12  Honor.

13  Q    If you would let me know when you have that in front of

14  you, I would appreciate it.

15  A    I do.

16  Q    Okay.  This is a document you gave to Sargento prior to

17  the acquisition, correct?

18  A    I believe it is.

19  Q    Okay.  And if we look along that first line, it says 4

20  000, and it says, sales.  Do you see that?

21  A    Yes.

22  Q    And for year 2005, it's $15,466,000?

23  A    Yes.

24  Q    And that's an actual number, correct?  I mean, those are

25  your actual sales for the year?

1   A    Yes.

2   Q    All right.  And then for 2006, $26,165,000, was that an

3   actual figure or a projection?

4   A    I'm not sure.

5   Q    Okay.

6   A    I'm not sure what time it was given to Sargento.

7   Q    Fair enough.  2007, $45,233,000 in sales, that was a

8   projection?

9   A    That was a projection.

10  Q    Okay.  In 2008, $74,950,000 in sales, again, that was a

11  projection?

12  A    Yes.

13  Q    Take a look at Trial Exhibit 15.  This bottom e-mail is

14  from Mr. Beard to Mr. Gentine.  And Mr. Beard was

15  representing you, is that correct?

16  A    Yes.

17  Q    Okay.  And you saw this before it went out, correct, or at

18  the time?  It was CC'd to you?

19  A    Yes.

20  Q    So it's accurate?

21  A    Yes.

22  Q    All right.  The third paragraph, operational control, do

23  you see that?

24  A    Yes, I do.

25  Q    You were requesting from Mr. Gentine, quote, full, end

```
 1  quote, operational control of Portionables, were you not?

 2  A   Yes.

 3  Q   In fact, Mr. Gentine did not agree to that, did he?

 4  A   He agreed to a partial.  He agreed to operational control

 5  with some limitations.

 6  Q   Thank you.  Let's take a look at Trial Exhibit 2.  Do you

 7  have that in front of you?

 8  A   I do.

 9  Q   Okay.  You signed this document, right?

10  A   I did.

11  Q   Okay.  Take a look, if you would, under recitals, B, at

12  the top there?

13  A   Yes.

14  Q   The corporation, meaning Sargento, desires to employ

15  executive, meaning you, right?

16  A   Yes.

17  Q   Executive desires to accept such employment on the terms

18  and conditions set forth in this agreement, correct?

19  A   Yes.

20  Q   So we can agree that you were an employee of Sargento?

21  A   Under certain terms and conditions.

22  Q   Understood.  But you were an employee?

23  A   Under certain terms and conditions.

24  Q   Well, let's look at those.

25  A   Okay.
```

```
 1   Q   Let's go to duties, paragraph 3.  And you agreed to this,
 2   right?
 3   A   Yes.  I signed it.
 4   Q   Executive, meaning you, shall serve as president of
 5   Portionables division of the corporation and will, under the
 6   direction of the corporation's president and chief executive
 7   officer, use his reasonable best efforts to perform his
 8   duties as assigned by the president and chief executive
 9   officer.
10       Do you see that?
11   A   I do.
12   Q   And the chief executive officer is Mr. Gentine?
13   A   Yes.
14   Q   And so you agreed that you were to act under the direction
15   of Mr. Gentine?
16   A   Yes.  But we have to read the whole paragraph.  You cannot
17   stop at the beginning, because this was under certain terms
18   and conditions.  So if we go to the conditions, I will agree
19   to the terms.
20   Q   We'll get there, sir.  But you agreed to work under the
21   direction of Mr. Gentine?
22   A   Under certain terms and conditions.  Again, as I just -- I
23   cannot say yes or no, because there's no accurate answer.
24   Q   He was your boss?
25   A   After the earnout period.
```

1   Q    So you are telling me that you've never called him your

2   boss during the earnout period?

3   A    He had decision over mine under certain terms and

4   conditions and under certain limitations that are in this

5   purchase agreement.

6   Q    And it also says here that you will use your best efforts

7   to perform duties as assigned by him, isn't that right, sir?

8   A    Yes, but the duties will be after the earnout period.

9   Q    It doesn't say here, sir, that he can only assign you

10  duties after the earnout period in that sentence, does it,

11  sir?

12  A    Not in that sentence.  But if we turn the page, in

13  incentives, it's clarified.

14  Q    So we're clear, Mr. Gentine could not assign you duties

15  during the earnout period, is that correct?

16  A    With the limitations that are in the sales and purchase

17  agreement.

18  Q    And, so, sir, when you signed the agreement, the offer, on

19  August 16, 2008, you then signed that under your own volition

20  and not because Mr. Gentine asked you to do it; is that your

21  testimony, sir?

22  A    I signed my employment agreement.

23  Q    My question's different.  Sorry if it wasn't clear.

24       When you signed the offer sheet on August 16th to

25  Unilever, is it your testimony that Mr. Gentine did not have

1   the authority to ask you to sign that?

2   A   He asked me to sign it.  It was my decision to sign it.

3   And I did sign it.

4   Q   So your testimony is, he did not have the authority to

5   tell you to sign it; you signed it on your own volition?

6   A   I agreed to sign it.

7   Q   And you agree then to accept the consequence of your

8   decision to sign that agreement, do you not, sir?

9   A   It wasn't an agreement.  It was an offer.

10   Q   You agreed to accept the consequences of your decision to

11   sign that offer?

12          MR. GOLDFARB:  Objection, your Honor.  Argumentative.

13          THE COURT:  Overruled.

14          MR. SULKIN:  May I reask the question?  I didn't hear

15   his answer, your Honor.

16   Q   You agreed to accept the consequences of your decision to

17   sign that offer, isn't that true, sir?

18   A   Yes.

19   Q   Let's go to the next page.  It says, third line:  Until

20   the contingent payment due date, under the purchase

21   agreement, executive shall serve as president of

22   Portionables, Inc. and shall have operational control of

23   Portionables' business subject to the limitations in the

24   purchase agreement throughout the employment period, right?

25   That would include both the earnout period and the nonearnout

1   period; would you agree with me?

2   A   Yes.

3   Q   Throughout the employment period, executive shall have

4   duties, responsibilities, and obligations that are not

5   inconsistent with that of a division president and/or

6   executive officer of the corporation.  Do you see that?

7   A   Yes, I see that.

8   Q   But your powers were that of a division president of the

9   company, is that correct?  You knew that?

10  A   I knew that I had operational control over the business.

11  Q   I'm sorry if my question wasn't clear enough.  You

12  understood that throughout your employment period you had

13  duties and responsibilities of that of a division president

14  at Sargento, isn't that true?

15  A   Executive officer of the corporation.

16  Q   And you met in February with Mr. Delahunt.  Do you recall

17  that testimony?

18  A   Yes, I did.

19  Q   You met with Mr. Delahunt in February of '07 to talk about

20  a potential sale, did you not?

21  A   I'm sure I met him at the first visit.

22  Q   Right.

23  A   It was in January.  It was an introductory visit.  So I

24  did not talk about my contract with him.

25  Q   You met him in January and also at a meeting in Wisconsin

1   where you met other division heads, did you not?

2   A   I did, yes.

3   Q   And you knew that the division heads at Sargento had a

4   boss, who is Lou Gentine, did you not?

5   A   Yes.

6   Q   If you would look at Trial Exhibit 2, page 7, sir.  We're

7   going to quickly shift to page 8, but you'll see that

8   paragraph 7 is a termination provision.  And if we flip the

9   page to page 8 -- I'm sorry.  Leave it at page 7, (a)(i),

10  under termination, cause, do you see that?

11  A   Yes.

12  Q   Now, you were not fired for cause by Sargento; we all

13  agree on that?

14  A   Yes.

15  Q   Okay.  But I want to focus on this section for just a

16  minute.  It says:  Cause.  For purposes of this agreement,

17  cause shall mean and only mean -- and let's skip down to (e).

18  Do you see that?  There are a bunch of reasons.  And (e)

19  says:  A material failure to perform the duties set forth in

20  this agreement to the reasonable satisfaction of the

21  president and the chief executive officer, which continues

22  for a period of 30 days.  And it goes on.  Do you see that?

23  A   Yes.

24  Q   So you understood that you had to work in a manner to meet

25  the reasonable satisfaction and expectations of Mr. Gentine?

1    A    Yes.

2    Q    Now, we talked a little bit about the shareholders of

3    Portionables.  And I think Mr. Ioannides testified that he is

4    from France.  There are other shareholders.  There were other

5    shareholders of Portionables, is that right?

6    A    Yes.

7    Q    Some of them live in Vancouver.  I think one lives in

8    Bellevue.  Fair enough?

9    A    In Bellevue?  I don't know.

10   Q    Some of them live in Vancouver?

11   A    Vancouver?

12   Q    Let me ask it this way:  Do any live in the Seattle area?

13   A    I do.

14   Q    Any others?

15   A    Oh, yes, of course, yeah.

16   Q    Okay.  Any live in Vancouver?

17   A    Yes, shareholders live in Canada.

18   Q    Thank you.  Let's look at Trial Exhibit 201.

19         MR. SULKIN:  Again, this has been admitted, your

20   Honor.

21   A    It does not appear that I have it.

22   BY MR. SULKIN:

23   Q    I'm sorry.  If you could hand it to him, I would

24   appreciate it.

25   A    No. 207?

1  Q   Do you have that, Mr. Calliari?

2  A   I do.

3  Q   I want to focus first on the bottom e-mail, July 23, '07.

4  Do you see that?  And it says that on July 23, '07,

5  Mr. Gentine wrote:  Patrick, can you send me the information,

6  slash, details of our potential expanded role that we

7  presented to Unilever?  It would help me be more aware of the

8  various issues that were addressed.  Thanks.  Lou.

9      Do you see that?

10  A   I do.

11  Q   Is it fair enough to say that certainly by July 23, 2007,

12  at least you understood that Mr. Gentine did not have

13  information and details concerning any Unilever proposal?

14  A   He asked me to send him more information.  He got some

15  information from Mike Gordy.  I don't know.

16  Q   Okay.  But he didn't have all the information.  That's why

17  he was asking you to provide it to him.  That's what you

18  understood?

19  A   Yeah, if I could provide him additional information.

20  Q   And you did get back to him, did you not?

21  A   Yeah, that's what the e-mail says.

22  Q   All right.  Let's go look at that.  This is an e-mail from

23  you to Mr. Gentine, CC'ing Mr. Gordy.  Do you see that?

24  A   Yes.

25  Q   And I should say, you chose to CC Mr. Gordy on that,

1    didn't you?

2    A   Well, Mr. Gordy is the one that started the communications

3    with Unilever.  And Mr. Gordy brought to my attention what

4    Unilever was looking for.  So I got involved secondhand.

5    Q   I'm not criticizing you.

6    A   Not firsthand.  Secondhand.  So, yes, it was -- Mike Gordy

7    was a part of the communications, yes.

8    Q   I'm not criticizing you for it.  I just want to make

9    clear, you decided to type in mikegordy@sargento.com and CC'd

10   him on this e-mail, did you not?

11   A   Yes.

12   Q   Okay.  Let's go to the first line:  I discussed the

13   following with Steve Boland, slash, Unilever.

14       And who is Mr. Boland?

15   A   He is the director of contract manufacturing at Unilever.

16   Q   So you're telling Mr. Gentine that you discussed the

17   following with Mr. Boland on June 8th after a conference call

18   meeting between Mr. Hoff, Mike Gordy, Larry Riley, Tom Kyle,

19   Ray Wyandt, and yourself, correct?

20   A   Yes.

21   Q   And just so I have this right, Mr. Hoff is a Sargento

22   employee, correct?

23   A   Yes.

24   Q   Mr. Gordy is a Sargento employee, correct?

25   A   Yes.

1   Q   Misters Riley, Kyle, Wyandt, and yourself were working for

2   the Portionables division of Sargento?

3   A   At the time we were called a subsidiary.

4   Q   I'm sorry?

5   A   At the time we were called a subsidiary.

6   Q   Fair enough.  You are working for Portionables at that

7   time?

8   A   Yes.

9   Q   And just so I'm clear, you didn't say to Mr. Hoff and

10  Mr. Gordy:  Please, get out of this meeting.  This is my

11  call.  I don't want you here.

12      You didn't say anything like that, did you, sir?

13  A   No.

14  Q   Okay.  You had that meeting, and then you made the call to

15  Mr. Boland, didn't you?

16  A   Yeah.  It was suggested that I would be the one to make

17  the call.

18  Q   Well, you were the one that decided to make the call,

19  didn't you, sir?

20  A   I did make the call.  But in prior discussions over the

21  phone, it was discussed that I will be the one that would

22  make the call.

23  Q   No one forced you to make the call; it was your decision?

24  A   No one forced me.

25  Q   Okay.

```
 1   A    But it was suggested to me that I should make the call.
 2   Q    And one of the things you told Mr. Gordy -- let's go down
 3   to the fourth line, conversion cost, do you see that?  I'm
 4   sorry.  One thing you told Mr. Boland was that Portionables
 5   was willing to reduce the price to Unilever?
 6   A    Could you repeat your question, please?
 7   Q    Sure.  One of the things you told Mr. Boland was that
 8   Portionables was willing to reduce its price to Unilever to
 9   prevent Unilever from self-manufacturing?
10   A    Yes.
11   Q    And you didn't call Mr. Gentine and say:  Mr. Gentine, I
12   am not doing this.  I do not believe in this.
13        You didn't do that, did you, sir?
14   A    I expressed my concern.  I told Mr. Gentine that I did not
15   want to do it.  I didn't like to do it.  But ultimately I did
16   it.  But I didn't want to do it.  I didn't think it was a
17   good idea to lower the price.
18   Q    It doesn't say anything in here to Mr. Gentine that you
19   didn't agree with it, does it, sir, in this e-mail?
20   A    No.  This is an e-mail that summarizes a certain event at
21   a certain point in time.  It doesn't summarize or it doesn't
22   talk about previous conversations that I had with
23   Mr. Gentine.
24   Q    I see.  So your testimony is you had previous
25   conversations with Mr. Gentine on this subject; is that your
```

1    testimony?

2    A    I don't know when exactly, but I must have had a

3    conversation with Mr. Gentine.

4    Q    Is it your testimony that he ordered you to make that

5    proposal?

6    A    I expressed my concern about -- no, he did not order me.

7    Q    Thank you.  That was your decision at the end; is that

8    your testimony?

9    A    I decided at the end to make the phone call, yes.

10   Q    Thank you.  Let's go to the top e-mail, if we could.  You

11   didn't claim loss of operational control at this point in

12   time, did you, sir?  You never wrote anything to that effect

13   to Mr. Gentine either by e-mail, letter, or any other way?

14   A    No.  I was trying to -- no, I didn't.  I was trying to

15   stay -- I had just been acquired.  And it was an awkward

16   situation.  So, no, I didn't.  I wanted to find a way to make

17   it work.

18   Q    Well, if you agreed to do the 35 cents, that was your

19   decision, and there was no loss of operational control, fair

20   enough?

21   A    Yeah.

22   Q    Okay.  Then you write to Mr. Gentine again, do you not, on

23   the 26th, 12:05?

24   A    Yes.

25   Q    And you write:  Just talked to Steve Boland about the

1   increase volume project and meeting him next month.

2       Do you see that?

3   A   Yes.

4   Q   He is looking for an additional 5 to 6 pounds off the 35

5   that we proposed last June.  Then you write:  Unilever has

6   not approved the capital expenditures for in-house yet.  Very

7   expensive, obviously.

8       Do you see that?

9   A   Yes.

10  Q   Then you write:  So there is room for negotiations, and

11  Steve would like to discuss this project on the phone next

12  August 2nd at 4 o'clock EST.  Isn't that right?

13  A   Yes.

14  Q   You wrote that there was room for negotiations, isn't that

15  right?

16  A   Yes.

17  Q   And then you end the e-mail to Mr. Gentine:  Have a good

18  weekend, and let's talk about this before next Thursday.

19  Right?

20  A   Yes.

21  Q   No mention at all that you are concerned about lowering

22  the price or negotiating further with Mr. Boland?

23  A   Well, we had initiated the process.  So I was going to go

24  along and see how far these negotiations would go.  But this

25  was only talk, no --

1   Q    I'm sorry if my question wasn't clear enough, sir.  My

2   question is just:  No mention in this e-mail of any concerns

3   you had about negotiating further with Unilever?

4   A    No, not in this e-mail.

5   Q    In fact, you were willing to do the deal that was set

6   forth in Exhibit 201, weren't you?

7   A    I would have gone along with this.  I wasn't very happy

8   about it, but I would have.

9   Q    So you were willing to do that deal?

10  A    But, again, you know, we have to look at the -- it was a

11  reduction, but we will keep the same period of time, the same

12  -- we have to get into more detail.

13  Q    A reduction to 35 cents a pound was acceptable to you, was

14  it not, sir?

15  A    It was acceptable.

16  Q    Take a look, if you would, at Exhibit 203.  This is a

17  draft of a letter you sent to Mr. Boland, is it not?

18  A    Yes.

19  Q    And it sets forth your proposal, isn't that right?

20  A    Yes.

21  Q    And you signed this letter and you sent it to Mr. Boland?

22  A    I did.

23  Q    Let's take a look at Exhibit 270, please.  The bottom is

24  an e-mail from Debbie, who you understood to be Mr. Gentine's

25  secretary?

A    Yes.

Q    She sends this to you, and she says -- this is on August

16th.  She writes:  Patrick, attached is the letter to Steve

Boland at Unilever.  A copy should go to Mike Pusterla,

supply manager, contract manufacturing, at the same address

shown for Steve Boland.

    And she goes on.  Do you see that?

A    Yes.

Q    And you wrote back.  Would you read what you wrote back?

A    I sent an overnight priority FedEx to Steve Boland and

Mike Pusterla this morning.  Thanks.

Q    And you sent that to her, Mr. Gordy, and Mr. Gentine?

A    Yes.

Q    And you were thanking them for sending you that letter?

A    I say, thanks, yes.

Q    You were thanking them.  You didn't say:  I signed it, but

I didn't want to.  You wrote:  Thanks?

A    Yes, of course.  But in a telephone conference that I have

before with Mr. Gentine, Mr. Hoff, Mr. Gordy, and myself, we

talk about this offer.  And I was -- Mr. Gentine said:

Patrick, I want you to send it.  I said:  Well, this is your

offer.  Why do you want me to send it?  He said:  No, you're

the president of Portionables.  I want you to send it.

    So I went along and I sent it.  But I didn't believe that

this would go anywhere anyway.

1    Q    Let's take it your way.  Let's take your version of the

2    story, not Mr. Gentine's.  You sent it because you understood

3    Mr. Gentine was your boss and you worked for him, and he

4    asked you to send it; is that what you're telling us?

5    A    No, because I wasn't within the team.  You know, it was a

6    team of four or five people.  And everybody wanted to do it

7    except me.  And I was just being acquired.  So I didn't want

8    to get into a confrontational issue.  So I say, 35 cents is

9    not great, but it was okay.

10   Q    And so you signed it?

11   A    So I signed it.

12   Q    And you never said, I'm losing operational control, did

13   you?

14   A    No, not at this point.

15   Q    Let's take a look at 260.  Sir, this is an e-mail from

16   Mr. Kyle, who worked for you, to you.  Do you see that?

17   A    Yes.

18   Q    And this was received by you in the normal course of

19   business, is that right?

20   A    Yes.

21        MR. SULKIN:  Your Honor, I offer this exhibit for the

22   purpose of showing notice to him of Unilever's reaction to

23   the August 16th offer.

24        MR. GOLDFARB:  The document is hearsay, your Honor.

25   And I don't understand why notice is an issue with regard to

1    this document.

2          THE COURT:  Let me understand.  The response comes

3    from Unilever.  It's not addressed to Mr. Calliari.  And it

4    is forwarded on.  Is that the issue?

5          MR. SULKIN:  If I may, your Honor, It's from

6    Mr. Kyle, who works for Mr. Calliari.  And what it shows is

7    what Unilever is doing in response to that letter.  And it's

8    really that last chart that shows the projected poundage of

9    product.  And the point is, I have follow-up questions to

10   that, which I don't want to say in front of the jury.

11         THE COURT:  Document 260 will be admitted, ladies and

12   gentlemen, but with the limitation that it's not offered for

13   the truthfulness of the information contained in it, but the

14   fact that it was sent.

15         (Exhibit(s) 260 admitted.)

16   BY MR. SULKIN:

17   Q   Mr. Calliari, this is an e-mail from Mr. Kyle to you.  Do

18   you see that?

19   A   Yes.

20   Q   And you received this September 4, 2007, correct?

21   A   Yes.

22   Q   And in it, he writes, in the first paragraph:  Hi, here is

23   the '08 volume estimates from UL, meaning Unilever.

24       Do you see that?

25   A   Yes.

1  Q   And if we go to the last page of the document, there is a

2  chart?

3  A   I can see it, yes.

4  Q   And if we go to the last column, it shows that Unilever's

5  projections for the year, as of September 4th, is over 28

6  million pounds?

7  A   Yes.

8  Q   And that was good?

9  A   Yes.

10 Q   And you didn't complain or say anything at this point when

11 you received that, did you, sir?

12 A   We received almost on a monthly basis updated schedules

13 from Unilever, or even sometimes they revise the forecast

14 weekly.  It's just the normal course of business.

15 Q   You didn't call Unilever and say:  We're not going to do

16 the deal?

17 A   Why would I do that?

18 Q   My point exactly.  Let's take a look at Exhibit 259.

19 Don't publish it, please.

20        MR. SULKIN:  Your Honor, this is the same issue.

21        THE COURT:  259 will be admitted, with the same

22 limitation.

23        (Exhibit(s) 259 admitted.)

24 BY MR. SULKIN:

25 Q   Let me know when you have that in front of you, sir.

1   A   I do.

2   Q   This is from Tom Kyle to you.  Again, Mr. Kyle worked for

3   you, correct?

4   A   Yes.

5   Q   Dated Monday, October 29th.  And at the bottom he writes:

6   Please find attached a summary of the Unilever visit from

7   last week.

8       So you knew that Unilever was visiting Bellingham?

9   A   Yes.

10  Q   All right.  If we turn the page, go to that big second

11  paragraph.  He writes:  Plant identified, and Unilever agreed

12  that the plan to pump both Pellos should be the primary focus

13  going into the F'08.  Implementation of this project will

14  enable the plant to increase the capacity up to an estimated

15  30,000 pounds annually.

16      Do you see that?  Correct?

17  A   30 million pounds.

18  Q   I'm sorry.  30 million pounds annually, correct?

19  A   Right.

20  Q   All right.  So you knew Unilever again was working -- let

21  me rephrase it.

22      You believed that Unilever was reacting to the letter you

23  sent on August 16th?

24  A   I don't believe this is in direct connection to the letter

25  I sent.  Unilever is a multi-billion dollar company.  You're

1   always finding ways to improve productions, to reduce costs,

2   to have more efficiencies.  So this is normal course of

3   business.

4   Q    But you think this is completely unrelated to your letter

5   of August 16th, and it's a mere coincidence that after you

6   sent the letter on September 4th, they tell you their

7   poundage is going to 28 million pounds, and five weeks later

8   they tell you it's going to 30 million pounds?  You think

9   that's just pure coincidence?

10  A    This is the normal course of business, Mr. Sulkin.  Since

11  we start production with Unilever, we have the plans on a

12  monthly basis, sometimes weekly basis.  We always look for

13  ways to improve efficiencies.

14  Q    Go to Exhibit 204.  You received a copy of this document,

15  did you not?

16  A    Yes.

17  Q    And this relates to Unilever, if you go to the second

18  page, some comments Unilever had on your proposal of August

19  16th, is that correct?

20  A    Yes, in relation to that, yes.

21  Q    And you did not send an e-mail to Lou, Mr. Gentine, at

22  this point:  I am losing operational control.  Please stop.

23  You didn't do anything like that, did you, sir?

24  A    I did talk to Mr. Gentine about it.

25  Q    My question is very simple.

1   A   I didn't send a return letter, that's correct.

2   Q   You didn't.  Let's just get this right.  You didn't write

3   anything to Mr. Gentine saying you were losing operational

4   control, isn't that right?

5   A   I only talked to Mr. Gentine.

6   Q   You only talked to Mr. Gentine.  You never e-mailed

7   Mr. Gentine.

8   A   No.

9   Q   Let's take a look at Exhibit 201.

10  A   I mean, I only talked after this letter, just to clarify

11  my answer.

12  Q   Let's look at Exhibit 201.  Is that an e-mail to

13  Mr. Gentine?  Does it reflect an e-mail to Mr. Gentine or

14  calling Mr. Gentine?

15  A   No.  It is an e-mail.  I clarify my answer before by

16  saying after January 29 I did talk to Mr. Gentine.

17  Q   Now, let me get this right.  Is it your testimony that you

18  were angry about what was going on related to Unilever?

19  A   I wasn't happy about it.

20  Q   You weren't happy about Mr. Gordy, is that right?

21  A   I wasn't happy about Mr. Gordy ever.

22  Q   You claim you weren't happy about Bellingham Cold Storage,

23  is that right?

24  A   Yes.

25  Q   In fact, sir, you have no problem writing e-mails when you

1   are unhappy, do you?

2   A   At times I do.

3   Q   Let's look at Exhibit 9.  This document was shown to you

4   by Mr. Goldfarb.  It relates to your response to the

5   Bellingham Cold Storage proposal.  Go to the middle e-mail.

6   You received this bottom e-mail relating to Bellingham Cold

7   Storage concerning a proposal they had made, is that right?

8   A   Yes.

9   Q   And you wrote back to Mr. Gordy:  How dare you call this a

10  $100,000 saving?  You are moving an operating cost from BCS's

11  books to ours.  That's all Sargento brings after four months

12  of negotiations with BCS?

13      You had no problem expressing your anger on that subject,

14  did you, sir?

15  A   That time, I did.

16  Q   Well, you did write the e-mail expressing your anger?

17  A   That time, I did.

18  Q   But you never wrote an e-mail on any other subjects, did

19  you, sir?

20  A   I expressed my concern to Mr. Gentine over the phone many

21  times.

22  Q   And the jury's going to have to decide whether to believe

23  you or Mr. Gentine on that, isn't that right?

24          MR. GOLDFARB:  Objection, your Honor.

25          THE COURT:  Sustained.

1          MR. SULKIN:  Let me rephrase the question.

2    Q    Let's go back to your contract, Trial Exhibit 2, page 7.

3    Turn the page.  Go to the top of page 8.  It says:  Good

4    reason.  Do you see that?

5    A    Yes.

6    Q    And it says:  Termination for good reason shall mean

7    termination of executive's employment, meaning your

8    employment, by executive, you, following a material breach by

9    the corporation of any provisions of this agreement, which

10   failure continues for a period of 30 days after the

11   corporation's receipt of written notice.

12        Do you see that?

13   A    Yes.

14   Q    So you knew you had a deal, and you were willing to live

15   by the deal, right?

16   A    Yes.

17   Q    And you knew that if you believed there was a material

18   breach by Sargento of your employment agreement, the way to

19   deal with it is by sending a written notice?

20   A    Yes.

21   Q    So that we wouldn't be in a situation of who do we believe

22   now?

23   A    I send them notice in May.

24   Q    I understand.  But you didn't send a notice -- let's get

25   this right.  In June of '07 you didn't send notice, did you?

1    A    No.

2    Q    July?

3    A    No.

4    Q    August?

5    A    No.

6    Q    September?

7    A    No.

8    Q    October?

9    A    No.

10   Q    November?

11   A    No.

12   Q    December?

13   A    No.

14   Q    January?

15   A    No.

16   Q    February?

17   A    No.  I was trying to --

18   Q    Now, Mr. Goldfarb suggested -- or it was suggested in your

19   direct examination -- or I'm sorry.  It's been suggested, at

20   least I think, in the examination of Mr. Gentine that it was

21   inappropriate for Mr. Gentine to speak to Mr. Boland.  Did

22   you believe that Mr. Gentine had a right to speak to

23   Mr. Boland?

24   A    He could talk to him, but not make a commitment with him.

25   Q    And did you ever ask Mr. Gentine in writing to not talk to

1   Mr. Boland?

2   A   We talked about this issue over the phone.

3   Q   The question is very simple.  Did you send any writing,

4   whether e-mail, letter, on a napkin, however, to Mr. Gentine

5   saying:  I don't want you speaking to Mr. Boland under

6   certain circumstances?

7   A   I did in the spring of 2008.

8   Q   Fair enough.  Prior?  You said March?

9   A   Yeah.

10  Q   We'll get to that.  Prior to March of '08, did you send

11  any writing to Mr. Gentine requesting that he not speak to

12  Mr. Boland under certain conditions?

13  A   No.

14  Q   And it's your testimony that you spoke to Mr. Gentine

15  about this earlier?

16  A   Yes, I did.

17  Q   And you told Mr. Gentine:  I don't want you to do that?

18  A   I told him I should be the one to do it.

19  Q   And you understood -- you testified earlier that

20  Portionables was your baby.  Do you remember that?

21  A   Yes.

22  Q   And you sold it, correct?

23  A   Yes.

24  Q   And you understood Sargento was Mr. Gentine's baby, did

25  you not?

1   A   Yes.

2   Q   And he didn't sell it?

3   A   The sale was not consummated until the end of the earnout

4   period.  Yes, he bought the company under certain terms and

5   conditions.

6   Q   Isn't it true in early, mid-January you told Mr. Hoff, the

7   CFO of Sargento, that you didn't believe you were going to

8   make the earnout?

9   A   You are referring this from an e-mail?  From discussion?

10  Can I see the document, please?

11  Q   Just asking your memory, sir.  Isn't it true you had a

12  conversation with Mr. Hoff in January of 2008 in which you

13  told him:  I don't believe we're going to make the earnout?

14  Isn't that right?

15  A   How could I have told him eight months or ten months in

16  advance I will not make the earnout?

17  Q   Sir, you're denying you had a conversation with Mr. Hoff

18  in 2008?

19  A   No.  I probably have a conversation with Mr. Hoff.  But

20  you're asking me to agree that in February or January I would

21  agree that I wouldn't make the earnout.  How can I say

22  something like that?

23  Q   Let me rephrase.  I just want to make it very clear.

24  You're testifying that you did not tell Mr. Hoff in January

25  of '08 that you didn't believe you were going to make the

```
 1   earnout?  That's your testimony?

 2   A   Yes.

 3   Q   Okay.  Now, you testified that you did not tell

 4   Mr. Ioannides of the facts of the Unilever offer prior to

 5   sending the March 28, '07 letter by your lawyer, isn't that

 6   correct?

 7   A   I did not tell him all the facts.

 8   Q   Well, you didn't tell him that Unilever wanted to

 9   self-manufacture, right?

10   A   No.  I just told him about the price reduction.

11   Q   You didn't tell him that the volumes were going to be

12   higher and that there were to be guaranteed minimums, right?

13   A   No.

14   Q   And you didn't tell him that under the Unilever offer the

15   projected revenues were higher than under your projections

16   under the contract in place.  You didn't tell him that

17   either?

18       MR. GOLDFARB:  Objection.  We did this yesterday.

19   It's been fully covered.  Asked and answered.

20       THE COURT:  Overruled.

21   A   Can you repeat the question?

22   BY MR. SULKIN:

23   Q   I'm not sure I can.  You did not tell Mr. Ioannides prior

24   to sending the March 28, '07 letter that the bottom line

25   revenues were better under the projection under the August
```

1   16th offer than under the existing contract you had.  You

2   didn't tell him that, did you, sir?

3   A   I did not tell him all the details.  It was only an offer.

4   Q   My question is:  Am I correct?  The answer is:  I'm

5   correct; you didn't tell him that?

6   A   No.

7   Q   All right.  Can we take a look at that document?  I think

8   it's Exhibit 13.  Sir, the reason you didn't tell

9   Mr. Ioannides those facts is because you didn't believe

10  Mr. Ioannides would have supported sending this letter had he

11  known those facts, isn't that right?

12  A   No.

13  Q   Isn't it true, sir, that you told Mr. Ioannides in March

14  of '08 that you lost operational control because you did not

15  want to accept responsibility for the fact that, under your

16  leadership, Portionables was not going to reach the earnout?

17  Isn't that true, sir?

18  A   No.

19  Q   And, sir, let's look at the second page of this letter, if

20  we could.  You write:  Our understanding, however, is that

21  Sargento seeks to reduce the agreed-upon processing fees in

22  the contract for production above 20 million dollars -- 20

23  million pounds, from 37 cents to 23 cents per pound.

24      Do you see that?

25  A   Yes, I do.

1    Q    And, again, you didn't tell Mr. Ioannides that there was a

2    guarantee of that 20 million pounds, isn't that right?

3    A    There was a proposed guarantee.

4    Q    Well, you're referring to the Unilever offer, right?

5    A    But it is irrelevant, because we're talking about the

6    price reductions that is above 20 million pounds.  You know,

7    it doesn't make any difference, because you go up to 20

8    million pounds.  And, afterwards, you have such a reduction

9    that as -- we're talking about 14 cents a pound above 20

10   million pounds.  And as I show you before, in September we

11   knew that we were going to ramp up to the 29 million pounds.

12   Q    Thank you for that answer.  All I asked you was:  You

13   didn't tell Mr. Ioannides, isn't that right?

14        MR. SULKIN:  Your Honor, I would like to play the

15   clip we discussed earlier this morning.

16        THE COURT:  Go ahead.

17        (Video played, not reported.)

18   BY MR. SULKIN:

19   Q    Look at Trial Exhibit 8, if you would.  This is the April

20   4th letter from Mr. Gentine to you.  Do you see that?

21   A    Yes.

22   Q    You received this, right?

23   A    Yes, I did.

24   Q    And you read it?

25   A    Yes.

1    Q    Just so we're all clear, April 4th was a Friday, okay?

2    A    If you say it, I believe you.

3    Q    Okay.  And at the top of the second page, he says:  Please

4    get back to me no later than Monday.  Do you see that?

5    A    Yes.

6    Q    You didn't call on Monday, did you?

7    A    My understanding was that both parties, we were countering

8    and we were talking between each other.  So Mr. Gentine

9    indirectly had received a phone call or communication from

10   his lawyers, because my legal counsel was in contact with

11   his.  So there was communication, but not direct

12   communication between Lou Gentine and myself.

13   Q    Thank you for that.  But my question is a little

14   different.  And I'm sorry if it wasn't clear enough.  You

15   didn't call Mr. Gentine on Monday?

16   A    Not directly.

17   Q    So did you call him indirectly, like through Europe and

18   then around and back?  I mean, what does that mean, not

19   directly, sir?  Did you call him or didn't you call him?  Did

20   you text him?

21   A    No, I don't call him, but we were in communications.  But

22   I didn't call him.

23   Q    And, sir, the truth of the matter is that you sent a

24   letter -- your lawyer sent a letter to his lawyer on March

25   28th, isn't that right?

1  A   Yes.

2  Q   And Mr. Gentine sent this letter to you, isn't that right?

3  A   I don't know if this letter was written or approved by his

4  legal counsel or not.

5  Q   He wrote it to you.  He was asking you to call him.  Did

6  you call him and say:  My lawyer will call your lawyer?

7  A   No, because --

8  Q   Did you e-mail him and say:  My lawyer will call your

9  lawyer?

10 A   I cannot say what my lawyer told me.  It's privileged

11 information.

12 Q   And, in fact, sir, he actually called you when you didn't

13 call him.  He actually called you a few times, and you didn't

14 return those calls, did you?

15 A   I understand.

16 Q   And so when he called you and left a message to call him

17 back, you knew that this wasn't going to be handled, in his

18 mind, from lawyer to lawyer because he called you directly,

19 didn't he, sir?

20 A   Well, we already had legal counsel involved.

21 Q   And so you chose not to call your boss back?

22 A   I was following recommendations from my legal counsel.

23 Q   Sir, we can go through this letter from Mr. Gentine.  Go

24 to the top of the first page, please.  He writes, on the

25 third line:  We need to know specifically and soon how you

1  intend to proceed on the proposed amendment to the Unilever

2  manufacturing agreement.

3      He wrote you that, and you understood that?

4  A   Yes.

5  Q   Despite his request for wanting to know what you intend to

6  do, you didn't return his calls?

7  A   But subsequently we send him a letter.

8  Q   I'm sorry if my question wasn't clear.  Despite his

9  request to know specifically what you intended to do, you

10 didn't return his calls?

11 A   As I already explained, Mr. Sulkin, we had legal counsel

12 involved, and I was following recommendations that was told

13 to me.

14 Q   Let me try it a third time.  You didn't -- despite knowing

15 that he wanted to know how you intended to proceed, you

16 didn't return his call?

17 A   No, I didn't.

18 Q   Thank you.  And then if you go to the bottom half of the

19 page, please, he writes in here:  I can understand, given the

20 disappointing sales results to new customers, why the former

21 shareholders of Portionables might be willing to take a "bet

22 the company" approach to Unilever feeling they have nothing

23 to lose.  Not surprisingly, though, that is not the deal we

24 signed up for, which was intended to promote long-term

25 profitable growth in accordance with sound business

1    practices.

2        Do you see that?

3    A    I see it.

4    Q    Do you agree that one of your functions was to run

5    Portionables as a division head, to promote long-term

6    profitable growth in accordance with sound business

7    practices?

8    A    I was working with the objective of short-term and

9    long-term growth.

10   Q    Take a look, if you would, at page 2, at the top?

11   A    May I comment?  Because you --

12   Q    I'm sure your lawyer --

13   A    You highlighted.  You know, you asked me a question, and

14   you highlighted some sentences.

15   Q    Yes.

16   A    So can I comment about it, or I don't have the right to

17   comment?

18   Q    I'll ask you a question.  You answer it.  How's that?

19   A    That's all right.

20   Q    All right.  Top of the page:  If because of conflicts of

21   interest or otherwise you do not believe you can fulfill your

22   obligations as Portionables' top executive with respect to

23   this matter or any other matter, please let me know that as

24   well so we can respond accordingly.

25       Do you see that?

1    A    Yes, I do.

2    Q    And, again, you didn't tell Mr. Gentine whether or not you

3    felt, in response to this letter, you had a conflict.  You

4    didn't return his call?

5    A    No, I didn't return the call.

6    Q    Let's look at Trial Exhibit 16.  That's the April 11th

7    letter.  This was sent by Mr. Gentine's lawyer to your

8    personal lawyer, Mr. Miller, is that right?

9    A    Yes.

10   Q    And just so that we all understand, the shareholders had

11   lawyers, Davis, Wright & Tremaine, the law firm, correct?

12   A    Yes.

13   Q    Then you had your own personal lawyer from Foster Pepper?

14   A    Yes.

15   Q    Okay.  If you would go to the second page, please, the

16   last paragraph:  As of today, Sargento believes that

17   Mr. Calliari has failed to perform his duties under his

18   employment agreement to the reasonable satisfaction of

19   Sargento's president and chief executive officer, which would

20   be grounds for termination of his employment for cause by

21   Sargento.

22        We looked at that language relating to reasonable

23   satisfaction of Sargento's president in Trial Exhibit 2.  Do

24   you recall that, sir?

25   A    Yes.

1    Q    And then it says:  This determination has been made not

2    due to Mr. Calliari's expressed concerns about the Unilever

3    amendment or any other business issue, but is specifically

4    focused on Mr. Calliari's failure to communicate with

5    Mr. Gentine in a timely fashion, paren, if at all, paren,

6    following multiple requests to do so.

7              MR. GOLDFARB:  Excuse me, your Honor.  Register an

8    objection at this point.  This was addressed in pretrial, and

9    there should be a limiting -- or we're requesting a limiting

10   instruction with regard to this line of questioning, that all

11   the performance issues and questions and debates about that

12   are not a part of this matter.

13             THE COURT:  Overruled.

14   BY MR. SULKIN:

15   Q    So you understood on April 11th that Mr. Gentine told you

16   that he was not satisfied under the -- reasonably satisfied

17   under the terms of your termination provision because you

18   were not returning his multiple calls, and, therefore, there

19   were grounds for termination for cause under your employment

20   agreement.  You understood that was his position, is that

21   correct?

22   A    Yeah, this is what the letter says, yes.  It also says

23   that --

24   Q    And then he writes in the last sentence, or the lawyer

25   writes:  If Mr. Calliari expects to continue a long-term

1    relationship with Sargento, prompt and substantive

2    communication is essential.

3        Do you see that?

4    A    Yes.

5    Q    So even as of this late date, you understood or you

6    believed that Mr. Gentine was still hoping to continue a

7    long-term relationship with you, isn't that right?

8    A    Yes.

9    Q    And you still didn't return his calls?

10   A    As I say, you know, we had legal counsel involved.  And

11   you have to -- we have limitations to what we can do.

12   Q    Well, sir, let's be fair here.  You chose to send Trial

13   Exhibit 13 through your lawyers, isn't that right?

14   A    Yes.

15   Q    It was your decision to go to a lawyer, right?

16   A    Yes.

17   Q    And Mr. Gentine responded person to person in his August

18   4th letter, isn't that right?

19   A    Yes.

20   Q    And you ignored him?

21   A    I what?

22   Q    And you ignored him?

23   A    I did not ignore him.  My lawyer was working on a

24   response.

25   Q    Go back to Trial Exhibit 13.  You give three reasons here

1  for your claim that you lost operational control, isn't that

2  right?

3  A   Yes.

4  Q   The first reason is Unilever, correct?

5  A   Yes.

6  Q   And you've already told us that you agreed to send the

7  August 16th letter, correct?

8  A   Yes.

9  Q   Your second reason is Bellingham Cold Storage, isn't that

10 right?

11 A   Yes.

12 Q   And if we look back at Exhibit 257, it's clear that you

13 had decided to forego the direct ship project back in January

14 of '08, isn't that right?

15 A   Well, after a while, you know, I was beating a dead horse,

16 so I give up.

17 Q   The question is simple.  It says:  Tom told me that you

18 have decided to forego the direct ship project.

19     So you did decide to forego it, did you not?

20 A   Yeah.  I had no support.

21 Q   And then you raise as an issue in Trial Exhibit 13 the SAP

22 issue.  You admit that when you made that request, the

23 company backed off?

24 A   Yes.

25 Q   And there's no mention in here about Mr. Gordy.  We talked

1   about Mr. McEvoy, is that right?

2   A   Yes.

3   Q   Now, just so I understand this, you had your lawyers work

4   with you in drafting -- representing you in drafting the

5   stock purchase agreement, is that right?

6   A   Yes.

7   Q   That was Davis Wright?

8   A   Yes.

9   Q   And you had Mr. Miller representing you from Foster Pepper

10  on the employment agreement, is that right?

11  A   Yes.

12  Q   And you thought they did a good job, right?

13  A   Yes.

14  Q   You had a good relationship with them?

15  A   Yes.

16  Q   You knew their phone numbers?

17  A   Yes.

18  Q   So at any time between July of '07 and March of '08, you

19  didn't know, without giving up operational control, you could

20  have given them a call?

21  A   Well, I don't know if it is client privilege.

22  Q   My question is:  You could have given them a call?

23  A   I did give them a call.

24  Q   And they could have written a letter had there been

25  sufficient evidence of loss of operational control?

```
 1   A    If we would have written the letter sooner, we would have.
 2   But I wanted to avoid a confrontation.
 3   Q    In your testimony, I believe there was some complaint you
 4   had about Mr. Zinzer of Sargento contacting Birds Eye.  Do
 5   you recall that?
 6   A    Yes.
 7   Q    Isn't it true that you knew that Mr. Zinzer had a
 8   relationship with Birds Eye that predated Portionables'
 9   acquisition?
10   A    Yes.
11   Q    And as part of the acquisition, you didn't ask Sargento to
12   give up its relationship with Birds Eye?
13   A    Why would I?
14   Q    That's my point.
15   A    He was in cheese, not sauces.
16   Q    And we also talked a little bit about South Dakota, didn't
17   we?
18   A    What do you mean, talked about South Dakota?
19   Q    Well, let's rephrase it.  Is it your claim that you feel
20   you lost operational control because of issues relating to
21   regulatory problems in South Dakota?
22   A    Yes.
23   Q    Take a look, if you would, at Trial Exhibit 14.  It's fair
24   to say that you were trying to be accurate in this letter as
25   to all the reasons you believe you lost operational control,
```

1  isn't that right?

2  A   Yes.

3  Q   You don't list South Dakota, do you, sir?

4  A   The issue of South Dakota came -- I got aware in more

5  detail about the issues in going through this litigation.

6  Q   And, in fact, sir, you bring up the litigation.  You were

7  deposed in this case just a few months ago, June 30th, is

8  that right?  Do you recall that?

9  A   Yes.

10  Q   And I asked you all the reasons you believe you lost

11  operational control.  Do you recall that?

12  A   I recall that.

13  Q   Do you recall you did not list South Dakota as one of

14  those reasons?

15  A   I had not had the discovery documents by that time.

16  Q   In fact, the discovery documents were provided well before

17  your deposition, sir, isn't that true?

18  A   I don't believe the discovery document about South Dakota

19  was by the time of my deposition.

20  Q   Isn't it true, sir, that you don't know, do you?

21  A   I don't believe so.  I don't recall exactly.

22  Q   And, in fact, you had a right to correct your deposition,

23  and you didn't add South Dakota to your list, did you, sir?

24  A   I did not correct my deposition.

25  Q   And, in fact, sir, isn't it true that you were in meetings

1  with Mr. McEvoy in which you were brought up to speed on

2  South Dakota?

3  A   No.  I had seen a couple of e-mails.

4  Q   You testified, sir, that the reason you got that million

5  dollar signing and retention bonus is because you agreed to a

6  seven-year noncompete, is that correct?

7  A   Yes.

8  Q   Let's take a look at Trial Exhibit 2, please.  If we go to

9  page 4D, signing bonus, this is the signing bonus you were

10 talking about?

11 A   Yeah, this is what we ended up doing.

12 Q   Okay.  And it reads:  In consideration for executive's

13 execution of this agreement, the corporation shall pay to

14 executive a signing and retention bonus.

15     Do you see that?

16 A   Yes.

17 Q   It doesn't say signing and noncompete bonus, does it, sir?

18 A   No, it doesn't say that.

19 Q   And, in fact, if you look at Trial Exhibit No. 3, page 28,

20 pull up 5.14, this also says, shareholder noncompetition.  Do

21 you see that?

22 A   Yes.

23 Q   And you were a shareholder, correct?

24 A   Yes.

25 Q   And you signed this agreement, yes?

1    A    Yes.

2    Q    And so this provision applies to you, correct?

3    A    Yes.

4    Q    All right.  And it reads:  Shareholder noncompetition.  As

5    an inducement for the purchaser, meaning Sargento, to enter

6    into this agreement, and for the consideration to be paid

7    under this agreement, of which $200,000 shall be allocated to

8    the covenant under this section as shown on 1.4, each

9    shareholder agrees.

10       Do you see that?

11   A    Yes.

12   Q    And then it goes on, I think, to show another full page

13   and part of the next.  Blow up 5.14(a) and the paragraph

14   above it, please.  This is a seven-year noncompete, is that

15   right?

16   A    Yes.

17   Q    And it says specifically in the agreement that $200,000

18   were allocated for that seven-year noncompete, isn't that

19   right?

20   A    Yes.

21   Q    And so is it your testimony that Sargento was paying you

22   twice for a noncompete that they already had?

23   A    If you compare the two noncompetes, they will be

24   different.

25   Q    In fact, the noncompete in the employment agreement is

1    just for two years, isn't it, sir?

2    A    It's two years after my employment.  So if I say five

3    years, it's seven.  If I say four years, it's six years.

4    Q    And how long did you stay?

5    A    I left the company June 23, 2008.

6    Q    A three-and-a-half-year noncompete?

7    A    No.  It would be two more years after the day I left.

8    Q    Right.  Three and a half years, right?

9    A    Yes.

10   Q    Is it your testimony, sir, that the day after signing your

11   employment agreement, you could have quit and kept the

12   million dollars?

13            MR. GOLDFARB:  Objection, your Honor.  Calls for a

14   legal conclusion.

15            THE COURT:  Sustained.

16            MR. SULKIN:  May I rephase, your Honor?

17   Q    Was it your belief when you signed the employment

18   agreement that you could have quit one day after signing it

19   and kept that million dollars?

20   A    Yes.

21   Q    And, again, you and Mr. Gentine just disagree on what was

22   said on this issue, correct?

23            MR. GOLDFARB:  Objection, your Honor.

24            THE COURT:  Sustained.

25            MR. SULKIN:  That's all I have, your Honor.

1          THE COURT:  Is there any redirect?

2          MR. GOLDFARB:  No, your Honor.

3          THE COURT:  Ladies and gentlemen of the jury, do you

4    have any questions that you would wish to ask?  No?

5        Thank you, sir.  You may step down.

6        Counsel, this appears to be a reasonable time for us to

7    take our morning recess.  So why don't we do that before we

8    call the next witness.

9        Ladies and gentlemen, you may be excused.

10          (Jury leaves courtroom.)

11          THE COURT:  Okay.  Anything we need to take care of

12    before we recess?

13          MR. GOLDFARB:  Your Honor, the next thing that we're

14    planning to do is read some excerpts of Mr. Gordy.  They are

15    brief.  Our reader, fortunately, has just arrived.  We got

16    counter-designations to this.  Originally, they were going to

17    call Mr. Gordy.  It was much longer.  It's gotten smaller.

18      We got their counter-designations last night.  We have

19    three or four objections to them.  And it will probably make

20    sense to clear those up in advance.

21          THE COURT:  Okay.  So where are the designations?

22          MR. FISHER:  Your Honor, while those are being

23    retrieved, can I ask another question, to make productive use

24    of the time?  When Mr. McEvoy testifies, I may want to use

25    the easel, the white board.  And I just want to make sure I

```
1   put it in the right place for that purpose.

2       And I tried to figure out how to do it so that they can

3   see it, or if they want to walk around and see it.  So I'm

4   wondering, can I put it here, or should I put it here?  Where

5   do you prefer that I would roll that?

6           THE COURT:  Well, I would prefer to have you put it

7   in a position where the jury and I can see it.  These

8   gentlemen can stand up and walk around.  I can't.

9           MR. FISHER:  So this would be okay?

10          THE COURT:  Put it wherever you think that it can be

11  seen.

12          MR. FISHER:  Okay.

13          THE COURT:  And I would suggest that you use a black

14  marker, not a red one.

15          MR. SULKIN:  And it would be okay to stand back

16  there?

17          THE COURT:  Sure.  Go wherever.  Nobody has chained

18  you to the table.  Although, I do have the capacity to do

19  that.

20          MR. SULKIN:  I'm well aware of that, your Honor.

21          THE COURT:  Okay.  All right.  Do you have the

22  designations for me?  Maybe it makes sense for me to read

23  them over the break and then come back and tell you.

24          MR. GOLDFARB:  Yes, your Honor.  May I approach?

25          THE COURT:  Yes.
```

```
1          MR. GOLDFARB:  I believe I have here the original and
2   copies for the court and one for the reader.
3          THE COURT:  Okay.  And which pages are the contested
4   issues on?
5          MR. GOLDFARB:  Page 9, your Honor, page 10 --
6          MR. LINEHAN:  I'm sorry, Mr. Goldfarb.  We haven't
7   seen these objections.  So could you tell us which ones?
8          MR. GOLDFARB:  Yes.  9; 10; 11; 19; 26, carried over
9   to 27; 32, line 22, to 33, line 13; 36, 12 to 25.
10         THE COURT:  So you've marked these, right?  You've
11  marked your objections?
12         MR. GOLDFARB:  On?  I'm sorry, your Honor.
13         THE COURT:  On what you gave me.  You've marked your
14  objections so I can find them by going -- do I need the line
15  number, or have you put down the --
16         MR. GOLDFARB:  We have not, your Honor.
17         THE COURT:  Okay.  Then why don't you do this:  Over
18  the break, you take them, you mark them, and then I'll take a
19  look at them.
20      All right.  We're going to take our recess.
21         (Brief recess.)
22         THE COURT:  Please be seated.
23      Mr. Goldfarb, can I do this in real time?
24         MR. GOLDFARB:  It becomes prejudicial, your Honor,
25  because the questions are out there at that point.
```

```
 1              THE COURT:  Okay.  And is this what you wanted to do
 2     next?
 3              MR. GOLDFARB:  Yes, your Honor.
 4              THE COURT:  All right.
 5              MR. GOLDFARB:  I don't think this is going to be
 6     lengthy.
 7              THE COURT:  Okay.  The objection at page 9 is
 8     sustained.
 9              MR. LINEHAN:  Your Honor, may I have a chance to
10     respond?
11              THE COURT:  Oh, you want to talk about it, do you?
12              MR. LINEHAN:  Well, I hope to make a fairly obvious
13     point.  Mr. Goldfarb was the one asking these questions, your
14     Honor.  And he did not move to strike any of the answers that
15     he's now objecting to.
16              THE COURT:  I don't know that that makes a
17     difference.
18              MR. LINEHAN:  Your Honor, my understanding of the
19     rule is if there was an objection as to form or anything that
20     could be cured at the time or anything else that can be
21     struck from the record, that you waive it; that is, if you do
22     not make it timely, that you waive the objection.
23              MR. GOLDFARB:  I would have had to object to myself,
24     your Honor, which I do frequently, but I did not on this
25     occasion.  This was a discovery deposition taken at a time
```

1   when we anticipated Mr. Gordy would be here, something we

2   anticipated until very recently.  It was my intent to probe

3   and get the entire knowledge of the witness, whether it

4   conformed with specific rules of evidence or not.

5           THE COURT:  I think the objection is still sustained.

6   I don't believe that's the right application of the rule.

7       All right.  The next one is on 10.  Let me look.

8           MR. GOLDFARB:  Your Honor, I want to make sure we're

9   marking up the reader's copy as we go here.

10          THE COURT:  Overruled, on page 10.

11          MR. GOLDFARB:  Your Honor, the basis there was at

12  line 17, the word "assumed."

13          THE COURT:  You marked the entire section as being

14  speculation.

15          MR. GOLDFARB:  And, again, at line 9, your Honor.

16          THE COURT:  Overruled.  11 is overruled.  19 is

17  overruled.  26 is overruled.  Line 12, the part, now whether

18  he chose to get involved or not, you'll have to ask him why

19  he didn't, is nonresponsive.  That line should be taken out.

20  57 is overruled.  108 is overruled.

21      And I think that takes care of it.  Let's bring them in.

22          (Jury enters courtroom.)

23          THE COURT:  Please be seated.

24      Mr. Goldfarb, your next plan, please.

25          MR. GOLDFARB:  Plaintiffs call Mike Gordy by

1    deposition, your Honor.

2          THE COURT:  Okay.  Ladies and gentlemen, we have a

3    reader for the deposition of Mr. Gordy, who cannot be with

4    us.  Please understand that you are to treat this testimony

5    the same way as if it were to come from the real witness.

6    But this gentleman is not Mr. Gordy.  And everyone is going

7    to play their original roles.  Mr. Goldfarb will ask

8    questions.

9          Please have a seat, sir.  Mr. Gordy, at the time of the

10   deposition, was placed under oath.

11         MR. GOLDFARB:  May I begin, your Honor?

12         THE COURT:  Please.

13         (Deposition read:)

14   Q   State your full name for the record, please.

15   A   Michael A. Gordy.

16   Q   How did you come to be involved with Portionables?

17   A   My original involvement was regarding sales forecasting.

18   And Portionables had sent a sales forecast in the due

19   diligence process.  I was asked to look at those forecasts to

20   see if they were reasonably accurate, if there was any paper

21   trail behind them, to see if they were just pie in the sky or

22   if there was some valid reason to put in the forecast that

23   they did.  Their forecasts were obviously very, very high

24   compared to prior sales.

25   Q   That's something you did in the due diligence process?

```
 1   A    Yeah.  That was before the purchase.

 2   Q    Okay.  And I take it that you have a background in sales?

 3   A    I do.

 4   Q    Tell us a little bit about that.

 5   A    How far back do you want to go?  1970, I started with the

 6   Kraft Foods Company in Miami as a salesman.

 7   Q    Okay.

 8   A    Eight years later I started with Sargento as a regional

 9   sales manager.  I had the Southeast, progressed to a division

10   manager, where I had the East Coast, VP of sales of the

11   nation, VP of sales in marketing, president of our food

12   ingredients group, president of our consumer products sales

13   division.  So I've got extensive sales experience.

14   Q    And after the acquisition, did you seek out a position

15   with Portionables?

16   A    Did I seek out a position with Portionables?

17   Q    Yes.

18   A    No.

19   Q    Actually, do you recall writing Mr. Gentine a memo where

20   you said, I'm the man for the job, or words to that effect?

21   A    Yeah.  I volunteered, whether they were looking for

22   somebody.

23   Q    Okay.  And what is it that you volunteered to do?

24   A    To be the liaison between Portionables and Sargento.

25   Q    Okay.  And what was your assignment with regard to
```

1   Portionables?  What was it you were supposed to do?

2   A   Help them in any way I could to make their sales numbers,

3   reduce costs.  I've also got a background in operations.  See

4   what resources Sargento would have to bring to bear that we

5   could help reduce their operating expenses.

6   Q   At any time were you made aware of the operational control

7   provisions that existed in either the stock purchase

8   agreement or the employment agreement?

9   A   Yes.

10  Q   When?

11  A   I'm assuming early on.  Patrick was the president and

12  running the company.

13  Q   But did you understand that there was an earnout period?

14  A   Yes.

15  Q   And did you understand that during that earnout period

16  Mr. Calliari was to have operational control over

17  Portionables?

18  A   Not complete operational control.  I mean, there were

19  provisions in the SPA that, besides his operational controls,

20  certain things he could not do.

21  Q   There were certain things that the SPA said he would have

22  to have approval of before he could do, is that correct?

23  A   That's my understanding.

24        MR. GOLDFARB:  Page 10.

25  Q   In a typical corporate structure, the CEO or president has

1    the ultimate decision-making authority?

2    A    Yes, I would assume so.

3    Q    Okay.  But there was an usual twist here because the

4    transitional documents gave decision-making authority,

5    operational control to Mr. Calliari.  Do you understand that?

6    A    I don't think they were carte blanche.

7    Q    Okay.  So that's what I'm just trying to understand, your

8    view of how this relationship was.

9    A    I would never have assumed they were carte blanche, just

10   having worked in the organization and being a sales division

11   president as Patrick was.

12   Q    Okay.  Well, what I'm probing to understand here is the

13   degree to which operational control was discussed by you and

14   others at Sargento, to understand the limits on what it was

15   that you could tell Mr. Calliari to do?

16   A    I couldn't tell Mr. Calliari to do anything.

17   Q    Could Mr. Gentine?

18   A    As the CEO of the organization, I'm assuming he could,

19   yes.  He tells me what to do all the time.

20   Q    In 2007, shortly after the acquisition, you received a

21   call from a representative at Unilever, is that correct?

22   A    That's correct.

23   Q    And what was that gentleman's name?

24   A    At the time, that would have been Mike Pusterla.  I'm

25   quite sure that's who it was.

1    Q    And that happened in May of 2007, did it not?

2    A    Shortly after the acquisition, yeah.  It was a huge

3    surprise.

4    Q    When this guy calls you up out of the blue -- I can never

5    pronounce his name.

6    A    Pusterla.

7    Q    Pusterla, when he called you in May, he introduced

8    himself, correct?

9    A    Uh-huh.

10   Q    And then he started talking to you about things Unilever

11   wanted, correct?

12   A    Uh-huh.

13   Q    And how did you respond to that?

14   A    I took notes.  I listened to him.  And I passed them on to

15   Patrick.  In fact, at some point -- I know we put this in

16   discovery -- I tried to turn it over to Patrick because I

17   didn't know the South -- at that point I didn't know the

18   South Dakota operation.

19   Q    Mr. Calliari was saying:  I know Unilever.  I have

20   connections in Europe.  They may say that, but they're not

21   going to do that.

22        Wasn't that his position?

23   A    I recall him saying that, yes.

24   Q    Okay.  And --

25   A    By the way, he would never tell us who his connection was,

1  though.  So, you know, whether it was from a CEO or a plant

2  manager in Italy, I don't know who would have told him that.

3  He never shared that with us.

4  Q    Okay.  But be all that as it may, it was certainly his

5  view -- whether it was right or wrong, it was his opinion

6  that Unilever wasn't going to self-manufacture?

7  A    That was his opinion.

8  Q    Okay.  And he told that to you and Mr. Gentine more than

9  once, didn't he?

10  A    I don't know about the word "once."  But he did express

11  that, yes.

12  Q    And his view was that there was no need to renegotiate the

13  Unilever contract because Unilever wasn't going to

14  self-manufacture, isn't that a fact?

15  A    That's a fair assessment.

16  Q    And, nonetheless, the decision was made to make a proposal

17  to Unilever to renegotiate the contract, isn't that right?

18  A    Well, Patrick made the decision.  Before that letter, he

19  made his verbal offer of 35 cents a pound.  And if you run

20  the numbers, our version is really close to those numbers,

21  other than the fact that we had guarantees in there, which

22  Patrick had no guarantees.

23       And if you look at the -- I'm sure you have it -- the

24  original Unilever contract, there's 60 days' notice, and they

25  could pull all production.  And the only liability was

1    $500,000 that Patrick had put into infrastructure to put in

2    their cookers.

3    Q    Between, say, January and March of 2008 --

4    A    Uh-huh.

5    Q    -- there were ongoing communications between Sargento and

6    Unilever --

7    A    That's correct.

8    Q    -- about reworking the Unilever contract, correct?

9    A    The amendment, correct.

10   Q    And the person or persons on the Unilever side of that

11   discussion were Mr. Boland and Mr. Pusterla, is that correct?

12   A    My involvement was only with Pusterla.  There were some

13   e-mail strings back and forth with Lou and -- Lou Gentine and

14   Steve Boland.

15   Q    Okay.  Mr. Calliari was not involved in any of the direct

16   communications, either telephonic or e-mail, with Unilever.

17   Those were being handled either by Mr. Gentine or you,

18   correct?

19   A    Well, I can only speak for my involvement.  And that was

20   with Mike Pusterla.  And as I said, Patrick was informed all

21   the way.  He absolutely was informed of everything.

22   Q    Tell me what your practice was with regard to

23   Mr. Gentine's e-mails.  Would you send these ordinarily to

24   Mr. Calliari?  You wouldn't?  You'd ask Mr. Gentine every

25   time first?  How would --

1  A    No.  If Lou sent me -- if he sent me an e-mail and didn't

2  copy Patrick, that would have been his prerogative to copy

3  Patrick.

4  Q    That's exactly what I was asking you.  So if you got an

5  e-mail from Mr. Gentine on a particular subject relating to

6  Unilever, for example, you wouldn't, in the ordinary course,

7  forward that to Mr. Calliari?

8  A    No.  But I certainly would have if it was regarding

9  Unilever.  I would have talked to Patrick.  You know, Patrick

10  wasn't big on e-mails.  We had a lot of verbal conversations.

11  Q    At some point in April, was a decision made to remove

12  Mr. Calliari from any part of the Unilever discussion?

13  A    There was a letter written, yes.

14  Q    Okay.  Were you a part of the decision to remove

15  Mr. Calliari from the Unilever discussion?

16  A    I was not.

17  Q    Who made that decision?

18  A    That would have been a Lou Gentine decision.

19  Q    Did he share that decision with you orally?

20  A    I'm sure he did.

21  Q    So what I'm asking is:  Did he either in person or by

22  telephone call -- by telephone, call you up and say:  Here's

23  what I've decided to do?

24  A    I knew about it, so he had to have told me.

25  Q    Okay.  So other than the fact that he told you that he

1   made the decision to remove Mr. Calliari from the Unilever

2   discussions, do you recall anything else that he told you in

3   that regard?  This is why?  This is how?  Anything?

4   A   I'm trying to remember.  It was Lou's decision.  I think

5   there was concern about the conflict between managing

6   Portionables and his responsibility to the shareholders.  He

7   had those conversations with counsel.

8   Q   Did you make a conscious decision with regard to Exhibit

9   219 not to copy Mr. Calliari?

10  A   On this copy, he is not copied.  So I must have made the

11  decision not to.

12  Q   Okay.  So what I'm asking you is:  Is that -- so what I'm

13  asking you is:  That was deliberate, wasn't it?  You didn't

14  just forget to copy him on this; you decided intentionally?

15  A   I'm trying to think.  I don't -- I don't actually recall

16  whether it was deliberate or not.  Was this before or after

17  the letter from our attorneys?

18  Q   After.

19          THE COURT:  Mr. Goldfarb.  219, can you show that to

20  the jury so that they know?  Is it the same number that we're

21  using here?

22          MR. GOLDFARB:  It is not, your Honor.

23          THE COURT:  It is not.  What is the number that

24  should be substituted in?

25          MR. GOLDFARB:  Your Honor, that particular document,

1    I believe, is not in this set.  Although, I'll supplement if

2    the court permits.

3              THE COURT:  Is there an objection to what that

4    document is?

5              MR. SULKIN:  Generally, no, your Honor.  But I would

6    like to see the document.

7              THE COURT:  Well, the sentence doesn't make any sense

8    unless the jury can see what the document is that you are

9    talking about.

10             MR. SULKIN:  We certainly have no problem with them

11   seeing it, your Honor.

12             MR. GOLDFARB:  May I approach, your Honor?

13             MR. SULKIN:  There's no problem with its

14   admissibility or them looking at it, your Honor.

15             THE COURT:  All right.  So this is Exhibit No. 63.

16   So how about if we do this:  Go back to page 60, line 16, and

17   substitute in that number.

18       And is there an objection?  Mr. Goldfarb, were you not

19   intending to offer 63?

20             MR. GOLDFARB:  I would like to offer 63, your Honor.

21             MR. SULKIN:  No objection.

22             THE COURT:  Okay.  Then 63 will be admitted.

23             (Exhibit(s) 63 admitted.)

24             THE COURT:  You can put it on for the jurors so they

25   can see what we're talking about in the deposition.

1      MR. GOLDFARB:  Your Honor, I'm told there is a video

2   input sign that is on that will go away.  I'll begin again,

3   your Honor, at page 60, line 16.

4      THE COURT:  Correct.

5      (Deposition read:)

6   Q   Did you make a conscious decision with regard to Exhibit

7   63 not to copy Mr. Calliari?

8   A   On this copy, he is not copied.  So I must have made the

9   decision not to.

10  Q   Okay.  So what I'm asking you is:  That was deliberate,

11  wasn't it?  You didn't just -- you didn't forget to copy him

12  on this; you decided not to intentionally?

13  A   I'm trying to think.  I don't -- I don't actually recall

14  if it was deliberate or not.  Was this before or after the

15  letter from our attorneys?

16  Q   It was -- I'm sorry.  After.

17  A   If it was after, then I would not have copied him.

18  Q   So what I want to know is, sitting here today, can you

19  explain to me why you wrote these words, quote:  Can we shut

20  off all direct correspondence to and from Patrick?

21  A   Okay.  I wrote that.  So what specifically is your

22  question?

23  Q   Why?

24  A   And I told you, I don't recall, unless it was related to

25  Unilever.

1   Q   Now, this first part says:  Since Patrick refuses to

2   communicate with Mac.  What can you tell me about that?

3   A   Mac was Patrick's direct report, and he refused to

4   communicate with Mac.

5   Q   Have you had face-to-face discussions with Mr. Calliari

6   about South Dakota regulatory issues?

7   A   Yes, when they first arose.

8   Q   When did they first arise?

9   A   Well, they actually first arose -- arisen -- I sound like

10  a guy from South Dakota, not you.  In October, when the USDA

11  inspector came through, we were not informed of the issue

12  until I want to say March or April.  We had hired a new

13  director of quality assurances, whatever his title is out

14  there, Cory Radloff.

15      When Karl was meeting with Cory, Cory said:  By the way, I

16  wasn't there.  Here's the USDA inspector report where we have

17  issues trying to get the export license.

18      And that's when it first came to light what the issues

19  were.

20  Q   Okay.  When was that?

21  A   March or April is when we were informed of the issues.

22  Q   Okay.

23  A   As well as the South Dakota Department of Ag, they were

24  copied on the report.

25  Q   So I'm focusing now on what you did --

1    A    Okay.

2    Q    -- yourself, okay?  I want to know when you talked to

3    Mr. Calliari about regulatory issues in South Dakota for the

4    first time.

5    A    Probably immediately after I was just told.  I had no

6    reason not to tell him.

7    Q    So when was that?

8    A    I'm telling you, I don't know.  It was -- if we were

9    informed in April, it would have been shortly thereafter when

10   Karl informed me.

11   Q    Okay.  And how did you inform Mr. Calliari?

12   A    I distinctly remember talking to him about it.  I don't

13   recall if I forwarded any e-mails to him.  I probably did.  I

14   do a lot of correspondence by e-mail.

15   Q    Where do you remember talking to Mr. Calliari about South

16   Dakota regulatory issues?

17   A    In Bellingham.

18   Q    In a meeting?

19   A    I do recall discussing it at a meeting, yes, a management

20   meeting.

21   Q    And who was present at that meeting?

22   A    His management staff.  I think Tom Kyle was gone by then.

23   In fact, I know he was.  I don't know that.  I think Tom was

24   gone by then.  But I would have -- it would have been his

25   management staff.

1  Q   Okay.  So your best recollection is that the first time

2  you raised the issue of South Dakota regulatory issues to

3  Mr. Calliari was at a management meeting.  And although you

4  don't know the exact time, your best recollection is that it

5  was after Mr. Kyle had resigned, is that right?

6  A   No.  I said I distinctly remember talking to him about it

7  at a management meeting.  I could have very likely discussed

8  it in private with him or on the phone or in an e-mail prior

9  to that management team meeting.

10 Q   Okay.  What did you tell Mr. Calliari in that meeting

11 about South Dakota?

12 A   I actually remember asking him -- so I know I talked to

13 him before that.  I remember asking him, saying:  Patrick,

14 you understand that we have an issue in South Dakota with the

15 dairy products.

16 Q   Okay.

17 A   And his comment was -- he had two comments:  One, I'll

18 call the governor of South Dakota; or, two, we'll just

19 produce it in Washington.

20 Q   But you understood, without having read the stock purchase

21 agreement, that Mr. Calliari had been reserved operational

22 control?  We talked about that earlier today, right?

23 A   Right.  And our definition of operating control is

24 different.

25 Q   I understand that, too.  I respect --

1    A    Well, I don't want you to trap me into words here that I

2    don't believe in.

3    Q    And it's not my intention to do that.  But I respect your

4    right to have an opinion about this.  Whether I agree with it

5    or not is a different question.  But in terms of the

6    operational control provisions and the fact that operational

7    control was provided to Mr. Calliari, you understood the

8    reason for that, right?

9    A    It was for him to protect his earnout.

10   Q    Is it true that in 2008, Portionables had foregone

11   soliciting new business for its Bellingham plant?

12   A    Yeah.  It was -- it was a Unilever plant.  That was always

13   Patrick's statement:  This is a Unilever plant.  Plus, they

14   were putting in cookers to maximize the use of the freezers.

15   So it would have been -- there would have been no capacity

16   for other customers.

17        MR. GOLDFARB:  That concludes the reading, your

18   Honor.

19        THE COURT:  Okay.  Thank you.  You may step down.

20     Next witness, please.

21        MR. FISHER:  Your Honor, the plaintiffs would call

22   Mike McEvoy.

23        THE COURT:  Is Mr. McEvoy coming in from the lobby?

24        MR. LINEHAN:  They went to go get him.

25        THE COURT:  Okay.  Please come forward, sir.

```
 1                    (Witness sworn.)
 2              THE COURT:  Please have a seat, sir.
 3                         MIKE MCEVOY,
 4      being first duly sworn, the witness was called and testified
 5      as follows:
 6                         DIRECT EXAMINATION
 7      BY MR. FISHER:
 8      Q   Good morning, Mr. McEvoy.  Would you please state your
 9      name.
10      A   Michael McEvoy.
11      Q   Mr. McEvoy, you're employed by Sargento, is that correct?
12      A   Yes, that is correct.
13      Q   How long have you been employed by Sargento?
14      A   Just over 12 years.
15      Q   What is your current position at Sargento?
16      A   The vice president of sales for our food ingredients
17      division.
18      Q   You moved to Bellingham, Washington, in August of 2007, at
19      the request of Mr. Gentine, correct?
20      A   Yes.  Shortly after the acquisition, Mr. Gentine
21      approached me and asked me if I'd be interested in
22      considering a position at Portionables in Bellingham.  I went
23      back and forth for a couple months until we were able to find
24      a home.  We moved there full time in August of '07.
25      Q   Okay.  What was your position at the time you moved to
```

1    Bellingham?

2    A    Director of Portionables' integration.

3    Q    I'm sorry.  What?

4    A    Director of Portionables' integration was my new title.  I

5    was previously in a marketing job at Sargento.

6    Q    Who were you reporting to at the time you joined

7    Portionables in August of 2007?

8    A    Mr. Mike Gordy.

9    Q    Okay.  So we're clear here, the chain of command in the

10   summer of 2007 is that you report up to Mike Gordy, correct?

11   A    That's correct.

12   Q    You don't report to Mr. Calliari at that point in time?

13   A    At that point in time, no.

14   Q    All right.  You were essentially Sargento's man on the

15   ground in Bellingham with respect to the Portionables

16   operation, correct?

17   A    I was on the ground at Bellingham to serve as a conduit

18   between the two companies.

19   Q    And when you moved to Bellingham, you were told before you

20   went that Mr. Calliari worked out of an office in Kirkland,

21   Washington, correct?

22   A    Yes, that was my understanding.

23   Q    I mean, that was the deal; everyone understood that?

24   A    Yes, that was clear.

25   Q    Okay.  Before you moved out to Bellingham to serve as

1  Portionables' integration director for Sargento, you were

2  told that Patrick Calliari had operational control over

3  Portionables' business, correct?

4  A   That was my understanding.  But I also knew that he

5  reported to Mr. Gentine, and he was the president of

6  Portionables.

7  Q   You were told at the time that he had operational control

8  over Portionables, correct?

9  A   Yes.  He was the president of Portionables.

10  Q   And you were told that by Mr. Gentine, correct?

11  A   I believe so.  It may have been him and Mr. Gordy.

12  Q   Right.  Both of those individuals, both of your bosses,

13  told you that Mr. Calliari was running Portionables when you

14  moved out to the state of Washington in the summer of 2007?

15  A   He was running Portionables as the president of the

16  Portionables division.

17  Q   You were told that things were supposed to work as they

18  had in the past prior to the acquisition, correct?  That's

19  what you were told by your bosses?

20  A   That was my understanding, yes.

21  Q   Okay.  For example, Mr. Calliari, it was Mr. Calliari who

22  was the ultimate decision-maker regarding production in South

23  Dakota, correct?

24  A   Production in South Dakota?

25  Q   He's the ultimate decision-maker, correct?

```
 1   A    Well, I would think Mr. Gentine would be the ultimate
 2   decision-maker.
 3           MR. FISHER:  Your Honor, may I approach?  Your Honor,
 4   permission to unseal and publish the deposition of
 5   Mr. McEvoy.
 6           THE COURT:  That's fine.
 7           MR. FISHER:  And this is a copy for the court.
 8           THE COURT:  Thank you.
 9   BY MR. FISHER:
10   Q    Mr. McEvoy, could I ask you to direct your attention to
11   page 164 of your deposition testimony?
12   A    Okay.
13   Q    Do you have that in front of you?
14   A    Yes, I do.
15   Q    And you can either start here, at the bottom of page --
16   actually, I'll take you to the bottom of page --
17           MR. LINEHAN:  Your Honor, I would voice an objection
18   to showing the deposition transcript.
19           THE COURT:  I'm sorry.  What?
20           MR. LINEHAN:  I object to showing the jury the
21   deposition transcript.
22           THE COURT:  Okay.  Well, first, let's establish, is
23   there an objection to the deposition?
24           MR. LINEHAN:  No, your Honor.  We just don't know
25   what the question is going to be or what the relevance of the
```

1    transcript is.

2            THE COURT:  Let's identify what the line --

3            MR. FISHER:  Your Honor, I was going to discuss with

4    Mr. McEvoy his testimony starting at line 17 on page 163,

5    running through line 6 on page 164.

6            THE COURT:  All right.  Go ahead.  But you've got

7    more on that page than just those lines, I take it?

8            MR. FISHER:  I do.  I'm just trying to be helpful.  I

9    don't need to put it on the Elmo.  We'll just talk through

10   it.

11   Q   Mr. McEvoy, do you have those deposition excerpts in front

12   of you?

13   A   Yes, page 164.

14   Q   Okay.  And this was your sworn testimony, correct?

15   A   Yes.

16   Q   On September 1st of this year?

17   A   That is correct.

18   Q   All right.  I'm going to read this to you, and I want you

19   to tell me whether these were the questions you heard and

20   your answers on that date, all right?  Starting at line 17,

21   question:  Had there been discussions about adding a line in

22   South Dakota in the time frame of the Ioannides visit?

23           Answer:  I think some of those discussions had

24   started even in 2007.

25           Question:  Okay, was a line added in South Dakota?

1          Answer:  No, it was not.

2          Question:  Why was that?

3          I'm not the decision-maker on that.  I don't know

4     why.  I don't know that it was determined that we had a need

5     at that point in time.

6          Question:  Who was the decision-maker on that?

7          Answer:  Mr. Calliari would have been the ultimate

8     decision-maker there based on the capacity and where the

9     future sales were coming from.

10        Were those the questions that were posed to you and your

11    answer on September 1st?

12    A   Yes.

13    Q   So was Mr. Calliari the ultimate decision-maker with

14    respect to production in South Dakota?

15    A   In production, yes.

16    Q   In your view, Mr. Calliari was supposed to have

17    operational control of Portionables in April of 2008,

18    correct?

19    A   He was still serving as the president of Portionables, so,

20    yes.

21    Q   So he was to have operational control in April of 2008?

22    A   That would be my understanding.

23    Q   Okay.  Let's spend a minute talking about the subject of

24    Bellingham Cold Storage.  You are familiar with that subject,

25    correct?

1  A    Yes, I am.

2  Q    All right.  You negotiated directly with Bellingham Cold

3  Storage on behalf of Portionables?

4  A    That is correct.

5  Q    Okay.  Those negotiations were directed by you and

6  Mr. Gordy?

7  A    Yes, at the direction of Mr. Hoff, who had given me and

8  Mr. Gordy the targeted cost savings he was looking for, and

9  to reestablish a relationship with Bellingham Cold Storage.

10  Q    Right.  And Mr. Hoff is the chief financial officer of

11  Sargento Foods, correct?

12  A    Yes, he is.

13  Q    Okay.  So you and Mr. Gordy set about negotiating a new

14  deal with Bellingham Cold Storage in the summer of 2007,

15  correct?

16  A    Not a new deal.  We were looking for some targeted cost

17  savings.

18  Q    Mr. Calliari wasn't present for any of the meetings that

19  you participated in with Bellingham Cold Storage, correct?

20  A    Not present at the meetings.  But I did keep him informed.

21  Q    Okay.  You didn't ask him for his authority to do anything

22  before you made a handshake deal with Doug Thomas at

23  Bellingham Cold Storage, correct?

24  A    My authority was under the assumption of the instructions

25  that was given by Mr. Hoff.  I didn't sign the deal.

1   Mr. Calliari had to approve any deal that would have been

2   signed.

3   Q   No, I understand.  You made a handshake deal with Doug

4   Thomas at Bellingham Cold Storage on the instructions of the

5   CFO of Sargento, correct?

6   A   A handshake deal was reached based on some cost savings,

7   yes.

8   Q   Right.  Mr. Calliari wanted to ship directly out of

9   Bellingham, correct?

10  A   Could you be more specific?  Out of the Portionables

11  facility or out of Bellingham Cold Storage?  His desire was

12  to ship directly out of the Portionables facility.

13  Q   Right.  He had an idea.  He wanted to cut out the storage

14  costs, the in and outs of cold storage, and he wanted to take

15  trucks and ship directly out of the Portionables facility,

16  correct?

17  A   Yes, that was his idea.

18  Q   Okay.  In fact, he thought it would save money for

19  Portionables, right?

20  A   That was the understanding, correct.

21  Q   And it was going to save money for Unilever?

22  A   That, I don't recall.

23  Q   Okay.  In any event, you were aware that that was his

24  desire at the time you were negotiating with Bellingham Cold

25  Storage, correct?

1   A   Yes, that was his desire.  And, you know, we questioned

2   that because there wasn't a thorough plan that was put in

3   front of us or in front of the Portionables team of how they

4   could successfully pull that off.

5   Q   Right.  But you found the plan in late April when you were

6   digging around trying to find things out about Mr. Calliari,

7   correct?

8   A   No, not about Mr. Calliari.  I found a plan in April of

9   2008 in the files of Jim Hart, who was the former quality

10  manager at Portionables.  And April 2008 was around the time

11  we had failed the -- or found out that we had failed the USDA

12  inspection.

13      And my responsibilities in April 2008 over operations, I

14  was doing some research to find out if there was any other

15  inspections or audits or anything that was related to the

16  Portionables South Dakota plant.  And that's when I came

17  across that file.

18  Q   Right.  And you sent it out to your superiors.  You said:

19  Here's what I found about what Mr. Calliari had in mind?

20  A   That was the first real evidence of a true plan that we

21  had seen up until that point, yes.

22  Q   Could I ask you to take a look at the document that's been

23  marked as Exhibit 41 in this case?  And I'm just going to ask

24  you about the first page.  Do you have Exhibit 41 in front of

25  you?

```
 1   A    Yes, I do.

 2   Q    Do you recognize it?

 3   A    Yes.

 4   Q    Okay.  This is an e-mail in September of 2007 from Mike

 5   Gordy to you, correct?

 6   A    That is correct.

 7            MR. FISHER:  Your Honor, plaintiffs move admission of

 8   Exhibit 41.

 9            MR. LINEHAN:  No objection, your Honor.

10            THE COURT:  41 will be admitted.

11            (Exhibit(s) 41 admitted.)

12   BY MR. FISHER:

13   Q    All right.  Mr. McEvoy, let's talk about Exhibit 41 for a

14   minute, all right?

15   A    Okay.

16   Q    Now, Mr. Gordy's writing to you in the fall of 2007.  And

17   he says here that the role they have in mind for you is to be

18   the good guy.  Do you see that?

19   A    Yes, I did.

20   Q    What was it you understood that your boss was telling you

21   to do?

22   A    Go in and establish a relationship with Bellingham Cold

23   Storage.  There was some friction that had developed over the

24   course of -- I don't know how long.  There wasn't a real good

25   relationship.  And I was just trying to be the good guy going
```

1  in and reestablishing the relationship between our two

2  companies.

3  Q   Right.  The good guy is you; the bad guy is Mr. Calliari,

4  correct?  That's what you're playing off against here,

5  correct?

6  A   I don't know.  It doesn't state that here.

7  Q   I'm just asking for your understanding about what your

8  boss was telling you to do.

9  A   I believe Mr. Gordy was taking the bad guy role.  I don't

10  remember for certain.

11  Q   Okay.  In the next paragraph, they talk about you setting

12  up a, quote, unauthorized conversation with Doug Thomas from

13  Bellingham Cold Storage.  Do you see that?

14  A   Yes.

15  Q   What was the reference there to the unauthorized

16  conversation that you were going to have with Mr. Thomas?

17  A   Again, those are Mr. Gordy's words.  And his negotiation

18  style is a bit different than mine.  Nothing was unauthorized

19  about me being there.  I was simply going in to tell

20  Mr. Thomas that Unilever is putting pressure on Portionables

21  to take some costs out of the system.  And I was trying to

22  apply some of that similar pressure to him to let him know we

23  were looking for cost savings.

24  Q   In the last paragraph, before he asks for your thoughts on

25  the suggestions he has here in the e-mail, can you read that

1  paragraph?  Can you read that out loud for the jury?

2  A    Last but not least is to convey the message that you,

3  George, and I are working very hard to make the direct

4  shipping go away and need to reach a level of concessions

5  that we can push through.

6  Q    Okay.  So the plan, Sargento's plan here, you, Mr. Hoff,

7  and Mr. Gordy, the plan here is to tell Doug Thomas:  Hey, I

8  can make this direct shipping thing go away if you do a deal

9  with us?  Right?  That's what you were being told to do here

10 by your boss?

11 A    We were trying to negotiate the best deal we could and

12 avoid any future litigation because Mr. Thomas did threaten

13 to take Portionables to court if they direct shipped.  He

14 believed it was a violation of the contract between them.

15 Q    Mr. McEvoy, you were negotiating away Mr. Calliari's plan

16 to direct ship, right?  That's what your boss was telling you

17 to do in September of 2007, correct?

18 A    Simply reading the last paragraph, that's what can be

19 inferred.

20 Q    Can we infer that?

21 A    Well, that's what it reads.  I was telling you, we were

22 not doing anything to trade.  We were just trying to

23 negotiate the best deal we possibly could.

24 Q    Okay.  Nobody told Mr. Calliari at this time that direct

25 shipping was being negotiated away by Sargento with

1  Mr. Thomas in order to cut a deal, right?  No one told him

2  that?

3  A   I know I didn't.  I can't be certain anybody else did.  I

4  know I did not.

5  Q   Right.  Because at this very time he was telling you that

6  he wanted very much to direct ship, correct?

7  A   And we were telling him that we wanted to see a thorough

8  plan that could be executed to carry that out.

9  Q   Okay.  Now, we discussed a few moments ago that you

10  eventually found a plan, correct?

11  A   I found a piece of that plan in April of 2008, yes.

12  Q   Okay.  Can I ask you to direct your attention to Exhibit

13  50?

14  A   Okay.

15  Q   This has previously been admitted in this trial.  This is

16  an e-mail from you to Mr. Gordy, correct?

17  A   Yes.

18  Q   You are doing some digging, and you found an assessment of

19  direct shipping related to Unilever from Bellingham, correct?

20  A   Yes.

21  Q   And it says:  It gives us a sense for how Patrick views

22  the situation?

23  A   That's correct.

24  Q   Right?  This is in April of 2008?

25  A   Correct, in April of 2008, when there was some letters

1   going back and forth amongst attorneys.

2   Q    Right.  So by this point, what you're doing is you're

3   working on building a case or a response to Mr. Calliari's

4   complaints about what happened to him while he was president

5   of Portionables, correct?

6   A    This was the first actual document that we had seen

7   related to a plan.

8   Q    Can you turn to page 3 of Exhibit 50?  Do you have that?

9   A    Yes.

10  Q    Do you see item No. 4 there, a certain proposal about one

11  way that the logistics might work for that proposal?

12  A    Yes.

13  Q    We heard some other testimony earlier about high risks and

14  high other things.  This is a proposal that shows a low

15  product risk and a low shutdown risk, correct?

16  A    That's what it says here, yes.

17  Q    And, in fact, you did ultimately effectively negotiate

18  away direct shipping, correct, with Doug Thomas?  You made a

19  handshake deal with him before you even talked to Calliari,

20  correct?

21  A    We negotiated a deal that brought some cost savings to the

22  bottom line of Portionables.

23  Q    Right.  I understand you think it saved some money.  You

24  didn't like direct shipping.  And so without seeking

25  Mr. Calliari's approval or consent, you negotiated that away,

1  correct?

2  A   "Negotiated away" is not the term I would use.  We

3  negotiated an alternative plan that would bring cost savings

4  to Portionables.

5  Q   But it wasn't direct shipping?

6  A   It was not direct shipping, no.

7  Q   Right.  Okay.  Let's go on to South Dakota regulatory

8  issues for a moment.  Are you familiar with the regulatory

9  issues that arose in South Dakota?

10  A   I'm somewhat familiar.  I'm not familiar with every

11  intimate detail, no.

12  Q   Okay.  In the spring of 2008, Karl Linck decided that he

13  thought that the South Dakota plant should have a dairy

14  license, correct?

15  A   Well, that's what we had learned based on a failed USDA

16  inspection, that the plant did not have a license and that

17  one should be acquired.

18  Q   Mr. Linck decided to go -- took it upon himself to go to

19  the state of South Dakota and raise the issue, correct?

20  A   It certainly wasn't upon himself.  I'm sure there was

21  direction from Mr. Gentine or his boss, Mr. Mark Rhyan.

22  Q   Sargento made the decision in the spring of 2008 to go to

23  the state of South Dakota and say, essentially:  There's a

24  problem with our plant in South Dakota?

25      That was the decision that was made, correct?

1   A   Well, anytime you have the USDA involved in something like

2   that, it's a pretty serious deal.  So, yes, we went and tried

3   to get some more information.

4   Q   Right.  And of course it's a serious deal.  And so if the

5   decision was going to be made to go to the state of South

6   Dakota and open up a Pandora's box of problems for the

7   company, you would expect Mr. Calliari to be involved in that

8   decision, correct?

9   A   I certainly know he was made aware of the issues that were

10  going on.  I didn't communicate every single detail with him.

11  And I can't speak to if other people did or didn't.

12  Q   Right.  He got some e-mails.  He got a couple e-mails

13  about general topics, correct?

14  A   And we discussed it at our weekly management team

15  meetings.

16  Q   You have no idea whether anyone told Mr. Calliari before

17  Sargento went to the state of South Dakota that you were

18  going to do that.  You have no idea, correct?

19  A   Me, personally, no, I don't.

20  Q   Okay.  But you're the Portionables person assigned -- or

21  excuse me.  You're the Sargento person assigned to

22  Portionables, correct?

23  A   To Portionables, yes.

24  Q   Okay.  And when this regulatory issue arose, who did

25  Sargento hire to evaluate the issues?

1   A   I think we first had some legal consultation in there to

2   better understand, you know, the South Dakota regulations and

3   understand what the USDA was looking for at the plant.

4   Q   Right.  Can you be more specific?  What law firm did you

5   hire to analyze the regulatory issues in South Dakota?

6   A   The first contact would have been Reinhart in Milwaukee,

7   who's our primary law firm.

8   Q   Okay.  You went to Bob Henkle and Patrick Hodan, correct?

9   A   I didn't personally, no.

10   Q   But you know for a fact that Sargento did that, correct?

11   A   Mr. Henkle would have been the first person we started

12   with, yes.

13   Q   Okay.  Did you know that they were writing letters to

14   Mr. Calliari suggesting that it would be appropriate for him

15   to be fired at that point in time?

16   A   To Mr. Calliari?

17   Q   Correct.

18   A   Yeah.  Well, I have seen those letters, yes.

19   Q   Okay.  So the law firm that you hired to analyze the

20   regulatory issues was the firm that was actually threatening

21   to terminate Mr. Calliari, correct?

22   A   Reinhart was our primary law firm, so, yeah, they would

23   have been involved in both cases.

24   Q   Right.  So whose interest is Reinhart looking out for when

25   you're making decisions about what to do in South Dakota?

1      MR. LINEHAN:  Objection.  Calls for speculation.

2  Calls for a legal conclusion.

3      THE COURT:  Sustained.

4  BY MR. FISHER:

5  Q   All right.  Mr. McEvoy, can I ask you to look at the

6  document that's previously been marked as Exhibit 28?

7  A   Okay.

8  Q   Do you have that in front of you?

9  A   Yes, I do.

10  Q   What is Exhibit 28?

11  A   It's a letter -- or e-mail from Mr. Gordy to Mr. Linck,

12  copying myself and Mark Rhyan and Lee McCollum of Sargento.

13  Q   And what is the date of that e-mail?

14  A   May 28, 2008.

15  Q   And this has previously been offered into evidence.  By

16  this point in time, you were working on hiring expert

17  witnesses for the purpose of bringing claims against the

18  shareholders?

19      MR. LINEHAN:  Objection.  Lack of foundation.

20      THE COURT:  Sustained.

21  BY MR. FISHER:

22  Q   Do you know whether Sargento was contemplating making

23  claims against the shareholders in connection with the

24  regulatory issues in late May of 2008?

25  A   I believe that was possible at that time, yes.

1   Q    Okay.  So Exhibit 28 is an e-mail that's directed to

2   building a case against the shareholders, correct?

3   A    It was directed at hiring some consultants to come in and

4   assess the situation.  I believe there were some ongoing

5   discussions about what this meant in the big scheme of things

6   as far as, you know, the stock purchase agreement and things

7   like that.

8   Q    Mr. Calliari is not included in any of those discussions,

9   correct?

10  A    He's not on this e-mail, no.

11  Q    Right.  Let's talk about the Unilever negotiations for a

12  minute and what happened with those.  Now, you weren't

13  heavily involved in that subject, is that correct?

14  A    That is correct.

15  Q    But you were on calls or in meetings where Mr. Calliari

16  told Sargento that he did not think it was a good idea to

17  reduce the price of the contract, correct?

18  A    I was not involved in all the meetings.  I never heard him

19  mention that in my presence.

20  Q    Okay.  Can I ask you to turn to page 124 of your

21  deposition testimony?

22  A    Okay.

23  Q    Start at line 5.  Are you with me?

24  A    Yes.

25  Q    All right.  Question:  Do you recall Mr. Calliari

1   expressing his view that he had European contacts at Unilever

2   and he was confident that Unilever wasn't going to allocate

3   funds for self-production?

4          Answer:  I remember him saying that, yes.

5          When do you remember him saying that?  Was it in this

6   call you just discussed or some other time?

7          May have been in that call.  I know it was probably

8   in the fall of 2007 and August of 2007, when negotiations

9   were taking place.

10         MR. LINEHAN:  Objection, your Honor.  Not proper

11   impeachment.

12         THE COURT:  Sustained.  The jury should disregard the

13   last reading.  It's not impeaching.

14   BY MR. FISHER:

15   Q   Mr. McEvoy, is your testimony today that you have no

16   recollection of Mr. Calliari saying that he was opposed to

17   reducing prices for Unilever in the summer of 2007?

18   A   As I said, I wasn't present at all the meetings.  I know

19   he didn't think that they were going to self-manufacture, and

20   the only extent of what I heard --

21         THE COURT:  You need to slow down.

22   A   As I said, I wasn't present for all the meetings or all

23   the conference calls --

24         THE COURT:  Please, slow down.

25         THE WITNESS:  Sorry.

A    And I know he did not believe that they could self-manufacture.  But, again, that was the only thing that I ever heard him say directly when I was at a meeting.

BY MR. FISHER:

Q    Okay.  And I'm not asking about any meetings you weren't at, okay?  Just your personal knowledge of what you heard. You heard in the summer of 2007 that he was opposed to reducing the price for Unilever, correct?

A    I did not hear that directly in any of the meetings I was present at.  I heard it secondhand through somebody else. But I didn't hear it directly from Mr. Calliari.

Q    You did not hear that in a call that you participated in?

A    Which call?

Q    I'm just asking you:  Did you have a call in which you heard him say those words in the summer of 2007?

A    Not in the summer of 2007.  The only thing I was directly involved with that he said around that was he didn't believe that they were going to self-manufacture, that the money wasn't there to do that.

Q    And when he made those statements, who else was present besides yourself?

A    I don't recall what you mean.  That would have been -- in August, there were several things going on.

Q    You don't recall Mr. Gordy and Mr. Gentine being present at a meeting in the summer of 2007, where that subject was

1   discussed?

2   A   As I said, there was several meetings.  I wasn't involved

3   in all of them.  I don't know which specific meeting you're

4   referring to.

5   Q   Okay.  Well, let's talk about what you heard secondhand

6   from others at Sargento.  You had heard from others in the

7   summer of 2007 that Mr. Calliari was opposed to redoing the

8   Unilever deal, correct?

9   A   He was opposed to it.  But I also heard that he made an

10  additional offer, a different offer as well.  Secondhand, I

11  heard that.

12  Q   So if someone were to say that opposition to the Unilever

13  amendment suddenly arose in spring of 2008, that's not true,

14  correct?

15          MR. LINEHAN:  Objection.  Lack of foundation.

16          THE COURT:  Sustained.

17  BY MR. FISHER:

18  Q   You heard about -- well, I don't want to know what anyone

19  else heard.  You heard about his objections to it in the

20  summer of 2007, correct?

21  A   There was some objections that were taking place, yes.

22  Q   Okay.  So you were aware of those nine months before the

23  spring of 2008, correct?

24  A   Yeah, yes.

25  Q   Okay.  Could I ask you to take a look at the document

1  marked as Exhibit 18?  Do you have Exhibit 18 in front of

2  you?

3  A   Yes, I do.

4  Q   What is that?

5  A   It's an e-mail from Mr. Gordy to Mr. Gentine, copying

6  Mr. Hoff, on October 17, 2007.

7          MR. FISHER:  Your Honor, plaintiffs offer Exhibit 18.

8          MR. LINEHAN:  Sorry.  I didn't hear the question.

9          THE COURT:  He's offering Exhibit 18.

10         MR. LINEHAN:  I object.  This witness has no

11 foundation to authenticate or testify about the subject, at

12 least as to the top e-mail.

13         MR. FISHER:  And, your Honor, this is an admission of

14 a party opponent.  The foundation establishes who the senders

15 and recipients are.  And they've stipulated to authenticity,

16 that it is what it is.

17         THE COURT:  It still doesn't mean you've laid a

18 foundation that he has any knowledge to be questioned about

19 this.  Sustained.

20 BY MR. FISHER:

21 Q   Mr. Gordy (sic), do you recall in the fall of 2007, do you

22 recall your boss telling you that he wasn't comfortable with

23 the way the Unilever relationship was being managed?

24 A   You addressed me as Mr. Gordy, but --

25 Q   I'm sorry.  I do that sometimes.  Mr. McEvoy, do you

1    remember being told by your boss in the fall of 2007 that

2    they had concerns, that Sargento had concerns about the way

3    that the Unilever relationship was being managed?

4           THE COURT:  Mr. Fisher, I don't know that the jury

5    will know what you mean by the boss.  Who is it you are

6    speaking of?

7           MR. FISHER:  Fair enough.  Sorry.

8    Q   Mr. Gordy -- Mr. McEvoy, I'm asking you, do you recall in

9    the fall of 2007 Mr. Gordy telling you that Sargento was

10   concerned about the Unilever relationship?

11   A   He had expressed some concern to me, yes.

12   Q   And do you recall Mr. Gordy telling you that he thought

13   that Sargento should start developing deeper relationships

14   with Unilever?

15   A   Well, we really didn't have any relationships with them.

16   And, you know, they were our largest customer of

17   Portionables.  And we wanted to get to know them better and

18   have them get to know us better.

19   Q   So do you recall being told to develop those relationships

20   in the fall of 2007?

21   A   Well, I established a relationship via telephone with

22   Mr. Mike Pusterla earlier.  He was coming to the plant, and I

23   simply wanted to, you know, establish a face-to-face

24   relationship with him.

25   Q   Do you remember Mr. Gordy telling you to stick to him like

1   glue during that visit?

2   A   Only because I just read it in that document you showed

3   me.

4   Q   Did that refresh your recollection about whether he said

5   that to you?

6   A   When I read it, yes.

7   Q   Okay.  So in the fall of 2007, Mr. Gordy's telling you to

8   develop your own relationship with Unilever, right?

9   A   A relationship with a person that I had previous

10  discussions with.

11  Q   And you knew a visit was coming up.  And the instructions

12  from Mr. Gordy were to stick to him like glue while he was in

13  Bellingham during that trip, correct?

14  A   Those were the words he used.  It wouldn't be my words.

15  Q   You didn't tell Mr. Calliari that that was the plan by

16  Sargento, correct?

17  A   No, I didn't.

18  Q   All right.  Ultimately, you were told by Mr. Gordy that

19  Mr. Calliari would not be involved in the Unilever

20  discussions, correct?

21  A   Could you be more specific with a point in time?

22  Q   Sure.  In the spring of 2008, say April, Mr. Gordy told

23  you that Mr. Calliari was out of the Unilever negotiations,

24  correct?

25  A   Told me only in response to some of the documents going

1    back and forth between lawyers.  That was the only context

2    for which he -- that I was aware of.

3    Q    Right.  What he told you was that Mr. Calliari's out, he's

4    not participating in these discussions anymore?

5    A    That was my understanding at that time.

6    Q    Right.  Okay.  Let's talk about the trip that

7    Mr. Ioannides made to the States in March of 2008, all right?

8    He came out to see you, correct?

9    A    He came to see the plant and several members of the

10   management team, yes.

11   Q    You knew for weeks in advance that he was coming, correct?

12   A    Approximately a week or ten days.  I don't know how many

13   weeks ahead for sure.

14   Q    You didn't get wind of that from Larry Riley, that

15   Mr. Ioannides was coming out to visit?

16   A    I think it was Mr. Calliari that had told several of us

17   that Mr. Ioannides was coming to the plant.

18   Q    Okay.  In fact, you were told that in advance so you could

19   be available to meet with him, correct?

20   A    Yes, and I was available.

21   Q    All right.  And during that meeting, they discussed with

22   you concerns they had about the issue of operational control,

23   correct?

24   A    That is correct.

25   Q    Okay.  And they indicated they weren't happy with the way

1   Unilever was being handled?

2   A   That was one of the subjects that was discussed, yes.

3   Q   Okay.  They indicated to you that they felt that Sargento

4   had overstepped its bounds in the Bellingham Cold Storage

5   matter?

6   A   That was another subject we discussed, yes.

7   Q   Okay.  Mr. Ioannides and Mr. Calliari said that they

8   didn't think Sargento was honoring the spirit of the

9   agreements that had been signed the previous year, correct?

10  A   They said that.  And I simply told them that I wasn't the

11  right audience to be having that being told to, that they

12  should direct their concerns to Mr. Hoff and Mr. Gentine.

13  Q   Okay.  And so you actually told them:  You should really

14  write a letter about these things, right?

15  A   I suggested they put their concerns in writing and submit

16  them to Mr. Hoff and Mr. Gentine, yes.

17  Q   Okay.  So when a letter came in a couple days later, you

18  were expecting a letter, correct?

19  A   Some type of letter, sure.

20  Q   Right.  In fact, they were just doing what you had told

21  them to do when they came out to the plant, right?

22  A   Again, it was my recommendation, they have these concerns,

23  that talking to me wasn't going to get them anywhere, they

24  should put their concerns in writing.

25  Q   Now, in January of 2008, you were supposed to begin

1    actually reporting directly to Mr. Calliari, is that correct?

2    A    Yes.  I was promoted in mid-January of 2008 to a vice

3    president role and assumed greater duties at Portionables

4    over operations and human resources.

5    Q    But, in fact, it didn't really work that way, correct?

6    A    Could you be more specific?

7    Q    Yes.  You felt that in fact you continued reporting to

8    Mr. Gordy on a dotted line basis?

9    A    On a dotted line basis for other integration activities,

10   yes.

11   Q    By the spring of 2008, you were essentially spying on

12   Mr. Calliari, correct?

13            MR. LINEHAN:  Objection.  Argumentative.

14            THE COURT:  Overruled.

15   A    Would you repeat the question?

16   BY MR. FISHER:

17   Q    Yes.  By the spring of 2008, you were essentially in

18   Bellingham spying on Mr. Calliari and gathering intelligence

19   for Sargento, correct?

20   A    That was never my role.  There were certain things that

21   were being traded back and forth.  And given the lawyer

22   discussions that were taking place, I shared certain pieces

23   of information with Mr. Gordy and Mr. Hoff and Mr. Gentine.

24   Q    Sorry.  What do you mean by that?  So do you think that's

25   a fair characterization, that you were gathering intelligence

```
1    and overhearing conversations around the office and then
2    reporting those back to the home office?
3    A   There were certain subjects that, you know, were
4    contentious.  And there were certain things that I did share
5    back because they were areas of concern on both sides.
6    Q   So, in your view, there really wasn't full transparency
7    between Sargento and Mr. Calliari by the spring of 2008,
8    correct?
9    A   It was --
10             MR. LINEHAN:  Objection.  Vague.
11             THE COURT:  Sustained.  Let's rephrase the question,
12   please.
13   BY MR. FISHER:
14   Q   Was it your view that there was a free and full exchange
15   of information taking place between Sargento and Mr. Calliari
16   in the spring of 2008?
17   A   It was a difficult time to be working at Portionables on
18   the management team.  There were conflicts going both ways.
19   I would say I wasn't the only one that felt like I was being
20   trapped and caught in the middle of certain things.
21   Q   Right.  And so there was a picking and choosing of what
22   subjects and information would go to Mr. Calliari, correct?
23             MR. LINEHAN:  Objection.  Lack of foundation.
24   BY MR. FISHER:
25   Q   By you.  I'm just asking about you.
```

1      THE COURT:   Rephrase the whole question then, please.

2      MR. FISHER:   Thank you.

3   Q   I'm just asking about you, not what everyone at Sargento

4   was doing.   In fulfilling your duties, you were selectively

5   sending information to Mr. Calliari on some subjects but not

6   others in the spring of 2008, correct?

7   A   That's correct, given the friction that was taking place.

8   Q   How did you decide what he should and shouldn't get with

9   respect to Portionables' business?

10  A   I wasn't getting much direction from him.   So I was just

11  trying to convey and do the best job I could with giving him

12  information on topics.   You know, our plant manager had given

13  us notice, so I was just, you know, trying to keep him

14  informed the best I could throughout the entire process.   It

15  was a hard time to be caught in the middle.

16  Q   But the one thing you were told not to communicate with

17  him about was Unilever, correct?

18  A   I had very little to do with Unilever.   So I was -- you

19  know, I couldn't be much help there to either side.   I just

20  was not really a high level part of that.

21  Q   The question is a little different.   You were told not to

22  communicate with him on the subject of Unilever, correct?

23  A   In what context?

24  Q   In any context.   In the spring of 2008, you were not to

25  send him information about the negotiations with Unilever?

1   A   Okay.  The negotiations I had very little to do with.  And

2   I did not send him anything.

3   Q   But you were told not to, right?

4   A   I believe that's what the case was.

5   Q   Ultimately, Sargento took it upon itself to amend the

6   Unilever contract, correct?

7   A   There wasn't an amended -- or an amendment to the

8   agreement that was signed, yes.

9   Q   And that took place after Mr. Calliari had left the

10  company?

11  A   I believe, yes.  I think it was in late June of '08.

12  Q   Okay.  Who was running Portionables after Mr. Calliari

13  left?

14  A   Mr. Gordy was put into a general manager role.  And my

15  role did not change at Portionables.

16  Q   In January of 2008, when your reporting duties changed,

17  you became a vice president, is that right?

18  A   A vice president of Sargento, yes.

19  Q   Right.  But it was related to Portionables' operations,

20  correct?

21  A   That is correct, and human resources.

22  Q   Right.  The decision by Sargento to amend the Unilever

23  contract had an impact on EBITDA in 2008, correct?

24          MR. LINEHAN:  Objection, your Honor.  We've already

25  discussed this outside of the proceedings.

1        THE COURT:  Sustained.

2   BY MR. FISHER:

3   Q   Are you familiar with the changes that were made to the

4   contract?

5   A   Yes, I am.

6        THE COURT:  I'm sorry, Mr. Fisher.  Which contract?

7        MR. FISHER:  The Unilever contract.

8   Q   Are you familiar with the changes in the price terms of

9   the contract?

10  A   Yes, I am.

11  Q   Okay.  What were the changes in the price terms of that

12  contract?

13  A   The initial 20 million pounds that we would sell Unilever,

14  the price remained the same.  Any product that was sold over

15  the 20 million pound mark was sold at 23 cents a pound.

16  Q   When approximately in 2008 did the change in the price

17  kick in?

18  A   Remembering, it would have been September-October of 2008.

19  Q   So basically the fourth quarter of 2008, based on the

20  amendment, the new pricing went into effect?

21       MR. LINEHAN:  Objection, your Honor.  I don't know

22  why we're discussing this.  My understanding was there was a

23  ruling that discussions of these topics were not appropriate

24  for the jury.

25       THE COURT:  Sustained.

1    MR. FISHER:  And, your Honor, I'll take it up during

2  a break.

3  Q    Was Bellingham making money in late 2008, after the

4  contract amendment went into effect?

5    MR. LINEHAN:  Objection.  Lack of foundation.

6    THE COURT:  Sustained.

7  BY MR. FISHER:

8  Q    You were the operations manager for Portionables, correct?

9  A    Correct.

10  Q    Okay.  Which included both Bellingham and South Dakota?

11  A    That's correct.

12  Q    Okay.  And you are familiar with the operations?

13  A    Yes, I am.

14  Q    All right.  After the pricing change, was Portionables'

15  Bellingham facility running profitably or not?

16    MR. LINEHAN:  Objection.  Relevance.

17    THE COURT:  Sustained.

18    MR. FISHER:  And, your Honor, I'm just trying to

19  establish injury in fact, for that purpose only.

20  Q    How about, by the end, in 2008, in the fourth quarter of

21  2008, the South Dakota plant was completely full, correct?

22  A    Full.  We were running three shifts seven days a week,

23  yes.

24  Q    I mean, just running flat out during that time period,

25  correct?

1   A    That's correct.

2   Q    It was your view that there were pricing opportunities for

3   Portionables in South Dakota, correct?

4           MR. LINEHAN:  Same objection, your Honor.

5           THE COURT:  Ladies and gentlemen, I think it's time

6   for you to go to lunch.  So how about if you close up your

7   pads and your pens.  Please remember the admonitions that

8   I've given you.  And have a good lunch.  Be back at the same

9   time.

10          (Jury leaves courtroom.)

11          THE COURT:  Okay.  Let's explain to me what you are

12  doing here, Mr. Fisher.

13          MR. FISHER:  Your Honor, a couple of things.  One is,

14  Sargento insisted during the pretrial conferences that we

15  establish injury in fact to prove up our claim for breach of

16  the stock purchase agreement.  So as I understood it, there

17  was a suggestion that we had to show that the removal of

18  operational control had an adverse effect on the

19  shareholders, that they had an interest that had been harmed

20  to establish injury in fact.

21      So that's one purpose of it.  We did not plan when we came

22  in to trial, really, frankly, to talk about these issues.

23  What happened during opening was that Mr. Sulkin got up and

24  he said -- we've now seen projections for how the year was

25  going to go, and Mr. Sulkin got up, and he told the jury that

1    the reason notice was given that Mr. Calliari resigned, and

2    the whole reason we're here, this is a big sham because they

3    were never going to hit the numbers in 2008, and that that

4    was the motive for what happened here.  I mean, it was argued

5    very explicitly in the opening.  That has been the suggestion

6    throughout.

7        Mr. Sulkin just asked Mr. Calliari about his discussions

8    with Mr. Hoff in January of 2008 and whether they were going

9    to hit the numbers or not.  So for purposes of completeness,

10   and for their motive and for willfulness and a number of

11   other reasons, I think it's appropriate to show how the

12   company was managed after Mr. Calliari left.

13       In fact, you know, what it will show is that this

14   gentleman will testify that prices could have been increased

15   10 to 15 cents a pound in South Dakota, but they didn't do

16   that until 2009, okay, that they were running at a loss, that

17   the great contract that was renegotiated by Mr. Gentine

18   actually forced the Bellingham plant -- it was running at a

19   loss once the price point kicked in, okay?  So they lost

20   money in the fourth quarter of the year because the contract

21   had been changed.

22       So we're trying to give the jury a complete picture of

23   what happened here.  And we didn't raise the issue of EBITDA.

24   We objected to EBITDA.  Then evidence has been allowed to

25   trickle in about projections and why numbers were missed and

1   what motives were.

2      So we're trying to tell the whole story here, and we think

3   it's pretty compelling.

4          MR. LINEHAN:  Your Honor, I guess I have two answers

5   for that.  The first thing being that our theory of the case

6   is not that the company wasn't actually going to make money.

7   Whether it was going to or wasn't really isn't the point.

8   It's --

9          THE COURT:  Well, that's not what Mr. Sulkin said in

10  his opening statement.  I mean, he stood up and said that

11  they weren't going to make their projections, that's why they

12  hatched this plan, to get themselves out.

13         MR. LINEHAN:  And, your Honor, actually, a finer

14  point to that is that Mr. Calliari didn't believe he was

15  going to make it.  Whether they eventually did or didn't is

16  beside the point.  The reason they hatched the plan, in our

17  view, is that Mr. Calliari had come to the conclusion the

18  customers weren't coming in and it didn't appear there was

19  any way he was going to make his earnout.  And Mr. Ioannides

20  reached the same conclusion when he came and talked to

21  Mr. McEvoy in March.  So that's our theory.  It's not whether

22  the company actually turned out to be profitable or not.

23     I also understood from our pretrial discussions that all

24  issues relating to Mr. Calliari's performance were off

25  limits.  And so now, to be questioning Sargento's performance

1  after Mr. Calliari resigned, it seems like an uneven playing

2  field.

3         THE COURT:  Well, I thought at the pretrial

4  conference I was pretty clear that we weren't going to talk

5  about Mr. Calliari's performance.  And I thought I also made

6  it very clear that we weren't going to be talking about who

7  made money, who didn't make money, and EBITDA, because all of

8  you decided you were going to take that to a different forum.

9      So anything that's been leaking into this is because

10  nobody objected along the way, including Mr. Sulkin's opening

11  statement.  Look, we're not going to go into this.  We're not

12  going to be establishing whether or not Portionables was

13  going to make money or whether Portionables was going to lose

14  money.  Mr. Sulkin is going to be limited to what

15  Mr. Calliari thought and not what the reality on the ground

16  was.  And that's precious little in this case.

17         MR. FISHER:  Your Honor, in this case, can we talk

18  about what they thought, what their motives were for the

19  actions they were taking prior to his departure, what they

20  thought about where it was going, since they put that issue

21  -- I mean, apparently we're going to litigate that issue.

22  Can we talk about their motive for the way they were treating

23  Mr. Calliari and such?

24         THE COURT:  Well, that's what this whole thing has

25  been about, hasn't it, in the sense that we have put in

1    multiple things, that from the beginning they inserted their

2    own people and started taking over on the particular issues

3    that we've discussed?

4        So that's always been a part.  But I don't know how this

5    last line of questioning as to what the numbers were at the

6    plant or how much production they had -- I'm a little shocked

7    that South Dakota is even -- that anybody mentioned it.  I

8    thought South Dakota was out of here.  But you all stuck in

9    South Dakota.  So let's stick to the things that we

10   originally thought.

11       Now, as to the issue of whether or not you have to prove

12   or have damages, I'm not so sure that I'm even going to

13   submit that issue to the jury, because I don't know that we

14   need to get there.

15           MR. FISHER:  Okay.  Fair enough, your Honor.  Just,

16   you know, for the record, I don't want something directed

17   against me because we didn't put in -- establish a sufficient

18   record of injury in fact based on removal of operational

19   control.

20       So I understand what you're saying.  I will limit it to

21   that.  And I only have some questions about their view of the

22   EBITDA, but before these events took place, not what happened

23   after Mr. Calliari left, not what actually happened.  I'll

24   move completely off this line and take these two pages out,

25   and I'll go from there.

1          THE COURT:  That would be good.

2          MR. FISHER:  Okay.

3          THE COURT:  All right.  Everybody understand?

4          MR. LINEHAN:  Yes, your Honor.

5          THE COURT:  Okay.  I'll see you after lunch.

6          (Lunch recess.)

7          THE COURT:  Are we ready to go?

8          MR. FISHER:  We are, your Honor.  I wanted to put in

9     a short offer of proof on the line of questioning of

10    Mr. McEvoy.  But I can do it whenever you would prefer.

11         THE COURT:  Go ahead.  Please be seated.

12         MR. FISHER:  Your Honor, plaintiffs would make an

13    offer of proof on a line of questioning of witness Mike

14    McEvoy, that if asked to testify at this trial, we expect

15    that Mr. McEvoy would testify to the following:  That the

16    decision by Sargento to amend the Unilever contract had an

17    impact on 2008 EBITDA; that Bellingham became unprofitable in

18    late 2008 because of the new deal that Sargento made with

19    Unilever; that the plant was actually losing money on the

20    Unilever deal after the first 20 million pounds; EBITDA for

21    Portionables went negative in the fourth quarter; South

22    Dakota was at capacity in the final quarter of 2008; that

23    Mr. McEvoy's view was that prices in South Dakota could be

24    increased 10 to 15 cents per pound in the fourth quarter of

25    2008; he could not explain why they elected not to increase

1   pricing in South Dakota; and that those increases would, in

2   fact, have enhanced the earnout prospect for the

3   shareholders.

4           THE COURT:  Okay.  Are we ready to bring in our jury

5   now?

6           MR. FISHER:  Yes.

7           THE COURT:  Okay.  Let's go get them.  And where is

8   our witness?  Okay.  Please come up, Mr. McEvoy.

9           (Jury enters courtroom.)

10          THE COURT:  Please be seated.  Ladies and gentlemen,

11  let's turn our attention back to Mr. Fisher, please.

12     Go ahead.

13  BY MR. FISHER:

14  Q   Good afternoon, Mr. McEvoy.

15  A   Good afternoon.

16  Q   I was asking you some questions about what your function

17  was at Portionables in the spring of 2008.  And I asked you

18  some questions about whether you were essentially providing

19  intelligence on Mr. Calliari's activities.  I would like to

20  direct your attention to the document that has been marked as

21  Exhibit 51 in this case.

22  A   Okay.

23  Q   Do you have 51?

24  A   Yes, I do.

25  Q   Do you recognize it?

1   A   Yes, I do.

2   Q   What is Exhibit 51?

3   A   It's an e-mail from myself to Mr. Gordy on Wednesday, May

4   28, 2008.

5           MR. FISHER:  Your Honor, plaintiffs would offer

6   Exhibit 51.

7           MR. LINEHAN:  No objection, your Honor.

8           THE COURT:  51 will be admitted.

9           (Exhibit(s) 51 admitted.)

10  BY MR. FISHER:

11  Q   Mr. McEvoy, this is an e-mail you sent to Mr. Gordy in May

12  2008, correct?

13  A   That's correct.

14  Q   And you've indicated here that this has high priority,

15  right?

16  A   That's what it says, yes.

17  Q   Right.  You have to click a special button when you're

18  sending an e-mail to make it a high priority, correct?

19  A   Yes, I believe so.

20  Q   Right.  Okay.  And you have here a specific time that you

21  typed into the message when you sent this e-mail, is that

22  right?

23  A   That's correct.

24  Q   What was the significance of the minute of the day that

25  this e-mail was being sent to Mr. Gordy?

1   A   I'm not sure about the significance of the time it was

2   sent.  It was an e-mail that I did write, something that I

3   did in the heat of the moment, kind of being caught up in the

4   hysteria of the fighting that was going back and forth.  You

5   know, I did write it.  But I did not take any further action

6   once I sent it out.  And with today's e-mail, once it's gone,

7   it's gone, type of thing.

8   Q   Right.  This is a description of the eavesdropping that

9   you were doing in the office, correct?

10          MR. LINEHAN:  Objection.  Mischaracterizes his

11  testimony.

12          MR. FISHER:  I'm sorry.

13          THE COURT:  Do you wish to rephrase?

14          MR. FISHER:  Sure.

15  Q   This is a description of the conversations that you were

16  hearing around the office, correct?

17  A   This is an example of one conversation.  We have an open

18  air office with cubicles.

19  Q   Right.  So what you were reporting back to is -- there's

20  reference to some people in this e-mail.  Who is Tom?

21  A   Tom would be Mr. Tom Kyle.

22  Q   And what is his role at Portionables?

23  A   At the time, he was the operations manager.

24  Q   Okay.  And who is Larry?

25  A   Mr. Larry Riley.  He was the controller at Portionables.

1   Q    So you're reporting to Mr. Gordy at Sargento that you

2   overheard a conversation between those two gentlemen about

3   the subject of direct shipping, correct?

4   A    That's what I wrote here, yes.

5   Q    And you went on to tell him that, from what you were able

6   to tell, there was a call involving Patrick on that subject

7   that day, correct?

8   A    With direct shipping, yes.

9   Q    Okay.  And you told Mr. Gordy that you were going to see

10  what else you could dig up on the subject of direct shipping,

11  correct?

12  A    That's what I wrote here, yes.

13  Q    This is during the period after Mr. Calliari gave notice

14  that he believed that Sargento was in breach of the

15  employment agreement, correct?

16  A    Yeah.  I believe he gave his notice five days before this

17  was sent.

18  Q    Okay.  So you were essentially helping to build a case

19  against the arguments that he had made to Sargento in his

20  notice of termination, correct?

21  A    Building a case?  Well, this was simply a conversation

22  that I was overhearing.  As I said, I wrote it.  I didn't

23  take any action, because after the fact, I just didn't feel

24  like it was the right thing for me to be doing, again, being

25  caught up in the middle of the fighting that was going on

1    between the two sides at that point in time, in May of 2008.

2    Q   Was it your belief that Sargento had a genuine interest in

3    keeping Mr. Calliari at the company for another four and a

4    half years at this point in time?

5              MR. LINEHAN:   Objection.  Lack of foundation.

6              THE COURT:  Overruled.

7    A   That wasn't a decision for me to decide.

8    BY MR. FISHER:

9    Q   Did you discuss Mr. Calliari's future with the other

10   executives at Sargento during this time period?

11   A   That wouldn't be for me to decide.  I worked for

12   Mr. Calliari.  That would be Mr. Gentine and Mr. Hoff's

13   decision.  Ultimately, Mr. Gentine.

14   Q   So he was your boss when you were listening to these

15   conversations around the office and reporting back, correct?

16   A   He was my boss, yes.

17   Q   Okay.  I want to talk just for a couple minutes about

18   projections that were swirling around in connection with

19   Portionables during the first half of 2008, okay?  Do you

20   recall receiving projections of earnings for Portionables for

21   the year 2008 from Larry Riley in May of that year?

22   A   I was involved in the forecasting process and received the

23   projections on a monthly basis.

24   Q   So you do recall receiving projections from Mr. Riley?

25   A   As I said, I did it on a monthly basis, correct.

1  Q   Do you recall what the projection was for earnings for

2  Portionables for calendar year 2008 on May 13th of that year?

3  A   On May 13th of that year, no, I wouldn't recall off the

4  top of my head no.

5         MR. FISHER:  Your Honor, may I approach the witness

6  for the purpose of showing him an exhibit that might refresh

7  his recollection?

8         THE COURT:  Go ahead.

9         MR. LINEHAN:  Mr. Fisher, can we have a copy?

10        MR. FISHER:  You sure can.

11 Q   Mr. McEvoy, have you had a chance to look at the document

12 that's been marked for identification purposes as Exhibit 64?

13 A   Yes, I have.

14 Q   Did that refresh your recollection about what the

15 projection was for EBITDA on or about May 13, 2008?

16 A   Yes, it does.

17 Q   What was the projection of EBITDA that was circulated

18 among management at Sargento on or about May 13, 2008?

19 A   This is showing a projection of 5.5 million dollars.

20        MR. LINEHAN:  Objection, your Honor.  Move to strike.

21 He has not shown these actually refreshed his recollection as

22 opposed to just reading off a document that someone else

23 created.

24        THE COURT:  So your objection is to foundation?

25        MR. LINEHAN:  Yes, your Honor, improper refreshing,

1   or lack of refreshing.

2           THE COURT:  Sustained.

3   BY MR. FISHER:

4   Q   Mr. McEvoy --

5           THE COURT:  The jury will disregard the last question

6   and the last answer.  Pose a new question.

7   BY MR. FISHER:

8   Q   With the benefit of reviewing your e-mail, what is your

9   current recollection of the EBITDA that was being circulated

10  among Sargento management as of May 13, 2008?

11  A   It was over 5 million dollars, 5.5.

12  Q   Okay.  Do you know how the earnout works?

13  A   I know very little.  But I know there's a formula at the

14  end of the day of how they get there, yes.

15  Q   You know the formula kicks in at 3 million dollars?

16  A   Yes, I do know that.

17  Q   Okay.  And every dollar above 3 million dollars, the

18  shareholders get paid 6 dollars, correct?  You are aware of

19  that?

20  A   Correct, that is part of the formula.

21  Q   Okay.  So rounding this, if this was about two and a half

22  million dollars over the 3 million dollar threshold, what

23  were the earning estimates -- using the earning estimates

24  that were in circulation at Sargento in May of 2008, what

25  would the multiple have been?  What would the earnout payment

1   have been?

2          MR. LINEHAN:  Your Honor, I object again to

3   foundation.

4          THE COURT:  Sustained.

5   BY MR. FISHER:

6   Q   I'm sorry.  You understand the earnout formula?

7   A   I do.  Basic.

8   Q   Okay.  Right.  It's six times earning, EBITDA, over 3

9   million dollars?

10  A   Correct.

11  Q   Okay.  So in May 2008, when earning forecasts were being

12  circulated, that translated to a projected 16 million dollar

13  payout for the shareholders, correct?

14         MR. LINEHAN:  Same objection, your Honor.

15         THE COURT:  Overruled.

16  A   Actually, looking at this document, this would come down

17  to about half a million dollars due to some duplication.  So,

18  in theory, you're down to 5 million of EBITDA, 2 million

19  dollars over that mark.

20  BY MR. FISHER:

21  Q   So 13 million dollars?

22  A   You're doing the math; I'm not.

23  Q   Right.  I'm trying to get you to do the math with me.  Is

24  that how the math would work?  If it's 5 instead of 5.5, they

25  are 2 million dollars over the earnout threshold, right?

1   A   Right.

2   Q   Times six takes us to 12, right?

3   A   That's correct.

4   Q   Plus one gets you to 13 million dollars, correct?

5   A   That would be the math, yes.

6   Q   Mr. McEvoy, I'd like you to take a look at what's been

7   marked as Exhibit 31 in this case.

8   A   Okay.

9   Q   I'd like to start by directing your attention to page 2 of

10  Exhibit 31, the bottom of this chain.

11  A   Okay.

12  Q   Do you have that in front of you?

13  A   Yes, I do.

14  Q   What is reflected on page 2 of Exhibit 31?

15  A   It's an e-mail from myself to Mr. Gordy on April 17, 2008.

16  Q   So we can try and publish this exhibit.  Other than the

17  e-mail at the top of page 1 from Mr. Hoff to Mr. Gentine,

18  below that, were you either the sender or the recipient of

19  all of these e-mails in this chain?

20  A   I was the sender in the first part of the string and the

21  recipient of the second one, it appears.

22  Q   Okay.  And then the third one, too.  There's actually four

23  messages here, right?

24  A   Four or five, yeah.

25          MR. FISHER:  Your Honor, plaintiffs would offer

1   Exhibit 31, with the exception of the single e-mail at the

2   top of the page.  And if the defendant wants that in, we

3   would have no problem with that.

4           MR. LINEHAN:  No objection, your Honor.

5           THE COURT:  31 will be admitted.

6           (Exhibit(s) 31 admitted.)

7   BY MR. FISHER:

8   Q   Mr. McEvoy, I'd like to take you back to page 2.  Do you

9   have that?

10  A   Yes, I do.

11  Q   This is your e-mail to Mr. Gordy on or about April 17,

12  2008, is that correct?

13  A   That is correct.

14  Q   And here you're reporting that Patrick was fishing around

15  about the Unilever contract, correct?

16  A   Yes, that's what I wrote.

17  Q   And he was asking you for some information about how the

18  Unilever visit went, and he asked where things were at in the

19  contract negotiation?

20  A   That's what I recall from our management team meeting,

21  yes.

22  Q   Okay.  And did you accurately recite your response to him

23  when he asked for information about the Unilever

24  negotiations?

25  A   That's exactly what I told him.  I was not part of the

1   discussions, and I wasn't familiar with where they stood at

2   that time.

3   Q    Okay.  Can I ask you to direct your attention to page 1 of

4   Exhibit 31.  Do you see that e-mail that takes up roughly the

5   bottom half of the page?

6   A    Yes.

7   Q    This is an e-mail from Mike Gordy to you with a copy to

8   George Hoff, correct?

9   A    Yes, that's what it shows.

10  Q    All right.  Let's look at some of the issues that were

11  under consideration among the Sargento executives in

12  mid-April of 2008.  So in the first paragraph here,

13  Mr. Gordy's asking you if Sargento can cut off all

14  correspondence to and from Mr. Calliari, correct?

15  A    That is what he had written in that e-mail, yes.

16  Q    It also indicates here that what Sargento was considering

17  doing to Mr. Calliari was prohibiting his presence in

18  Bellingham.  Do you see that statement?

19  A    Yes, I do.

20  Q    Was that something that was under consideration in April

21  of 2008?

22  A    Not by myself.  Nor had I heard that from anybody else.

23  This is just what Gordy had typed in an e-mail, probably in

24  some frustration.

25  Q    Look at the paragraph below that.  It says -- can you read

1    the first sentence there?

2    A    It seems like it's time to play hardball and force the

3    loyalty card in Washington.

4    Q    So as of, I guess, April 17, Mr. Gordy is suggesting to

5    you and Mr. Hoff that it seems like it's time to, quote, play

6    hardball with Mr. Calliari, correct?

7    A    That's what he wrote.  Those are his words, not mine,

8    though.

9    Q    Right.  And he then went on to suggest that one

10   appropriate approach might be to play the loyalty card in

11   Washington.  Do you see that?

12   A    I do see it, yes.

13   Q    And the suggestion was that you were going to make people

14   at Portionables in Bellingham take sides, correct?

15         MR. LINEHAN:  Objection, your Honor.  There's nothing

16   here that says Mr. McEvoy was doing anything.

17         MR. FISHER:  I can rephrase.

18   Q    The discussions that were taking place around these issues

19   were whether Portionables' employees were going to be called

20   out and asked to take a side between Mr. Calliari on the one

21   hand and Sargento on the other, correct?

22   A    That's what Mr. Gordy wrote here.  I don't know if that

23   was the opinion everybody shared.  It certainly wasn't my

24   opinion.

25   Q    Did you believe that Sargento was seriously interested in

1    keeping Mr. Calliari on as the president of Portionables for

2    another four years as of this point in April of 2008?

3            MR. LINEHAN:  Objection.  Lack of foundation.

4            THE COURT:  Overruled.

5    A    That wasn't for me to decide, Mr. Fisher.

6    BY MR. FISHER:

7    Q    Never discussed among anyone what the plans were as to

8    what to do with Patrick?

9    A    If that was the case, it wasn't discussed with me.

10   Q    The last sentence there from Mr. Gordy, he's suggesting

11   that he's willing to hop on the first plane out here to

12   Washington if Mr. Calliari is forced out of the company,

13   correct?

14   A    I think you're inferring that's what he was suggesting.

15   He was out in Bellingham several times, on several occasions.

16   Q    Did you have discussions with him about his ability to

17   move to Washington on a moment's notice?

18   A    I don't believe that was ever the direction or desire of

19   anybody.  I was there as a member of the management team.  I

20   don't know what Mr. Gordy's role would have been differently.

21   Q    Do you know whether or not your lawyers had told

22   Mr. Calliari by this point that they believed there were

23   grounds to terminate him because he wasn't being sufficiently

24   responsive to Mr. Gentine?

25   A    I believe there was a letter that was submitted to him in

1   early April that suggested something of that nature, yes.

2   Q   And, Mr. McEvoy, Sargento did decide to play hardball with

3   Mr. Calliari, correct?

4           MR. LINEHAN:  Objection.  Lack of foundation.

5           THE COURT:  Overruled.

6   A   Could you repeat the question, please?

7   BY MR. FISHER:

8   Q   Sure.  Sargento, in the spring of 2008, made the decision

9   that it was going to play hardball with Mr. Calliari,

10  correct?

11  A   Only hardball in the fact that the only correspondence was

12  really taking place back and forth between our lawyers and

13  his lawyers.

14  Q   And after this point, Sargento never gave an inch on a

15  single issue, correct?

16  A   Specifically to what issues?  I mean, it was dealt with on

17  a daily basis.

18  Q   Any issue.  Where he got to park, anything.

19          MR. LINEHAN:  Objection.  Overbroad and vague.

20          MR. FISHER:  Okay.  Sorry.

21          THE COURT:  Sustained.

22          MR. FISHER:  I'll rephrase that.

23  Q   Sargento did not compromise on a single issue after April

24  17, 2008, correct?

25  A   I think it really came down to what the lawyers were

1  doing, trading letters back and forth.  In my opinion, that's

2  how things were going to get resolved.

3  Q   Okay.  But to your knowledge, they didn't give on any

4  aspect of operational control, correct?

5  A   Nothing had transpired in April or May to do that, no.

6  Q   And the decision was made that after Mr. Calliari gave

7  notice that he was intending to resign, and after he

8  resigned, Sargento made the decision not to pay him another

9  penny, correct?

10 A   Yes, again, that's an issue that doesn't involve me.

11 That's a higher level than me.  I worked with Mr. Calliari.

12 I worked at Portionables.  I was a member of the management

13 team.  I wasn't going to make that decision whether we paid

14 him or not.  That was outside my area of responsibility.

15         MR. FISHER:  Your Honor, I don't have anything

16 further.

17                    CROSS-EXAMINATION

18 BY MR. LINEHAN:

19 Q   Good afternoon.  We haven't heard very much about you.

20 I'd like to start there.

21 A   I was born and raised in Milwaukee, Wisconsin.  I was

22 raised in the suburbs of the south side of Milwaukee.  I

23 attended St. Norbert College, in de Pere, Wisconsin, which is

24 just outside of Green Bay, where I earned a bachelor's

25 degree.  I earned a master's degree from Cardinal Stritch

1  University in Milwaukee, Wisconsin.  I'm married.  My wife,

2  Nicole, and I live in Plymouth, Wisconsin.  And I have three

3  children.

4  Q   How long have you been at Sargento, Mr. McEvoy?

5  A   Just a little over 12 years.

6  Q   Can you tell us how you started there?

7  A   Before I got married, I was in between jobs.  I knew that

8  I wanted to someday perhaps work at Sargento.  I got the

9  opportunity to do that.  I took a job working in the

10 manufacturing area of Sargento in September of '97.

11 Q   And what jobs have you held there?

12 A   I've held several different positions: manufacturing,

13 production, logistics, consumer products division, trade

14 promotions manager, marketing manager, and then my assignment

15 with Portionables.

16 Q   Okay.  Let's start.  Let's talk about the time right after

17 Sargento closed on the acquisition of Portionables.  Can you

18 tell me when you became involved with Portionables?

19 A   I learned about the acquisition, I think, from Lou Gentine

20 just prior to the date of close.  Shortly thereafter, Lou

21 Gentine approached me and asked me to consider taking on a

22 position out at Bellingham where I would have a more integral

23 role with the two companies.

24 Q   Okay.  What was your reaction to being asked by

25 Mr. Gentine to go out to Bellingham?

1    A    First a little surprised, but kind of excited about the

2    opportunity.  My wife and I actually traveled out to

3    Bellingham just after Memorial Day in 2007 to get a feel for

4    the area, get a feel for the company, looked at some houses,

5    and just determine if this was, you know, something we wanted

6    to do as a family.

7    Q    Okay.  And did you actually make the move?

8    A    We did.  As I said earlier today, I went back and forth

9    for part of June and July.  And we purchased a home, and we

10   moved there full time in August of '07.

11   Q    What was your role at Portionables supposed to be after

12   you started working there?

13   A    As the director of Portionables' integration, I was really

14   there to serve as a conduit and welcome the Portionables

15   family into the Sargento family and act as a resource for

16   them for whatever things that they needed, whether it was

17   questions they had or problems they were looking to solve and

18   where could we bring in Sargento resources to assist them.

19   Q    And what qualifications did you have to be able to

20   facilitate that role?

21   A    I have a fairly, you know, extensive cross-functional

22   background at Sargento, working in a number of different

23   areas.  As part of the third generation, I've had the

24   opportunity to move around and try a lot of different things

25   and gain some experience for a year or two and then move on

1   to another position.  And that's, you know, where my

2   background had broadened at Sargento.

3   Q    Okay.  Who did you report to when you started?

4   A    I reported to Mr. Gordy.

5   Q    And were you eventually promoted from your original

6   position at Portionables?

7   A    Yes, I was.  In January 2008, I was given some additional

8   responsibilities at Portionables over operations and human

9   resources.  And then later, actually, I was promoted to a

10  vice president role.

11  Q    And was that a suggestion that Mr. Calliari made?

12  A    That was the understanding I had, that it was

13  Mr. Calliari's suggestion to Mr. Gordy and Mr. Gentine that I

14  be given some additional responsibilities at Portionables.

15  Q    How did your responsibilities grow after that point?

16  A    Having direct supervisory responsibility over operations

17  and human resources, I was more involved than I was

18  previously on the day-to-day business of running the

19  production side and things like that, as well as human

20  resources.

21  Q    Did you gain any direct reports or supervisory

22  responsibilities in that position?

23  A    Yes, I did.  I gained two direct reports and then their

24  staff underneath them.

25  Q    And who were those people?

1   A   That was Tom Kyle and Marilyn Morrissey.

2   Q   Who did they report to before they reported to you?

3   A   Mr. Calliari.

4   Q   And he approved of their transition to being under you?

5   A   Yes, that was my understanding.

6   Q   Did he ever object to your being their supervisor, to your

7   knowledge?

8   A   No, he did not.

9   Q   Was it your assignment -- did you understand your

10  assignment from Mr. Gentine to be to go into Portionables and

11  start giving orders?

12  A   That wasn't my responsibility.  First and foremost, I was

13  trying to fit into their family.  And they did a very nice

14  job of welcoming me in.  And, really, just trying to see

15  where I could provide synergies and help in any way I could

16  to, you know, again, extend to the marriage of the two

17  companies.

18  Q   So tell me some of the things that you did when you first

19  got there in order to play that role that you were tasked

20  with.

21  A   Well, first and foremost was just to learn the people and

22  the operation, the processing, what we did in the plant, what

23  we did, you know, throughout the entire organization, you

24  know, just learn as much as I could so I could be a more

25  valuable contributing member and offer recommendations.

1      We brought some instant cost savings, synergies, and

2   things like that.  You know, we have some pretty good buying

3   power at Sargento, being a little bit bigger company than

4   Portionables is.  And they took advantage of some of that

5   buying power as well.

6   Q   Did any of the folks at Portionables come to you and ask

7   you for help in any of their operations, duties, or

8   otherwise?

9   A   On several occasions, absolutely.

10  Q   Can you give me an example or two?

11  A   Mr. Tom Kyle, you know, had asked a lot about how -- you

12  know, we were doing maintenance at Sargento, and, you know,

13  how he could bring better discipline to the maintenance area

14  and then just overall manufacturing.  You know, he asked a

15  lot of questions about how we did things, based on his

16  previous experiences and his current experiences of, you

17  know, what resource we could bring to the table to help him

18  in his department.

19  Q   And I think you mentioned a few minutes ago that one of

20  the things that you were trying to accomplish was to find

21  cost savings?

22  A   That's correct.

23  Q   Can you tell me how you went about that?

24  A   Just asking a lot of questions about how things were done.

25  We identified one quickly off the bat with regard to shipping

1   samples.  Being in the food products division, a lot of

2   product is sent to customers to sample and try out before

3   they make a decision about a product.  We brought some

4   instant savings with our FedEx program that we applied at

5   Portionables that went right to the Portionables' bottom

6   line.

7   Q    In your effort to find cost savings, did Mr. Calliari ever

8   come to you and ask you to please stop interfering with his

9   business?

10  A    Not to me directly, no.

11  Q    One of the things that Mr. Fisher raised with you earlier

12  was whether you were assigned to be a spy, whether Sargento

13  was going to start playing hardball with Portionables or with

14  anyone at Portionables.

15       Can you tell me a little bit about -- I think you

16  mentioned you had feelings of conflict.  What was the

17  conflict that was going on at the time?

18  A    Well, certainly, when I came to the company, in my role,

19  I'm never going to be a spy.  As things progressed, you know,

20  into spring 2008, there was a lot of tension that was brewing

21  amongst the two sides, Mr. Calliari and Sargento.  And there

22  were a lot of lawyer letters being traded back and forth.

23       And those of us on the management team that were doing the

24  day-to-day work really, you know, felt trapped and conflicted

25  as to things going on and where loyalties lie and things like

1  that.  It was a difficult time for all of us.

2  Q   And at some point did anyone circulate a policy that was

3  designed to try and fix those feelings of getting caught in

4  the middle?

5  A   There was a letter that was sent by Mr. Gordy to all

6  members of the management team at Portionables in early May

7  of 2008 that, you know, called for transparency to things

8  that were going on, that things would be shared openly, and

9  trying to take the people that, you know, were doing their

10  day job and take all that out of the middle of this.

11  Q   Would you take a look at Exhibit 33, please?  I believe

12  it's already been admitted.  And blow up the first paragraph,

13  please.  Is this the memo that you were referring to a few

14  minutes ago?

15  A   Yes, it is.

16  Q   Can you read the first paragraph, please?

17  A   I am sending this memo to address concerns over recent

18  events that may take our focus off managing the Portionables'

19  business, both short and long term.

20        THE COURT:  Sir, she's trying to write down what you

21  say.  You have to slow down.

22        THE WITNESS:  I'm just excited.

23        MR. LINEHAN:  Aren't we all?

24        THE COURT:  Well, try and contain your enthusiasm.

25  A   As we continue the integration of Portionables into the

1   Sargento family, open communication is critical.  At the same

2   time, we understand that, due in part to the performance

3   incentives agreed to as part of the sale, you may find

4   yourself in the middle of situations involving actual or

5   perceived conflicts of interest.  At a minimum, those

6   situations are likely to make you uncomfortable and make you

7   uncertain as to how you should conduct yourself.  One purpose

8   of this memo is to give you a road map to follow if you feel

9   caught in one of these situations.  Lou and Patrick have

10  discussed and are aware of these requests in advance of this

11  mailing.

12  BY MR. LINEHAN:

13  Q   And this memo is from Mike Gordy.  Had you had any

14  discussions with Mr. Gordy about your feelings of conflict

15  before he sent this out?

16  A   I didn't --

17         MR. FISHER:  Objection, your Honor.  This is hearsay.

18         MR. LINEHAN:  Your Honor, I'm not offering it for

19  hearsay purposes, just merely whether there were any

20  background leading up to this memo.

21         THE COURT:  Sustained.

22  BY MR. LINEHAN:

23  Q   Mr. McEvoy, let's move on.  Let's take a look at the

24  second paragraph, the one that begins:  It is in the best

25  interest of all parties.  Do you see that?

1    A    Yes.

2    Q    I'd like to pick up with the second sentence there.  Can

3    you read that, please?

4    A    To that end, and to limit potential conflicts between

5    short and long-term business interests, we are establishing

6    the following protocol.

7    Q    And then go down to paragraph No. 1.  This paragraph

8    states:  Any substantive communications between you and

9    Patrick Calliari concerning the Portionables business,

10    including but not limited to correspondence, e-mails, memos,

11    and reports occurring subsequent to the date of this memo or

12    within 45 days prior should be disclosed and made available

13    to me.

14        What did you understand your requirements were after

15    receiving this memo?

16    A    I think really, in my opinion, it was to take those of us

17    doing the day-to-day stuff and just, you know, get it off

18    your plate, share it on both directions, and then try and

19    just, you know, do your day job and not get involved in the

20    stuff that's happening in the periphery.

21    Q    But you weren't supposed to hide anything from

22    Mr. Calliari, were you?

23    A    No.

24    Q    In fact, can you read the last sentence of that paragraph?

25    A    Likewise, to the extent Patrick so requests, similar

1   communications between you and me or other representatives of

2   the Portionables' board or Sargento should be disclosed to

3   and made available to Patrick.

4   Q   So there was nothing being hidden, is that right?  Was

5   that your understanding?

6   A   I think this is the attempt to take the day-to-day and not

7   hide anything.

8   Q   And this was the transparency you referred to a couple

9   minutes ago?

10  A   That's correct.

11  Q   Let's look at the second page of that document.  Highlight

12  paragraph 2.  I won't read this provision, but was it your

13  understanding that essentially the same conditions were

14  supposed to apply to any communication with the other

15  shareholders?

16  A   Yes, that was my understanding.

17  Q   Full transparency was the policy?

18  A   Yes.

19  Q   Okay.  One more paragraph, the one right below that:  It

20  is our intent.  Mr. Gordy writes:  Our intent is to give the

21  Patrick -- I assume that should have just been Patrick -- and

22  the Portionables' board equal access to information so that

23  if issues arise, they will be in the best position to deal

24  with them.

25       Let's talk a little bit about Bellingham Cold Storage.

1    A    Okay.

2    Q    We've heard bits and pieces from various witnesses about

3    Bellingham Cold Storage.  But I think you might be the guy to

4    help us put all that together into a complete picture.  Can

5    you first tell us, what's the relationship between Bellingham

6    Cold Storage and Portionables?

7    A    Bellingham Cold Storage is a cold storage facility located

8    in Bellingham.  They are the landmark of Portionables at that

9    facility in Bellingham.  The Portionables plant is located in

10   the center of the Bellingham Cold Storage campus, if you

11   will.

12   Q    Okay.  And was Bellingham Cold Storage one of the ways

13   that you were going to target to try and save money?

14   A    It was a directive from Mr. Hoff that, you know, we

15   establish a relationship.  There was some friction going on

16   between the two companies.  You know, my presence at

17   Bellingham, I was in a good position to go in and make

18   contact with them.  And our directive was to find some cost

19   savings for Portionables.

20   Q    And why was cost savings important?

21   A    Well, it's important in all occasions.  For Portionables,

22   we had gone back and done some assessment on storage costs,

23   you know, with some other cold storage partners we used in

24   Wisconsin.  And, you know, the rates for Bellingham Cold

25   Storage appeared to be a little bit higher than what we were

1  normally accustomed to paying.  Mr. Hoff had thrown a number

2  out there of somewhere, you know, a six figure cost savings

3  for Portionables that he was targeting.

4  Q   By six figure, you mean over $100,000?

5  A   Correct, over 100,000.

6  Q   Okay.  How did Mr. Calliari react to the idea that you

7  were going to be having discussions with Bellingham Cold

8  Storage?

9  A   I didn't have direct conversation with him.  My

10  understanding was that Mr. Calliari and Mr. Hoff had an

11  agreement that we were going to go in and speak to Bellingham

12  Cold Storage, again, trying to reestablish a relationship

13  and, you know, target cost savings.

14  Q   Why wasn't Mr. Calliari going to have this discussion with

15  Bellingham Cold Storage?

16  A   I think the communication had broken down between

17  Mr. Calliari and Mr. Thomas, who's the president of

18  Bellingham Cold Storage.  And I don't know.  I think they

19  were at an impasse.

20  Q   Let's talk a little bit about your initial approach to

21  Bellingham Cold Storage.  Did they seem happy to see you?

22  A   Yes, they did.

23  Q   Did they give you any indication as to why?

24       MR. FISHER:  Your Honor, objection.  Hearsay.

25       THE COURT:  Sustained.

1   BY MR. LINEHAN:

2   Q   What was the source of friction between Bellingham Cold

3   Storage and Portionables?

4   A   As I understood it, it was in regards to the direct ship

5   idea that Mr. Calliari had.

6   Q   So describe for me what direct shipping really means.

7   A   Direct shipping was a concept to ship product immediately

8   off the Portionables' production floor onto trucks to go to

9   the end customer, that being Unilever, and bypass Bellingham

10  Cold Storage.

11  Q   And by doing that, they would bypass some additional cost

12  that Bellingham Cold Storage was imposing?

13  A   Correct, the storage and handling expense that would take

14  place.

15  Q   Okay.  What was Bellingham Cold Storage's problem with

16  that?  What did they tell you was the issue?

17          MR. FISHER:  Your Honor, objection.  Hearsay.

18          THE COURT:  Sustained.

19  BY MR. LINEHAN:

20  Q   What was the problem with Bellingham Cold Storage doing

21  direct shipping?

22          MR. FISHER:  Your Honor, either lack of foundation

23  and hearsay at this point.

24          MR. LINEHAN:  Your Honor, Mr. McEvoy testified he was

25  involved with the negotiations.  If anyone should know what

1   the problems were with direct shipping, he should be the one

2   to know.

3         THE COURT:  Sustained.

4   BY MR. LINEHAN:

5   Q   Mr. McEvoy, tell me who Doug Thomas is.

6   A   He's the president and the CEO of Bellingham Cold Storage.

7   Q   And did Mr. Thomas ever state to you what his intentions

8   were if Portionables proceeded with direct shipment?

9         MR. FISHER:  Your Honor, objection.  Hearsay.

10        MR. LINEHAN:  Your Honor, I phrased the question

11  deliberately to ask for his statement of intentions, because

12  it comes under the hearsay exception under item 803(3) for

13  statement of state of mind by the declarant.

14        THE COURT:  The objection is sustained.

15        MR. LINEHAN:  Your Honor, may I ask for -- may I ask

16  why that's an improper question?

17        THE COURT:  803(3) doesn't apply to that situation.

18  It applies to present sense impression of the declarant.  And

19  this isn't that.

20  BY MR. LINEHAN:

21  Q   Let's have Exhibit 211.  Mr. McEvoy, can you see Exhibit

22  211 in front of you?

23  A   Yes.

24  Q   Without describing the contents of the document, can you

25  tell me what Exhibit 211 is?

1   A    It's an e-mail from myself on November 8, 2007, to

2   Mr. Gordy, Mr. Hoff, and Mr. Calliari.

3   Q    And what is the subject?

4   A    It's an update on the -- BCS update, is the subject line.

5   Q    Did you inform Mr. Calliari of your discussions with

6   Bellingham Cold Storage?

7   A    I kept him and others up to speed, you know, at

8   significant milestones along the way of our negotiations,

9   yes.

10  Q    Was this e-mail something that you provided to

11  Mr. Calliari to help keep him informed?

12  A    Yes, it was.

13          MR. LINEHAN:  Your Honor, I would move the admission

14  of Exhibit 211 for the purpose of explaining -- or reflecting

15  Mr. Calliari's receipt of notice of the intentions and the

16  status of negotiations with Bellingham Cold Storage.

17          MR. FISHER:  And, your Honor, it's hearsay.  And

18  there's hearsay within hearsay in this document.  So it's not

19  only hearsay from Mr. McEvoy; it talks about hearsay of what

20  other declarants said.

21          MR. LINEHAN:  Your Honor, it's not hearsay.  It's not

22  offered for a hearsay purpose.  It's only offered --

23  regardless of whether anything in this e-mail is true, it's

24  offered to show that Mr. Calliari, contrary to his

25  contentions in this case, received updates about the BCS

1   negotiations.

2           THE COURT:   211 will be admitted.

3           (Exhibit(s) 211 admitted.)

4           THE COURT:   Ladies and gentlemen, 211 has a

5   limitation.   It's not offered for the truth of what is

6   discussed in the document.   It's offered for the fact of its

7   receipt for notification.

8   BY MR. LINEHAN:

9   Q   Publish the document and highlight the second to the last

10  paragraph that begins with "Doug."   It says, "Doug."   Who is

11  Doug?

12  A   That would be Mr. Thomas.

13  Q   So you told Mr. Calliari that Doug will not support

14  Portionables' direct shipping and will do everything in his

15  power to stop that from happening should Portionables move in

16  that direction?

17  A   Yes.

18  Q   What were the risks at that point that you perceived for

19  going forward with direct shipping?

20  A   My understanding was that Bellingham Cold Storage would

21  bring legal action against Portionables if they chose to go

22  that route.

23          MR. FISHER:   Your Honor, I move to strike that.

24  That's also hearsay.

25          THE COURT:   Sustained.

1    MR. LINEHAN:  If I phrase the question as to what is

2    his understanding, will that be permitted, your Honor?

3    THE COURT:  It goes beyond the limitation of the

4    document that I just put on it, which is notification about

5    the topic, but not the statements contained therein, because

6    you are attempting to show that that is in fact true.

7    MR. LINEHAN:  Okay, your Honor.

8  Q   Mr. McEvoy, who provided the ammonia refrigerant to

9    Portionables?

10  A   That was supplied by Bellingham Cold Storage.

11  Q   Were you concerned about the possibility that it might be

12    shut off?

13  A   They had mentioned in passing that that may be a tactic

14    that they would take against direct shipping.

15    MR. FISHER:  Your Honor, objection.  Move to strike

16    as hearsay.

17    THE COURT:  Sustained.  The jury will disregard the

18    last response.

19  BY MR. LINEHAN:

20  Q   As the director of -- at some point, did you get a

21    promotion?  Did we discuss that?

22  A   Yes, in January 2008.

23  Q   What was your new title at that point?

24  A   Vice president of Portionables' integration.

25  Q   And did you have responsibility for the operations of the

1   Bellingham plant?

2   A   After January of '08, yes.

3   Q   Okay.  What would have been the consequence had the

4   ammonia been shut off to the Bellingham plant?

5   A   We wouldn't be able to run our production freezers to make

6   finished product for our customer.

7   Q   In light of the concerns that you had about the viability

8   of direct shipping, did you seek other ways to save costs

9   with BCS that didn't involve that?

10  A   We negotiated -- that is, we were negotiating along the

11  way.  In January of 2008, we reached an agreement for a

12  volume-based rebate that would come back to the Portionables'

13  bottom line.  That was a rebate built on volume tiers, that

14  BCS would give an incentive at the end of the calendar year

15  back to Portionables, to the bottom line.

16  Q   Okay.  Can you describe for me how those negotiations

17  went?

18  A   There was a series of negotiations back and forth,

19  starting in mid to late August of '07, all the way through

20  November-December of 2008 before we reached a final

21  agreement.  There were several different iterations along the

22  way.  There were proposals made both ways until we finally

23  reached the end solution.

24  Q   Mr. McEvoy, look at Exhibit 9, please, which has already

25  been admitted.  I'd like to call your attention first to the

1   paragraph with the brackets around it.

2   A   Okay.

3   Q   Do you recall or do you remember getting that e-mail?

4   A   Yes, I do.

5   Q   Was Mr. Calliari pretty upset?

6   A   Yes, he was.

7   Q   Why was he upset?

8   A   This was the first proposal offered by Bellingham Cold

9   Storage.  And it was simply trading costs out of their pocket

10  to Portionables' pocket, and it wasn't saving money for

11  anybody.  And we agreed with Mr. Calliari that this was not a

12  good proposal.  But, again, it was the first of a series of

13  negotiations back and forth.

14  Q   And if you could look at Exhibit 10, please, which has

15  also been admitted.  Did you go back to Bellingham Cold

16  Storage and try to negotiate something better than the offer

17  that Mr. Calliari had just complained about?

18  A   Yes, we did.

19  Q   Did you keep Mr. Calliari informed of the status of those

20  negotiations?

21  A   I did.  And he was also copied on this particular e-mail.

22  Q   So can you just -- without going through the intimate

23  details of these negotiations, can you tell me generally what

24  this e-mail is intended to convey?

25  A   Just give me a moment to read through it.

1    Q    Sure.

2    A    It's just a summary of the first proposal that was given

3    by BCS and which we agreed it wasn't significant of cost

4    savings.  Just again another recap of our efforts to go back

5    and try to negotiate a better deal.

6    Q    Okay.  At this point, was Sargento refusing to implement

7    direct shipping?

8    A    Refusing, no.  I think our approach was, we wanted to see

9    a plan.  You know, it had to have contingencies in it.  And

10   we were going down parallel paths at that point.

11   Q    And in the last paragraph Mr. Gordy writes:  If we don't

12   get concessions at the desired level from BCS, we agreed to

13   initiate a detailed plan from PI.  Is that Portionables?

14   A    That would be our acronym for Portionables, yes.

15   Q    Okay.  And how they would execute direct shipments?

16   A    Yes, that's correct.

17   Q    Okay.  And were you going to be in charge of -- or not in

18   charge, but were you going to be helping with preparation of

19   a plan if that was the case?

20   A    I was assisting Mr. Kyle, who was the operations manager

21   at the time, and did provide some suggestions and

22   recommendations and things to consider when looking at that

23   plan.

24   Q    Direct shipment was still very much on the table?

25   A    It absolutely was.

1    Q    How did the BCS negotiations resolve?

2    A    As I said, we negotiated from, you know, mid-August

3    through January or November -- or November-December 2008 --

4    sorry -- 2007, and eventually reached an agreement on the

5    volume-based rebate incentive that would deliver that six-

6    figure savings that Mr. Hoff had targeted to Portionables.

7    Q    Take a look at Exhibit 257.  I'm not sure if it has been

8    admitted yet.  It has been.  Just double-checking.

9         Mr. McEvoy, can you tell us what this e-mail is?

10   A    It's an e-mail from myself on January 7, 2008, to

11   Mr. Calliari in regards to the BCS rebate incentive addendum

12   on the contract I just mentioned.

13   Q    So you were forwarding the draft addendum to Mr. Calliari?

14   A    That is correct.

15   Q    Can we look at the second page of the document, please.

16   Can you tell us what that page is, Mr. McEvoy?

17   A    This was the addendum to the original lease.  The addendum

18   related to that volume-based rebate incentive.

19   Q    Why did you send this to Mr. Calliari on January 7, 2008?

20   A    Mr. Calliari needed to approve anything that we put into

21   place.  And I wanted him to see this document as soon as it

22   was, you know, verbally agreed to with BCS.

23   Q    Did he respond to this e-mail?

24   A    If I recall, not at first.  But he did call me maybe a day

25   or two later.  Maybe the next day.  I don't recall for

1    certain.  But we talked about it.  After that, I shared with

2    him more of the background of how we got to this point.

3    Q   Okay.  Take a look at Exhibit 267.  But don't publish it,

4    please.  Actually, let's just -- never mind.

5         During that discussion with Mr. Calliari that you just

6    described, did he agree to the cost savings proposal that was

7    reflected in the addendum that you sent him in Exhibit 257?

8    A   Not right away.  But over -- I think within the next month

9    we reached an agreement with this proposal with him.

10   Q   Okay.  And he seemed comfortable with the proposal as

11   drafted?

12   A   He did.  He had a question regarding direct ship, that if

13   it was still a plan we wanted to go through with, you know,

14   how would that impact this particular agreement.  And as we

15   told him, it would simply void this agreement, and, you know,

16   a direct ship plan could be put into place.  This was, you

17   know, again, a plan that provided an incentive to

18   Portionables for the product that was shipped through the

19   doors of Bellingham Cold Storage.

20   Q   Who signed this document?

21   A   I ultimately signed it.  But Mr. Calliari did give me the

22   permission to go ahead and sign it, being an officer of the

23   company.  And he was okay with that.

24   Q   Look at Exhibit 47, please, but don't publish it yet.

25        MR. LINEHAN:  Mr. Fisher, this is one of your

1    exhibits.  No problem?

2           MR. FISHER:  No objection.

3           MR. LINEHAN:  Move the admission of 47.

4           THE COURT:  47 will be admitted.

5           (Exhibit(s) 47 admitted.)

6    BY MR. LINEHAN:

7    Q   Mr. McEvoy, is this the addendum that you signed?

8    A   Yes, it is.

9    Q   And if you look at -- sorry.  You said you signed this at

10   the instruction of Mr. Calliari?

11   A   He authorized me to go ahead and sign it.

12   Q   Okay.  At any time, if he had instructed you not to sign

13   it, would you have obeyed him?

14   A   Yes, I would have.  I wouldn't have signed it, not unless

15   I had his permission or his signature.

16   Q   And if he had instructed you to stop negotiating with BCS

17   at any time, would you have followed his direction?

18   A   Yes, I would have.

19   Q   He was your boss?

20   A   He was my boss at the time, yes.

21   Q   Look at Exhibit 50, which you've seen earlier today.  Do

22   you recognize this document, Mr. McEvoy?

23   A   I do.

24   Q   Tell us what it is, please.

25   A   It's a plan for direct shipment that I had found when

1    doing research on another matter in the files of the former

2    quality manager, Jim Hart.

3    Q    Now, we discussed before that Sargento had talked about

4    developing a plan for direct shipping; do you remember that?

5    A    It was one of the things we were asking for, you know, in

6    the lines of direct ship, to see a comprehensive and thorough

7    plan of how it would be executed.

8    Q    Did Mr. Calliari ever disclose the existence of this?

9    A    Not prior to me finding it, no.

10   Q    And can you describe the circumstances of how you found

11   it?

12   A    In April 2008, with the USDA issues we were having in

13   South Dakota, I was reviewing Mr. Hart's old files to

14   determine if there was any previous audits or notes related

15   to audits or the USDA or of any nature.

16   Q    Let's look at the attachment to the separate e-mail, the

17   two pages behind it.  And, specifically, let's look at the

18   third page of the document.  Mr. Fisher had asked you to look

19   at paragraph 4, which identified a low product risk and a low

20   shutdown risk.

21   A    Okay.

22   Q    Did this option address any of the implementing factors --

23   let me back up.  Look at D below there.  Did paragraph 4,

24   that option, did it address any of these implementing

25   factors?

1   A   I'm sorry.  Could you ask that question again?

2   Q   Sure.  Did paragraph 4 account for or address the

3   implementing factors in paragraph D?

4   A   I think there was still risks.  The implementing factors

5   had to be considered before any plan was put into place,

6   because I think it needed enough contingencies to make sure

7   this would work on a daily basis.

8   Q   Could you describe what the implementing factors are where

9   they're not accounted for in the low risk option?

10  A   In my opinion, you know, you needed to have an alternative

11  for storage if trucks didn't show up or if there was a

12  natural disaster and trucks couldn't get to the facility.

13  You know, that was the biggest one.  And there was no place

14  within the Portionables facility to store product for any

15  extended period of time.

16  Q   How much would it have cost if one truckload of product

17  had spoiled?

18  A   Well, if you take, you know, a truckload of 40- to 42,000

19  pounds and profit loss, you know, probably around $60,000 for

20  one truck.

21  Q   And what was the projected savings from direct shipment

22  that Mr. Calliari was telling you?

23  A   I believe he said in the neighborhood of $300,000.

24  Q   So how many truckloads before that's all gone?

25  A   Not too many.

1   Q    And the 300 and some thousand dollars, is that gross or

2   net savings?

3   A    I believe it was a gross savings.

4   Q    And so that means other costs involved in implementing

5   were not included?

6   A    Yeah.  Like, I think there was a need to have an

7   additional forklift to move the materials around the plant

8   and perhaps minor capital, you know, within the facility.

9   Q    Had Unilever approved direct shipping?

10  A    I don't know that they were aware of direct shipping.

11  Q    As an officer of the company, working in the operations

12  area at Portionables in Bellingham, that's where Unilever's

13  products were made?

14  A    That is correct.

15  Q    And would it have been important to have Unilever's

16  approval before you changed the way products were shipped to

17  them?

18  A    I think it would have been important that they know the

19  plan that was being implemented and, you know, that they were

20  okay with it.

21  Q    Did they have quality control requirements?

22  A    Absolutely, they did.

23  Q    Okay.  Look at Exhibit 14, please, specifically page 3 of

24  that document, please.  Could we pull up the top half of that

25  document.

1      Mr. McEvoy, we've had some other witnesses describe for us

2   what SAP is, so I won't go into that.  But was SAP

3   implementation at Portionables something that was on the

4   radar in late 2007, early 2008?

5   A    It was on the radar for some time at Portionables.  I

6   don't know.  There was some exploratory work done in 2008.

7   And as I understood, it was going to be implemented at some

8   point in the future.

9   Q    Did Mr. Calliari ever express an opinion as to whether or

10  not it should or should not be implemented during the earnout

11  period?

12  A    I think, you know, around the time that lawyer letters

13  were being traded back and forth was the first objection I

14  heard to it.

15  Q    Okay.  And did Portionables ever in fact -- well,

16  actually, let me stop there.  Let's take a look at the second

17  paragraph under No. 4, the one that begins:  Despite

18  protestations from Portionables, Sargento has continued to

19  demand implementation of this system during the earnout

20  period.

21      Is that a correct statement?

22  A    As I said, there was some exploratory work done.  When

23  Mr. Calliari did express concern, the process was stopped and

24  the system was not implemented in 2008.

25  Q    So then at the bottom of that section, where it says,

1   Mr. Calliari is clearly and repeatedly telling Sargento that

2   he does not approve of the replacement, but Sargento has

3   charged forward anyway, does that accurately summarize what

4   Portionables was in fact doing with the SAP system?

5   A    No.

6           MR. FISHER:  Objection, your Honor.  Leading.

7           THE COURT:  Sustained.

8   BY MR. LINEHAN:

9   Q    Were you charging ahead, Mr. McEvoy?

10  A    No.  The decision was made not to press forward at that

11  point.

12  Q    Was that consistent to your understanding with

13  Mr. Calliari's wishes?

14  A    Yes, it was.

15  Q    Let's talk about the South Dakota regulatory issues that

16  were mentioned today to clear up a few things.  Did you

17  become aware in April of 2008 of some emerging regulatory

18  problems with the South Dakota facility?

19  A    Yes, I did.

20  Q    Do you recall whether Mr. Calliari was informed of those

21  problems?

22  A    Yes, he was.

23  Q    And how do you know that he was informed?

24  A    I know I shared a couple of e-mails with him.  I believe

25  Mr. Gordy did as well.  And there were discussions on that

1  topic at our weekly management team meetings.

2  Q   Were those meetings that Mr. Calliari attended?

3  A   He attended either in person or via a conference call,

4  yes.

5           MR. LINEHAN:  No further questions.

6           THE COURT:  Mr. Fisher, anything further?

7           MR. FISHER:  Just one.

8                    REDIRECT EXAMINATION

9  BY MR. FISHER:

10 Q   Mr. McEvoy, did you just testify a minute ago that if

11 Mr. Calliari had said not to do the Bellingham Cold Storage

12 deal, it would have been a no go?

13 A   In January of 2008, when I shared the information with

14 him, if he said that, you know, we certainly -- I would not

15 have signed that document, no.

16 Q   Right, because he had control over the business, correct?

17 A   He was the president of Portionables.

18 Q   It was his decision whether to amend the existing

19 Bellingham Cold Storage contract, correct?

20          MR. LINEHAN:  Objection.  Lack of foundation.

21          THE COURT:  Overruled.

22 A   Would you repeat the question, please?

23 BY MR. FISHER:

24 Q   Yes.  It was his decision, with respect to the Bellingham

25 Cold Storage contract, whether to amend it or not, correct?

1    A    At the end of the day, yes, it was his decision, and he

2    did allow me to sign it, and he agreed to it.

3    Q    Right.  I showed you Exhibit 51 earlier today?

4    A    Yes.

5    Q    Do you recall that?

6    A    Yes.

7    Q    This is well after the memo on April 30, 2007, correct?

8    A    That is correct.

9    Q    So the transparency regime, the free flow of information,

10   that was not taking place, correct?

11   A    As I said earlier, I didn't take action on this e-mail.  I

12   wrote it.  I regretted writing it.  And, as a matter of fact,

13   Mr. Kyle came to me later and told me about this

14   conversation.

15   Q    Right.  So transparency was not the rule, was it?

16   A    It was --

17   Q    There were secret reports going back to Wisconsin about

18   everything that was happening at Portionables in Bellingham,

19   correct?

20          MR. LINEHAN:  Objection.  Assumes facts not in

21   evidence.

22          THE COURT:  Overruled.

23   A    I did testify earlier today that I was sending information

24   back and forth at this time, during the fighting and the

25   lawyer letters that were going back and forth.

BY MR. FISHER:

Q   So transparency was sort of a one-way street, right?

A   That's your interpretation.

Q   Well, would you agree with that?  He was expected to divulge everything about his affairs, but you could decide what you would and wouldn't share with him?

A   It was targeted at the employees and the management staff at Portionables.

Q   Okay.  When Mr. Ioannides came out to Bellingham to meet with you in March of 2008, you told him that direct shipping was an option that could have been pulled off based on the wording in the contract, correct?

A   I think I -- I would have to see that document to say that.  But we talked about it.  I think he actually put those words in my mouth, that it could have been pulled off.  It may have been from a contractual standpoint.  I don't know if it could have been executed from an operational standpoint.

Q   You said it could have been pulled off, but Sargento didn't support it, correct?

A   I didn't say that.

Q   I'm sorry.  You did not?

A   You're trying to put words in my mouth here.

Q   Can I ask you to look at Exhibit 213?

A   Okay.

Q   Do you recognize Exhibit 213?

1   A   Yes, I do.

2   Q   Is this something that you prepared?

3   A   It was an e-mail I wrote to Mr. Hoff and Mr. Gentine

4   following Mr. Ioannides' visit to the plant that day, March

5   26, 2008.

6   Q   Now, we're not admitting this.  I just want to see if

7   reading the paragraph concerning Bellingham Cold Storage

8   refreshes your recollection about what you told Mr. Ioannides

9   during that meeting?

10  A   I would like to read it, if I could.

11  Q   Yes, absolutely.

12  A   Okay.

13  Q   Does reviewing Exhibit 213 refresh your recollection about

14  what you told Mr. Ioannides in March of 2008?

15  A   I said that it probably could, and I underlined it when I

16  wrote it.

17  Q   Right.  But Sargento didn't support it?

18  A   Didn't support it, because we never saw a plan to execute

19  it.

20  Q   Okay.  Mr. Calliari gave you the go ahead to sign the BCS

21  amendment in early 2008, correct?

22  A   That is correct.

23  Q   And you never told him that you and Mr. Hoff and Mr. Gordy

24  had told Mike Thomas you could make direct shipping go away

25  if you could get Mr. Calliari to sign off on that deal,

1    correct?

2    A    I never told him that directly, no.

3    Q    To your knowledge, no one told him that you had made that

4    handshake deal with Doug Thomas, correct?

5    A    Could you be more specific?  I'm not sure I follow you.

6    Q    Do you know whether anyone at Sargento told Mr. Calliari

7    about the handshake deal that had been made between Sargento

8    representatives and Doug Thomas of BCS?

9    A    We kept him apprised along the way.  But in January, when

10   I sent him the proposal, that was the agreement to the

11   handshake deal.

12        MR. FISHER:  Nothing further, your Honor.

13        MR. LINEHAN:  I just have two questions.  We'll be

14   done by 2:45.

15                    RECROSS-EXAMINATION

16   BY MR. LINEHAN:

17   Q    Mr. McEvoy, was it your understanding under the contract,

18   under the stock purchase agreement and the employment

19   agreement, that Mr. Gentine was the boss?

20        MR. FISHER:  Objection, your Honor.  Leading and lack

21   of foundation.

22   BY MR. LINEHAN:

23   Q    Mr. McEvoy?

24        THE COURT:  Overruled.

25   A    Mr. Gentine is the boss, yes.

BY MR. LINEHAN:

Q   So if Mr. Gentine said, we're going to do something, you're going to do it?

A   I would follow his order, yes.

        THE COURT:  That's two.

        MR. LINEHAN:  May I have one more, please?

Q   Okay.  With respect to Bellingham Cold Storage and your statement that you thought it probably could have been pulled off, would you look at that paragraph one more time?  It's Exhibit 213.

A   Okay.

Q   And don't read it out loud, but read that sentence to yourself again, please.  Does that refresh your recollection as to what you meant when you said it could have been pulled off?

A   Yes.

Q   And what is your recollection now as to what that meant?

A   Could you restate your question?

Q   Sure.  You said in here that -- sorry.  You said earlier that you thought it could have been pulled off.  Can you tell us what you meant by it could have been pulled off?

A   I think at the end of the day, the language in the contract, you know, that could work itself out.  Logistically is where I was concerned that it would have some flaws if it wasn't the right plan put in place.

1           MR. LINEHAN:  Okay.  That's all I have.

2           THE COURT:  Ladies and gentlemen, do you have any

3    questions for this witness?

4       Thank you, sir.  You may step down.

5       And it's time for our afternoon recess.  You may close up

6    your pads and your pens and be excused.

7           (Jury leaves courtroom.)

8           THE COURT:  Please be seated for a moment.  I wanted

9    to give some clarification on the objection that was made to

10   Exhibit 213.  The objection was hearsay.  The counter was

11   803(3):  Then existing mental, emotional, or physical

12   condition.

13      It's my understanding that the operation of that rule

14   allows in things like:  I'm cold.  I'm tired.  I'm mad.  I'm

15   out of here.  Let's go.  But it does not include:  I had a

16   chat with Mike, and he told me that Doug said he was

17   unwilling to go 15 percent more, because that is a remembered

18   statement from someone else.

19          MR. LINEHAN:  So are we --

20          THE COURT:  803(3) really is a rule that can

21   eviscerate the hearsay rule if it's not applied much like

22   excited utterance, but you don't have to build the underlying

23   criteria of having somebody be excited.  But it's an

24   announcement of something that someone declares, not two guys

25   negotiating over contracts and one guy telling others what he

```
 1   remembers of the conversation.  So that's why 803(3) I don't
 2   think is the proper --
 3            MR. LINEHAN:  Your Honor, I was just trying to make
 4   sure I formulate a better question next time.
 5            THE COURT:  Okay.  And I'm just trying to tell you
 6   where I was coming from.
 7            MR. LINEHAN:  I understand.  I know how to do it now.
 8            THE COURT:  All right.  Let's take our recess,
 9   please.
10            (Brief recess.)
11            THE COURT:  Okay.  Let's bring in our jury.
12            (Jury enters courtroom.)
13            THE COURT:  Please be seated.
14        Next witness, please.
15            MR. GOLDFARB:  Plaintiffs rest, your Honor.
16            THE COURT:  Plaintiffs rest.
17        Defense witness, please.
18            MR. LINEHAN:  Your Honor, just to let you know, we
19   will be making a motion after we rest.
20            THE COURT:  Okay.
21            MR. LINEHAN:  The defense will call George Hoff.
22            THE COURT:  Please come forward.
23            (Witness sworn.)
24            THE COURT:  Please have a seat, sir.
25
```

```
 1                            GEORGE HOFF,

 2   being first duly sworn, the witness was called and testified

 3   as follows:

 4                         DIRECT EXAMINATION

 5   BY MR. LINEHAN:

 6   Q    Good afternoon, Mr. Hoff.

 7   A    Good afternoon.

 8   Q    I appreciate your patience.  It's been a long wait for

 9   you.

10   A    Thank you.

11   Q    Can you tell us what your position is at Sargento, please?

12   A    I am the chief financial officer.

13   Q    What does a chief financial officer do?

14   A    In addition to making the coffee in the morning, a variety

15   of things.  Financial reporting reports up through me.  Our

16   treasury group reports up through me.  Our information

17   technology group does as well.  And I also am responsible for

18   legislative affairs and corporate communication.

19   Q    Who do you report to?

20   A    I report to Lou Gentine, our chairman and CEO.

21   Q    Are you also on the board of directors?

22   A    I am the secretary to our corporate board.  And I am on

23   the board of directors of Portionables.

24   Q    Okay.  How long have you been the CFO of Sargento?

25   A    I've been the CFO for 13 of my 27 years.
```

1    Q    What other positions have you held with the company?

2    A    I started with the company in 1983 as controller.  And in

3    1987, I was promoted to vice president of finance.  In 1991

4    or 1992, I was promoted to executive vice president and chief

5    financial officer.  And then in 1996, Lou's younger brother,

6    Lee, decided to retire, and we did not have someone fully

7    trained in the retail group to replace him.  So I went over

8    as president of the consumer products division for four and a

9    half years.  And then I returned to my role as CFO.

10   Q    Okay.  Are you married?

11   A    Yes, I am.

12   Q    Do you have any kids?

13   A    I have been married for 32 years, and I have three adult

14   children, two of which are married, two grandchildren, and

15   one on the way.

16   Q    Congratulations.

17   A    Thank you.

18   Q    Where did you go to school?

19   A    I went to school at the University of Notre Dame.

20   Q    Did you graduate with degrees?

21   A    Yes, I did.  I graduated with a business degree and went

22   on to work for one of the big eight public accounting firms,

23   Pricewaterhouse.

24   Q    When did you start at Sargento?

25   A    1983.

1   Q   All right.  Well, let's fast-forward from 1983 to 2007.

2   A   Okay.

3   Q   That's a long ways.  What role did you play in the

4   acquisition of Portionables?

5   A   I led the internal integration team for Sargento in

6   acquiring Portionables.

7   Q   And what does that mean?

8   A   I was responsible for coordinating the legal services

9   surrounding the acquisition of Portionables.  And I also led

10   the internal due diligence team with respect to acquiring the

11   company.

12   Q   And due diligence is a term that lawyers use a lot.  Can

13   you explain that in more everyday language?

14   A   I'm sorry.  Due diligence, in everyday language, what it

15   means is it's validating the promises and representations of

16   the seller.

17   Q   Okay.  Were you excited about the acquisition, and why?

18   A   Oh, we were very excited about the acquisition.  And I

19   probably could go on for a long time about that.  But at the

20   top of the line, the top things we were excited about, is we

21   were already in this business.  We were in the frozen sauce

22   business at Sargento.

23   So Patrick Calliari's company was an extension of a

24   business that we were already in.  We were familiar with it.

25   And we looked upon his -- the purchase of his company as

1  increasing our market share.  That was number one.

2     Number two, he had some very good customers, Unilever

3  being one of them, that we had not been successful

4  penetrating at Sargento.  And we looked at that as very

5  positive.

6     And I probably should have said this first:  Probably the

7  primary reason we were excited about the company was Patrick

8  Calliari.  He was --

9  Q   Let me stop you there.  Why were you excited about Patrick

10 Calliari?

11 A   He was an incredibly successful guy, fluent in multiple

12 languages, a professional race car driver, pilot, started

13 three businesses before the age of 50.  He was the classic

14 entrepreneur, the visionary, big idea guy, the type of guy

15 that founded our country.

16 Q   Okay.  Were there any concerns or clouds that you were

17 worried about when you bought the company?

18 A   You know, one of the issues we were concerned about,

19 honestly, was the fact that the company was losing money and

20 had been losing money for 24 months.  Typically, you don't go

21 buy companies that are losing money.  But there was a very

22 clear reason for that.

23    Basically, Portionables had two plants, and they only

24 needed one.  A year -- two years previous to the purchase, he

25 had built a plant in North Sioux City, South Dakota,

1   primarily to service a major customer, General Mills.  And he

2   began to service General Mills and then lost the business

3   over a pricing dispute.

4        So we basically had an extra plant that we didn't need.

5   Now, that was a negative financially, but it was also an

6   opportunity for us if we could grow revenues.

7   Q   Okay.  So what did you feel like the immediate prospects

8   were for the company?

9   A   Oh, we thought the immediate prospects were extremely

10  bright.  I think that we had a very detailed sales forecast

11  that Patrick and his business advisor, Bill Beard, had

12  provided us that gave us a granularity into how he was going

13  to grow the business, actually, almost triple the business in

14  24 months with some major key accounts.

15  Q   And what was your understanding was going to be the key?

16  What did Sargento view as the key to going from losing money

17  to tripling sales?

18  A   It was absolutely growing sales, growing revenues.  And,

19  actually, we viewed the key as Patrick Calliari.  I'll be

20  honest with you; we wouldn't have done this deal without

21  Patrick.

22  Q   So after the acquisition, what was your role with

23  Portionables after the purchase closed?

24  A   You know, basically, I was available as a resource and as,

25  really, someone to support Patrick.  I know on the day that

1    we closed the transaction on April 30th, I came to Milwaukee

2    early to have breakfast with him.  We had breakfast.  He

3    clearly knew that I respected him.

4        And I made it clear to him as I was welcoming him into the

5    Sargento family that I was going to be a resource and support

6    to him.  I had my name on the recommendation to our board of

7    directors to buy his company.  So if he failed, it certainly

8    was not going to be a good reflection on me.

9    Q    What were some of the initial steps that you took after

10   the acquisition closed?

11   A    Well, the immediate steps I took, as I indicated before,

12   this was not a healthy company that we were acquiring.  I

13   integrated the cash and credit cycles of our business.  At

14   the time, Portionables' bank was not interested in lending

15   them more money or, in fact, even staying on as a bank.

16       And the controller, Larry Riley, was busy putting accounts

17   payable vouchers into buckets of 30, 60, 90, 120, 180.  And

18   he was spending all of his time managing cash flow.  And we

19   gave Portionables immediate access to our line of credit to

20   take the pressure off and allow the management team to focus

21   on growing the business.

22   Q    And, in your view, was that a good thing to do?

23   A    I thought it was a great thing to do, because when you're

24   in that situation, it's a very demoralizing situation to be

25   in.

1   Q   Did Sargento do anything to help Portionables make the

2   earnout?

3   A   Oh, I think Sargento did a number of things to help

4   Portionables make the earnout.

5           MR. GOLDFARB:  Excuse me.  Your Honor, object to this

6   line based on the court's prior ruling.  I thought that what

7   happened here with regard to the earnout was off-limits for

8   both sides.

9           MR. LINEHAN:  Your Honor, I believe the accusation

10  against our client was that we were doing things to keep them

11  from making the earnout.  And I think Mr. Hoff should be

12  allowed to say what Sargento actually did.

13          THE COURT:  Why don't we stick to the issues that

14  we've been litigating and those specific contracts and

15  negotiations, please.

16          MR. LINEHAN:  Okay.  Your Honor, we'll move on.

17  Q   Tell me who Mike Gordy is.

18  A   Mike Gordy is a senior level executive at Sargento.  And

19  he is probably -- well, he is the single most cross-trained

20  executive that we have.  He started with our company probably

21  30 years ago in a sales role and has advanced up through

22  multiple promotions, including running our consumer products

23  division, running our food ingredients division.  He ran our

24  operations group.  A very talented guy.

25  Q   And was he assigned a role to play at Portionables?

1   A    He was assigned the role of heading up the integration of

2   Portionables.

3   Q    How was his role defined?

4   A    I think his role was defined as to align all of the

5   resources that Sargento had to give to Portionables and to

6   facilitate that in terms of either helping them grow their

7   sales or helping them reduce their costs or helping them do

8   things more efficiently and effectually.

9   Q    All right.  Was he there to order people around and tell

10  them how to do their business better?

11  A    That was not my understanding.

12  Q    Okay.  Did Mr. Calliari approve of Mr. Gordy's placement

13  with Portionables?

14  A    I think he not only approved --

15         MR. GOLDFARB:  Objection.

16  A    -- he welcomed it.

17         THE COURT:  Just a minute.

18         MR. GOLDFARB:  Objection, your Honor.  No foundation

19  has been established at this point.  Lack of foundation.

20         THE COURT:  Let's rephrase, please.

21  BY MR. LINEHAN:

22  Q    Mr. Hoff, did you ever have any discussion was

23  Mr. Calliari about Mr. Gordy or Mr. McEvoy assisting

24  Portionables?

25  A    During the due diligence process while we were buying his

1   company, I had discussions directly with Patrick, as well as

2   his business advisor, Bill Beard.  And we had talked about

3   the fact that although Patrick had skill sets in many of the

4   operating areas of the business, he no longer had the

5   interest to be involved in those types of functions.

6       He was a visionary sales entrepreneurial leader.  And he

7   would welcome help that we could give him.  And, honestly, we

8   chose, I think, one of our finest senior level executives to

9   help him.

10  Q   How much did Sargento charge Portionables for Mr. Gordy or

11  Mr. McEvoy's time and effort?

12  A   We didn't charge him the time.

13  Q   Did Mr. Calliari ever complain to you that Sargento was

14  interfering with his operational control because Mr. McEvoy

15  or Mr. Gordy was there?

16  A   Not once.

17          MR. GOLDFARB:  Excuse me, your Honor.  Objection.

18  Lack of foundation.  No showing that there was any basis for

19  that communication.

20          THE COURT:  Are you asking whether anyone complained

21  directly to him or the company as a whole?

22          MR. LINEHAN:  I'm not sure how I phrased it, but my

23  intent was to ask whether Mr. Calliari had ever complained to

24  Mr. Hoff.

25          THE COURT:  The objection is overruled.

1   A   Not once.

2   BY MR. LINEHAN:

3   Q   Mr. Hoff, did you play any role in the discussions with

4   Bellingham Cold Storage after the acquisition closed?

5   A   I did.

6   Q   Can you tell us what your role was?

7   A   Well, can I tell you, previous to the acquisition, in

8   doing some of the due diligence work, I had discovered that

9   there was a savings number in one of the projections.  And it

10  was a place marker for $500,000.

11  Q   Who had placed that marker?

12  A   Patrick had asked Larry Riley to put the number into the

13  forecast.  And when I followed up with Larry Riley directly,

14  he told me that there was little, if any, support for the

15  number, but that there was an opportunity --

16          MR. GOLDFARB:  Excuse me, your Honor.  The question

17  is narrative, and the answer is hearsay.

18          THE COURT:  Sustained as to the last comment about

19  what Larry Riley said.  The jury will disregard it.  Pose

20  another question.

21  BY MR. LINEHAN:

22  Q   Let's try that again, Mr. Hoff.  We'll do it a little

23  differently.

24  A   Okay.

25  Q   Did Mr. Calliari come to you for help in dealing with

1    Bellingham Cold Storage?

2    A    Yes, he did.

3    Q    And what reasons did he give you as to why he came for

4    help?

5    A    Because we had identified a major opportunity to save

6    money.  And he had communicated that to us previous to the

7    time we bought his company.  And he also had communicated to

8    us that he had had an impasse with Bellingham Cold Storage.

9    He came to me for help to see if I could alleviate that

10   impasse.

11   Q    And what was the impasse that he described?

12   A    Well, the impasse was a dispute that he had been having

13   with the president of Bellingham Cold Storage for quite a

14   while over the issue of direct ship.  It was his contention

15   that direct ship would save money for his business.  And he

16   had a passion about that particular idea.

17   Q    Okay.  Can we look at Exhibit No. 3, please.  Go to page

18   555.  I'm sorry.  That wasn't the page I was suggesting.

19   Page 557.  Highlight Section 1.6(a), please.

20        Mr. Hoff, do you see that section that I just asked to be

21   highlighted?

22   A    Yes, I do.

23   Q    You testified earlier that one of your roles was legal

24   functions involved in the acquisition?

25   A    That's correct.

1   Q   Did you have a role in negotiating this agreement?

2   A   I had a role in negotiating the agreement, that's correct.

3   Q   Okay.  And are you familiar with Section 1.6?

4   A   Yes, I am.

5   Q   Can you read the first sentence of Section 1.6(a), please?

6   A   Sure.  The parties agree that, prior to the contingent

7   payment due date, the company and the sub will be operated in

8   a manner consistent with past practice and under the

9   operational control of the shareholders' representative.

10  Q   Let's stop there, because I'm only going to focus on the

11  first part of that.

12  A   Okay.

13  Q   We've talked about all the language there before.  What

14  I'm interested in is the language:  Operated in a manner

15  consistent with past practice.

16      To your knowledge, had direct shipping ever been

17  implemented at Portionables?

18  A   No, not to my knowledge, I wasn't aware of that.

19  Q   Prior to the acquisition?

20  A   No.

21  Q   In your view, would it have been consistent with past

22  practice?

23  A   It would not have been.

24  Q   In your dealings with Bellingham Cold Storage, did you

25  keep Mr. Calliari in the loop in those dealings?

1   A   I did the best I could.  I did the best I could.

2   Q   If you could put up 271, but do not publish, please.

3       Mr. Hoff, without describing the document, do you

4   recognize that document?

5   A   Yes, I do.

6   Q   Can you tell me generally what it is?

7   A   It's an e-mail that I am sending to Patrick Calliari.

8   Q   And when was it dated?

9   A   July 31, 2007.

10  Q   And you sent it to patrick.calliari@portionables.com?

11  A   That's correct.

12  Q   Was that his e-mail address at Portionables?

13  A   Yes, it was.

14  Q   Does this relate to the subject of Bellingham Cold Storage

15  negotiations?

16  A   It does.

17      MR. LINEHAN:  Your Honor, I'd offer Exhibit 271, with

18  a limiting instruction that it be received for evidence that

19  Mr. Calliari received notice of negotiations.

20      MR. GOLDFARB:  The lower portion of the e-mail is

21  hearsay, your Honor.

22      MR. LINEHAN:  Your Honor, we're fine with limiting

23  the document to the upper e-mail.

24      MR. GOLDFARB:  The upper portion is also hearsay,

25  your Honor.

```
1          MR. LINEHAN:  As I said, your Honor, I'm happy to
2    cure the hearsay problem by only offering it for the limited
3    purpose of --
4          THE COURT:  The upper portion of the e-mail is
5    offered only for the limited purpose of showing notice, not
6    for the truth of the discussions contained in the body of the
7    e-mail.
8          MR. LINEHAN:  That's my understanding, your Honor.
9          THE COURT:  Go ahead.
10         MR. LINEHAN:  Will it be admitted?
11         THE COURT:  Yes.
12         (Exhibit(s) 271 admitted.)
13         MR. LINEHAN:  Thank you, your Honor.
14   Q    Just show the top part there.  Mr. Hoff, you write:
15   Patrick and Larry, please accept my apologies for not
16   forwarding this to you earlier.  I've been working with Mike
17   Gordy and Mike McEvoy on this end and failed to update both
18   of you on the good cop/bad cop routine.
19        First off, what is a good cop/bad cop routine?
20   A    Well, one of the things that we were attempting to do here
21   is Patrick and I agreed totally on the need to secure a cost
22   savings from Bellingham Cold Storage.  He had had an idea
23   that direct ship was one of those routes.  And I had some
24   concerns with direct ship from a risk and return and
25   financial perspective.
```

1        But that didn't deter me from pursuing alternative B,

2    which was to try and secure a significant six-figure cost

3    savings by negotiating some other kind of incentive from

4    Bellingham Cold Storage.  Patrick was in the loop on that.

5    Q    So what was the good cop/bad cop?  Was that just a

6    negotiating strategy?  Is that what you were presenting?

7    A    Well, yes.  At the time, the good cop/bad cop was, at

8    least on the bad cop side, we had an appropriate person to

9    play that role, because the communication between both

10   Patrick and Doug Thomas, the president of Bellingham Cold

11   Storage, was nothing.  It had deteriorated to zero.  And at

12   least I had an opportunity, as the good cop, to come in and

13   begin the dialogue to secure the cost savings that the

14   company so vitally needed.

15   Q    Okay.  Starting in the middle of that top paragraph, you

16   say:  Going forward, you will definitely be in the loop, as

17   Mike McEvoy will likely take the lead with selected folks on

18   your end to get the savings implemented ASAP?

19   A    I absolutely shared Patrick's sense of urgency on this

20   matter.  No one knows how urgent that is when you're losing

21   money and you need to do something, and do something very,

22   very quickly.  So I work and live in Wisconsin, so I handed

23   off the day-to-day responsibility to Mike McEvoy, who was out

24   in Bellingham.

25   Q    Okay.  Mr. Hoff, earlier today you obviously weren't in

1  the room under the exclusion rule, but there was some

2  testimony about some EBITDA projections that Mr. --

3          MR. GOLDFARB:  Objection, your Honor, to this

4  reference.  What happened elsewhere is kind of precisely the

5  point of the exclusion rule, among other things.  That's an

6  improper question.

7          THE COURT:  It is.  That's the point of sequestering.

8  You don't tell them what happened first.

9          MR. LINEHAN:  I'm sorry, your Honor.  I wasn't

10  intending to reveal the substance.  I was just trying to lay

11  a marker for the jury so that they could compare notes here.

12          THE COURT:  Pose another question.

13          MR. LINEHAN:  I will do so.

14  Q   Were you provided any EBITDA earnings projections from

15  Patrick Calliari in May of 2008?

16  A   Yes.  In fact, I was provided projections periodically by

17  Patrick.

18  Q   And do you recall receiving a projection that entailed 5

19  million dollars and above, potentially, in earnings?

20  A   I do.

21  Q   What was going on at the time when that projection was

22  provided to you?

23  A   We were in the middle of this dispute.

24  Q   And what was your reaction when you saw that 5 million

25  dollar projected earnings figure?

1    A    Honestly, I laughed.

2    Q    Why did you laugh?

3    A    Because earlier in the year I had had a direct

4    conversation with Patrick in my office where he had told me

5    that it was highly likely that they would not be making the

6    earnout in 2008.

7    Q    When did that --

8    A    And a couple of months later, to look at a forecast of 5.5

9    million dollars, I'm sorry, I did laugh.

10   Q    The conversation you just described in your office, when

11   did that take place?

12   A    In mid-January.

13   Q    And who was present there?

14   A    Patrick and myself.

15   Q    Why was Patrick in your office?

16   A    Actually, he had come to visit Lou.  And it was not

17   uncommon for him -- he is a very nice and cordial guy -- to

18   always walk down the hallway and visit with me.  And we

19   initially started talking about his Christmas, which was

20   good, and how his daughter, Favia, was doing.  And he's a

21   great father and a very devoted dad, and we talked about

22   that.  And then he just simply said:  It's highly likely

23   we're not going to make the earnout this year.

24   Q    Let's talk about Unilever.

25   A    Okay.

1   Q   How involved were you in the discussions regarding

2   amending the Unilever manufacturing agreement?

3   A   I would say I was personally involved in the Unilever

4   conversation after Patrick had made his initial offer.

5   Q   So what was your role?

6   A   After Patrick had made his initial offer to Unilever of 35

7   cents --

8   Q   Just a moment.

9   A   Oh, what was my role?

10  Q   No, I'm sorry.  I want to make sure that everyone

11  understands exactly what your testimony is.  When you say

12  Patrick made the initial offer, which offer are you referring

13  to?

14        MR. GOLDFARB:  Excuse me, your Honor.  Objection.

15  Lack of foundation.  The witness has just testified his

16  involvement post-dated those events.

17        THE COURT:  Let's clear this up as to what we're

18  talking about, please.  Pose another question.

19        MR. LINEHAN:  I will, your Honor.

20  Q   Let's start from the beginning.  What was your role in the

21  negotiations with Unilever regarding amending the agreement?

22  A   I helped Patrick re-present the offer of 35 cents a pound

23  in a different way to sell it to Unilever.

24  Q   What do you mean re-present?

25  A   He had made an offer in the summer of 35 cents a pound

1   that was rejected by Unilever.

2   Q   And how do you know that he did that?

3   A   Because he told us.  He told me.

4   Q   When?

5   A   Right after Unilever rejected the offer.  They asked for

6   another 5 or 6 cent price concession.  And he came to me.  He

7   came to Lou.  He came to Sargento and apprised us of the

8   situation, which is certainly appropriate, and asked for our

9   help in dealing with a counter-response to their rejection of

10  his offer.

11  Q   When you say he came to Sargento, was that he physically

12  came?

13  A   He came physically, but we also talked to him several

14  times on the phone.

15  Q   Okay.  Tell me what happened when he physically came to, I

16  presume, Plymouth, Wisconsin?

17  A   We worked on trying to create a different way to sell him

18  the same concept.  Patrick is a savvy businessman.  And I

19  think the 35 cent offer was an appropriate offer.  Since

20  Unilever rejected it, we needed to come back with something

21  that would make sense for them but clearly wouldn't

22  compromise us any further.  So we came up with a two-tiered

23  pricing strategy that was the equivalent, literally the

24  equivalent, of the same offer, a blended price of 35 cents a

25  pound.

1    Q    When you say tiered pricing, is that the --

2    A    38 and a half cents and 23 cents a pound.

3    Q    And you had run some numbers?

4    A    I did some modeling work with my controller, Jim

5    Birenbaum.  And we had the capability at Sargento to help

6    Patrick where he did not have the resources in Bellingham,

7    nor the software, to be able to do these things very quickly,

8    because we needed to get back to Unilever very quickly with a

9    counter-proposal.  And, honestly, neither one of us wanted to

10   reduce our price further below the 35 cent blended average.

11   Q    Okay.  So tell me about this meeting where you came up

12   with this alternative theory.

13   A    Well, we were all in the conference room, in the executive

14   conference room, working on multiple models.  And this one

15   seemed to make the most sense to us, is to go back with a

16   blended price equal to the one that he had suggested to them

17   earlier.

18   Q    So when you say it made the most sense to us, who is the

19   "us" you are referring to?

20   A    Lou Gentine, George Hoff, Mike Gordy, Patrick Calliari,

21   and Jim Birenbaum, is my recollection.

22   Q    So it's your testimony that Mr. Calliari -- this offer

23   made sense?

24   A    Yes.  Mostly it was his offer.  Or the equivalent.  I'm

25   sorry.  The equivalent of his offer.

1   Q   Okay.  Did you have any concerns about this two-tiered

2   pricing program?

3   A   I did not.

4   Q   You felt comfortable with it?

5   A   You know, any time a key customer that is 80 percent of

6   your volume comes to you and asks you to reduce prices,

7   you're not a happy person.  I wasn't happy.  We had just

8   bought his company a couple of months ago or previous to

9   that.  And I know Patrick wasn't happy.  But I trusted his

10   judgment that that was the right number to go after, so, yes.

11   Q   Did Mr. Calliari mention self-manufacturing?

12   A   He did.

13   Q   And what did he say about it?

14   A   He said that he believed that it was an idle threat.

15   Q   Was there a discussion about the risks of that?

16   A   There was a discussion about the risks of losing Unilever.

17   I mean, the self-manufacturing threat was one tree in a very

18   large forest.  We had no contract with Unilever.  They were

19   also saying they were thinking of -- we lost our exclusivity

20   provision with them when we bought the company.  And they

21   were also suggesting that they could go elsewhere to buy the

22   product.  So it was a big deal.

23         MR. GOLDFARB:  Objection, your Honor.  Narrative

24   answer, apparently involves hearsay about Unilever.

25         THE COURT:  Overruled.

BY MR. LINEHAN:

Q   Did Mr. Calliari indicate whether he was willing to take the risk of losing the Unilever account?

A   He was absolutely not willing to take that risk.  And, honestly, the respect I have for him as a businessman would lead me to that conclusion.  He would not have offered that price concession unless he felt he had to.

         MR. GOLDFARB:  Excuse me.  Objection, your Honor. Move to strike the nonresponsive portion.

         THE COURT:  The last sentence is nonresponsive, and the jury should disregard it.

BY MR. LINEHAN:

Q   At any time during that meeting that you just described in Plymouth to come up with the 38 and a half, 23 proposal, did Mr. Calliari ever say to you or anyone else in the room when you were present that Sargento was usurping his operational control?

         MR. GOLDFARB:  Objection, your Honor.  Leading.

         THE COURT:  Overruled.

A   No, he did not.

BY MR. LINEHAN:

Q   Did he ever suggest that you were breaching his employment agreement?

A   No, he did not.

Q   Mr. Hoff, do you recall a phone conversation with

1   Mr. Calliari and Lou Gentine on April 2, 2008?

2   A   Yes, I do.

3   Q   What was the occasion for that call?

4   A   It was a follow-up call to a letter that we had received

5   from Patrick Calliari -- Patrick Calliari's attorney, on

6   March 28th.  The letter came in from out of the blue.  And we

7   had requested that Patrick contact us.  Lou had requested

8   personally that he contact us regarding the substance of that

9   letter.  And that call on April 2nd was the first time we had

10   talked to Patrick about his concerns.

11   Q   Exhibit 13, Mr. Hoff, is that the letter that you were

12   just describing?

13   A   Yes, it is.

14   Q   And that's what triggered the --

15   A   That's what triggered the phone call.  Because up until

16   that time, we had not talked to him personally about any of

17   these concerns.

18   Q   Who initiated that phone call?

19   A   Lou Gentine asked Patrick to call him and for me to join

20   the call.

21   Q   Did Mr. Calliari make the phone call?

22   A   He did, five or six days later.

23   Q   What do you remember about what Mr. Calliari said in this

24   phone call?

25   A   Well, I remember many things.  But I think the summary of

1   what I remember is he was conflicted and confused.

2   Q   What did he say he was conflicted about?

3   A   He was conflicted by the dual role that he was playing as

4   shareholders' rep and president of Portionables.

5   Q   Were you at all concerned about where his loyalties lie

6   after that phone call?

7   A   Absolutely.

8   Q   Why were you concerned?

9   A   Well, the confusing part was, this phone call was in

10  response to the letter.  And the letter is a litany of things

11  that the shareholders and Patrick Calliari were contending

12  were done wrong by Sargento.  And yet, during the course of

13  our phone call, he had agreed that he was involved in the

14  negotiation of the Unilever contract and he understood where

15  we were coming from.  So it was almost playing both sides of

16  the issue.  And it was very unclear, when the phone call

17  ended, what team he was on.

18  Q   Why was it unclear?

19  A   Because he did not state what team he was on.  Lou had

20  asked him at the end:  Where do we go from here?  And his

21  response directly was:  I don't know.

22  Q   Look at Exhibit 16, Mr. Hoff.  Do you have that in front

23  of you?

24  A   Yes, I do.

25  Q   This is the April 11th letter sent to Mr. Calliari's

1   personal attorney, Mr. Miller, from the Reinhart firm?

2   A   Yes.

3   Q   Can you look at the second page of that, please?

4   A   I can.

5   Q   First let me ask you:  Were you involved at all in the

6   preparation of this letter?

7   A   I saw the letter before it went out.

8   Q   You reviewed it before it went out?

9   A   Yes, I did.

10  Q   Okay.  Let's look at the bracketed section.  Take a look

11  at paragraph 1.  Read that to yourself, if you need a moment

12  to orient yourself.

13  A   Okay.

14  Q   It says:  Mr. Calliari shall take no further action with

15  respect to the discussions concerning the Unilever amendment

16  except after discussion and approval of such actions by

17  Mr. Gentine, and any approval must be in writing.

18      Do you have contact with the other division heads,

19  division presidents at Sargento?

20  A   I do.  I work with them all the time.

21  Q   And in your experience, is this an appropriate limitation

22  for Mr. Gentine to place on his division heads?

23          MR. GOLDFARB:  Objection, your Honor.  The issue here

24  is what the contractual language provides.  Relevance.

25          MR. LINEHAN:  Your Honor, one of the questions in

1    this case is what the responsibilities of a division head are

2    and what the obligations are.

3            THE COURT:   Rephrase the question concerning whether

4    this is something usual for the division heads, not whether

5    it's appropriate, please.   That's for the jury to decide.

6            MR. LINEHAN:   Good advice, your Honor.

7    Q   Mr. Hoff, would this be a typical or a usual type of

8    restriction for Mr. Gentine to place on division presidents

9    at Sargento?

10   A   Given the circumstances, yes.

11   Q   What about the second paragraph, would you give the same

12   answer if I asked you the same question?

13   A   I would give the same answer.

14   Q   Mr. Hoff, let's go back to the April 11th phone call.   At

15   any point in that call, did Mr. Calliari express the opinion

16   that Sargento was taking away his operational control with

17   respect to Unilever?

18   A   No, he did not.

19   Q   What concerns did he indicate about his operational

20   control, if any?

21   A   He did not indicate any with the phrase "operational

22   control."

23           MR. LINEHAN:   No further questions right now, your

24   Honor.

25           THE COURT:   Any cross-examination?

```
1            MR. GOLDFARB:  Yes, your Honor.
2                      CROSS-EXAMINATION
3    BY MR. GOLDFARB:
4    Q   Good afternoon, Mr. Hoff.
5    A   Good afternoon, Mr. Goldfarb.
6    Q   We met in Milwaukee, when I took your deposition a couple
7    of months ago, is that correct?
8    A   Yes.
9    Q   Now, is there any division president -- put aside this
10   case and Mr. Calliari.  Is there any division president at
11   Sargento that has a written employment agreement with a term
12   identical to Mr. Calliari's employment agreement that grants
13   operational control during an earnout period?
14   A   No.
15   Q   The telephone conversation you described to us that
16   occurred on April 2nd, 2008, you said that Mr. Calliari did
17   not specifically use the words "operational control," is that
18   right?
19   A   Yes, I do not recall him using those words.
20   Q   Okay.  But in that call, he did tell you that Antoine
21   Ioannides has over 25 years of dealing with Unilever and that
22   he had over 20 years of dealing with Unilever, didn't he?
23   A   That's correct.
24   Q   And he also told you that from the beginning he had
25   registered his disagreement with giving Unilever any price
```

1  concessions, correct?

2  A   He told us that.

3  Q   He said that in the call, didn't he?

4  A   He said that.

5  Q   Yes.  And he also told you that he had said that they were

6  bluffing, correct?

7  A   He said that, yes.

8  Q   And also in this April 2nd call, he told you that Unilever

9  had no intention of going into self-manufacture, correct?

10 A   He said that, yes.

11 Q   And in the call, he told you he had contacts in Europe on

12 the vendor side that supported his contention, correct?

13 A   He said that, yes.

14 Q   And he told you that both he and Mr. Ioannides knew more

15 about Unilever than Sargento did, but that no one was

16 listening to him.  He said that, did he not?

17 A   He made that statement as well.

18 Q   And he told you that although he had signed the proposed

19 Unilever document even though he disagreed with it, he

20 thought too much time had transpired from the date of the

21 original letter in August until April 2008.  He said those

22 words, correct?

23 A   He did.

24 Q   And he said that since Unilever did not get back to us

25 until January of 2008, he thought it was appropriate to tell

1    them that the world had changed, correct?

2    A    Yes, he said that.

3    Q    Now, he may not have used the words "operational control"

4    in that call, but he made it very clear to both you and

5    Mr. Gentine that he opposed the amendment of the Unilever

6    agreement, correct?

7    A    He did.  In fact, he even asked us or our attorney to look

8    into how we could get out of it.

9    Q    Now, you described for us in your testimony just a few

10   moments ago that there was a meeting that occurred in

11   Plymouth?

12   A    Yes.

13   Q    And that meeting occurred sometime in the fall of 2007, is

14   that correct?

15   A    Oh, I'm sorry.  I believe the meeting I'm describing was

16   in July.  I don't have the specific date, but it was in July.

17   It was before the offer letter that Patrick signed went to

18   Unilever.

19   Q    Okay.  And you described a meeting that occurred in a

20   conference room?

21   A    Yes.

22   Q    At your headquarters, correct?

23   A    I did.

24   Q    You were there?

25   A    I was there.  I believe Patrick might have been there by

1    conference call.  Lou Gentine was there.  Mike Gordy was

2    there.  And Jim Birenbaum was there.

3    Q    And in that meeting, Mr. Calliari told you that he thought

4    Unilever would not self-manufacture, correct?

5    A    He did share that.

6    Q    And he told you in that meeting, which you say was July of

7    2007, that he thought they were bluffing, correct?

8              MR. LINEHAN:  Objection, your Honor.  Hearsay.

9              THE COURT:  Overruled.

10   A    Yes.

11   BY MR. GOLDFARB:

12   Q    And there was a response by the Sargento side in that

13   meeting, wasn't there?

14   A    Could you be more specific?

15   Q    Yes.  What you characterized as happening in that meeting

16   was a respectful disagreement regarding the evaluation of the

17   risk of calling their bluff, isn't that right?

18   A    Yes, that's correct.

19   Q    So there was a business judgment issue about whether or

20   not to -- what the risk was with regard to Unilever that went

21   all the way back to July of 2007, correct?

22   A    I would phrase that a little bit differently.  I would

23   phrase that to suggest that Unilever had come to us asking

24   for a price concession, Mr. Calliari had offered them one,

25   and we supported him 100 percent in getting that done.

1   Q    But at the meeting, what happened was -- and I'm now in

2   July of 2007, the boardroom.  You are there?

3   A    Yes.

4   Q    Mr. Calliari's either in person or by phone; you are not

5   sure.  And there was a respectful disagreement between the

6   Sargento side of the room and Mr. Calliari about how much

7   risk there was with regard to Unilever, correct?

8   A    Now, I think that is a mischaracterization of the meeting.

9   There was a respectful disagreement on direct ship, not on

10  the risk of potentially losing Unilever.  There's a

11  difference.

12          MR. GOLDFARB:  Your Honor, may I approach?

13          THE COURT:  You may.

14          MR. GOLDFARB:  Move to open and publish the

15  deposition of Mr. Hoff.

16  Q    Sir, if you would turn in your deposition, please, to page

17  96, line 10.

18          MR. LINEHAN:  Which page?

19          MR. GOLDFARB:  96, line 10.

20  Q    Mr. Hoff, this is testimony that you gave on September 2nd

21  of this year, is that correct?

22  A    That's correct.

23  Q    And this was taken at the Reinhart law firm in Milwaukee,

24  is that right?

25  A    That is correct.

1    Q    And you were testifying under oath at that time, correct?

2    A    Yes.

3    Q    Beginning at line 10, let me read the question and answer

4    to you.

5              Question:  So the meeting when Mr. Calliari said he

6    didn't think Unilever would self-manufacture, who was there?

7              Answer:  As I recall, it was in our boardroom, and

8    Mike Gordy was there.  Lou Gentine was there.  I was there.

9    And our controller, Jim Birenbaum was there.  And Patrick

10   expressed that he thought they were bluffing.

11        That was the question I asked you, correct?

12   A    That's correct.

13   Q    I'm sorry.  That was the answer you provided.  And then

14   the question I asked was:  Was there a response to that?

15        And could you read for the jury your answer?

16   A    Yes, I would be happy to read it.

17              Well, I think there was a respectful disagreement

18   regarding the evaluation of risk of calling their bluff.

19        Which is well beyond the self-manufacturing point.

20   Q    Sorry, sir.  Your testimony was that there was a

21   respectful disagreement regarding the evaluation of risk of

22   calling their bluff, correct?

23   A    That's correct.

24   Q    You testified about a forecast that you received in May of

25   2008 regarding EBITDA, correct?

1    A    Yes, I did.

2    Q    That forecast was not prepared by Mr. Calliari, was it?

3    A    I believe Mr. Calliari had direct input into that

4    forecast, from conversations with Larry Riley, our

5    controller.

6    Q    The forecast was prepared by Larry Riley, isn't that

7    correct?

8    A    Well, technically, that's correct.  But the forecast has

9    input from other people to it.

10   Q    The forecast was prepared by Larry Riley, yes or no?

11   A    Yes.

12   Q    And that forecast was then circulated to both Mr. Gordy

13   and Mr. McEvoy, isn't that right?

14   A    That's correct.

15   Q    And the forecast suggested EBITDA of 5.5 million dollars

16   as of May of 2008, a forecast for the entire year of 2008,

17   correct?

18   A    That is correct.

19   Q    And Mr. McEvoy and Mr. Gordy, when they transmitted it to

20   you, added a comment where they thought that it should be

21   reduced by $500,000 for certain factors, isn't that true?

22   A    If you show me the document, I can confirm that, yes.  I

23   recall the forecast.  I don't recall what you're talking

24   about specifically here.  I remember the number.  I'm sorry.

25   Q    The prospects for the Portionables business had improved

1  by April of 2008, is that not so?

2  A   We were hopeful that they were improving by April of 2008.

3  But, quite frankly, looking at where we were and looking

4  back, the string of losses had just continued.

5  Q   When the company was acquired by Sargento, everyone, you,

6  Mr. Calliari, everyone knew the key to success was to fill up

7  the South Dakota plant, correct?

8  A   I don't think I could have said that better.

9  Q   And efforts were made in the sales area in 2007 and early

10  2008 to achieve that goal, correct?

11  A   There were efforts made from the beginning, yes.

12  Q   And those efforts, because of the nature of this business,

13  take time, don't they?

14  A   They do.  They take more time than people are typically

15  patient for.

16  Q   But it is a fact, isn't it, that by the fourth quarter of

17  2008, the South Dakota facility was operating 20 hours a day,

18  seven days a week, which is as much as it can operate,

19  because you need four hours a day for cleaning, correct?

20         MR. LINEHAN:  Objection, your Honor.  We've covered

21  this.

22         THE COURT:  I thought we did, too.  Let's move to a

23  new area, please.

24  BY MR. GOLDFARB:

25  Q   I think you opened your testimony today by -- you

1    testified that you are on the board of Sargento, is that

2    correct?

3    A    No.  I am the secretary to the board.  I am a nonvoting

4    member, corporate secretary.

5    Q    And Sargento is a corporation, is that right?

6    A    Family-held business, that's correct.

7    Q    Is it something called a C corporation?

8    A    No.  It's actually an S corp.

9    Q    Okay.  And that is a corporation that exists for profit,

10   is that correct?

11   A    It does.

12   Q    Okay.  And prior to the acquisition, Portionables was a

13   corporation as well, is that correct?

14   A    It was and still is.

15   Q    Yes.  Portionables is a C corporation, isn't that correct?

16   A    It is correct.

17   Q    The parent company now is Sargento, correct?

18   A    Yes.

19   Q    So it is a wholly-owned subsidiary of Sargento, isn't that

20   right?

21   A    That's correct.

22   Q    But it is a separate, stand-alone business, correct?

23   A    Yes.

24   Q    A separate legal entity, right?

25   A    Yes.

1    Q    So it is not a division of Sargento, is it, sir?

2    A    Technically, it is not a division of Sargento.

3    Q    Does Sargento have any other wholly-owned subsidiaries?

4    A    No, we do not.

5    Q    So the other executives that run Sargento divisions are

6    all part of the Sargento company, correct?

7    A    They are.

8    Q    Mr. Calliari was the president of Portionables during the

9    earnout period, right?

10   A    He was.

11   Q    So he was the president of a separate legal entity, isn't

12   that so?

13   A    Yes.  And he had his employment contract with Sargento.

14   Q    But the employment contract made him the president of a

15   separate legal company?

16   A    That's correct.

17   Q    Not a division, right?

18   A    Not technically a division, that's correct.

19         THE COURT:  Mr. Goldfarb, we need to find a place to

20   stop.

21         MR. GOLDFARB:  Now is fine, your Honor.

22         THE COURT:  Okay.  Thank you, sir.  You may step

23   down.  We'll continue with you tomorrow.

24         THE WITNESS:  Thank you very much.

25         THE COURT:  All right.  Ladies and gentlemen, it's

1   time to go home.  And when you go home tonight -- have they

2   given up on you?  They're not talking to you anymore?  Okay.

3   Good.

4        So I'd like, please, for you to remember that the words,

5   phrases, legal concepts that you hear -- we just heard some

6   testimony about an S corp and a C corp -- those aren't things

7   that you need to look up.  Nothing has changed.  No homework.

8   There's nothing to do when you go home except enjoy yourself

9   and come back to us refreshed.

10       But here is your homework assignment:  Take a look at the

11  murals on the second floor of the courthouse, because I'm

12  going to ask you tomorrow what they represent, okay?  So I'm

13  giving you these little art projects.

14       I hope you have a good evening.  Please remember your

15  admonitions.

16            (Jury leaves courtroom.)

17            THE COURT:  You may step down.

18       All right.  Let's talk about what we're doing.  Like a

19  phoenix, South Dakota keeps rearing its head, and I keep

20  beating it back down.  Why are we talking about South Dakota?

21            MR. GOLDFARB:  Your Honor, the testimony that I was

22  just attempting to offer had to do with the fact that when

23  they acquired the business, everyone knew South Dakota needed

24  to be filled up, that there was a process that they went

25  through.  They were ramping.  And they filled it up.

1     Now, this witness testified in direct that when he heard

2  the numbers, he laughed, and the reason he laughed is he

3  thought the implication was because they were never going to

4  make the number.

5     So to counteract that testimony, I wanted to demonstrate

6  that in fact it came to fruition several months later.  It

7  was full, which everybody agreed.  He agreed.  In my question

8  before, he agreed that that's what it was going to take to

9  make it work.  And it happened.  That's why I was trying to

10 offer the testimony.

11       THE COURT:  Well, let's go back to at least where --

12 let me try again conceptually where I think we are, okay?

13 And I think I get a little savvier every day as I see this

14 play out.

15     What we're really litigating here is the loss of a chance.

16 We are not litigating what the number is.  But we keep,

17 however, circling around about whether or not they were going

18 to make the number or whether or not they weren't going to

19 make the number.

20     But when we walked in here and started this trial, I

21 thought we decided, or you decided previously coming in, that

22 this jury is not going to decide what, if anything, this is

23 worth on the other end.  So it's simply, was there going to

24 be a chance to prove something later, is what we are talking

25 about.

1          Now, have I conceptually misunderstood you here?

2              MR. GOLDFARB:  I think you are at least half right,

3     your Honor.

4              THE COURT:  Okay.  Tell me where the other half is.

5              MR. GOLDFARB:  And I say that facetiously.  I think

6     we are still on the same page, that the determination of the

7     amounts owing under the EBITDA formula are properly decided

8     in arbitration.  Those are quantitative judgments.  There is

9     a qualitative aspect to this case about who believed who and

10    who had pretexts and who had motives.

11         And it was, as my colleague pointed out, argued in opening

12    statement that it was a pretext.  This witness just got up

13    there and said they could never make the number.  And so

14    there needs to be a certain -- and, you know, I don't think

15    that we need to be trying to prove what the numbers actually

16    were or what the ultimate dispositions of EBITDA were.

17         But in response to a question elicited by the defense that

18    says that he got this thing and it was a joke, we ought to be

19    entitled to show that they were ramping.  Because, as has

20    already come in, you know, if our numbers proved out, there

21    was tremendous upside here staying in the company.  The

22    argument they're advancing is we got out or our clients got

23    out because they didn't think they could make this work.

24         So I agree with your Honor; it's a very blurry line here,

25    and it's difficult.  But this all started because of the

1    argument that was advanced by the defendants.

2         THE COURT:  Well, I'm trying hard to follow along as

3    everyone asks these questions.  And you do keep, at least

4    from what I see, jumping across one line or the other in

5    terms of what you are trying to show.  I understand you're

6    trying to show that one side had an interest in making the

7    company more valuable, and it's questionable whether the

8    other side did.

9         But I think we're kind of getting lost in some of the

10   minutia of it.  And the real focus or thrust that we need

11   this jury to decide is the issue of the infringement on

12   control.  So that's why I keep, you know, pinning back your

13   ears here.

14        MR. GOLDFARB:  And, again, your Honor, I understand

15   that fully.  If your Honor recalls the position I was

16   advancing at the motions in limine stage, I thought the issue

17   here -- and I still believe this.  The issue is:  What do

18   these contracts mean?  And the facts here seem largely

19   undisputed.

20        THE COURT:  All right.  Where are we, and what are we

21   doing tomorrow?

22        MR. GOLDFARB:  So I have a bit more with Mr. Hoff,

23   but not a lot.

24        MR. SULKIN:  Our intent is not to call another

25   witness after Mr. Hoff, your Honor.

```
1              THE COURT:  I'm sorry.  I didn't hear you,
2   Mr. Sulkin.
3              MR. SULKIN:  I'm sorry.  We do not intend to call a
4   witness other than Mr. Hoff.  It's possible Mr. Gentine could
5   get on for ten minutes.  But with all due respect, we'll be
6   very short.
7              THE COURT:  Okay.  Well, that's a little problematic,
8   because are you telling me that we're going to get to the
9   jury earlier?
10             MR. SULKIN:  My hope is that we will be getting to
11  the jury tomorrow, your Honor.  I mean, I think you are
12  almost done.  And we have very little redirect, if any.  I
13  don't know if we'll call Mr. Gentine.  It will be literally
14  ten minutes or less.  So I think we'll be done early in the
15  morning, mid-morning.
16             THE COURT:  Well, I didn't get any jury instructions
17  from you.  So I assume that that means you think the ones you
18  already gave are just fine.
19             MR. SULKIN:  Your Honor, there was a miscommunication
20  in our office.  I think there are one or two tweaks we have,
21  which we'll try to get to you tonight.  We are relatively
22  happy with the instructions.  I think there are a couple of
23  things we would like you to look at.  And we apologize for
24  not getting them to you.  It's our fault.
25             THE COURT:  Okay.  Well, one of the things that, you
```

1   know, I should be signalling loud and clear is I'm

2   contemplating taking out the main proving of damages as one

3   of the elements.  In other words, once you show that you've

4   got this dispute, you have removed the issue of damages, or

5   you at least are legally accepting -- both sides are legally

6   accepting that what we have here is damages, loss of chance.

7           MR. SULKIN:  I understand the court's position.  And

8   perhaps we can talk about it in the morning.  But I

9   understand exactly what the court is saying.

10          THE COURT:  Okay.  Well, then, I think that you

11  better come in ready to argue tomorrow.

12          MR. SULKIN:  Your Honor, may I ask a question as to

13  that issue?  May I play a videotape in closing from the

14  depositions of questions and answers I got at trial?  I have

15  four or five clips.  I don't know what the court's --

16          THE COURT:  Let me understand.  You haven't been

17  filming in here, have you?

18          MR. SULKIN:  No.  That's why I said of depositions.

19  And I don't know what your rules are on that, that's all.

20          THE COURT:  Are they the same clips that you played

21  for the jury during the course of the direct of your

22  witnesses?

23          MR. SULKIN:  Your Honor, there are some clips I'd

24  like to play that weren't played for the very reason that he

25  gave me the answer I asked.  On cross, I asked a precise

1    question in the deposition.  If I get the answer, I don't

2    have to play the clip.

3         So I understand as to the clips that were used in opening,

4    I presume I can use.  And the one clip you ruled on, I

5    presume I can use that.  The question is whether I can use,

6    for instance, clips of Mr. Ioannides.  I have the same

7    questions and answers I got today -- yesterday from his

8    deposition.

9         And so my question is, can I play those clips, certainly

10   with preapproval from the court, as a theoretical matter or

11   not?  Whatever the court's position is on that, that's fine.

12   I'm not going to argue it.  I just want to know.

13            THE COURT:  If a clip was not played as part of the

14   evidence here in court while you were putting it on, in other

15   words, part of your examination, you may not use it in

16   closing argument, even if it was dead-on the same question.

17            MR. SULKIN:  Okay.  One last question, if I may, your

18   Honor.  In opening, you allowed us to play clips.  And I

19   believe the court's ruling was, you can play a clip if it's

20   going to come out of the mouth of a witness, which I tried to

21   do.

22        Can I play those same clips, if I want -- I'm not sure I

23   want to -- that I used in opening in closing?

24            THE COURT:  Not unless you played them during the

25   course of the trial.

1          MR. SULKIN:  Thank you, your Honor.

2          THE COURT:  Okay.  In other words, you are limited to

3   what came in as evidence.

4          MR. SULKIN:  I understand loud and clear.

5          THE COURT:  Okay.  All right.

6          MR. LINEHAN:  Your Honor, we do have that proposed

7   verdict form we can share today, if that would help move

8   things along.

9          THE COURT:  Okay.  Well, let's get the verdict form

10  in.  Just give me some idea.  How long do you think we can

11  run tomorrow before we're done?

12         MR. GOLDFARB:  Your Honor, I'm a very bad judge of

13  this, as the court can tell by now.  But half an hour at the

14  top, I think, at the absolute outside.

15         MR. SULKIN:  If he went half an hour, my guess is a

16  redirect would be 20 minutes or less, your Honor.

17         THE COURT:  Okay.  I really wish that you had given

18  me a heads up here, because what I would have done is brought

19  our jury in at noon or later, brought them in at 10:00, so we

20  could work on instructions.  But I've got others who are

21  waiting here.  They're the ones that we told you weren't

22  going to get finished.

23     So they're finished, but I didn't know that.  I want you

24  loud and clear to hear I did not know that.

25         MR. SULKIN:  Can we sell our minutes to them, your

1   Honor?

2          THE COURT:  They might want to purchase them, that's

3   true.

4      Okay.  So we'll finish up, and we'll work on a set of

5   instructions.  But would you please go through the

6   instructions given and make sure that you are ready to be

7   efficient in moving through them?

8          MR. SULKIN:  Yes, your Honor.

9          MR. GOLDFARB:  Yes, your Honor.

10          MR. LINEHAN:  Your Honor, a question just as to

11   logistics.  The final set of instructions were e-mailed to us

12   in PDF format.  Would you prefer us to do them in Word with

13   interlineations or handwrite?  There's just a few

14   instructions that we would even bother suggesting changes to.

15          THE COURT:  Send me the interlineations so we can

16   look at what you are doing, because otherwise it takes us

17   longer to try and match, oh, they changed a "whereas" on page

18   3.

19          MR. LINEHAN:  Okay.

20          THE COURT:  So send it in a way that we can see if

21   you changed a word.

22          MR. LINEHAN:  That's what we'll do.

23          THE COURT:  And we'll go through that.  We'll go

24   through and fix the tenses.  In other words, "You will see"

25   becomes "You have seen" or "You have heard," okay?

1      MR. GOLDFARB:  Your Honor, it sounds like both sides

2   are going to have motions at the close of the evidence.  We

3   have something short that is prepared that at the close of

4   the evidence we're ready to file.  At the court's behest, we

5   could either file electronically with your Honor tonight so

6   that you can look, or we can wait until the formal evidence

7   is closed.  We didn't want to presume to file it in advance.

8      THE COURT:  Earlier is better.  If I get half a

9   chance of looking at it before I have to rule on it, the

10  quality of the decision-making hopefully gets better.  So

11  file it tonight.  We'll see how far I get.  I've got other

12  lawyers who are backed up.  They're doing the same thing with

13  me tonight.  So I don't know when we're going to get done.

14     MR. GOLDFARB:  It is the shortest thing we've ever

15  written, your Honor.

16     THE COURT:  The shortest thing you've ever written.

17  Is that like promising me two questions?

18     Okay.  Just out of curiosity, how big is Sargento?  How

19  many employees?

20     MR. SULKIN:  1400 employees.

21     MR. GENTINE:  1300 to 1400 employees.

22     THE COURT:  Okay.  Because I'm getting a little dizzy

23  with how many divisions this, vice presidents that.  So I had

24  a sense that it was smaller than that.  But now that makes

25  sense.

1        MR. GENTINE:  It's all on the Internet.

2        THE COURT:  I don't go there and do research on my

3    own.  That would not be a good thing for me to do.

4      All right.  Good night, gentlemen.  Have a good evening.

5    We'll see you tomorrow.

6        (Proceedings adjourned.)

7

8              *****************

9

10              C E R T I F I C A T E

11

12        I, Kari McGrath, CCR, CRR, RMR, Official Court

13   Reporter for the United States District Court in the Western

14   District of Washington at Seattle, do hereby certify that I

15   was present in court during the foregoing matter and reported

16   said proceedings stenographically.

17        I further certify that thereafter, I have caused

18   said stenographic notes to be transcribed under my direction

19   and that the foregoing pages are a true and accurate

20   transcription to the best of my ability.

21

22

23              /S/  KARI McGRATH

24              Kari McGrath, CCR, CRR, RMR

25              Official Court Reporter